UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CROSSROADS COMMUNICATIONS OF OLD SAYBROOK, LLC, | : | |
| Plaintiff, | : | CIVIL NO. 3:03CV459(PCD) |
| | : | |
| VS. | : | |
| | : | |
| TOWER VENTURES, INC., | : | AUGUST 9, 2004 |
| Defendant. | | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

The defendant, Tower Ventures, Inc. ("TVI"), submits this memorandum of law in support of its motion for summary judgment, pursuant to Fed. R. Civ. P. 56 and Local Civil Rule of Procedure 56(a)(1), against the plaintiff Crossroads Communications of Old Saybrook, LLC ("Crossroads"). The issue before this court is whether TVI rightfully terminated its contract with Crossroads on August 7, 2002. The contract provides that either party may terminate the contract if all the Conditions Precedent were not satisfied by July 31, 2002, so long as the terminating party was not then in material breach of the contract. Because certain Conditions Precedent were not satisfied by July 31, 2002 and because TVI was not in material breach of the contract at that time, TVI had the right, which it exercised, to terminate the contract. Accordingly, summary judgment should enter in favor of TVI on all counts of the complaint.

## II.    FACTUAL BACKGROUND

This dispute arises out of a contract that Crossroads and TVI entered into on September 20, 2001, wherein TVI was to construct and operate a telecommunications tower and thereafter enter into a lease with Crossroads for use of the tower. (Compl. ¶¶ 8, 9, 18; Agreement, attached hereto as Exhibit A ("Agreement").)[1]   The contract provided that TVI was responsible, with the cooperation of Crossroads, for obtaining any approvals necessary to construct the tower and to construct the tower itself. (Agreement, ¶ 1.) However, the contract also provided that either party could terminate the contract "if all the Conditions Precedent have not been satisfied by July 31, 2002 . . . so long as the terminating party is not then in material breach." (Id., ¶ 8.)

After the contract was executed, Keenan Brinn from TVI began the work to obtain the approvals that were required before construction of the tower could commence. (Affidavit of Keenan Brinn, ("Brinn Aff.") at ¶ 5, attached hereto as Exhibit B.) There was an existing lattice tower with guy wires on the land which was old and being used by Crossroads as a backup radio tower. (Id. at 10.) The intention of TVI and Crossroads was to replace the existing tower with a similar, stronger lattice tower. (Deposition of Don DeCesare ("DeCesare") at 41, attached hereto as Exhibit C.) TVI wanted to construct a tower which mirrored the existing tower because the approval process would be quicker.[2] (Deposition of Robert Maccini ("Maccini") at 75, attached hereto as Exhibit D.) Given the existence of a tower on the property, TVI believed that in order

---

[1] In addition, the agreement provided that TVI would pay off the mortgage and note on the Springbrook Road Property (the "Raycee Note") in an amount not to exceed $150,000, and enter into a ground lease with Crossroads (the "Lease"), in which it would pay Crossroads (1) a one-time fee of $150,000; (2) an annual rent of $18,000, payable in equal monthly installments, with increases of 4% on the anniversary of the Rent Start Date; and (3) a share of revenues received by TVI from tenants leasing space on the new communications tower. (Compl. ¶¶ 10, 12, 14-17.) In turn, Crossroads would obtain a discharge of the Raycee Mortgage, execute and deliver to TVI a promissory note in the amount of the sum paid by TVI to Raycee to effect the payoff of the Raycee Note, execute and deliver to TVI a mortgage deed and other related documents, and enter into the Lease. (Agreement, at 1.)

[2] If the town agreed that the tower was a replacement in the same location, all that would have been required was a building permit that could have been obtained with an approved site plan.

to replace it the only permit necessary would be a building permit. (Brinn Aff., at ¶11.) In other words, a variance would not be needed because a variance had been granted for the existing tower. Applying for a variance would take substantially longer than simply applying for a building permit, because to obtain a variance, applications would have to be made and approval received from several town boards and commissions. (Id.)

In the last week of September after the contract had been signed, Mr. Brinn hired a company to perform a survey and to create a site plan for the tower construction. (Deposition of Keenan Brinn ("Brinn Depo.") at 82-85, attached hereto as Exhibit E.) The survey and site plan were required as part of any application for a building permit. (Brinn Aff., ¶ 13.) The initial plan called for a lattice tower with guy wires – which was the same as the existing tower -- to be built on the same spot on the site. (Maccini, at 75.) In the first week of October 2001, Mr. Brinn met with surveyors on the property to perform an initial site walk and give the surveyors an idea of what needed to be done. (Brinn, at 85.)[3] Also in October, Mr. Brinn met with the Old Saybrook Code Enforcement Officer, Chester Sklodosky. At that time, he discussed the plan to build a replacement tower and also picked up a building permit application for the new tower. (Brinn Aff., at 3.)

---

[3] Mr. Brinn told the surveyor that Crossroads possessed a "FAA no hazard" letter which Mr. Brinn would provide so the surveyor so he would have the coordinates of the existing tower. (Brinn Aff., at 2-3.) Accordingly, the surveyor did not conduct any triangulations to determine the precise coordinates of the existing tower which were needed for the completed site plan. Pursuant to the contract which stated that Crossroads was to provide Property Documentation to TVI, Mr. Brinn had asked Don DeCesare, president of Crossroads, for the FAA no hazard letter. Mr. DeCesare stated that he had the letter and would provide it to Mr. Brinn. Despite numerous requests for the letter, Mr. DeCesare never provided the letter to Mr. Brinn. This caused a delay in the completion of the site plan for the new tower. (Id.) Had Mr. Brinn known that Mr. DeCesare was not going to provide the FAA no hazard letter, Mr. Brinn would have had the surveyors determine the exact coordinates of the existing tower. (Brinn. Depo. at 91.)

Crossroads' failure to provide the FAA no hazard letter pursuant to the requirements of the contract delayed the filing of the application and is the grounds for TVI's Second Affirmative Defense. TVI is not moving for summary judgment on the basis of its affirmative defense at this time but reserves its right to assert this defense at a later date.

Later that month, Mr. Brinn again met with Mr. Sklodosky and had an application ready, although he could not submit the application because the site plan had not yet been completed. (Brinn Aff. ¶ 22.) The surveyors provided Mr. Brinn a preliminary site plan on October 26, 2001, however, it was not complete because it lacked the exact coordinates of the existing tower, and thus the exact coordinates for the new tower. Mr. Brinn had been waiting for the exact coordinates of the tower from a document which Don DeCesare, the president of Crossroads, promised to provide him. (Brinn Aff., at 2-4.) Because Mr. DeCesare did not provide Mr. Brinn with that document, Mr. Brinn requested the document directly from the FAA on November 6, 2001. (See n.3, supra.)

On November 25, 2001, Mr. Brinn received a final version of the site plan for the new tower. However, on November 26, 2001, when Mr. Brinn spoke with the Old Saybrook Town Planner, the planner suggested that the proposed lattice guyed tower be changed to a monopole tower. (Brinn Aff., ¶34-35.) This change was discussed with Mr. DeCesare and he agreed to the change. (DeCesare, at 48, 51; Brinn Aff. ¶ 40.) The change from a guyed tower to a monopole tower would require additional work on the site plan thereby delaying the application process.[4] (Brinn Aff., at 5.)

In December of 2001, Mr. Brinn and Mr. DeCesare met with Mr. Sklodosky to discuss the plans for the new monopole tower. (Id. at 5-6.) Mr. Sklodosky informed Mr. Brinn and Mr. DeCesare that they would most likely have to go through the variance application process, rather than the shorter route of obtaining a building permit. (Id.) Nonetheless, on December 27, 2001, an attorney for TVI, Ken Spigle, sent a letter to Mr. Sklodosky attempting to persuade Mr.

---

[4] Some of the guy wires for the existing tower were on an abutting owner's property. Erection of a monopole tower at a different location on Crossroads' property would eliminate the need to intrude on the neighbor's property.

Sklodosky that only a building permit was necessary. (Brinn Aff. ¶ 43, Ex. 1.) On January 7, 2002, Mr. Brinn appeared before the Old Saybrook Zoning Commission and was told he had to go to the Old Saybrook Zoning Board of Appeals ("ZBA") to apply for a variance because a building permit would not be issued before a new variance was obtained. (Brinn. Aff., at 6.)

Mr. DeCesare suggested to Mr. Brinn that TVI hire a prominent local attorney who could help TVI in the variance application process. Mr. DeCesare suggested Attorney William Childress, and TVI retained Attorney Childress in January of 2002 to help with the application process. (Brinn Aff., at 6; DeCesare, at 54.) Attorney Childress was very experienced with applying for variances, and handles 80% to 90% of the variances in Old Saybrook that involve counsel. (Deposition of William Childress ("Childress"), at 73, attached hereto as Exhibit F.) Once Attorney Childress was hired, he was given all necessary information by Mr. Brinn and Mr. DeCesare. Similar to TVI, based on his 25 years of experience, Attorney Childress thought a variance should not be necessary and he investigated this issue with Town officials. (Id., 73.) However, Attorney Childress was also unsuccessful in persuading the zoning officer that only a building permit was necessary, and thereafter started working on a variance application. (Id. at 73-74.)

With Mr. Brinn's assistance, Attorney Childress prepared and filed a variance application with the ZBA. At the ZBA's meeting on April 10, 2002, which Attorney Childress, Mr. Brinn and Mr. DeCesare attended, the ZBA voted to approve the variance. (Brinn Aff., at 6-7.) Once the variance was approved by the ZBA, the next step was to apply to the Zoning Commission to

approve the site plan and obtain a special exemption permit.[5]  (Childress, at 33-34.)  With Mr.

Brinn's help, Attorney Childress applied for Zoning Commission approval and for the special

exemption permit in May of 2002. (Id.)  Attorney Childress appeared before the Zoning

Commission on July 1, 2002 to explain the application and to request a hearing date.  (Id. at 38.)

The hearing was set for August 19, 2001.[6]

Because a special exemption permit was needed, the application was referred to the Old

Saybrook Planning Commission for an advisory report.  (Id. at 35.)   By statute, the Planning

Commission had 35 days to provide the Zoning Commission with an opinion.  (Id.)  Attorney

Childress and Mr. DeCesare thereafter appeared before the Planning Commission on July 17,

2002, and the Planning Commission recommended approval to the Zoning Commission.  (Id. at

39.)  Attorney Childress then had to appear before the Old Saybrook Architectural Review

Board, another advisory board which must review the ZBA's approval before any project can be

built in a business zone.  (Id. at 44.)  Attorney Childress appeared before the Architectural

Review Board on July 22,  2002, which ultimately also recommended approval of the application

to the Zoning Commission.  (Id. at 43.)  At that point, Attorney Childress still needed to appear

before the Zoning Commission to obtain the special exemption permit.  (Id. at 45.)  There is no

guarantee that the Zoning Commission would allow the tower to be constructed.   Attorney

Childress had reservations as to whether the variance would be granted because the Zoning

Commission is very restrictive and he knew the commission generally did not like tower projects

at all.  (Id. at 78-79, 64-65.)

---

[5] Before submitting the site plan to the Zoning Commission, one has to have obtained a variance from the Zoning
Board of Appeals.  (Childress, at 34.)
[6] According to Attorney Childress, it was quite typical of the Old Saybrook zoning commission to set public hearing
dates "far out." (Id. at 38.)

On August 7, 2002, 12 days before the Zoning Commission was scheduled to begin its

hearing on the special exemption permit, TVI sent a letter to Crossroads exercising its right to

terminate the contract because all Conditions Precedent enumerated in the contract had not been

met by July 31, 2002. (Brinn Aff., ¶ 55, Ex. 2)  Crossroads thereafter informed TVI that it was

taking the position that the termination was ineffective because TVI was in material breach of

the contract.  Crossroads claimed that TVI's material breach was its alleged failure to apply for

all approvals within the required 45-day period after execution of the contract.  (Comp. ¶ 26;

Brinn Aff., Ex.3.)   This claim of material breach came as a surprise to TVI, as Crossroads never

communicated any claim of breach until after termination, nor had Crossroads ever demanded

strict adherence to the 45-day contractual provision it referenced.  (Brinn Aff., at 4, 8.)

    The obligations of TVI and Crossroads pertaining to the construction and operation of

the tower was governed by the following contractual provision:

> 1.     Acquisition of Approvals.  Upon execution and delivery of
> this Agreement by each of the parties hereto, TVI shall apply for as
> expeditiously as possible, but in no event later than forty-five (45)
> days after the execution of this Agreement by each of the parties
> hereto, all approvals, permits, variances, consents, waivers, filings,
> certificates, certifications and other instruments and documentation
> from any and all federal, state, local and other governmental
> entities, and any and all departments and agencies thereof, which
> are required for and/or otherwise facilitate the construction and
> operation of the Communications Facility on and at the Tower Site
> (collectively, the "Approvals"), excluding only those Approvals
> which by their terms cannot be applied for within such 45 day
> period and/or until other Approvals are first obtained, provided that
> such subsequent Approvals shall be applied for as expeditiously as
> possible, and TVI and [sic] shall thereafter use its best efforts
> diligently to obtain all such Approvals.   Crossroads shall
> reasonably cooperate with TVI in connection with TVI's
> acquisition of the Approvals, provided that all fees, costs and
> expenses incurred with regard to the Approvals shall be borne
> exclusively by TVI.

(Agreement, at 1.)

The 45-day period in which to apply for all approvals for the construction of the tower (except approvals which by their terms could not be applied for within the 45-day period) elapsed on November 4, 2001. (Compl. ¶ 19.) Crossroads claims that at the time of termination, TVI was "then in material breach" because TVI did not file any applications for approval within 45 days after the signing of the agreement. (Compl. ¶ 26.) This is Crossroads' only claim of material breach which would prevent termination by TVI. (Id.) However, at and after the 45-day mark, Crossroads did not complain or communicate to TVI that TVI was in breach of the contract. Rather, Crossroads continued to work with TVI in the application process for the construction of the tower and never mentioned any purported breach of the agreement until after the contract's termination. (Brinn Aff., at 4, 8.)

Despite its termination of the contract, at the request of Crossroads, TVI continued with the application process before the Zoning Commission without waiving its prior termination. (Maccini, 117-118). TVI's reason for doing so was to help Mr. DeCesare if he wanted to continue with the site himself or if he wanted to enter into a contract for the construction of the tower with someone else. (Id. at 118).

On August 19, 2002, Attorney Childress and Mr. Brinn appeared before the Zoning Commission for approval of the tower. The meeting had to be continued to the following month because the Commission requested changes to the application. On September 3, 2002, the Zoning Commission voted to approve the tower's construction. (Brinn Aff., at 7.) Even at that point, however, before it could build the tower, Crossroads still needed to obtain FAA clearance and an approval from the Connecticut Siting Council to operate the new tower as a

telecommunications tower. (Id. at 8.) Attorney Childress thought it was the best strategy to obtain the variance before filing an application with the Siting Council for approval to operate a telecommunications tower. (Id. at 48.) No application was ever filed with the Connecticut Siting Council for the tower.

Crossroads instituted this action on or about March 14, 2003, alleging breach of contract, specific performance, breach of an implied covenant of good faith and fair dealing, and a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). The court previously dismissed count two seeking specific performance.

## III.  ARGUMENT

### A.  <u>Legal Standard</u>

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" <u>Kinsella v. Rumsfeld</u>, 320 F.3d 309, 311 (2d Cir. 2003) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Id.</u> (quoting <u>Anderson</u>, 477 U.S. at 248.)

The moving party must make a prima facie showing that there are no genuine issues of material fact for trial by demonstrating an absence of evidence in support of the opponent's claims. <u>Miller v. Wolpoff & Abramson, L.L.P.</u>, 321 F.3d 292, 2003 WL 462421 (2d Cir. Feb.

25, 2003); see also Celotex, 477 U.S. at 325.  Once this initial burden has been satisfied, the

burden shifts to the party opposing summary judgment to demonstrate that a genuine issue of

material fact exists.  Weg v. Macchiarola, 995 F.2d 15, 18 (2d Cir. 1993) (citing Anderson, 477

U.S. at 250).  The "mere possibility that a factual dispute may exist, without more, is not

sufficient."  Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980)

(citations omitted).  In determining whether summary judgment is appropriate, a court must

resolve all ambiguities and draw all reasonable inferences against the moving party.  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v.

Diebold, Inc., 369 U.S. 654, 655 (1962)).

There are no genuine issues of material fact here.  Analysis of the unambiguous terms of

the contract and the facts leads to the irrefutable conclusion that TVI had the right to and

properly terminated the contract.  Accordingly, TVI is entitled to summary judgment.

**B.     TVI's Motion For Summary Judgment Should Be Granted**

**1.     The Plain Terms Of The Contract Allowed TVI To Terminate**

TVI is entitled to summary judgment in accordance with the plain, unambiguous terms of

the contract, which permits either party to terminate the contract if all Conditions Precedent were

not satisfied by July 31, 2002, so long as the terminating party was not then in material breach of

the contract.   The contract at issue in this case contains a termination clause which provides:

> If all of the Conditions Precedent have not been satisfied by July
> 31, 2002, then either Crossroads or TVI may terminate this
> Agreement so long as the terminating party is not then in material
> breach.   Upon termination of this Agreement pursuant to this
> Section 10, neither of the parties hereto shall have any further
> obligations or liabilities hereunder, and this Agreement shall be
> void and of no further force and effect.

(Agreement, ¶ 1.)

On August 7, 2002, TVI had the right to terminate the contract because all Conditions Precedent were not satisfied and it was not then in material breach of the contract.

    a.    <u>All Conditions Precedent of The Contract<br>Were Not Satisfied By July 31, 2002</u>

The contract provides that for purposes of the agreement, "the term '<u>Conditions Precedent</u>' shall mean: (i) TVI's receipt of all the Approvals[7]; (ii) TVI receipt of all the Non-disturbance Agreements (if any); (iii) TVI's receipt of all of the Releases (if any); and (iv) TVI's acceptance and approval of the results of its Due Diligence Review." (Agreement ¶ 4(a).)  It is undisputed between the parties that TVI had not received all of the Approvals by July 31, 2002. (DeCesare, at 89[8]; Brinn Aff., ¶ 54.)   As of July 31, 2002, approvals were still needed from the Old Saybrook Zoning Commission, the FAA, and for the tower to operate as a telecommunications facility, from the Connecticut Siting Council.  (Brinn Aff. ¶ 59-60.) Accordingly, the first Condition Precedent was not satisfied by July 31, 2002.

Furthermore, a second Condition Precedent was not met in that TVI did not approve the results of its Due Diligence Review.  Pursuant to the contract, TVI was permitted to conduct Due Diligence, including any investigations it reasonably deemed appropriate.[9]  (Agreement, ¶ 2.)

---

[7] "Approvals" is defined in the contract as "all approvals, permits, variances, consents, waivers, filings, certificates, certifications and other instruments and documentation from any and all federal, state, local and other governmental entities, and any and all departments and agencies thereof, which are required for and/or otherwise facilitate the construction and operation of the Communications Facility on and at the Tower Site." (Agreement, ¶ 1)

[8] During his deposition, when asked the question: "So you are admitting that not all the approvals had been received, correct?", Mr. DeCesare responded: "I'm saying that, yes." (DeCesare, 89)

[9] The Due Diligence clause of the contract provides: "Upon execution and delivery of this Agreement by each of the parties hereto, TVI may order with respect to the Property: (i) a title commitment for lessee's title insurance; (ii) a survey and/or (iii) a Phase I Environmental Assessment and NEPA Screen.   TVI shall also have the right to inspect (at TVI's expense) the Property and the improvements presently located thereon, and to have conducted such engineering studies and other investigations as it reasonably may deem appropriate, and to review copies of all

This included, but was not limited to, looking at the ownership of the property, the properties' liens and encumbrances, the business prospects for the tower in terms of being able to lease the tower, the general competition with other towers in the area and the general condition of the wireless industry. (Maccini, at 97). TVI had determined through its Due Diligence investigation that there would not likely be any tenants to lease space on the tower, that there was a utility easement on the property that was not assignable, and that there was another mortgagee on the property which had not agreed to provide a subordination and nondisturbance agreement. (Maccini, 93-94). Given that TVI's acceptance and approval of the results of its Due Diligence Review was a Condition Precedent and because TVI was not satisfied with the results of its Due Diligence investigation, the fourth Condition Precedent also was not met.

            b.      <u>TVI Was Not In Material Breach Of The<br>Contract At The Time Of Termination</u>

Because all of the Conditions Precedent had not been met by July 31, 2002, TVI was entitled to terminate the contract after July 31, 2002 so long as it was not then in material beach. Crossroads alleges TVI could not terminate the contract because TVI was then in material breach by having failed to apply for the necessary approvals within 45 days of the contract's execution. Contrary to Crossroads' allegations, TVI was not in material breach of the contract on August 7, 2002. First, standards for determining materiality demonstrate that the there was no material breach of the contract. Second, Crossroads' actions belie its post termination contention that the failure to file application by November 4, 2001 was a material breach by TVI.

---

documentation . . . in Crossroads' possession relating to the Property (collectively, the "<u>Due Diligence Review</u>"). . . ." Ex. A, ¶ 2.

A material breach as opposed to an incidental breach has been aptly described as one that is "so important that it vitiates or destroys the entire purpose for entering into the contract." A. Prete & Son Constr. v. Madison, No. 3103073, 1994 Conn. Super. LEXIS 2532 (Conn. Super. Ct. 1994). "A substantive or material breach is one which touches the fundamental purpose of the contract and defeats the object of the parties in making the contract . . ." Id. "The standard of materiality of contractual breach must be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." 669 Atlantic St. Assoc. v. Atlantic-Rockland Stamford Assoc., 43 Conn. App. 113, 128, 682 A.2d 572 (1996).

Connecticut has adopted the Restatement of Contracts' multi-factored test for determining whether a breach of contract is material. See Bernstein v. Nemeyer, 213 Conn. 665, 670, 570 A.2d 164 (1990). The Restatement provides:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) Contracts § 241.

Connecticut courts analyzing whether a claimed breach is material focus on the purpose of the parties entering into a contract and their expectations. See 669 Atl. St. Assocs. v. Atlantic-Rockland Stamford Assocs., 43 Conn. App. 113, 127-128; Carlyle Johnson Mach. Co. v. Edward

April, CV 970481543, 2000 Conn. Super. LEXIS 403 (Conn. Super. Ct. 2000) (asking "What was the purpose of the parties in entering into the contract at issue here? What were their expectations?") Thus, a failure to perform may not defeat the purpose of the contract if the parties are not deprived of a benefit they reasonably expected. 669 Atl. St. Assocs., 43 Conn. App. at 127-28.

In the case at hand, the parties agree that the purpose for entering the contract was for TVI to build a replacement tower on Crossroads's property and for both parties to get income related to use of the tower. (DeCesare, at 132-33.) The fact that formal applications for the tower's construction were not filed within 45 days of the signing of the contract (November 4, 2001) did not deprive Crossroads of a benefit it reasonably expected. The following month, TVI did submit an application for a building permit for the tower.

With Crossroads' knowledge, TVI diligently worked to obtain the documentation necessary for an application to be filed before and after the 45-day period. TVI could not submit an application for the tower until it had a completed site plan from the surveyors, and the site plan was not completed until the end of November due to a delay that was attributable in part to Crossroads. (Brinn Aff., at 3-4.) The following month, TVI did submit papers in an attempt to obtain a building permit, but the building permit was in essence denied.[10] (Brinn. Aff., at 4.) Nonetheless, TVI, with Mr. DeCesare's active and consistent involvement, continued its efforts to fulfill the purpose of the contract. TVI hired an attorney recommended by Crossroads and

---

[10] It is evident that even if TVI had filed for a building permit by November 4, 2001, the application would have been denied. The change in the location and type of tower to be put in place made it impossible to file any applications by November 4, 2001. This supports the contention that the November 4, 2001 date was not pivotal: TVI had to formulate an alternate plan for the tower's approval and go through the long process of applying for a variance, despite the attempts of three knowledgeable individuals to persuade the town that only a building permit should have been necessary.

was ultimately successful in obtaining all local approvals necessary to obtain a building permit to construct the tower. Thus, Crossroads was not deprived of its expectations that approvals would be obtained by TVI for the tower's construction. See Restatement § 241(a).

"It has been said that the best indication of the true intent of the parties as to the materiality of a breach is their treatment of it." Williston on Contracts § 63:3 (citing Gibson v. City of Cranston, 37 F.3d 731 (1st Cir. 1994)). Here, Crossroads's actions belie its post termination contention that the failure to file applications by November 4, 2001 was a material breach by TVI. Crossroads did not bring the purported breach to the attention of TVI until after TVI terminated the contract more than nine months later. (Brinn Aff. ¶ 63.) Indeed, neither before nor in the several months after November 4, 2001, did Crossroads ever mention to TVI, orally or in writing, that TVI had failed to properly perform pursuant to the contract. Crossroads never communicated anything to TVI about the 45-day deadline and never demanded adherence to the 45-day time frame. (Brinn Aff., at 4, 8.) Furthermore, Crossroads continued to work with TVI in its efforts to obtain local approval for the tower's construction. (Brinn Aff., at 4-7) Crossroads accepted the benefit of TVI's work for months after November 4, 2001 without any mention of a breach of contract.

Crossroads's acceptance of strategies for approval and changes to the tower which would cause delay after November 4, 2001 also demonstrates that the failure to file applications by that date was neither important to nor did it defeat the essence of the contract. Mr. DeCesare told TVI that changes to the tower which would cause further delay were "fine" with him. (DeCesare, at 48, 51.) Moreover, Crossroads was not damaged by the failure to file for approvals by November 4, 2001, as opposed to a later date. Crossroads cannot credibly claim

that the delay in filing the application, which was not attributable to any failures by TVI, damaged Crossroads in any way.  Crossroads does not claim that TVI acted in bad faith by not filing an application before November 4, 2001.  To the contrary, the evidence shows that TVI acted diligently to obtain the documentation needed for the applications, did submit applications, hired an attorney to help prepare and process applications to build the replacement tower and advanced the process as quickly as reasonably possible.

Another circumstance evaluated by the Restatement regarding materiality is the likelihood that the party failing to perform will cure his failure.  § 241(d).  The Restatement's comment on cure reflects that:

> A material failure by one party gives the other party the right to withhold
> further performance as a means of securing his expectation of an
> exchange of performances.  To the extent that expectation is already
> reasonably secure, in spite of the failure, there is less reason to conclude
> that the failure is material.  The likelihood that the failure will be cured is
> therefore a significant circumstance in determining whether it is material.

Restatement § 241, Comment e.   In the present case, not only was there a likelihood that applications would be filed, but the applications were indeed filed by TVI.  Accordingly, even assuming *arguendo* that there was a breach, TVI cured the breach by continuing to work diligently, hiring competent counsel to assist with the approval process, and filing the necessary application for approvals.

Moreover, TVI comported with the standards of good faith and fair dealing.  See Restatement § 241 (e).  The reason approvals were not filed by November 4, 2001 had nothing to do with bad faith on the part of TVI.  TVI acted diligently upon the contract's execution.  The delay in filing applications for approvals related to the delay in obtaining the final site plan which was attributable in part to Crossroads, the change from a guyed tower to a monopole

tower at the town's suggestion, the inability to proceed simply by obtaining a building permit and the unexpected need to apply for a variance for the tower. (Brinn Aff., at 2-4.) TVI acted as quickly as it could under the circumstances and at all times acted in good faith in the approval process.

Crossroads never indicated in any way to TVI that it was in breach of the contract because approvals were not applied for by November 4, 2001. Indeed, every action by Crossroads leads to the conclusion that the November 4, 2001 date was not important to Crossroads. What was important is that TVI worked diligently to have the plans for the replacement tower approved. TVI did work diligently and did obtain certain local approvals for the replacement tower. Accordingly, TVI was not in material breach of the contract at the time of termination and is entitled to the entry of summary judgment in its favor.

### 2.     Crossroads Waived Any Possible Claim of Material Breach

Crossroads waived any argument that it may have had that TVI was in material breach of the contract. Crossroads's waiver is evidenced by its acquiescence to changes in design, its continued participation in the application process and its failure to communicate at any time that it considered a material breach had occurred.

"Waiver is the intentional relinquishment of a known right." Novella v. Hartford Accident and Ind. Co., 163 Conn. 552, 561 (1972). "To constitute waiver there must be both knowledge of the existence of the right and intention to relinquish it." Id. "To establish an implied waiver, there must be a clear, unequivocal and decisive act of a party showing such a purpose." Lamborn v. Dittmer, 873 F.2d 522, 529 (2d Cir. 1989). "To determine the presence of waiver, there must be evidence of intelligent and intentional action by the petitioner of the right

claimed to be waived." <u>McClain v. Manson</u>, 183 Conn. 418, 430, 439 A.2d (1981). It must be shown that the party understood its rights and voluntarily relinquished them anyway. <u>United States v. Carr</u>, 445 F. Supp. 1383, 1390 (D. Conn. 1978).

The failure to enforce a contract term which is purportedly material constitutes a waiver. <u>See</u> <u>Van Dyck Printing Co. v. Dinicola</u>, 43 Conn. Supp. 191, 199 (1993). In <u>Van Dyck</u>, the defendant's failure to enforce the contract for repeated failure to pay sales commissions within forty-five days lead the court to conclude that "any breach in this regard was waived by the defendant." The defendant waived any claim of material breach because he "never took steps to enforce the contract's provisions" and "never treated the contract as not being in effect." <u>Id.</u>

The Connecticut Supreme court has also been instructive on waiving purported breaches of contract. In <u>Bradford Novelty Co. v. Technomatic, Inc.</u>, 142 Conn. 166, 112 A.2d 214 (1955), the plaintiff buyer brought an action against the defendant seller to recover a deposit paid to the seller pursuant to a contract to construct a machine. <u>Id.</u> at 167. The plaintiff alleged that the defendant had failed to perform the contract within the time frame agreed upon. The court noted that although there was a time fixed for performance by the parties, where the contract called for the manufacture of an item not yet in existence, the time specified for performance is less likely to be considered of the essence. <u>Id.</u> The court noted that

> the conduct of the plaintiff clearly indicated that it acquiesced in the delay and would not require rigid adherence to the dates specified for the completion of the machine. Its conduct justified the defendant's belief that strict performance as to time would not be demanded. It sanctioned the defendant's continued efforts to finish the machine even though the day stated in the original agreement for final performance had long since passed. *The plaintiff, by its conduct, waived its right to strict compliance with the provisions of the contract as to time of performance.*

<u>Id.</u> (emphasis added).

Similar to the defendant in <u>Van Dyck</u> and the plaintiff in <u>Bradford Novelty</u>, Crossroads waived the 45-day time frame requirement. Crossroads never demanded adherence to the 45-day time limit and acquiesced to the delay in filing the application after the 45-day time frame. Mr. DeCesare admitted he was aware of the 45-day time frame as it was approaching and as it passed. (DeCesare, at 74-76.) During his deposition, he testified that he wondered to himself "what will I do if we pass the date without any real progress." (<u>Id.</u> at 74). Mr. DeCesare testified that he "ultimately decided" that he "would allow the date to pass." (<u>Id.</u>) He never told TVI that it was in breach, nor did he send any written communications to TVI notifying TVI that it was in breach. (<u>Id.</u> at 74-76.) Thus, Crossroads was aware of the right to seek to enforce the 45-day time frame, but relinquished it by simply allowing the date to pass unnoticed.

Furthermore, Crossroads sanctioned and assisted TVI's efforts to obtain local approvals for the replacement tower after November 4, 2001. Mr. DeCesare continued to help Mr. Brinn, contacted town officials himself to assist in the application process and attended various town meetings. (Brinn Aff., at 2-4.) Crossroads at all times acted as if the contract was in full force. Crossroads's conduct justified TVI's belief that strict performance to the 45-day time frame was not necessary.

Crossroads's failure to enforce the 45-day time frame demonstrates its waiver of that contractual requirement. <u>Van Dyck</u>, 43 Conn. Supp. at 199. Crossroads's waiver of any claimed material breach is also evident because Crossroads "clearly indicated that it acquiesced in the delay and would not require rigid adherence to the dates specified" in the contract. <u>Bradford Novelty</u>, 142 Conn. at 170. Accordingly, Crossroads waived any claim that TVI was in material

breach of the contract because all of the applications were not filed within the 45-day time period stipulated by the contract.  Id.

### 3.    The Defendant's Conduct Could Not Violate CUTPA

In its claim alleging a violation of CUTPA, Crossroads alleges that TVI's acts "were done in the conduct of trade or commerce within the State of Connecticut," and further alleges that "the conduct of TVI described above constitutes an unfair or deceptive act or practice in the conduct of trade or commerce" in violation of CUTPA.  (Compl. ¶¶ 51-53.)  Crossroads cannot support its CUTPA claim because TVI validly terminated the contract on August 7, 2002 and never acted unfairly or in a deceptive way.

CUTPA prohibits a person from "engag[ing] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  In determining whether a given action is "unfair," the Connecticut Supreme Court adopted the so-called "cigarette rule" developed by the Federal Trade Commission in the context of section 5(a)(1) of the Federal Trade Commission Act, in which the court must consider:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other business].

Boulevard Assocs. v. Sovereign Hotels, 72 F.3d 1029, 1038 (2d Cir. 1995) (quoting Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 239, 520 A.2d 1008, 1012 (1987) (alteration in original)); Jacobs v. Healey Ford-Subaru, Inc., 231 Conn. 707, 725, 652 A.2d 496, 505 (1995).

A simple breach of contract does not offend traditional notions of fairness and is insufficient to establish a violation of CUTPA. Boulevard Assoc., 72 F.3d at 1038-39; Loda Agency, Inc. v. Nationwide Ins. Co., 2000 WL 1849865, at *3-4 (D. Conn. Oct. 10, 2000); BIC Sport USA, Inc. v. Kerbel, 995 F. Supp. 244, 257 (D. Conn. 1997).

> We agree with . . . the vast majority of courts in Connecticut that a simple breach of contract action is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and *does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy.*

Boulevard Assoc., 72 F.3d at 1039 (emphasis added) (citing Chaspek Mfg. Corp. v. Tandet, 1995 WL 447948, at *12 (Conn. Super. June 16, 1995)).

"In order that a breach of contract action also serve as a CUTPA violation, a plaintiff must show 'substantial aggravating circumstances'" attending the breach. City of Bridgeport v. Aerialscope, Inc., 122 F. Supp. 2d 275, 278 (D. Conn. 2000) (quoting Greenwich Cap. Fin. v. Citicorp Mtg., 1999 WL 293912, at *3 (Conn. Super. 1999)); see also Boulevard Assoc., 72 F.3d at 1038 (holding that CUTPA requires a showing of substantial aggravating circumstances); BIC Sport, 995 F. Supp. at 257 ("'Because a breach of contract standing alone does not offend public policy to invoke CUTPA, [the plaintiff] was required to show that the defendants engaged in some conduct that was more offensive than simply not paying . . . .'").

Boulevard Assoc. is similar to this case. There, prior to the institution of the action, the defendant attempted to renegotiate its lease with the plaintiff because of deteriorating financial circumstances, and during the negotiations took the position that it would stop paying rent unless the plaintiff agreed to reduce the defendant's payments under the lease. Id. at 1032. The United

States Court of Appeals for the Second Circuit held that the defendant's refusal to pay rent

because it was attempting to back out of a business venture that was losing money "*is precisely*

*the standard reason for a breach and offends no particular public policy*." (emphasis added)

Boulevard Assoc., 72 F.3d at 1039. Finding that the plaintiff had "failed to allege, much less

prove, any aggravating circumstances surrounding the breach of the lease," the court reversed the

trial court's award of punitive damages under CUTPA and held that the defendant had not

committed an "unfair" or "deceptive" act in violation of CUTPA. Id. The Court emphasized the

fact that "the count alleging CUTPA simply incorporates by reference the breach of contract

claim and does not set forth how or in what respect the defendant's activities are either immoral,

unethical, unscrupulous or offensive to public policy", which is exactly what Crossroads did

here. Id. Crossroads has merely incorporated by reference the allegations of its breach of

contract count, and has failed to allege how or in what respect TVI's activities were either

immoral, unethical, unscrupulous or offensive to public policy. Crossroads is simply attempting

to make more out of this simple breach of contract action than exists under applicable legal

standards.

In denying TVI's motion to dismiss the CUTPA count, this court noted that the plaintiff

raised sufficient questions surrounding TVI's conduct, particularly in relation to the approval

process, to survive a motion to dismiss. (Ruling on Motion to Dismiss, at 9.) The court noted

that Crossroads alleged that all approvals were applied for and received, yet TVI asserted more

were necessary without applying for such approvals. (Id.) Now that discovery is closed and the

facts have been established, it is undisputed that all the necessary approvals to construct the

tower had not been obtained by July 31, 2002. Therefore, the allegations in the CUTPA count are insufficient to survive this motion for summary judgment.

The facts demonstrate that TVI only acted scrupulously and in good faith in its dealings with Crossroads. Crossroads admitted that TVI was not acting in bad faith. (DeCesare, at 73.) Rather, Crossroads's only concern was with regard to how long it was taking to get all of the approvals in place. Mr. DeCesare testified that he was "frustrated about the slowness of the process moving along." (Id.) When asked whether the frustration stemmed from the actual zoning application process versus something that TVI was doing or not doing, Mr. DeCesare stated: "Boy, it's hard for me to separate that into parts. I think a little of both. *I certainly was not happy that there were so many boards and commissions that had to review all this*, but I deferred to [Attorney Childress]." (Id. at 63 (emphasis added).)[11]

In its ruling on TVI's motion to dismiss, the court also found significant that TVI asserted that more approvals were necessary without ever applying for such approvals. As the deposition testimony demonstrates, however, the strategy chosen by Attorney Childress was to apply for local approvals first, then to apply to the Connecticut Siting Council and the FAA after obtaining all local approvals. (Childress, at 48.) As TVI's lawyer and advisor, it was Attorney Childress's belief that the Siting Council would be more likely to approve the tower if all local approvals were already obtained. (Id. at 48-49.) Attorney Childress also discussed the strategy he adopted to get it through as quickly as possible with Mr. DeCesare. (Id. at 52.) Thus, relying on the

---

[11] Indeed, Crossroads had no complaints about Attorney Childress's actions in applying for the tower's approval. (Id. at 56-57.) The only example Crossroads could point as to TVI's inaction was that in the Spring of 2002, Attorney Childress asked Mr. DeCesare to intercede with TVI "to get them to move faster." (Id. at 64.) However, this assertion is clearly refuted by Attorney Childress's testimony that TVI always supplied information and material on time. (Childress, at 75-76.) In any event, this disputed fact does not raise a genuine issue of material fact sufficient to deprive TVI of the entry of summary judgment in its favor because Crossroads' only claim of material breach relates to actions in November, 2001.

advice of counsel, TVI had not applied to the Connecticut Siting Council before the time of the

contract's termination because all local approvals had not yet been obtained.  Furthermore, it was

futile to apply to the Connecticut Siting Council for the FAA for clearance until local approval

was obtained because there was legitimate doubt as to whether the Zoning Commission would

grant the variance because of their known restrictiveness and dislike of towers.  There is no

guarantee that the Zoning Commission would allow the tower to be constructed.   Attorney

Childress had reservations as to whether the variance would be granted because the Zoning

Commission is very restrictive and he knew the commission generally did not like tower projects

at all.  (Childress, at 78-79, 64-65.)

It is important to note that in invoking the termination clause of the contract, TVI was not

only relying on the lack of Approvals by July 31, 2002, but also the dissatisfaction of its Due

Diligence Review.   In the Due Diligence portion of the contract, TVI had the right to conduct

"other investigations as it reasonably may deem appropriate" and TVI did so.  (Agreement, ¶ 2.)

TVI determined through its investigation that there would not likely be any tenants to lease space

on the tower, that there was a utility easement on the property that was not assignable, and that

there was another mortgagee on the property which had not agreed to provide a subordination

and nondisturbance agreement.  (Maccini, 93-94).   Given that TVI's acceptance and approval of

the results of its Due Diligence Review was a Condition Precedent and because TVI was not

satisfied with the results of its Due Diligence investigation, the fourth Condition Precedent also

was not met and TVI had the right to terminate the contract.

For all of these reasons, Crossroads cannot show that TVI acted unfairly in its dealings with Crossroads such that TVI violated CUTPA and summary judgment should be entered in TVI's favor.

### 4.     There Is No Support For Crossroads's Claim For Breach Of An Implied Covenant Of Good Faith And Fair Dealing

TVI has not breached the implied covenant of good faith and fair dealing because it never acted in bad faith, including its act of terminating the contract.  Under Connecticut law, a plaintiff must demonstrate that (1) the plaintiff and the defendant were parties to a contract under which the plaintiffs reasonably expected to receive certain benefits; (2) the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and (3) when committing the acts by which it injured the plaintiff's right to receive the benefits it reasonably expected to receive under the contract, the defendant was acting in bad faith.  Franco v. Yale Univ., 238 F. Supp. 2d 449, 455 (D. Conn. 2002) (citing Fairfield Fin. Mort. Group, Inc. v. Salazar, 2002 WL 1009809, at *3 (Conn. Super. Apr. 23, 2002)); Charlesworth v. SBC Comm., 2003 WL 430510, at *4 (Conn. Super. Feb. 3, 2003).

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . . Bad faith means more than mere negligence; it involves a dishonest purpose." Habetz v. Condon, 224 Conn. 231, 237, 618 A.2d 501 (1992) (emphasis added) (citations omitted); Gupta v. New Britain Hosp., 239 Conn. 574, 598, 687 A.2d 111 (1996); Franco, 238 F. Supp. 2d at 455; Gibbons v. NER Holdings, Inc., 983 F. Supp. 310, 319 (D. Conn. 1997).

The implied covenant of good faith and fair dealing invoked by the plaintiff is a rule of construction, designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. Magnan v. Anaconda Indus., Inc., 193 Conn. 558, 566, 479 A.2d 781 (1984). "The principle therefore cannot be applied to achieve a result contrary to the clearly expressed terms of a contract." EIS v. Meyer, 213 Conn. 29, 36-37, 566 A.2d 422 (1989).

There is no evidence of bad faith on the part of TVI. TVI worked diligently to obtain approvals for the tower's construction and properly exercised its right under the contract to terminate when those approvals were not obtained by July 31, 2002. TVI also properly exercised its right to terminate because it had not approved the results from its Due Diligence Review which revealed that there would not likely be any tenants to lease space on the tower, that there was a utility easement on the property that was not assignable, and that there was another mortgagee on the property which had not agreed to provide a subordination and nondisturbance agreement. (Maccini, 93-94). The plaintiff cannot, by invoking the implied covenant of good faith and fair dealing, negate the defendant's contractual right to terminate the contract. See Magnan, 193 Conn. at 566. Crossroads cannot supply any evidence of bad faith by TVI prior to the termination of the contract. Indeed, its claim of bad faith is based on TVI's conduct after termination in its effort to renegotiate the contract between the parties. (Compl. ¶ 44-49.) Mr. DeCesare admitted that if TVI properly terminated the contract, then it could properly renegotiate the contract. (DeCesare, at 118-121.) Therefore, if the court finds that TVI properly terminated the contract, Crossroads's claim of breach of the implied covenant of good faith and fair dealing fails. Further, as the court in Boulevard Assoc. stated, there is nothing wrong or

contrary to public policy in attempting to renegotiate a contract.  <u>Boulevard Assoc.</u>, 72 F.3d at 1039.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Tower Ventures, Inc. respectfully requests that its motion to for summary judgment on Counts One, Three and Four of the Complaint be granted.

DEFENDANT
TOWER VENTURES, INC.


By _____
Steven R. Humphrey (ct06053)
shumphrey@rc.com
Marion B. Manzo (ct22068)
mmanzo@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT  06103-3597
Tel.:  (860) 275-8200
Fax:   (860) 275-8299

## **CERTIFICATION**

This is to certify that a copy of the foregoing appearance was mailed via first-class mail,

postage prepaid, on this 9th day of August, 2004, to the following:

David T. Grudberg, Esq.
Jacobs, Grudberg, Belt & Dow, P.C.
350 Orange Street
P. O. Box 606
New Haven, CT 06503-0606

Marion B. Manzo