UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CROSSROADS COMMUNICATIONS OF OLD SAYBROOK, LLC,<br>   Plaintiff,<br><br>VS.<br><br>TOWER VENTURES, INC.,<br>   Defendant. | CIVIL NO. 3:03CV459(PCD) |

### AFFIDAVIT OF KEENAN BRINN IN SUPPORT OF TOWER VENTURES, INC.'S MOTION FOR SUMMARY JUDGMENT

I, Keenan Brinn, being duly sworn, depose and say:

1. I am over 18 years old and understand the obligations of an oath.

2. I am a Site Acquisition Manager for Tower Ventures, Inc. ("TVI")

3. I gave a deposition in the above captioned matter on June 24, 2004. This affidavit supplements my testimony in that deposition.

4. At all times relevant hereto, part of my job responsibility was to obtain approvals for the construction of the tower on Crossroads Communications of Old Saybrook, LLC's ("Crossroads") Springbrook Road Property ("Property") and to oversee the development and marketing of the tower.

5. After the contract between TVI and Crossroads was executed on September 20, 2001, I began working on obtaining the approvals that were required before construction of the tower could commence.

6.  At the time the contract was signed, I asked Don DeCesare, president of Crossroads, to provide me with all documentation he had which would help us put together a survey of the site and the tower.

7.  I specifically asked Mr. DeCesare for an "FAA no hazard" letter. This letter would contain the exact coordinates of the tower on the property. The exact coordinates are important to the surveyor because he needs to indicate the exact location of the tower on the site.

8.  Mr. DeCesare told me that he had the FAA no hazard letter and that he would provide it to me.

9.  Mr. DeCesare did not provide me the FAA no hazard letter, despite my asking him for it on a number of occasions.

10. There was an existing lattice tower with guyed wires on the Property which was old and being used by Crossroads as a backup radio tower.

11. Given the existence of a tower on the property, I believed that in order to replace it the only approval necessary would be a building permit from Old Saybrook. I did not think a zoning variance would not be needed because a variance had already been granted for the existing tower.

12. Generally, it takes substantially longer than to obtain a variance than to obtain a building permit, because to obtain a variance, applications would have to be made and approval received from several town boards and commissions.

13. To obtain a building permit, all this is necessary is to have an approved site plan for the tower.

2

14. In the last week of September, 2001, I made contact with a survey company, Andrews Survey, to forward a proposal for creating a site plan for a new tower on the Property.

15. On October 2, 2001, Andrews Survey accepted the survey proposal and we made plans to move ahead with Andrews Survey on the project.

16. On October 9, 2001, I met with Scott Medeiros from Andrews Survey to walk the Property and explain the scope of the work necessary.

17. I stated to Mr. Medeiros that there was an FAA no hazard letter which I would provide so he could have the coordinates of the existing tower on the Property.

18. After the execution of the contract, I spoke with Don DeCesare frequently on the phone and in person concerning my progress and the status of the project.

19. On one of my site visits in October, I spoke with the Old Saybrook zoning code enforcement officer, Chester Sklodosky. I discussed with him the possibility of replacing the existing tower on the Property. I also tried to get some direction from Mr. Sklodosky on how to proceed with applying for a building permit.

20. Mr. Sklodosky told me to put together an application for the permit, which would include a site plan for the new tower.

21. At that meeting, I picked up an application for a building permit.

22. Later in October, I again met with Mr. Sklodosky and had an application ready, although I could not submit the application because the site plan had not yet been completed.

23. On October 23, 2001, Mr. Medeiros informed me that the survey crew was at the site to begin their field work. He told me that they expected to be done with the field portion on the same date.

24. Shortly after October 23, 2001, Mr. Medeiros asked me if I had received the FAA coordinates from Crossroads. I told him I did not, but would get them from Mr. DeCesare in the near future.

25. The FAA coordinates would have helped the surveyors in determining the exact coordinates for the new tower.

26. I could have told the surveyors to calculate the exact coordinates themselves, but I did not do so because Mr. DeCesare told me he would provide them to me.

27. The surveyors provided me a preliminary site plan on October 26, 2001, however, it was not complete because it lacked the exact coordinates of the existing tower, and thus the exact coordinates for the new tower.

28. On or after November 4, 2001, no one on behalf of Crossroads, including Mr. DeCesare, told me that TVI was in breach of the agreement.

29. Mr. DeCesare never sent any written communications to me nor to TVI regarding a purported breach of contract until after TVI gave its notice terminating the contract.

30. I spoke to Mr. DeCesare on almost a weekly basis from November 5, 2001 to August 5, 2002, and he never once mentioned or referred to the 45 day time referenced in the contract.

31. In the nine months following the 45-day mark, Mr. DeCesare never communicated that TVI was in breach of the agreement.

32. Mr. DeCesare continued to work with me in the application process for the construction of the tower and never mentioned any purported breach of the agreement, until after TVI terminated the contract.

33. Because I had not received the FAA no hazard letter from Mr. DeCesare, I wrote to the FAA on November 6, 2001 to obtain a copy of the letter.

34. On November 25, 2001, I received a final drawing plan from the surveyors showing a guyed tower on the property for submission to the town.

35. On November 26, 2001, I received a phone call from the Old Saybrook Town Planner. She had some questions concerning the tower and its location because Mr. DeCesare had spoken to her earlier.

36. She suggested to me that we change the guyed tower to a monopole tower. She thought this would mitigate the effect on the neighbors and would be more acceptable to the various boards and commissions that would be receiving the matter.

37. If the tower to be constructed was changed to a monopole, its location on the property would also be changed.

38. A change in the type and location of the tower would eliminate the intrusion on abutting property owners by guy wires.

39. The change to a monopole design would require additional engineering and delay preparation of plans and specifications.

40. I discussed this change with Mr. DeCesare and he agreed with me that the change was for the best.

41. In December of 2001, Mr. DeCesare and I met with Mr. Sklodosky, to discuss the plans for the new monopole tower. At that point, a site plan for the new monopole design was being completed for submission.

42. Mr. Sklodosky informed me and Mr. DeCesare that we would most likely have to go through the variance application process, rather than the shorter route of obtaining a building permit.

43. After being advised that a variance might be required, TVI's outside counsel, Ken Spigle, prepared a letter and submitted it to Mr. Sklodosky with a new monopole design for the tower replacement seeking issuance of a building permit. Attached hereto as Exhibit 1 is the letter.

44. Mr. Sklodosky would not issue a building permit and suggested a meeting with the Zoning Commission.

45. On January 7, 2002, I appeared before the Old Saybrook Zoning Commission with Mr. Sklodosky. The Commission heard my request for a building permit and simply told me that I would have to go to the Old Saybrook Zoning Board of Appeals ("ZBA") to apply for a variance because a building permit would not be issued before a new variance was obtained.

46. In light of this position, Mr. DeCesare suggested to me that TVI hire a prominent local attorney, named William Childress, who could help TVI in the variance application process.

47. On behalf of TVI, I retained Attorney William Childress in January of 2002 to help with the application process.

48. I provided Attorney Childress with the information he requested to apply for a variance.

49. At the ZBA's meeting on April 10, 2002, which Attorney Childress, Mr. DeCesare and I attended, the ZBA voted to approve the variance.

50. With my help, Attorney Childress also applied for Zoning Commission approval and for the special exemption permit in May of 2002.

51. Attorney Childress appeared before the Zoning Commission on July 1, 2002 to explain the application and to request a hearing date. The hearing was set for August 19, 2001.

52. Attorney Childress appeared before the Architectural Review Board on July 22, 2002, which ultimately also recommended approval of the application to the Zoning Commission.

53. Attorney Childress also appeared before the Planning Commission and who also ultimately recommended approval of the application to the Zoning Commission.

54. By July 31, 2002, TVI was not in receipt of all the Approvals, as defined in the Agreement.

55. On August 7, 2002 before approval of the variance by the Zoning Commission was received, TVI sent a letter to Crossroads exercising its right to terminate the contract because all Conditions Precedent in the Agreement had not been met by July 31, 2002. The letter is attached hereto as Exhibit 2.

56. TVI, at the request of Crossroads, continued with the application process before the Zoning Commission without waiving its prior termination at the request of Crossroads.

57. On August 19, 2002, Attorney Childress and I appeared before the Zoning Commission for approval of the tower. The meeting had to be continued to the following month because the Commission requested changes to the application.

58. On September 3, 2002, the Zoning Commission voted 4 to 1 to approve the tower's construction.

59. Before it could build the tower, TVI still needed to obtain FAA clearance.

60. Approval from the Connecticut Siting Council was also required before the tower could operate as a telecommunications tower.

61. Attorney Childress thought it was the best strategy to obtain the variance before filing an application with the Siting Council for approval to operate a telecommunications tower.

62. We would not have sought to obtain the FAA clearance until the Zoning Commission approved the variance.

63. The first time I was aware that Crossroads accused TVI of breaching the contract was when my boss, Robert Maccini, told me in a phone conversation that TVI received a letter from Crossroads in response to TVI's termination. The letter stated TVI was in breach because it had failed to file for approvals before November 4, 2001. He later showed me the letter from Crossroads which accused TVI of being in breach. The letter is attached hereto at Exhibit 3.

64. The accusation of beach of contract came as a shock to me because Mr. DeCesare never mentioned it to me nor did he lead me to believe he was upset with my efforts at any time.

_____
Keenan Brinn

Subscribed and sworn to before me
On this 19th day of August, 2004.

_____
Notary Public Maureen Sullivan Brinn
My commission expires: 2/3/06