6/3/2004                                                    Don DeCesare

Page 1

1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
2

3

4        - - - - - - - - - - - - - -
    CROSSROADS COMMUNICATIONS OF
5    OLD SAYBROOK, LLC
    vs.                           No. 3:03CV459(PCD)
6    TOWER VENTURES, INC.
        - - - - - - - - - - - - - -
7

8

9                        COPY

10

                DEPOSITION OF:  DON DeCESARE
11              DATE:  June 3, 2004
                HELD AT:  JACOBS, GRUDBERG, BELT & DOW,
12              350 Orange Street, New Haven, CT

13

14

15

16

17

18

19

20

21

22
                     Jayne Ciccotelli, LSR
23           Brandon Smith Reporting Service, LLC
                     44 Capitol Avenue
24                 Hartford, CT  06106
                      (860) 549-1850
25

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

```
Page 2
  1    A P P E A R A N C E S :

  2    FOR THE PLAINTIFF:
       JACOBS, GRUDBERG, BELT & DOW
  3    350 Orange Street
       P.O. Box 606
  4    New Haven, CT  06503-0606
       By:  DAVID T. GRUDBERG, Esq.
  5

  6    FOR THE DEFENDANT:
       ROBINSON & COLE
  7    280 Trumbull Street
       Hartford, CT  06103
  8    By:  STEVEN R. HUMPHREY, Esq.
            MARION B. MANZO, Esq.
  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 3

1                          I N D E X

2    Witness: DON DeCESARE                          Page

3    Direct by Mr. Humphrey ........................   5

4    Cross by Mr. Grudberg ........................  134

5

6                    INDEX OF EXHIBITS

7          DEFENDANT'S EXHIBITS FOR IDENTIFICATION

8    No.  Description                              Page

9    1    Notice of Deposition .......................  28

10   2    Contract ...................................  28

11   3    Complaint ..................................  29

12   4    Letter from Kenneth Spigle to Chester  .....  51
          Sklodosky, 12/26/01
13
     5    Letter of 1/27/02 .........................   59
14
     6    Letter from Keenan Brinn to  ............. 101
15        Mr. DeCesare, 10/26/01

16   7    Letter of 5/2/02 .......................... 102

17   8    Letter from Mr. Maccini to Mr. DeCesare,  . 104
          8/7/02
18
     9    Letter from Attorney Brown to Attorney  ... 104
19        Wolfe, 8/9/02

20   10   Letter from Robert Maccini to Don DeCesare, 107
          8/16/02
21
     11   Letter of 11/25/02 ......................... 107
22
              (Exhibits retained by Attorney Humphrey)
23

24

25

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                               Don DeCesare

Page 4

S T I P U L A T I O N S

1

2

3          It is stipulated by the Attorneys for the

4    Plaintiff and the Defendant that each party reserves

5    the right to make specific objections in open court to

6    each and every question asked and the answers given

7    thereto by the witness, DON DeCESARE, except as to such

8    objections as are directed to the form of the question.

9          It is stipulated and agreed by and between

10   counsel for the parties that the proof of the authority

11   of the Notary Public before whom this deposition is

12   taken is waived.

13         It is further stipulated that any defects in

14   the notice are waived.

15

16

17

18

19

20

21

22

23

24

25

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                Don DeCesare

Page 5

```
 1                (Deposition commenced:  10:04 a.m.)

 2

 3                  D O N   D e C E S A R E ,

 4      was called as a witness by the Defendant and, having

 5      first been duly sworn, testified as follows:

 6

 7                          EXAMINATION

 8      BY MR. HUMPHREY:

 9

10          Q.    For the record, would you please state your

11      full name and residence address.

12          A.    Donald E. DeCesare, spelled capital D, small

13      E, capital C, small E-S-A-R-E.  I live at 157 North

14      Seir, S-E-I-R, Hill Road, Norwalk, Connecticut, 06850.

15          Q.    Would you please give us a quick

16      chronological, a chronology of your educational

17      background.

18          A.    Okay.

19          Q.    Or extended, if it's extended.

20          A.    I graduated from Central Catholic High School

21      in Pittsburgh, Pennsylvania in 1964.  I graduated from

22      the University of Pittsburgh with a Bachelor of Arts

23      degree in 1967.  I achieved a master's degree from the

24      University of Connecticut in 1969.

25          Q.    Master's in?
```

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 6

```
 1        A.    In English.
 2              I did my Ph.D. course work between 1969 and
 3    1971 at the University of Connecticut; I did not write
 4    a dissertation.
 5        Q.    Did you ever start one?
 6        A.    I did, several times.
 7        Q.    Was it the same topic?
 8        A.    Yes.  I had a lot trouble with that.
 9        Q.    Does the topic have anything to do with your
10    subsequent work?
11        A.    No.  I was going to write a dissertation on
12    20 Century American Poetry.
13        Q.    Now, were you -- withdraw the question.
14              Do the same thing, give a chronology of your
15    business experience starting in 1967 after you
16    graduated from the University of Pittsburgh.
17        A.    When I went to the University of Connecticut,
18    they gave me an opportunity to be a teaching fellow; I
19    did that between 1967 and 1971, both during regular
20    academic years and also during the summers, it was a
21    way that I was able to earn money to continue my
22    studies.  About 1969-ish, I fell in love and I found
23    that my father-in-law to be had the desire that I pay
24    for his daughter's education, my wife's to be
25    education, so I needed to get a job on top of the
```

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                    Don DeCesare

Page 7

1    teaching fellowship that I had.  So I took a job

2    working for The Hartford Times newspaper covering

3    various meetings and hearings and things for $5 a

4    story.

5        Q.    When you say "various," is that zoning type

6    meanings or town council meetings?

7        A.    Exactly, in various towns of eastern

8    Connecticut.  At the time, The Hartford Times was

9    trying to penetrate those towns for further circulation

10   and they assigned me to cover some events.

11       Q.    In eastern Connecticut?

12       A.    In eastern Connecticut.  Close to the

13   university so it would -- I could accomplish it.  So

14   anyway, I started doing that for $5 a story.  This is

15   about late '69, early '70.

16            And at the time, a gentleman who owned a

17   radio station out that way was reading my articles and

18   contacted me, asked me whether or not I would have an

19   interest in doing those kinds of stories for his radio

20   station, and I had some interest in doing that because

21   it would mean some more money, but I also felt an

22   obligation to my editor at the newspaper so I asked him

23   what he thought, whether I could, in effect, work for

24   two competing organizations, and he said it was okay

25   with him as long as I got my copy in to him first.

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                          Don DeCesare

Page 8

1           So that's how I started working in radio

2   business, initially just writing stories, radio

3   versions, or what I thought to be radio versions, of

4   the meetings that I had covered and I would slip them

5   under the door at the radio station after I had filed

6   my story to the paper.

7           Sometime thereafter, I don't remember the

8   exact date, we're talking maybe spring to summer of

9   '70, the gentleman who owned the radio station asked me

10  whether or not I would like to do an audition to try to

11  read the stories on the air, which at that point I

12  hadn't been doing.  I said sure, I'll do an audition.

13  I did the audition and he hated it.  And so we

14  continued with my writing the stories, slipping them

15  under the door.

16          I learned for the first time that the radio

17  business can be very fickle, within some few weeks of

18  my having done the audition that didn't work out, I got

19  a phone call from the owner of the station again

20  saying, you know the audition that you did, I don't

21  hate it as much as I used to.  As it turned out, his

22  news director quit and so he offered me a job to start

23  covering news for them doing it on the air, which I

24  then did in late '70, early '71, was when I started

25  working for them on a more regular basis where I

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                  Don DeCesare

Page 9

1     actually had an assignment from the station.

2          Q.    Was that a regular program every weekday

3     night or --

4          A.    Every morning, yeah.  I would come in and put

5     newscasts together and air them during the morning

6     period.  And so one thing led to another and --

7          Q.    What station was it, by the way?

8          A.    That was WILI in Willimantic.

9                MR. GRUDBERG:  Off the record for a

10    second.

11                    (Pause in the proceedings)

12         Q.    So WILI or whatever it was --

13         A.    Right, I started working there on a regular

14    basis, few hours a day.  I was fortunate in that at the

15    time, there was an older gentleman there, a

16    broadcaster, who took me under his wing and helped me

17    to learn the basics of the business, and I revere him

18    to this day as my first mentor.

19         Q.    And is this the excuse you used not to finish

20    your dissertation?

21         A.    Yes, 100 percent correct on that one.  I had

22    two competing masters at that point, my dissertation

23    and my new beginning career, and, truthfully, the

24    radio, although it paid poorly, paid better than the

25    dissertation part did and we made a conscious decision,

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 10

```
 1    my fiancee at the time and immediately thereafter my

 2    wife, that I would work and earn what I could so we

 3    could finish her college education, she was a couple

 4    years behind me, so that's what I did.

 5        Q.    And how long did you stay working at WILI,

 6    approximately?

 7        A.    A year and a half and maybe twenty months,

 8    something like that.

 9        Q.    Then what was your next business progression?

10        A.    From there I went to WGCH in Greenwich, the

11    owner of that station had, I guess, been looking for

12    someone and asked around the industry and my owner at

13    the time in Willimantic actually made my name available

14    to the gentleman in Greenwich because he thought it

15    would be a good career move for me and he was very nice

16    to me about that.

17        Q.    And you did that?

18        A.    I did.

19        Q.    And how long were you at WGCH?

20        A.    I was at WGCH for about two, maybe two and a

21    quarter years, this would take us to about 1974.  I was

22    there from either late '71, early '72, to about the

23    middle of '74.

24        Q.    Similar functions at that station?

25        A.    A little bit more responsibility there.  I
```

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

1    was there as the news director and it was the first

2    time I actually had some people reporting to me.

3        Q.    Then continue on from '74.

4        A.    In '74, again, I was trying to improve my

5    financial situation, mostly, and I had heard that WINS

6    in New York, which was then owned by Westinghouse

7    Broadcasting, had an interest in somebody in lower

8    Fairfield county who could do reports for them and I

9    offered my services to them on a freelance basis, after

10   having gotten permission to do that from my owner, and

11   they hired me per-story basis and I started doing

12   stories for them around, I would say, mid '74,

13   something like that, might have been fall of '74.

14           And the news director there at the time liked

15   my work and offered me other opportunities to come in

16   to the city from time to time to do fill-in work on the

17   air and I started doing that from time to time until

18   eventually they said why don't you become like a

19   utility infielder for us and you'll make enough money

20   to justify that and that's what I did.  I went there

21   not on staff but as a freelancer working pretty regular

22   shifts in '75, somewhere in there.

23       Q.    Brian Williams of WINS.

24       A.    He's much handsomer than I.

25       Q.    Okay.  How long did you stay in the

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                    Don DeCesare

Page 12

1    broadcasting end of the radio business?

2        A.    I went from WINS in 1976 to the CBS network.

3    At the time, CBS news recruiting recruited people into

4    the network and not specifically into either radio or

5    television.  As it turned out, my initial assignment

6    was in radio and I went there in May or maybe it was

7    April of '76, on staff, and worked on the radio side

8    for about two years, maybe two and a half years, then

9    they asked me to move over to the television side,

10   which I did in about 1979, and I stayed on the

11   television side for the whole time that I was at CBS.

12       Q.    And when did that end?

13       A.    I left CBS in April of '96.

14       Q.    And were you still in the television news

15   side up until '96?

16       A.    Yes, I was.

17       Q.    At that point, up through '96, have you had

18   any ownership interests in any radio station or similar

19   industry?

20       A.    No.

21       Q.    What did you do then in '96?

22       A.    In '96, we contracted to buy first WCNX, what

23   was then WCNX, in Middletown.

24       Q.    And you used the word "we," who is that?

25       A.    My wife and I.

Crossroads vs Tower Ventures, Inc.

6/3/2004                                           Don DeCesare

Page 13

1       Q.    Okay.

2       A.    And then we also, within a few months of

3    that, agreed to buy WLIS in Old Saybrook.

4       Q.    And so you did both of those sometime '96,

5    '97?

6       A.    '96.

7       Q.    Okay.  What were those stations, were they

8    news stations, sport stations, 24 hour, give me a

9    little description of them.

10      A.    What was then WCNX was at the time running a

11   sunrise to sunset radio format, altogether satellite

12   delivered, right-wing, political talk.

13            WLIS was much, a more community oriented

14   programming with a lot of local origination and it was

15   operating from 6:00 a.m. till midnight, daily.

16      Q.    Now, had you tried to buy any other radio

17   stations before you actually bought these two?

18      A.    Help me out with the word "tried."  I don't

19   know what you mean by that.

20      Q.    Were you interested, had you investigated,

21   had you made any offers to buy stations.

22      A.    I had looked at a number of stations that

23   were available for sale and looked at the prospectuses

24   that were made available by the broker that were

25   marketing the stations and didn't find one until I came

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 14

1    to WCNX that I thought either was appropriate or we

2    could afford or -- there were different reasons why we

3    chose not to activate one or another of these deals.

4         Q.   And in the purchases of those stations, were

5    you represented by an attorney --

6         A.   Yes.

7         Q.   -- you and your wife?

8         A.   Yes.

9         Q.   Who was that?

10        A.   Well, in terms of buying radio stations, you

11   need to have a lot of attorneys, it's a good business

12   for lawyers, so I had an attorney who represented me in

13   terms of the business side, his name is Michael Brown.

14        Q.   And is that the same Michael Brown who

15   represented you --

16        A.   Yes, it is.

17        Q.   -- in connection with the transaction we will

18   eventually get to here today?

19        A.   Same gentleman.

20        Q.   And then did you have an FCC attorney?

21        A.   I did, Mark Lipp, L-I-P-P.

22        Q.   And was he in D.C.?

23        A.   Yes.

24        Q.   Was anyone else besides your wife and

25   yourself on the ownership side of these two when you

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

```
 1    were purchasing?

 2         A.    No.

 3         Q.    And to the present time, do you have any

 4    ownership interest in those stations?

 5         A.    In the stations?

 6         Q.    Yes.

 7         A.    Yes, I do.

 8         Q.    And have you since 1996 to the present

 9    continue, you and your wife continue to be the owners

10    of those stations?

11         A.    Yes, we do.

12         Q.    Have you purchased any other stations since

13    those two purchases?

14         A.    No.

15         Q.    Now, when you purchased the stations, and for

16    the moment, let's just talk about Mr. Brown, the

17    business attorney, was it your practice to negotiate

18    the deal yourself and then just give like a term sheet

19    to your lawyer and have the lawyer draft it, draft up

20    an agreement, or did you send a lawyer out to negotiate

21    and then you approved the terms of an agreement?  If

22    you had a general way of operating.

23         A.    Well, I didn't have a practice in that sense.

24    With respect to the radio station deals, I did the

25    initial negotiating, to use your word, with the owners
```

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 16

1    at the time, and then I would consult with Michael

2    about language and so forth, and ultimately he did the

3    legal language of the contract.

4        Q.    But as far as price and other terms, was that

5    something that you, you and your wife pretty much

6    handled and then instructed the lawyer on what they

7    were to draw up as an agreement?

8        A.    Yes.

9        Q.    And from the time you purchased these two --

10   withdraw the question.

11           From 1996, have you purchased any other

12   assets, and that could be referring to towers or other

13   properties, that you've used in conjunction with

14   operating these radio stations?

15       A.    I purchased the property on which sit two of

16   the towers that are a part of the WLIS configuration.

17       Q.    And where are those properties?

18       A.    That property is in Old Saybrook, doesn't

19   have a street address, it's known as Route 9 Old

20   Saybrook.

21       Q.    And you used the term "two properties," are

22   they contiguous and it's two lots or what did you mean

23   by two properties?

24       A.    They are not contiguous.  The station has two

25   pieces of property as part of its assets.  The one is

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

Don DeCesare

1    separated from the other by, as the crow flies, about a

2    mile and a half in distance.

3         Q.    And what was the purpose, if any, and

4    function with regard to that, those properties and the

5    radio station?

6         A.    One piece of property has on it the studio

7    building and also an auxiliary tower.  The other piece

8    of property, the Route 9 piece, has on it two

9    broadcasting towers from which the actual signal

10   emanates routinely.

11        Q.    Now, are either one of those properties the

12   property where the tower that's in, or the sale of the

13   tower that's in dispute in our litigation located?

14        A.    Yes.

15        Q.    Which one?

16        A.    It's the one that I talked about first, it's

17   the one that has the studio building and the auxiliary

18   tower.

19        Q.    And, approximately, when were the properties

20   purchased or were they at the same time as the radio

21   station?

22        A.    The studio building property with the

23   auxiliary tower was part of -- was purchased with the

24   assets of the radio station.

25        Q.    What about the Route 9 piece?

Crossroads vs Tower Ventures, Inc.

6/3/2004                                          Don DeCesare

Page 18

1    A.    The Route 9 piece was leased from the time

2    that I bought the radio station until the time that I

3    bought the property.

4    Q.    And when you -- in 1996, were there any other

5    entities using or leasing space on either one of these

6    properties?

7    A.    No.

8    Q.    Did there come a time before September 20,

9    2001 that any other operators were leasing space on

10   either the towers or any other portion of these

11   properties?

12   A.    Yes.

13   Q.    Okay.  And what was that?

14   A.    We leased the opportunity to erect a paging

15   antennae on the auxiliary tower on the studio property

16   to what was then known as Air Touch Paging, but is now

17   a portion of the Verizon companies.

18   Q.    And do you recall, approximately, when that

19   was?

20   A.    I can't be 100 percent certain, I'll say '98.

21   Don't hold me to that, I could be wrong.

22   Q.    I think I heard your answer say you leased

23   the opportunity, did they ever actually put facilities

24   on the tower?

25   A.    They did.

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 19

1      Q.   And do those facilities continue to be on

2   that tower?

3      A.   Yes.

4      Q.   And at least through September 2001 -- and

5   I'm using that date because that's the date I think

6   we'll establish and agree upon that you entered into a

7   contract with Tower Ventures -- no one else was on the

8   tower, on the auxiliary tower, and no one else was

9   using the other two broadcast facilities?

10     A.   Certainly that's true of the auxiliary tower.

11          Help me out again here, divide your question

12   for me.  You said, you threw in the date September 2001

13   and that's what --

14     Q.   Prior to that time.  Withdrawn, I'll start

15   again.

16          For the period '96 of September 2001, you had

17   one tenant on both properties and that was Air Touch

18   which was using the auxiliary tower?

19     A.   Well, certainly Air Touch was on the

20   auxiliary tower, no question in my mind about that.

21   I'm wrestling with the date September 2001 and whether

22   or not that date is significant as to when anybody else

23   might have come on board.

24     Q.   Okay.  Let's extend it to today then --

25     A.   Okay.

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 20

1       Q.    -- and not worry about the 2001 date.

2             As of today, who else besides Air Touch,

3    Verizon, is on the auxiliary tower?

4       A.    No one.

5       Q.    Who else, if anyone, is on the Route 9 piece?

6       A.    On Route 9, we have what is now known as

7    T-Mobile, which was, I forget what the heck they were

8    called before that, and we also have AT&T.

9       Q.    And are those wireless operations or are they

10   some other --

11      A.    They're cellular.

12      Q.    Cellular.  The tower that was on the, with

13   the studio building, auxiliary tower, what type of

14   tower was that?

15      A.    It's a lattice work steel structure with guy

16   wires supporting it.

17      Q.    And was that a tower -- withdraw the

18   question.

19            You testified that that tower came as part of

20   your purchase price when you bought the station along

21   with the studio, correct?

22      A.    Yes.

23      Q.    And what was the height of that tower at that

24   time, if you know?

25      A.    Approximately, 190 feet above terrain.

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 21

```
 1        Q.    Were there any other facilities, and by that
 2   I would mean an equipment shed, something like that,
 3   that were with the tower?  I'm not counting the studio
 4   building.
 5        A.    No.
 6        Q.    Now, were the guy wires all on, physically on
 7   the property that encompassed or included the studio
 8   building?
 9        A.    No.
10        Q.    And tell me about that, what was the
11   arrangement?
12        A.    The guy wires fall primarily on or
13   principally on the property, that is the studio
14   property, but one of them falls on an adjacent
15   property.
16        Q.    And that was true when you bought it in '96?
17        A.    Yes.
18        Q.    And is that still true today?
19        A.    Yes.
20        Q.    Now, in addition to these radio stations and
21   their related facilities, have you purchased any other
22   commercial real estate?
23        A.    No.  Other than the one I mentioned, the --
24        Q.    The Route 9?
25        A.    -- Route 9 property.
```

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                    Don DeCesare

Page 22

1      Q.     I'm including both those, I've included both

2    those in my question.

3            And have you purchased any other radio

4    station or related-type property?

5      A.     No.

6      Q.     I'm talking whether in Connecticut or

7    anyplace else.

8      A.     No.

9      Q.     Have you been involved in the acquisition of

10    residential real estate from time to time?

11     A.     Yes.

12     Q.     And what towns have you been involved in with

13    that, town or towns?

14     A.     What is the time frame here?

15     Q.     1990 to the present.

16     A.     Guilford, Branford.

17     Q.     And you presently live in Norwalk?

18     A.     Yes.

19     Q.     So that was purchased prior to 1990?

20     A.     What?

21     Q.     The property in Norwalk.

22     A.     Yes.

23     Q.     Now, in any of those purchases, either at the

24    time you purchased or subsequently, were you involved

25    in needing any zoning changes or have anything to do

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 23

1    with town zoning or planning commissions?

2         A.   No.

3         Q.   Now, with respect to the radio station

4    property, had you, up until the Tower Ventures,

5    September 2001, been involved with any zoning

6    applications or planning and zoning commissions or

7    building inspectors, any of those types people in the

8    town of Old Saybrook?

9         A.   With respect to the radio stations, no.

10        Q.   Had you had any experience in the areas, and

11   I'm talking up through 2001, any experience with

12   zoning, obtaining variances, that type of working with

13   town officials --

14        A.   No.

15        Q.   -- regarding licenses, permits?

16        A.   No.

17        Q.   Were you active in local business/community

18   affairs from 1996 to the present time?

19        A.   Yes.

20        Q.   And are you chambers of commerce or --

21        A.   Yes.

22        Q.   -- other organizations like that?

23        A.   Yes.

24        Q.   Can you tell me a little bit about your

25   participation?

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 24

1     A.    I participate very regularly in various

2  community events and organizations including chambers

3  of commerce in both Old Saybrook and Middletown.  I am

4  now the immediate past president of the Old Saybrook

5  Chamber of Commerce, of which I was president for two

6  years prior to this year.  I have been asked to serve

7  on various boards and committees and have -- to this

8  time, I don't think I've turned anybody down.

9     Q.    Have you ever served on a zoning board or a

10  planning and zoning commission or committee?

11     A.    No.

12     Q.    Have you ever served on any administrative

13  bodies of the town or municipality?

14     A.    No.

15     Q.    Had, prior to working on the Tower Ventures

16  matter, had you participated in any, complete any

17  zoning applications for variances or permits or

18  anything of that nature?

19     A.    No.

20     Q.    Had you, prior to the Tower Ventures

21  agreement, offered or been advertising your tower for

22  lease by other either wireless or paging companies?

23     A.    Yes.

24     Q.    Tell me a little bit about what the time

25  frame you'd been doing this and what you'd been doing.

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 25

1       A.    Again, I'm not going to be real clear about

2   the specific date I started this, but in general, I

3   think around 1997, maybe late '97, I started to realize

4   the possibility of doing more with our assets and

5   started to look for a way to do that.  Initially, I

6   contacted a real estate brokerage firm that I was told

7   specialized in commercial properties and engaged them

8   to assist me in the process of either selling to what

9   we're calling the studio property or in finding some

10  opportunity to realize more from the asset.

11      Q.    Okay.  And that's something '97, '98 --

12      A.    Yeah, I think that's about right.

13      Q.    -- in that time frame?

14            And is this what eventually led to the Air

15  Touch lease?

16      A.    No.

17      Q.    How did you get the Air Touch lease?

18      A.    They contacted me.

19      Q.    Did this advertising -- withdrawn.

20            Did the work with this brokerage firm lead to

21  any leasing opportunities?

22      A.    No.

23      Q.    And how did you get in touch with or come to

24  be acquainted with Tower Ventures?

25      A.    They contacted me.

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 26

1       Q.    Do you recall who that was?

2       A.    Bob Maccini.

3       Q.    And what was Tower Ventures interest as

4    expressed by Bob Maccini at that time?

5       A.    My recollection is that initially he had an

6    interest in asking me about working together on tower

7    opportunities with respect to my properties.  Yes,

8    that's what I remember.

9       Q.    Explain that a little bit more to me, please.

10      A.    I believe the first contact, if you will, was

11   by telephone, I don't recall specifically why or what

12   the initial conversational point was, but as a result

13   of that telephone conversation, I invited Bob to come

14   and look at the properties.

15      Q.    And did, in fact, he do that?

16      A.    Yes.

17      Q.    When you say "the properties," you're

18   referring to the auxiliary tower and the Route 9

19   properties?

20      A.    No, I'm referring to all of them.

21      Q.    Including --

22      A.    Middletown.

23      Q.    -- Middletown.

24            What was in Middletown?

25      A.    In Middletown is W, what we now call WMRD, we

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                  Don DeCesare

Page 27

1    had changed the call letters from WCNX, and on that

2    property exists a radio tower, as well.

3         Q.   Now, as of this time, on your towers, there

4    was only radio operations, is that a correct statement?

5    As of 2001.

6         A.   Well, we're not talking about 2001, or I'm

7    not.

8         Q.   Okay.  What time frame are you --

9         A.   You asked me, I believe, did I have

10   conversations with Bob Maccini.  I --

11        Q.   Right.  What was the time frame when you

12   first had conversations with Bob, if you recall?

13        A.   1999.

14        Q.   Now, just to clarify my prior question,

15   through the September 2001, were there any operations

16   other than radio transmissions on any of your towers?

17        A.   The Air Touch or what is now Verizon.

18        Q.   Anything else besides Air Touch?

19        A.   No.

20        Q.   I take it that nothing dramatic developed for

21   a couple of years with your conversations with Maccini?

22        A.   I'm not sure I know what you mean by,

23   "dramatic," sorry.

24        Q.   No contract came until September of 2001?

25        A.   That's true.

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

Don DeCesare

6/3/2004

Page 28

1    Q.  Was this kind of an off and on again or were

2  you staying in constant touch with Bob?

3    A.  I think off and on again would be a better

4  way of characterizing it. We had some initial back and

5  forth in '99. I don't remember any conversations or

6  communications of any kind in 2000, and then 2001, we

7  had more detailed conversation.

8    Q.  And you did state that you showed Maccini all

9  of your properties, the two pieces in Old Saybrook and

10  then the piece in Middletown?

11    A.  I did, yes.

12      MR. HUMPHREY: Let me just mark a couple

13  of things, just for identification, get them in the

14  record.

15      (Notice of Deposition marked Defendant's

16      Exhibit 1 for identification)

17      MR. HUMPHREY: For Exhibit 2, let's do

18  the contract, which we'll identify later, and I will

19  state for the record I have put in a copy of the

20  contract which has two signature pages, one which we'll

21  identify later, which is yours, and one was

22  Mr. Maccini's. I have not included all the exhibits

23  for this deposition, which were attached to that.

24      So if you'd do that, too.

25      (Contract marked Defendant's Exhibit 2

Brandon Smith Reporting

1              for identification)

2              MR. HUMPHREY:  And Exhibit 3 is a copy

3    of the complaint, and for the record, I think when I

4    went through it, David, that although one count is out,

5    there is no amended complaint that has been filed, all

6    we have is the original complaint.

7              (Complaint marked Defendant's Exhibit 3

8              for identification)

9         Q.   If you would look at the Exhibit 2, and can

10   you identify that for me.

11        A.   Looks to be a copy of the agreement between

12   Crossroads Communications of Old Saybrook and Tower

13   Ventures, states, "Made and entered into as of the 20th

14   day of September 2001."

15        Q.   And on what has been Bates stamped TVI0004,

16   down in the bottom right-hand corner.

17        A.   TVI0004, yes.

18        Q.   Okay.  There's a signature on that page, do

19   you recognize that signature?

20        A.   One of the signatures is mine, yes.

21        Q.   Okay.  And to the left of that there's

22   another signature, Philomenia Simmons, and who's that?

23        A.   That's the notary public.

24        Q.   And although it doesn't have the exhibits

25   attached, this is the contract you negotiated with

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                    Don DeCesare

Page 30

1    Tower Ventures?

2         A.   Seems to be, yes.

3         Q.   And the other party's name is Crossroads

4    Communications of Old Saybrook, LLC?

5         A.   Yes.

6         Q.   Who is that?

7         A.   That's the company we created in 1996 under

8    which we bought the radio station.

9         Q.   And are you and your wife the sole

10   shareholders of that company?

11        A.   Yes.

12        Q.   And what corporate office titles --

13        A.   I'm sorry, what do you mean?

14        Q.   It's an LLC, are you a managing partner?

15        A.   I'm managing partner and my wife is the

16   managing or the member, and I operate also as the

17   president.

18        Q.   And it states here in the agreement that it's

19   a Connecticut limited liability company; is that a

20   correct statement?

21        A.   Yes.

22        Q.   So it was incorporated or formed under the

23   laws of the state of Connecticut?

24        A.   That's correct.

25        Q.   Is it authorized to do business in any other

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 31

1       state?

2            A.    No.

3            Q.    Now, Exhibit 3, have you seen that or a copy

4       of that before today?

5            A.    Yes.

6            Q.    Is that the complaint which you had filed on

7       behalf of Crossroads and its action against Tower

8       Ventures?

9            A.    Yes.

10           Q.    Prior to dealing with Tower Ventures, what

11      had been your experience in the wireless communication

12      field?

13           A.    I want to be responsive, so please tell me

14      what you mean by "experience."

15           Q.    Had you invested in any wireless

16      communications, had you done research into the field of

17      wireless communications and as to how you might, they

18      might want to use your property, such companies, what,

19      if anything, had you done?

20           A.    I had not invested.  I had done some

21      inquiries about the opportunity that might exist for

22      leasing space on my towers to wireless companies.

23           Q.    Okay.  And can you tell me, in that -- what

24      had you done besides hire the broker, I assume that's

25      one of the things you had in mind?

**Brandon Smith Reporting**

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                Don DeCesare

Page 32

1      A.   Right.  Well, that was the first thing that

2   we did, and, thereafter, I had been contacted

3   periodically in this time frame, meaning roughly '97 to

4   '99, by representatives of tower acquisition or tower

5   leasing companies, several of them, and I had spoken

6   with each of those individuals when they materialized

7   and we tried to pursue different opportunities to

8   either lease or sell our property to these other

9   entities.

10     Q.   And other than Air Touch, the only other one

11  up until today that you were successful signing an

12  agreement with, anyway, was Tower Ventures; is that

13  correct?

14     A.   I don't -- no.  But I'm not sure what you

15  mean by "successful."

16     Q.   Okay.  You have Air Touch is a tenant; is

17  that correct?

18     A.   Yes.

19     Q.   Is there any, besides Tower Ventures, was

20  there any other wireless entities that you have signed

21  lease agreements with?

22     A.   Yes.

23     Q.   And who are they?

24     A.   T-Mobile, formerly -- I forget what they were

25  called -- Omnipoint, they were called, initially, AT&T

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 33

1    and Verizon.

2        Q.    And what facilities is Verizon using?

3        A.    They are not using any at the moment, but

4    they have a lease that would enable them to use one of

5    the towers on Route 9.   I'm distinguishing this one

6    from the Air Touch/Verizon.

7        Q.    Were you, as far as the wireless industry was

8    concerned, familiar with the Connecticut Siting --

9    that's S-I-T-I-N-G -- Agency or Council, and I'm

10   talking about 2001?

11       A.    Right.   I knew that there was such a thing,

12   but I wouldn't say I was familiar with it.

13       Q.    So you didn't know what their jurisdiction

14   was or how it -- whether or not it had jurisdiction

15   over wireless communications?

16       A.    No.

17       Q.    Or the construction of towers?

18       A.    No.

19       Q.    Now, aside from the lawsuit, which is the

20   complaint which we've identified as Exhibit 3, have you

21   been involved in any other lawsuits?

22       A.    No.

23       Q.    So I take it from that answer you have

24   neither sued anyone besides Tower Ventures nor have you

25   been sued by somebody, some other third party --

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 34

1        A.    That's correct.

2                  MR. GRUDBERG:    Talking about "you,"

3    Crossroads?

4        Q.    You or Crossroads.

5        A.    That's correct.

6        Q.    Now, from your experience in the Old Saybrook

7    area, had you come to know people in Saybrook who were

8    on the various zoning boards and planning commissions

9    and historic commission, et cetera?

10       A.    Yes.

11       Q.    And were those people that you met through

12   the chamber work or how did you come to know those

13   people?

14       A.    Oh, in various ways, certainly somewhat

15   through the chamber work and through the normal course

16   of business.

17       Q.    When you say "normal course of business,"

18   what do you mean?

19       A.    I mean the radio business.  We are very

20   active in the community with the way we run the

21   station.

22       Q.    And that would be interviewing those people

23   for stories or getting information from them about

24   local events?

25       A.    Yes.

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 35

```
 1        Q.    Did you know the building inspector in Old
 2   Saybrook in that period of --
 3        A.    I knew his name.
 4        Q.    -- time, 2001?
 5        A.    I wouldn't say I was friendly with him or
 6   knew him in that sense.
 7        Q.    Can you pronounce his last name for me, just
 8   his last name.
 9        A.    Well, Chester wasn't the building inspector.
10        Q.    What was Chester's position?
11        A.    Chester was the zoning enforcement officer.
12        Q.    And that was a different position in Old
13   Saybrook at that time from the building inspector?
14        A.    Yes.
15        Q.    And who was the building inspector?
16        A.    Don Lucas.
17        Q.    And so in 2001, the time frame 2001-2002, you
18   knew Don Lucas and Chester --
19        A.    Sklodosky.
20        Q.    -- Sklodosky?
21        A.    Yes.
22        Q.    From your earlier testimony, I take it that
23   your experience with Tower Ventures and working with
24   the zoning enforcement officers, building inspectors
25   and other town officials, was your first business, in
```

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                            Don DeCesare

Page 36

1    terms of Crossroads, contact with those people?

2        A.    Yes.

3        Q.    Did -- Bill Childress was a lawyer in Old

4    Saybrook and you knew him in the 2001-2002 time frame?

5        A.    Yes.

6        Q.    And how had you come to know Bill or know of

7    him?

8        A.    I don't recall when I first met him, but he

9    also is and was very active in the community affairs,

10   and at some point in my time there, I came across him.

11   It was probably fairly early in my time.

12       Q.    In the '96, '97 time frame?

13       A.    Right.

14       Q.    And had you had any business dealings with

15   Bill Childress?

16       A.    No.

17       Q.    So I take it he had not represented you or

18   Crossroads in any matters prior to 2001 or -2?

19       A.    Correct, he had not.

20       Q.    And had you been involved in any committees

21   or other activities in the chamber where Bill was on

22   the same committee with you or working on the same

23   project with you?

24       A.    Yes.

25       Q.    What I'm trying to get at is you got to know

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 37

1    him more than just going to a meeting once a month and

2    happy to see him at a meeting?

3        A.    Yes.

4        Q.    And did there come a time in late 2001 or

5    early 2002 that you recommended to Tower Ventures that

6    they contact Bill Childress with respect to any zoning

7    issues that were developing on your project with Tower

8    Ventures?

9        A.    Yes.

10       Q.    And why did you suggest that they contact

11   Bill?

12       A.    I felt that for us to proceed through the

13   town, there should be local representation, and I knew

14   by reputation and by general interaction with Bill that

15   he was a very capable attorney.

16       Q.    And were you generally aware that he had been

17   practicing law for 20, 25 years in real estate around

18   the Saybrook area?

19       A.    I didn't know how many years, but I generally

20   was aware that he had practiced law, primarily real

21   estate law, yes.

22       Q.    And had you ever seen him when, in a working

23   environment like before a zoning board or anything

24   else, prior to working on the Tower Ventures matter?

25       A.    I may have; I don't recall.

Crossroads vs Tower Ventures, Inc.

Don DeCesare

6/3/2004

Page 38

1    Q.    Had he done any work for the chamber or

2    anything like that --

3    A.    Yes.

4    Q.    -- with regard --

5    A.    Yes.

6    Q.    And were you familiar with that work?

7    A.    Yes, I was.

8    Q.    And what was your opinion as to the extent he

9    had worked or seen him work, his ability?

10   A.    Highly competent.

11   Q.    And what about his integrity and business

12   persona?

13   A.    I don't think I thought of it in that term,

14   but I thought highly of him.

15   Q.    And has anything happened since 2001 to

16   change your opinion?

17   A.    No.

18   Q.    Have you had Bill represent either you or

19   Crossroads since 2001?

20   A.    No.

21   Q.    Has he represented anybody that you have been

22   involved in with any transactions?

23   A.    No.

24   Q.    So he hasn't been on the other side, and I'm

25   not counting Tower Ventures for the moment, another

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 39

1    matter in which you've been involved?

2        A.    No.

3        Q.    Going back to Exhibit 2, which is the copy of

4    the contract, could you tell me when, as best you can

5    recall, you started negotiating seriously so that it

6    led to the execution of this contract?

7        A.    Late spring of 2001, I'll call it May, might

8    have been April, we started, using your word, seriously

9    negotiating this contract.

10       Q.    And who did the negotiation for Tower

11   Ventures, who was involved for them?

12       A.    Mr. Maccini.

13       Q.    Anybody else at that point in time?

14       A.    Well, from time-to-time he was joined in

15   telephone conversation by an attorney named John Wolfe.

16            MR. HUMPHREY:    Just read back, I think

17   he said telephone conversation.

18       A.    That's what I said.

19       Q.    Okay.  So that early on you did not have

20   face-to-face meetings where Wolfe was present while you

21   were talking these things over with Maccini?

22       A.    I don't believe we did.

23       Q.    Now, from your side, that early part, who

24   else was representing Crossroads on the negotiations?

25       A.    Michael Brown.

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 40

1        Q.    And was he in on direct personal or were

2   those telephone conversations, also?  Conferences.

3        A.    I remember him being on some telephone

4   conversations.  I don't specifically recall him ever

5   being physically present with Bob Maccini.  I could be

6   wrong; I don't recall that.

7        Q.    Now, assuming your recollection of the time

8   frame early May of 2001, is it -- do you agree that the

9   contract was signed on or about September 20 of 2001?

10       A.    Yes.

11       Q.    And that you, on page two or 0004, signed on

12   or about that date?

13       A.    Yes.

14       Q.    And were you and Maccini present at the time

15   it was signed or you signed separate pages because you

16   were not present?

17       A.    The latter, we signed separate pages because

18   we were not present.

19       Q.    And how much time would you say from May

20   through September 20 did you spend with Maccini

21   negotiating?

22       A.    You mean in hours?

23       Q.    Or --

24       A.    Boy, I don't really know.  There were lots of

25   conversations, telephone primarily.  I don't know how