Crossroads vs Tower Ventures, Inc.
6/3/2004                                                          Don DeCesare

Page 121

1    Q.   Pretty simple assumption.

2    A.   -- strongly believe that they were.

3    Q.   Okay. But simple assumption, assume that
4    they're not.

5    A.   Yeah.

6    Q.   Is there anything wrong with trying to
7    renegotiate, negotiate the terms of a contract?

8    A.   Again, I'll just answer it to the best of my
9    ability this way, if one party fully observing the
10   agreement that they've made with the other party --

11   Q.   The assumption is they're not in breach, so
12   that's the assumption.

13   A.   I'm trying to put it in my words and the way
14   that I think. That is the only way I can do it. Now
15   I'm going to have to start over again so you'll have to
16   forgive me.

17        If one party assumes that both parties are
18   fully following the agreement that they have already
19   made, for whatever business reason, thinks to itself I
20   would like to change this agreement, let me propose
21   this change to the other party, then the other party
22   can make whatever judgment it chooses to make about
23   that proposed change.

24   Q.   Similarly, isn't it fair to say if a party
25   has the right to terminate under the contract and it

Page 122

1  exercises that right, that's not bad faith, is it?
2       A.    Again, we have the gigantic presumption that
3  I don't accept in this case, that the other party is in
4  full compliance with the agreement.
5       Q.    But with any right under a contract, any
6  right you have under a contract, isn't -- is it bad
7  faith for a party to exercise that right?
8             MR. GRUDBERG:  Object to the form.
9       Q.    I'll withdraw that question, I'll withdraw.
10            What -- other than your claim that there was
11 a material breach because of the 45 day condition, is
12 there anything else that you claim was an improper act,
13 a bad faith act, on the part of TVI?
14      A.    Only that which is referenced in Michael
15 Brown's letter that we were looking at earlier.
16      Q.    And that's all that you claim is the bad
17 faith or immoral conduct?
18      A.    Yes, I guess so.  That's what we put into the
19 letter.
20      Q.    And just so we're clear on that, the other
21 thing in Mr. Brown's letter, which is Exhibit 9, is the
22 fact that you claim he misstated whether or not the
23 application was likely to be approved or denied?
24      A.    Bear with me a second.
25      Q.    Exhibit 9.

1    A.   There it is. Okay. On page two we were
2  talking earlier that two things happened here, that
3  Mr. Maccini's statements in his August 7 letter that
4  the required applications would be denied were not true
5  and that he knew they were not true, and that by either
6  withdrawing or not proceeding with the application
7  process, both the reputation and business interests of
8  Crossroads itself and myself personally would be
9  seriously and materially damaged.
10    Q.   In the complaint or what is Crossroads
11  claiming are its damages?
12    A.   Are you looking to a particular document or?
13    Q.   You can refer to the complaint or if you know
14  from your own recollection.
15    A.   I'm sorry, repeat, restate the question.
16    Q.   How is Crossroads, how are you claiming that
17  Crossroads was damaged as a result of TVI terminating
18  the contract?
19    A.   Well, I think the simple answer to the
20  question is that all of the reasons and expectations
21  that we had with respect to that are stated in this
22  document known as "The Complaint."
23    Q.   And from your testimony, however, since 2002
24  you have not been able, Crossroads has not been able to
25  get any tenants to lease on that existing tower or come

Page 124

1  in and propose another tower?

2     A.   That's correct.

3     Q.   Do you believe that that is because of the

4  market, are the markets changed?

5     A.   I don't know all the reasons why that may be

6  the case.  I know that in the inquiries that I have

7  made, I have not been successful in getting another,

8  you know, partner.

9          MR. HUMPHREY:  One second.

10         (Pause in the proceedings)

11    Q.   You've testified that at least until the fall

12 of 2002 nothing was ever put in writing by Crossroads

13 that it considered Tower Ventures to be in breach of

14 the lease?  Or the agreement, pardon me.

15    A.   Yes, I did.

16    Q.   You have testified that on occasion or some

17 occasions you spoke with Keenan Brinn concerning the

18 time it was taking to process or obtain the necessary

19 approvals?

20    A.   Yes, I did.

21    Q.   Did you ever speak to anyone besides Keenan

22 Brinn about that?

23    A.   I can't be certain.  I don't recall doing so.

24 I may have.  I had several conversations with

25 Mr. Maccini during this time period, telephone

Crossroads vs Tower Ventures, Inc.
6/3/2004                                                          Don DeCesare

Page 125

1    conversations, it would not surprise me that I did, but
2    I can't swear to it.
3        Q.   And is it correct that your testimony is that
4    you never used the words "breach" or "material breach"
5    with Mr. Brinn or Mr. Maccini?
6        A.   I'm saying that I don't recall using those
7    words.
8        Q.   And that you didn't use them with any, to
9    anyone else who was working with Tower Ventures,
10   Mr. Wolfe or Mr. McCarthy?  Just say Mr. Wolfe.
11       A.   I don't recall using those words with him,
12   no, not prior to the time that they went into writing.
13       Q.   With respect to Mr. Brinn, what exactly do
14   you recall that you said to him?
15       A.   Well, I can't be exact.  I was terribly
16   frustrated about the slowness of the process.
17       Q.   And was that during the zoning hearings?
18       A.   No, no, well before that.
19       Q.   When was the first time you ever said
20   anything to him?
21       A.   Again, I can't be 100 percent certain, but I
22   would bet that it was in early to middle October.  I
23   had expected that, especially after we had agreed on a
24   time frame, we were going to go full tilt to get it
25   done in that time frame.

Crossroads vs Tower Ventures, Inc.

6/3/2004

Don DeCesare

Page 126

```
1    Q.    Was there anything that you were aware of
2    that Tower Ventures wasn't doing that it could have
3    been doing during that time frame?
4    A.    No. Again, I've said earlier, I'm not an
5    expert on how you do this, my understanding was that
6    they were expert.
7    Q.    But there's nothing that they were failing to
8    do that you knew about that was creating the problem?
9    A.    I can't be specific about that, but I think
10   I've said several times I was very frustrated at what
11   -- I had thought we were going to be moving very
12   rapidly and that 45 days would be sufficient and I saw
13   that we're weren't moving very rapidly.
14   Q.    And you quickly came to see that 45 days
15   wasn't going to be sufficient to get whatever approvals
16   were necessary?
17   A.    I don't know that I would --
18           MR. GRUDBERG:  Object to the form.
19   A.    I don't understand that, exactly.
20   Q.    Did there come a time when you realized that
21   45 days was not going to be sufficient?
22   A.    I suppose.
23   Q.    And in January of 2002 when you learned you
24   were going to have to do the full zoning procedure, you
25   knew then, one, you were way past 45 days, correct?
```

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

1   A.   Yes.

2   Q.   And you knew it was going to be much more
3   than 45 more days before you were going to get
4   approvals?

5   A.   I can't respond to whether I knew it was
6   going to be another 45 days. I knew it was going to
7   take longer.

8   Q.   And weren't you aware then that it was even
9   going to be more than 45 days before the application
10  was presented to the zoning board of appeals to get on
11  their calendar?

12  A.   Well, again, I don't know that I took -- that
13  I transferred the 45 day thought from one part of our
14  process to another.

15  Q.   Were you aware that in order to get on the
16  zoning board of appeals calendar for a hearing you had
17  to file your application 30 days prior to that?

18  A.   No, I don't, I don't think I ever knew nor
19  now know exactly, you know, how many days you need to
20  file this application or that application. I know you
21  have to file them.

22  Q.   When you were meeting with Bill Childress, in
23  your discussion with him, did he explain the process
24  that was necessary in order to get the approval for the
25  tower?

Page 128

1    A.    I don't think we ever had a process
2    explanation meeting, per se.  I think as we continued
3    our dialogues, mostly three-part dialogues, meaning
4    myself, Mr. Brinn and Mr. Childress, sometimes me and
5    Mr. Childress, and other times, which I was not party
6    to, between Mr. Brinn and Mr. Childress, that there was
7    a process that they were involved in.
8    Q.    And that was clearly taking a long time?
9    A.    It was in my mind, yes.
10   Q.    And yet you did not mention this 45 days to
11   anyone, specifically the 45 days, did you?
12   A.    In what context?
13   Q.    You didn't mention in writing that 45 days
14   was passed, "Tower Ventures, you're in breach," you did
15   not do that?
16   A.    I did not.
17   Q.    You did not tell Keenan Brinn it's more than
18   45 days, Tower Ventures is in material breach of the
19   contract?
20   A.    I did not.
21   Q.    And you did not tell this to Mr. Maccini?
22   A.    No.
23   Q.    And yet we're now in January, February,
24   March, April, and May and longer, 2002, correct?
25   A.    Well, that's where you want me to be

1    thinking, yes.

2        Q.    Well, that's where you were.

3        A.    Okay. Well, yes, we're there.

4        Q.    And did you ever ask Mr. Childress exactly
5    how long or approximately how long is this going to
6    take?

7        A.    Boy, yes I did.

8        Q.    And what did he say?

9        A.    Again, I can't, I can't give you the exact
10   quotation, something to the effect I'm doing the best I
11   can, we've got to follow the procedures, you know, I
12   know what I'm doing, something to that effect.

13       Q.    And to the best of your knowledge, he
14   followed those procedures?

15       A.    Yes.

16       Q.    Now, I believe the record will show that on
17   March 14, 2002, the application was filed to the zoning
18   board of appeals and then on April 10, 2002, there was
19   a hearing?

20       A.    If the record shows that then it shows that.
21   Sounds about right.

22       Q.    Within plus or minus the day.
23             And that, I think your testimony is you
24   recall attending that hearing with the zoning board of
25   appeals?

Page 130

1    A.    Yes.

2    Q.    And, in fact, that --

3          Are they nighttime meetings for that board?

4    A.    Yes.

5    Q.    And at that meeting, April 10, in fact, the

6    application for a monopole was approved; do you recall

7    that?

8    A.    I believe that is the case. And, yes, I

9    think I do recall that way, yes.

10   Q.    And, in fact, do you recall that being a

11   unanimous approval?

12   A.    Yes.

13   Q.    And subsequent to that, there was the

14   approval or the evaluation from NEPA and then the

15   environmental site assessment, which we talked about,

16   in May and June, and then do you recall in July going

17   before the zoning commission and submitting -- not

18   before -- but submitting the application in to the

19   zoning commission for approval?

20   A.    I didn't, Bill did.

21   Q.    Okay. And that was the zoning commission

22   setting up the hearing first in August and then in

23   September?

24   A.    Yes.

25   Q.    And did you attend those hearings?

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                 Don DeCesare

Page 131

```
1      A.   I did not attend the August one; I did attend
2  the September one.
3      Q.   And do you recall what the vote was in the
4  September one?
5      A.   Four to one.
6      Q.   And do you recall what the -- and that
7  constituted approval?
8      A.   Yes.
9      Q.   Do you know what was -- how many votes "for"
10 were required in order to get approval?
11     A.   Three of five.
12     Q.   If Tower Ventures had proceeded to go ahead
13 and build a tower in accordance with the approval
14 obtained in September 2002, would that have completed
15 the agreement, would the purpose of the agreement been
16 met?
17     A.   No, there were various payments that needed
18 to be made.
19     Q.   And made the payments.
20     A.   Well, I'm not sure that was the question, I'm
21 sorry.
22     Q.   If Tower Ventures had gone through with the
23 -- completed the approval process, which they did, they
24 got approval?
25     A.   Yes, they did.
```

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Page 132

1  Q. And gone ahead and built the tower and made
2  the payments --
3  A. Yes.
4  Q. -- would that have met the purpose of the
5  agreement?
6  A. Well, now you're asking --
7          MR. GRUDBERG: Objection to the form.
8  A. -- me to be a lawyer.
9  Q. What was the purpose of the agreement, in
10 your mind?
11 A. The purpose of the agreement in my mind was
12 to have a business transaction between Crossroads
13 Communications and Tower Ventures to build a
14 replacement tower and for both companies to benefit
15 from that.
16 Q. So if they had gone ahead, even though they
17 got the approval in September of 2000, a year after the
18 contract, built a tower and made the payments, the
19 purpose of the agreement would have been satisfied,
20 would it not?
21          MR. GRUDBERG: Same objection.
22 Q. In your mind.
23 A. I honestly don't know. If they had done
24 everything that they were supposed to be doing
25 including make all the payments on time that they were

1  supposed to make, then I suppose I would have a whole
2  lot less objection to what they did than I do now.
3      Q.   Okay.  But the purpose was, what you
4  testified to, the purpose of the agreement was to have
5  a business venture and put a replacement tower up and
6  sign up tenants?
7      A.   Yes.
8      Q.   And for Tower Ventures to get income from
9  tenants and to make the payments to you in accordance
10 with the agreement?
11     A.   Yes, that was the concept that we agreed to.
12     Q.   In the town of Old Saybrook what -- do you
13 know what the planning, the scope of or job description
14 or statutory description of the planning commission is
15 as different from the zoning board?
16     A.   I certainly don't know on a statutory basis.
17 I know that there are, in that town, for whatever
18 reasons, there are two boards, one called planning and
19 one called zoning, whereas in some other towns there's
20 one board that does both.
21     Q.   And in July, you went to the, when I say you,
22 Tower Ventures and Crossroads, went to the planning
23 commission after they had gone to the zoning board of
24 appeals?
25     A.   That's correct.

Page 134

1   Q.   And then after the planning commission, you
2   went to the architectural review board?
3   A.   That is correct.
4   Q.   And after the architectural review board, you
5   went to the zoning commission?
6   A.   That's correct.
7   Q.   And that was, to the best of your knowledge,
8   all required by the town regulation, ordinance or state
9   statute in order to get this approval?
10  A.   I can't comment on any of that, only that
11  Bill Childress said that's what we needed to do.
12           MR. HUMPHREY:  I have no further
13  questions.
14           MR. GRUDBERG:  I do have a very few.
15
16                  CROSS-EXAMINATION
17  BY MR. GRUDBERG:
18
19  Q.   Mr. DeCesare, Attorney Humphrey was asking
20  you questions about Exhibit 3, the complaint that was
21  filed in this case, and specifically he was directing
22  your attention to the count beginning on page 10 of
23  Exhibit 3 captioned "Breach of Implied Covenant and
24  Good Faith and Fair Dealing;" do you recall those
25  questions?

Crossroads vs Tower Ventures, Inc.
6/3/2004                                                    Don DeCesare

Page 135

1     A.    Yes.

2     Q.    Would you take a moment to just review the
3  paragraphs under the breach of covenant and good faith
4  and fair dealing count, the allegations, paragraphs 43
5  through 50 of the complaint.

6     A.    Okay, I will do that.

7           (Pause in the proceedings)

8     A.    Okay. I've read it.

9     Q.    Are you withdrawing or disavowing or is
10 Crossroads withdrawing or disavowing any of the
11 allegations that I just asked you to read, paragraphs
12 43 through 50?

13    A.    No.

14    Q.    And do those remain the basis for Crossroads'
15 allegation that there was a breach of implied covenant
16 and good faith and fair dealing by Tower Ventures in
17 this case?

18    A.    They do.

19              MR. GRUDBERG:    That's all I have.

20              MR. HUMPHREY:    No further questions.

21              (Whereupon the proceedings concluded
22 at: 2:30 p.m.)

23              (Jurat follows on page 136)

24

25

Page 136

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
 2
    - - - - - - - - - - - - - - - -
 3  CROSSROADS COMMUNICATIONS OF
    OLD SAYBROOK, LLC
 4  vs.                          No. 3:03CV459(PCD)
    TOWER VENTURES, INC.
 5  - - - - - - - - - - - - - - - -

 6       With the addition of the changes, if any,
    indicated on the attached errata sheet, the foregoing
 7  is a true and accurate transcript of my testimony given
    in the above-entitled action on June 3, 2004.
 8

 9
                       _____
10                             DON DeCESARE

11

12

13

14       Subscribed and sworn to before me, the

15  undersigned authority, on this the _____ day of

16  _____, 2004.

17

18                     _____
                               Notary Public
19

20  My commission expires:

21

22

23                                                (JVC)

24

25
```

Page 137

1                    ERRATA SHEET

2       I, DON DeCESARE, do hereby certify that the
    following corrections and additions are true and
3   accurate to the best of my knowledge and belief.

4   PAGE     LINE      CORRECTION

5   ____    ____    _____

6   ____    ____    _____

7   ____    ____    _____

8   ____    ____    _____

9   ____    ____    _____

10  ____    ____    _____

11  ____    ____    _____

12  ____    ____    _____

13  ____    ____    _____

14  ____    ____    _____

15  ____    ____    _____

16

17  _____                      _____
    Date                                 DON DeCESARE

18
        At _____, in said County of _____,
19
    This _____ day of _____, 2004 personally
20
    appeared DON DeCESARE, and he made oath to the
21
    truth of the foregoing corrections by him
22
    subscribed.
23
        Before me, _____, Notary Public
24
        My Commission Expires: _____
25

Case 3:03-cv-00459-PCD  Document 43-4  Filed 10/29/2004  Page 18 of 18

Crossroads vs Tower Ventures, Inc.
6/3/2004                                                Don DeCesare

```
                    C E R T I F I C A T E
 1
 2
 3        I, Jayne Ciccotelli, duly qualified Notary
 4   Public, in and for the State of Connecticut, do hereby
 5   certify that pursuant to notice there came before me on
 6   the 3rd day of June 2004, the following named person,
 7   to wit:  DON DeCESARE, who was by me duly sworn to
 8   testify to the truth and nothing but the truth; that he
 9   was thereupon carefully examined upon his oath and his
10   examination reduced to print under my supervision; that
11   this deposition is a true record of the testimony given
12   by the witness.
13        I further certify that I am neither attorney
14   nor counsel for nor related nor employed by any of the
15   parties to said action, in which this deposition is
16   taken.  And further, that I am not a relative or
17   employee of any attorney or counsel employed by the
18   parties hereto, or financially interested in this
19   action.
20        IN WITNESS THEREOF, I have hereunto set my
21   hand and affixed my seal the fourth day of June, 2004.
22                         _____
23                         Jayne Ciccotelli, LSR No. 215
                           Court Reporter - Notary Public
                           My Commission expires: 3/31/06
24
25
```

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81