CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 22, 2004

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF CONNECTICUT

 3

 4

 5    -----------------------------x

 6    CROSSROADS COMMUNICATIONS OF
      OLD SAYBROOK, LLC,                  :
 7
                    Plaintiff,      :
 8                                          Civil Action
          -versus-                  : No. 3:03 CV 459
 9                                             PCD
      TOWER VENTURES, INC.,          :
10
                    Defendant.       :
11
      -----------------------------x
12

13

14

15              Deposition of ROBERT MACCINI,

16    taken pursuant to the Federal Rules of Civil

17    Procedure, at the law offices of Robinson & Cole,

18    LLP, 280 Trumbull Street, Hartford, Connecticut,

19    before James A. Martone, L.S.R. #00248, a Notary

20    Public in and for the State of Connecticut, on

21    June 22, 2004, at 11:15 a.m.

22

23

24

25
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 22, 2004

Page 2

```
 1   A P P E A R A N C E S:

 2           For the Plaintiff:

 3           JACOBS, GRUDBERG, BELT & DOW, PC
             350 Orange Street
 4           New Haven, Connecticut  06503
             By:  DAVID T. GRUDBERG, ESQ.
 5

 6           For the Defendant:

 7           ROBINSON & COLE, LLP
             280 Trumbull Street
 8           Hartford, Connecticut  06103
             By:  STEVEN R. HUMPHREY, ESQ.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES

June 22, 2004

Page 3

```
 1                    WITNESS INDEX

 2                                          PAGE

 3      Direct Examination by Mr. Grudberg      4

 4

 5

 6                    EXHIBIT INDEX

 7   PLAINTIFF'S        DESCRIPTION        PAGE

 8
         12    E-mail with Attached Letter    127
 9             dated October 4, 2002

10       13    E-mail with Attached Letter    127
               dated October 8, 2002
11
         14    Letter dated September 10, 2002   138
12
         15    Answer and Affirmative Defenses   140
13             of Defendant, Tower Ventures, Inc.

14       16    E-mail dated April 11, 2002      150

15       17    E-mail dated September 18, 2002   154

16       18    E-mail dated September 24, 2002   154

17       19    E-mail dated October 1, 2002 with   154
               Attached Tower Lease Agreement
18

19   NOTE:  Exhibits retained by counsel.

20

21

22

23

24

25
```

```
 1    R O B E R T    M A C C I N I,

 2    8 Newell Drive, Cumberland, Rhode Island 02864,

 3         called as a witness, having been first duly

 4         sworn by James A. Martone, L.S.R., a Notary

 5         Public in and for the State of Connecticut,

 6         was examined and testified as follows:

 7    DIRECT EXAMINATION

 8    BY MR. GRUDBERG:

 9         Q.   Good morning, Mr. Maccini.

10         A.   Good morning.

11         Q.   My name is David Grudberg and I

12    represent Crossroads Communications of Old

13    Saybrook, LLC, in connection with the lawsuit

14    that's been brought against Tower Ventures,

15    Incorporated.

16               Have you ever had your deposition

17    taken before?

18         A.   Yes.

19         Q.   So you're generally familiar with the

20    process we're going to be going through this

21    morning.

22         A.   Yes.

23         Q.   Let me -- for the sake of completeness,

24    notwithstanding your experience, let me go over a

25    few ground rules that I hope will make everything
```

1    go more smoothly today.

2              I'm going to be asking you a

3    series of questions.  I'd ask that you answer out

4    loud, rather than with a nod of the head or some

5    nonverbal gesture, so the court reporter can take

6    down what you say.  Okay?

7        A.    Okay.

8        Q.    I will try as best I can to not speak

9    over you, and I'd ask you to, as best you can, to

10   try to let me complete my questions before you

11   begin your answers.  Is that fair?

12       A.    Yes.

13       Q.    Okay.  If you don't understand one of

14   my questions, please ask me to rephrase it and

15   I'll be happy to do so.  Okay?

16       A.    Okay.

17       Q.    And if you go ahead and answer one of

18   my questions without asking me to rephrase it,

19   I'll assume that you've understood it.  Is that

20   fair?

21       A.    Yes.

22       Q.    Okay.  If you need a break at any time,

23   either to consult with your counsel or for any

24   reason at all, please let me know and I'll be

25   happy to accommodate you.  Okay?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 6

1      A.    Very good.

2      Q.    The only thing I'd ask is that if there

3  is a question pending when ask you for a break,

4  that you answer the pending question before we

5  break.  Is that fair?

6      A.    Yes.

7      Q.    What type of proceedings have you given

8  deposition testimony in before?

9      A.    Are we going to differentiate between

10  expert witness and depositions or -- just

11  depositions?

12      Q.    I'm just asking about depositions now.

13      A.    All right.  In communication

14  tower-related cases, and also regarding radio and

15  television stations.

16      Q.    Is this during the time you've been

17  affiliated with Tower Ventures?

18      A.    Yes, and prior.

19      Q.    Okay.  You mentioned serving as an

20  expert witness.  I gather from what you've said

21  that you have served as an expert witness on at

22  least one occasion; is that correct?

23      A.    Actually, on numerous occasions.

24  Actually through another business I'm involved

25  with, Media Services Group, I've acted as a

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 7

```
 1   federal district court receiver in a number of
 2   cases throughout the country involving radio and
 3   cable television systems, and during the course
 4   of those proceedings, have testified on numerous
 5   occasions.  And also in the valuation area of
 6   radio, television, cable television systems, have
 7   served as an expert witness, regarding various
 8   valuation type issues.
 9       Q.   The circumstances when you've been
10   appointed by say a federal court in a
11   receivership proceeding to serve as an expert,
12   was that with respect to valuation or some other
13   aspect of the radio/television business?
14       A.   Primarily on valuation type issues.
15   But also on other potential issues as well.
16       Q.   You mentioned this other business that
17   you had, mediation was it?
18       A.   Media Services Group.
19       Q.   Media Services Group.  That's a
20   business you -- well, tell me about that
21   business.  What is it?
22       A.   Okay.  Media Services Group was formed
23   in 1990 by six principals, of which I am one.
24   Today Media Services Group is the largest broker
25   of radio and television stations in the country.
```

```
 1   And we represent buyers and sellers of radio and

 2   TV stations.  We also perform valuation of TV and

 3   radio stations, and also are involved in the

 4   investment banking side of raising financing,

 5   debt and equity for groups that are buying radio

 6   and TV stations.

 7        Q.    So you've been involved with that group

 8   from 1990 to the present?

 9        A.    That's correct.

10        Q.    Okay.  Let's back up a little bit and

11   review your personal background.

12               Tell me -- would you review with

13   me, please, your educational background,

14   beginning college?

15        A.    I graduated from the College of the

16   Holy Cross with a BA in economics in 1981, and

17   then obtained an MBA in finance from Babson

18   College in 1983.

19        Q.    All right.  Where did you go to work

20   after obtaining your MBA?

21        A.    I went to work for Old Stone Bank,

22   which is a six billion dollar federal savings

23   bank in Providence, Rhode Island.  I went through

24   approximately four months through the credit loan

25   training program, and then went to work for the
```

Page 9

```
 1    Communications Lending Group, where we used to

 2    lend on a nationwide basis to radio, television,

 3    cable, newspaper, outdoor paging companies, and

 4    eventually became the head of that group, and --

 5    should I continue on with --

 6        Q.    Well, for how long were you with Old

 7    Stone Bank?

 8        A.    From '83 through '88.

 9        Q.    When you left in '88, were you -- what

10    was your position?  Were you head of the

11    Communications Lending Group?

12        A.    Head of the Communications Lending

13    Group, yes.

14        Q.    What position did you take upon leaving

15    Old Stone Bank?

16        A.    I formed an investment banking

17    subsidiary for what was then the oldest and

18    largest broker of radio, TV and cable systems,

19    company called Chapman Associates.  And we formed

20    Chapman Financial Services in Boston primarily

21    involved in the investment banking arena in,

22    again, the broadcasting kind of industry, in

23    terms of securing financing, debt and equity for

24    groups that were buying or needed to refinance

25    their companies.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 22, 2004

Page 10

```
 1        Q.    You said you formed the subsidiary.
 2   Did you have an ownership interest in that
 3   company?
 4        A.    No.
 5        Q.    For how long were you with the Chapman
 6   Financial Services?
 7        A.    '88 until 2000, when six of us left
 8   that company to form Media Services Group.
 9        Q.    You said you do have an ownership
10   interest in Media Services Group; is that
11   correct?
12        A.    Yes.
13        Q.    Is it a corporation?
14        A.    Yes.
15        Q.    And what's your title with Media
16   Services Group?
17        A.    I'm a director.
18        Q.    We're up to the present and we haven't
19   touched upon the entity that brings us here
20   today.  So we need to loop back a little bit.
21              You currently hold a position also
22   with Tower Ventures, Incorporated; is that
23   correct?
24        A.    Yes, that's correct.
25        Q.    For how long have you -- what's your
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 11

```
 1    current position?
 2         A.    I'm the chief operating officer and
 3    CFO.
 4         Q.    How long have you held that position?
 5         A.    This present iteration of Tower
 6    Ventures was formed in 2000.  So since 2000.
 7         Q.    Okay.  When you say "present
 8    iteration," are you talking about Tower Ventures,
 9    Incorporated or some other entity?
10         A.    Well, we had another entity called
11    Tower Ventures, that actually was a Rhode Island
12    corporation, that we sold to American Tower on
13    November 15th, 2000.  And we kept our name, we
14    kept all our people, and we started over again,
15    as Tower Ventures, Inc., a Massachusetts
16    corporation.
17         Q.    Okay.
18         A.    Maybe it was vice versa.  I think it
19    was Massachusetts and then became a Rhode Island
20    corporation.
21         Q.    So Tower Ventures, Inc. has been a
22    Rhode Island corporation, as best you remember,
23    formed at some point in 2000; is that correct?
24         A.    Yes.
25         Q.    Without regard to TVI, Tower Ventures,
```

 1    Incorporated, or its predecessor, how long have

 2    you been affiliated with Tower Ventures,

 3    generally?

 4         A.    You mean involved in the Tower

 5    business?

 6         Q.    Let's back up.  You said there was a

 7    predecessor entity that became -- well, that's

 8    incorrect based upon your description, but the

 9    present Tower Ventures, Incorporated dates back

10    to sometime in November of 2000, correct?

11         A.    Correct.

12         Q.    You had involvement with some business

13    known generally by the name of Tower Ventures,

14    before that date; is that correct?

15         A.    Correct, right.

16         Q.    How far back did that involvement date?

17         A.    Approximately 1997, although the -- the

18    company that -- well, the original Tower Ventures

19    started in 1992, and its name actually was

20    Aritaur Realty and it was changed to Tower

21    Ventures, Inc.  A-r-i-t-a-u-r.

22         Q.    All right.  You said you came on board

23    in 1997; is that correct?

24         A.    Well, I invested personally in Aritaur

25    Communications, and also in Aritaur Realty.  That

Page 13

1    was approximately 1995-96, but Aritaur is

2    primarily a radio station company.

3         Q.   Now, you mentioned --  Withdrawn.

4              Is Aritaur still -- Aritaur is no

5    longer --

6         A.   Aritaur still exists.

7         Q.   It still exists.  Who are the

8    principals of Aritaur?

9         A.   Myself, Joseph Gallagher, Bill

10   Collatos, Kevin Landry, and Brian Applegate.

11        Q.   You said earlier that at some point in

12   1997, you joined Tower Ventures, in some

13   capacity; is that correct?

14        A.   Well, again, Aritaur Realty was kind of

15   the holding company for all the towers and real

16   estate of the radio company, Aritaur

17   Communications, Inc., and it continued to kind of

18   hold the real estate and towers.  And in 1997, we

19   decided to expand and to buy and to develop

20   communication towers as more of a full-time

21   business.  And that's when we changed the name

22   from Aritaur Realty to Tower Ventures.

23        Q.   So you've had an ownership interest in

24   what was -- what ultimately became Tower Ventures

25   since that '95-96 date that you referenced,

June 22, 2004

1    correct?

2        A.    Correct.

3        Q.    For how long have you been COO and CFO

4    of Tower Ventures, Incorporated?

5        A.    Well, in this entity since the --

6        Q.    Since its inception?

7        A.    Since its inception, right.

8        Q.    Were you either COO or CFO of its

9    predecessor, Tower Ventures?

10       A.    Yes.

11       Q.    And did you hold that position from its

12   inception, from the point when you went from

13   being Aritaur Realty to the first Tower Ventures?

14       A.    No.

15       Q.    When did you become COO and CFO of the

16   first Tower Ventures?

17       A.    I don't recall the exact date.

18       Q.    Sometime between '97 and 2000; is that

19   fair?

20       A.    Yes.  I would say more the '97 time

21   frame.

22       Q.    Okay.  And did the assumption of those

23   positions, COO and CFO, of the two Tower Ventures

24   entities that we're talking about, did that cause

25   you to alter your involvement in any way in the

```
 1    Media Services Group that we're been talking
 2    about?
 3         A.    Slightly.  I have two people who work
 4    for me in the Providence office, who are kind of
 5    Media Services Group employees.  So they do a lot
 6    of the day-to-day work and just report to me.  So
 7    I kind of oversee the larger picture and they do
 8    the actual day-to-day work.
 9         Q.    And this is Media Services Group we're
10    talking about?
11         A.    This is Media Services Group.
12         Q.    So since your involvement with Tower
13    Ventures, you have been less involved on a
14    day-to-day basis with Media Services; is that
15    fair?
16         A.    Yes.
17         Q.    In a typical workweek, as we speak now,
18    is the Tower Ventures, Incorporated job a -- you
19    know, a full-time job for you?  Are you in an
20    office there for 40-plus hours a week?
21         A.    Yes.
22         Q.    And you said you've got a Providence
23    office with the other company.  Do you typically
24    spend time in that office?
25         A.    Well, actually, the companies share
```

Page 16

```
 1    offices, so Media Services Group and Tower
 2    Ventures share offices.
 3         Q.    Who are the principals of Tower
 4    Ventures, Incorporated?
 5         A.    Myself, Joseph Gallagher, Sandra
 6    Greenspan, Keenan Brinn, and Christopher Ciolfi,
 7    C-i-o-l-f-i.
 8         Q.    C-h-i --
 9         A.    No.  No H.
10         Q.    Okay.  And do you know what percentages
11    each individual you just mentioned holds in TVI?
12         A.    Joseph Gallagher and I own roughly I'm
13    going to say 97 percent.  And the remaining three
14    own the remainder.
15         Q.    Is that 97 percent between you and Mr.
16    Gallagher split evenly?
17         A.    Yes.
18         Q.    Now, I've seen I believe references,
19    either in print or in records, to a Tower
20    Ventures II.  Is that a separate entity?
21         A.    Tower Ventures, Inc. is a member of
22    Tower Ventures II, LLC, a Delaware limited
23    liability company.
24         Q.    And when was Tower Ventures II, LLC
25    formed?
```

Case 3:03-cv-00459-PCD    Document 43-5    Filed 10/29/2004    Page 17 of 40
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                      June 22, 2004

Page 17

1          A.    In -- I'm not sure of the exact date,

2    but sometime in 2002.

3          Q.    Why was that done?

4          A.    Let's see.  Why was -- we actually

5    secured an equity investment from a venture

6    capital fund called Seaport Capital, and we

7    formed a new LLC.  And Seaport, or various

8    Seaport entities, and Tower Ventures, Inc. became

9    the members.

10         Q.    Describe for me the business of Tower

11   Ventures, Incorporated.

12         A.    Well, Tower Ventures, Inc. is a member

13   of Tower Ventures II, LLC.  And today we conduct

14   business really through Tower Ventures II, LLC.

15   When we formed the LLC, Tower Ventures, Inc.

16   contributed all of its assets to Tower Ventures

17   II.

18         Q.    How about its potential liabilities?

19         A.    What about potential liability?

20         Q.    Did Tower Ventures -- you said Tower

21   Ventures, Inc. contributed its assets to Tower

22   Ventures II, LLC.  What about the liabilities of

23   Tower Ventures, Inc.?

24         A.    No liabilities were assumed.

25         Q.    Suppose Tower Ventures, Incorporated is

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 22, 2004

Page 18

1    found liable in connection with this lawsuit,

2    does it have the assets to pay a judgment?

3              MR. HUMPHREY:   Objection on the

4    grounds of calling for a legal conclusion.

5         Q.   What assets does, to your knowledge,

6    does Tower Ventures, Incorporated currently have?

7         A.   $10,000 in a bank account.

8         Q.   Is there an agreement, to your

9    knowledge, in connection with the asset transfer

10   from Tower Ventures, Incorporated to Tower

11   Ventures II, LLC?

12        A.   Agreement -- regarding what?

13        Q.   You said there was apparently a

14   transaction whereby the assets of Tower Ventures,

15   Incorporated were transferred to Tower Ventures

16   II, LLC, correct?

17        A.   Uh-huh.

18        Q.   And my question is, was that done

19   pursuant to any written agreement, that you're

20   aware of?

21        A.   Yes.

22        Q.   Was there a law firm that assisted in

23   that transaction?

24        A.   Yes.

25        Q.   What law firm was that?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                     June 22, 2004

Page 19

```
 1        A.    Cameron & Middleman.

 2        Q.    And was there a lawyer there that --

 3   well, there's been reference to a John Wolfe,

 4   whose name pops up from that firm in connection

 5   with this transaction.  Did Mr. Wolfe assist in

 6   connection with the transaction we've been

 7   discussing?

 8        A.    Yes.

 9        Q.    And he, to the best of your knowledge,

10   would have the agreement?

11        A.    Yes.  He would have a copy.

12        Q.    Do you know whether Tower Ventures,

13   Incorporated has a copy?

14        A.    I believe we do, yes.

15        Q.    Would you have any objection to

16   providing a copy of that agreement if I request

17   that through your counsel?

18        A.    Yes.

19        Q.    Why is that?

20        A.    It's confidential in terms of the

21   terms -- it's a separate kind of business

22   arrangement, and --

23        Q.    The date of this transaction you said

24   was at some point in 2002, correct?

25        A.    Correct.
```

Page 20

```
 1        Q.    Do you remember whether it was the

 2   latter half or the first half of 2002?

 3        A.    The actual transaction with Seaport

 4   took place on August 28th, I believe.

 5        Q.    When you say the actual transaction

 6   with Seaport, are you talking about -- well, what

 7   are you talking about?

 8        A.    That's the closing, when they invested

 9   probably $6 million and we contributed our

10   assets.

11        Q.    Seaport invested about six million in

12   the newly-formed entity, Tower Ventures II, LLC?

13        A.    Yes.

14        Q.    And Tower Ventures, Incorporated's

15   contribution to that was all of its assets?

16        A.    Correct.

17        Q.    You understand that we've brought a

18   lawsuit against Tower Ventures, Incorporated,

19   correct?

20        A.    Uh-huh.

21              MR. HUMPHREY:   You have to answer

22   "yes" or "no."

23        A.    Yes.

24        Q.    And it's your position that it's

25   irrelevant what Tower Ventures, Incorporated
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 21

 1    might have done with all of its -- all or almost

 2    all of its assets in late August or September of

 3    2002?

 4                    MR. HUMPHREY:  Object to the

 5    form.

 6        A.    I'm not saying it's irrelevant.

 7        Q.    Well, let me get back to the simpler

 8    way I asked this.

 9                    If Tower Ventures, Incorporated is

10    held liable in this lawsuit, will it honor a

11    judgment?

12        A.    If it has the ability to, yes.

13        Q.    Okay.  And is it your position, as you

14    sit here, that the only assets of Tower Ventures,

15    Incorporated that are available to satisfy a

16    judgment are approximately $10,000 that you

17    referenced before?

18        A.    I don't know, because I think it

19    involves some legal kind of opinions and

20    conclusions, which are, at this point, outside my

21    realm, and I have not researched this matter

22    either so --

23        Q.    All right.  Are you certain that Tower

24    Ventures II, LLC did not acquire both the assets

25    and liabilities of Tower Ventures, Incorporated?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 22, 2004

Page 22

```
 1        A.    Yes.   It acquired -- we contributed the

 2   assets but they were free and clear of

 3   liabilities.

 4        Q.    Since that date, that late August 2002

 5   transaction where Tower Ventures II, LLC came

 6   into being, has Tower Ventures -- what, if any,

 7   business has Tower Ventures, Incorporated

 8   conducted?

 9        A.    None.

10        Q.    Okay.   Do you draw a paycheck on a

11   regular basis?

12        A.    Yes.

13        Q.    And against whose account is that

14   drawn, against what entity?

15        A.    Tower Ventures II.

16        Q.    And that's been the case since the

17   August 2002 transaction that we've been

18   discussing?

19        A.    That's correct.

20        Q.    Prior to that, it was Tower Ventures,

21   Incorporated?

22        A.    That's correct.

23        Q.    The approximately $10,000 in assets

24   that you talked about for Tower Ventures,

25   Incorporated, what does that consist of?  Is that
```

June 22, 2004

```
 1   just a bank account?

 2        A.    Just a bank account.

 3        Q.    And for how long has that been the

 4   approximate asset value of Tower Ventures,

 5   Incorporated?

 6        A.    I don't recall.

 7        Q.    Back when the transaction with Tower

 8   Ventures II was consummated in 2002, were -- I

 9   take it Tower Ventures, Incorporated had

10   substantially more than $10,000 in assets,

11   correct?

12        A.    Correct.

13        Q.    Can you tell -- describe for me what

14   assets Tower Ventures, Incorporated transferred

15   to Tower Ventures II in connection with this 2002

16   transaction that we've been discussing.  Were

17   there bank accounts?

18        A.    No.  Primarily tower sites located

19   throughout New England and work in process.  Only

20   things that kind of go into developing additional

21   tower sites.

22        Q.    I take it there was an investment bank

23   or some banking entity that assisted in this

24   transaction we've been discussing; is that

25   correct?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 24

1       A.    Yes.

2       Q.    And in connection with the banking work

3   that was done, do you know whether there was an

4   effort made to value the assets of Tower

5   Ventures, Incorporated that TVI was contributing

6   to the new entity?

7       A.    Yes.

8       Q.    And do you know what Tower Ventures,

9   Incorporated's assets were valued at back in or

10  about August of 2002?

11      A.    I don't recall.

12      Q.    Can you give me an approximate figure?

13      A.    Somewhere in the eight to 12 million

14  dollar range.

15      Q.    So in or about late August of 2002, the

16  assets of Tower Ventures, Incorporated went from

17  approximately eight to 12 million dollars to

18  approximately $10,000; is that fair?

19      A.    On August 28th, yes.

20      Q.    And from that point forward, they've

21  been approximately $10,000?  The --

22      A.    I don't recall the exact amount, but I

23  know the bank account balance probably has

24  varied.  I'm not sure what it was back then.  And

25  again today, it's approximately $10,000.  But --

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                              June 22, 2004

Page 25

1        Q.    I'm not looking to hold you to exact

2    figures.

3        A.    Uh-huh.

4        Q.    When we're talking about variations,

5    we're talking about variations due to bank

6    charges or small interest accruals, things of

7    that nature?

8        A.    It would be some miscellaneous expenses

9    of Tower Ventures, that Tower Ventures would

10   pay.  Whether the bank balance -- you know, 40 or

11   50 thousand dollars at the time of August 28th,

12   and it's 10,000 now, you know, I'm not sure what

13   the bank balance was on August 28th.

14       Q.    I'm not looking to hold you to exact

15   figures, Mr. Maccini.  I'm just trying to get a

16   feel as to the range.  I just want to make sure

17   we're not talking about fluctuations up to a

18   million dollars and back then to 20,000.

19       A.    I can tell that you it's definitely

20   under $100,000.

21       Q.    From August 28th of 2002 to the present

22   date?

23       A.    Right.

24       Q.    Okay.  Now, TVI, prior to August 28th,

25   2002, was in what business?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES

June 22, 2004

Page 26

1      A.    The development of telecommunications

2   towers.

3      Q.    For how long had it been in that

4   business?

5      A.    Since roughly -- under its kind of

6   predecessor, if you want to go back kind of that

7   far, since about 1997.

8      Q.    Do you know approximately -- as of say

9   August 2002, do you know approximately how many

10  telecommunications towers TVI and its predecessor

11  had developed?

12     A.    Thirty.

13     Q.    So it's fair to state that the company

14  had significant experience in developing

15  telecommunications towers as of 2001 and 2002,

16  correct?

17     A.    Yes.

18     Q.    Was there a particular geographic limit

19  or geographic concentration for TVI's development

20  of towers?

21     A.    Yes, in New England.

22     Q.    So all of the approximately 30 towers

23  that you mentioned that TVI and its predecessor

24  had developed were in New England?

25     A.    Correct.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                           June 22, 2004

Page 27

1        Q.    Do you know roughly how many of those

2   30 would have been in Connecticut?

3        A.    Probably four or five.

4        Q.    What state did you have the most in?

5        A.    Massachusetts.

6        Q.    Roughly how many there?

7        A.    I don't recall.

8        Q.    Now, the agreement that gives rise to

9   the lawsuit that brings us here today was signed

10  I believe in September of 2001.  As of that date,

11  do you know how many towers TVI or its

12  predecessor had been involved in developing in

13  Connecticut?

14       A.    Just a handful.  I'm not sure whether

15  it was two or four.

16       Q.    Okay.  I mean you mentioned a total of

17  approximately four or five in Connecticut of the

18  30.

19       A.    Uh-huh.

20       Q.    You don't recall whether all of those

21  four or five were before the Crossroads agreement

22  was signed?

23       A.    Well, I can tell you that when the

24  Crossroads agreement was signed, I don't believe

25  we had any towers in the new Tower Ventures.  So

```
 1    I'm really referring back to the previous Tower
 2    Ventures.
 3         Q.    And that's the entity that you think
 4    had somewhere between two and four in Connecticut
 5    as of that date?
 6         A.    Right.
 7         Q.    Is there any other business that Tower
 8    Ventures was engaged in other than the
 9    development of telecommunications towers?
10         A.    No.
11         Q.    So it's fair to state, Mr. Maccini,
12    that as of September 2001, you felt that you had
13    substantial expertise in the field of
14    telecommunications tower development?
15         A.    Yes.
16         Q.    Okay.  When did you first become
17    familiar with a company called Crossroads
18    Communications of Old Saybrook?
19         A.    I don't recall the exact date.
20         Q.    Can you give me the year?  Do you
21    recall what year it was?
22         A.    I know that we had some discussions
23    with Mr. DeCesare in kind of the prior Tower
24    Ventures, and then when we formed the new
25    company, we kind of picked up our conversations
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 29

1    again.

2        Q.    The new company you said began in 2000,

3    right?

4        A.    Correct.

5        Q.    So at some point prior to 2000 -- well,

6    discussions with Mr. DeCesare, when do you first

7    recall meeting Mr. DeCesare?

8        A.    I know that Keenan Brinn and I traveled

9    to his radio station offices and I believe that

10   was again in the old portfolio.  So that would

11   have been prior to 2000.

12       Q.    All right.

13       A.    I'm not sure exactly when we met, just

14   previous to, or kind of during the period of

15   negotiation of the agreement in question.

16       Q.    This first meeting that you can recall

17   with yourself, Mr. Brinn and Mr. DeCesare, do you

18   remember how it was that Mr. DeCesare or

19   Crossroads came to your attention?

20       A.    I don't.

21       Q.    Do you remember how it was that this

22   meeting came to be set up?  Did you contact Mr.

23   DeCesare?

24       A.    I think Mr. Brinn may have done that.

25       Q.    Was Tower Ventures -- this I guess

Page 30

```
 1   would be the initial incarnation of Tower

 2   Ventures.   Was Tower Ventures actively seeking

 3   potential tower development sites?

 4        A.   Yes.

 5        Q.   Do you think it would have been in

 6   connection with that quest that Mr. DeCesare

 7   and/or Crossroads came to Tower Ventures'

 8   attention?

 9        A.   Correct.

10        Q.   Do you remember whether you met with

11   Mr. DeCesare in Old Saybrook or Middletown?

12        A.   In Middletown.

13        Q.   And do you remember what you discussed?

14        A.   Just the fact that he had two tower

15   sites, one in Old Saybrook, and one on Route 9 --

16   I forget the exact town that it was actually

17   located in -- and that he was interested in

18   developing them into a telecommunications type

19   business.

20        Q.   Did you ask him whether he was

21   interested in developing them or he indicated to

22   you he was?

23        A.   I don't recall.

24        Q.   I just want to make sure we're clear

25   what parcels of land we're talking about.  One of
```

Page 31

1    them is the parcel of land that's at issue in the

2    agreement that's the subject of the lawsuit?

3         A.    Correct.

4         Q.    And the Route 9 property you're talking

5    about is near the intersection of Route 9 and

6    I-95; is that correct?

7         A.    Let's --

8         Q.    Let me ask you this.  You met with them

9    in Middletown?

10        A.    Yes.

11        Q.    Route 9 also runs through Middletown

12   and it's my understanding there's a parcel of

13   land owned by Crossroads up in Middletown.  When

14   you're talking about Route 9 -- a Route 9 piece

15   of land for potential tower development, were you

16   talking about Middletown or were you talking

17   about a parcel on Route 9 closer to Old Saybrook?

18        A.    Initially I think both.

19        Q.    So there were actually three pieces of

20   land then?

21        A.    Well, there's one on Route 9, and then

22   there's -- I forget what town it's in, and then

23   there's one at the radio station where his towers

24   are located, in -- is it Downtown Middletown?

25   And I believe that property is not owned, it's

1    leased.  But he does own the towers.

 2        Q.    Do you remember there being another

 3    Route 9 parcel closer to Old Saybrook near the

 4    intersection of Route 9 and I-95, do you remember

 5    any discussion about that?

 6        A.    Well, there's a site I believe a couple

 7    of miles up on Route 9 that is the AM tower site

 8    for one of his stations, because I believe he

 9    owns two AM stations.

10        Q.    This initial meeting, did anything

11    concrete by way of business come of the initial

12    meeting with Mr. DeCesare and yourself and Mr.

13    Brinn?

14        A.    No.

15        Q.    Can you recall anything else that was

16    discussed at that initial meeting?

17        A.    No.

18        Q.    I'm just trying to get a flavor.  Were

19    you discussing broad concepts?  Were you

20    discussing specific dollar figures?

21        A.    Broad concepts.

22        Q.    "Gee, would you be interested in

23    potentially developing a communications tower,"

24    that sort of thing?

25        A.    It was just an introductory type of

Page 33

```
 1   meeting.
 2        Q.    "This is who we are, this is what we
 3   do, maybe we can do business," that sort of
 4   thing?
 5        A.    Correct.
 6        Q.    And nothing came -- nothing immediate
 7   came out of that meeting, right?
 8        A.    Correct.
 9        Q.    Now, later obviously there is further
10   talk because it ultimately leads to an agreement,
11   finalized in September 2001, right?
12        A.    Correct.
13        Q.    You're familiar with that agreement?
14        A.    Correct.
15        Q.    Have you read it recently?
16        A.    Yes.
17        Q.    Did you read it to help prepare for the
18   deposition?
19        A.    Yes.
20        Q.    Okay.  The discussions that led to the
21   agreement being entered into between Tower
22   Ventures, Inc. and Crossroads, do you remember
23   when they began?
24        A.    No.
25        Q.    Do you remember how they began?   In
```

 1    other words, whether Tower Ventures contacted Mr.

 2    DeCesare again, whether he reached out for you or

 3    someone else with Tower?

 4        A.    No.

 5        Q.    What's the first time you can recall

 6    becoming aware of renewed discussions with Mr.

 7    DeCesare and Crossroads on the subject of

 8    development of a telecommunications tower?

 9        A.    Sometime in 2001, but I cannot recall

10    the exact date.

11        Q.    We've mentioned Mr. Brinn several

12    times.  What's Mr. Brinn's title in the company?

13        A.    He's a site development manager.

14        Q.    And was that his position back in 2001

15    as well?

16        A.    Yes.

17        Q.    What would the responsibilities be of a

18    site development manager?

19        A.    He was responsible for locating

20    potential tower sites, or tower development

21    opportunities, and then would take that site

22    through the zoning process and at the same time

23    be marketing the sites to potential tenants.

24        Q.    Back in 2001, how many employees did

25    TVI have?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 22, 2004

Page 35

```
 1        A.    Approximately eight.

 2        Q.    Were there other site development

 3   managers besides Mr. Brinn?

 4        A.    Yes.

 5        Q.    And was Mr. Brinn assigned to a

 6   particular territory?

 7        A.    Yes.

 8        Q.    What was his territory?

 9        A.    Eastern Connecticut, Rhode Island, and

10   Eastern Massachusetts.

11        Q.    How many other site development

12   managers were there?

13        A.    Approximately five.

14        Q.    Was each of them assigned to a

15   different exclusive territory?

16        A.    Correct.

17        Q.    Seems like Mr. Brinn was covering a

18   pretty fair amount of real estate there.  I'm

19   just curious as to what was left for the other

20   five.

21        A.    Well, there's someone in -- that

22   handled kind of Rhode Island, who reported to Mr.

23   Brinn.

24        Q.    All right.

25        A.    Yes.
```

```
 1        Q.    Was there someone who handled the
 2   balance of Connecticut?
 3        A.    Actually, two people who handled kind
 4   of the balance of Connecticut.
 5        Q.    Who were they?
 6        A.    David Vivian and Chris Ciolfi.
 7        Q.    Did either Mr. Vivian or Mr. Ciolfi, to
 8   your knowledge, have any involvement in the
 9   Crossroads Communications deal that is the
10   subject of this lawsuit?
11        A.    No.
12        Q.    And did they report to Mr. Brinn or did
13   they report to you?
14        A.    They -- Chris reported to Joe Gallagher
15   and Dave kind of split his reporting.
16        Q.    To whom did Mr. Brinn report?
17        A.    To me.
18        Q.    What was Mr. Gallagher's title back in
19   2001?
20        A.    He was the president of Tower
21   Ventures.
22        Q.    And the two of you were the main
23   principals of the company.  How did you divide
24   responsibility for running the company?  What
25   were your primary functions, what were Mr.
```

June 22, 2004

```
 1   Gallagher's primary functions?

 2        A.    It was primarily along geographic

 3   lines.

 4        Q.    So what geographic territory did you

 5   take responsibility for?

 6        A.    The areas that Mr. Brinn -- that I just

 7   previously recited, and also the state of Maine.

 8        Q.    So that would be Eastern Connecticut,

 9   Eastern Massachusetts, Rhode Island and Maine?

10        A.    And Maine, right.

11        Q.    Mr. Gallagher took care of the rest of

12   Massachusetts, the rest of Connecticut, Vermont,

13   New Hampshire?

14        A.    Correct.

15        Q.    And did you and Mr. Gallagher

16   essentially perform identical parallel functions

17   divided only by that geographic break?

18        A.    For the most part, except I negotiated

19   all of the ground leases and tenant leases that

20   Tower Ventures entered into.

21        Q.    By tenant leases, we're talking about

22   broadband or cellular carriers; is that right?

23        A.    Correct.

24        Q.    Broadband is a synonym for cellular.

25   You know, when I think of a cellular phone, that
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 38

```
 1    is -- that works in part due to broadband tenants

 2    leasing space on towers such as the ones we've

 3    been talking about, correct?

 4         A.    Correct, and on other structures like

 5    smokestacks and water tanks.

 6         Q.    Anything that goes up high in the air?

 7         A.    Anything with height.

 8         Q.    And there are other electronic media

 9    that potentially rent space on towers, like the

10    ones that we're talking about; is that correct?

11         A.    Yes.

12         Q.    Those are generally referred to as

13    what, non-broadband tenant?

14         A.    Narrowband, things like paging and

15    two-way.  Broadcasting, that would be radio and

16    television.  And then there's a whole host of

17    other services.

18         Q.    And Tower Ventures was -- did not limit

19    its business to one particular segment; is that

20    fair?

21         A.    I would say that most of the towers

22    that we're constructing are under 200 feet, and

23    in that arena, when you get to a tower of that

24    height, you're principally looking at cell phone

25    carriers.  Also, we're in the period when paging
```

```
 1    has declined dramatically and almost ceases to

 2    exist as a business anymore.  So the primary use

 3    of an under 200-foot tower today would be your

 4    cell phone carriers.

 5         Q.   When you say paging has declined or

 6    almost ceased to exist, you're talking present

 7    day now, correct?

 8         A.   Well, present day and for the last

 9    approximately 10 years, it's been on a decline.

10    In the last five years, it has -- the decline has

11    been pretty precipitous.  There's been a number

12    of Chapter 11 filings by the paging companies.

13         Q.   I'm just trying to differentiate

14    between now and the date of the agreement.  I

15    gather from your answer that back in 2001,

16    September of 2001, the narrowband or the paging

17    industry, in your view, was an industry in

18    serious decline; is that correct?

19         A.   Correct.

20         Q.   Okay.  Why is that?  Because the cell

21    phones have text messaging now and that's largely

22    supplanted it?

23         A.   Correct.

24         Q.   You said you became aware of

25    negotiations concerning a potential deal with
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 40

```
 1    Crossroads at some point in 2001; is that
 2    correct?
 3         A.    Right.
 4         Q.    Do you remember who you learned about
 5    it from?
 6         A.    No, I don't recall whether it was
 7    directly from Mr. DeCesare or whether it was
 8    through Mr. Brinn.
 9         Q.    That's Michael Brown you're talking
10    about?
11         A.    No.  Mr. Brinn.
12         Q.    I'm sorry, I misheard you.
13               Do you remember whether you met
14    with Mr. DeCesare at some point in 2001, to
15    discuss again the possibility of doing a deal
16    together?
17         A.    I don't recall.
18         Q.    Do you remember whether you met with
19    him at any point prior to signing the agreement
20    with Crossroads?
21         A.    I don't recall.
22         Q.    Do you remember being presented with
23    drafts of an agreement or a proposed agreement
24    with Crossroads to develop a communications
25    facility?
```