CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                      June 22, 2004

1    A.    Yes, we obviously obtained drafts of

2    documents, yes.

3    Q.    Do you remember reviewing those drafts

4    as part of your day-to-day duties with TVI,

5    particularly with respect to that geographical

6    area?

7    A.    Yes.

8    Q.    Would it have been the normal course of

9    your work for TVI that you would have been the

10   one -- you would have been a person who reviewed

11   drafts of agreements concerning potential tower

12   development sites?

13   A.    Yes.

14   Q.    Do you know whether Mr. Brinn was

15   involved in a more direct fashion with Mr.

16   DeCesare prior to the execution of the September

17   2001 agreement?

18   A.    What do you mean by that?

19   Q.    Let me ask it this way.  Do you know

20   whether Mr. Brinn had any involvement in the

21   negotiation of an agreement with Mr. DeCesare and

22   Crossroads, to develop a communications facility

23   or communications tower?

24   A.    Not of the agreement itself, no.

25   Q.    Would it be fair to state that Mr.

1    Brinn's involvement typically would be after an

2    agreement is signed, his role would typically be

3    to come in and make the deal happen, help get the

4    appropriate approvals, help find tenants for the

5    structure that you're planning to build?

6         A.    Primarily, but also kind of assessing

7    the site, you know, prior to execution of the

8    agreement as well.

9         Q.    All right.  I'm just trying to get a

10   sense, Mr. Maccini, of who it is within the

11   company -- you know, I take it that there was

12   some negotiation back and forth preceding the

13   final execution of an agreement with Crossroads

14   in September 2001, right?

15        A.    Right.

16        Q.    And what I'm trying to get a sense of

17   is who at Tower was responsible for those

18   negotiations?  Was it --

19        A.    Yes.

20              (Pause in the proceedings.)

21        Q.    So to the extent there was any back and

22   forth and negotiation about the agreement, you

23   would have been the person at Tower Ventures who

24   was doing the negotiating on your side?

25        A.    Along with our attorney.

1      Q.    And do you know whether Mr. DeCesare

2   and Crossroads were represented by counsel?

3      A.    Yes.

4      Q.    Would you typically review draft

5   agreements and other deal-related documents

6   yourself or would you leave that to your counsel

7   to do?

8      A.    We would both do it.

9      Q.    So is it fair to state, Mr. Maccini,

10   that you reviewed the -- you reviewed drafts of

11   the Tower Ventures/Crossroads agreement before it

12   was ultimately signed?

13      A.    Yes.

14      Q.    Are there any particular terms or

15   points within the agreement that you can recall

16   either a disagreement over or negotiation about?

17      A.    The whole document was a subject of

18   negotiation.

19      Q.    Is it fair --

20      A.    I am sure there were definitely a

21   number of points.  Exactly what those point were,

22   you know, the position of, you know, both us and

23   Mr. DeCesare, I really can't recall.

24      Q.    Nothing jumps out at you, as you sit

25   here right now?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 44

```
 1      A.    No.

 2      Q.    No particular point where you say,

 3   "Boy, I remember this business about getting

 4   approvals"?

 5      A.    Oh, there were a lot of back and forth

 6   about the business terms.  You know, again,

 7   exactly what those -- you know, what those

 8   discussions were, I don't recall.

 9      Q.    Now, one factor that came into play

10   with the Crossroads agreement was the existence

11   of a mortgage on the property from the prior

12   owner, correct?

13      A.    That's correct.

14      Q.    And that was a Mr. Raycee, right?

15      A.    He held the note and had a security

16   interest in the real estate in question.

17      Q.    Okay.  And do you remember -- in the

18   course of your negotiations leading up to the

19   agreement with Crossroads, do you remember

20   getting copies of the documents relating to Mr.

21   Raycee's mortgage and note?

22      A.    Yes.

23      Q.    That was obviously of interest to Tower

24   Ventures, right?

25      A.    That's correct.
```

1      Q.    And that's something you would have

2    wanted to look at prior to signing any deal to go

3    forward with Crossroads, right?

4      A.    That's correct.

5      Q.    And the deal that ultimately was

6    signed -- I'm summarizing broadly here.  But the

7    deal that eventually was signed called for Tower

8    Ventures to step into Mr. Raycee's place as the

9    mortgage holder, correct?

10      A.    That's correct.

11      Q.    You were going to pay off the Raycee

12   note and start collecting payments from Mr.

13   DeCesare under the same terms that Mr. Raycee had

14   been, right?

15      A.    Correct.

16      Q.    Since that was your anticipated role,

17   it was, of course, of significant interest to you

18   _and Tower, that you see what terms -- the terms

19   of Mr. Raycee's deal with Mr. DeCesare and

20   Crossroads were, correct?

21      A.    Correct.

22      Q.    Did you have title work or a title

23   search done on the property?

24      A.    Yes.

25      Q.    Can you remember what other

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

1    pre-agreement investigation Tower did concerning

2    the Old Saybrook property in question?

3        A.    Yes.  We had discussions with a number

4    of cell phone carriers about their interest in

5    the site.  We researched where other tower

6    locations were in the general area, to see if

7    they would be kind of contiguous and hand off

8    site.

9        Q.    Let's get back to your discussions with

10   carriers.  Is it fair to say, Mr. Maccini, that

11   one reason you did that is you want to see if

12   there's going to be business interest in this

13   tower you're proposing to build, right?

14       A.    That's correct.

15       Q.    And the -- a significant source of

16   revenue for Tower Ventures would be leasing space

17   on the proposed tower to these carriers, right?

18       A.    That's correct.

19       Q.    So you want to make sure that there's

20   potential tenants out there who will rent on the

21   tower that you're thinking about building before

22   you commit to build the tower, right?

23       A.    Yes.

24       Q.    Did you do any formal projections or

25   pro formas, as to how many tenants you projected

1    having on this proposed tower and what rentals

2    you projected receiving from them?

3          A.    No.

4          Q.    Do you remember generally what sort of

5    feedback you received from prospective tenants on

6    the tower you were contemplating building

7    pursuant to your agreement with Crossroads?

8          A.    There were two tenants that were

9    interested.  Actually Verizon, who had previously

10    contacted Mr. DeCesare, and, you know, was at one

11    point speaking with Mr. DeCesare about developing

12    the tower themselves, had interest.  And actually

13    Mr. DeCesare is the one who suggested that we

14    contact Verizon, which we would have done anyway,

15    but -- and the other one was T-Mobile, or at that

16    time Omnipoint.

17          Q.    T-Mobile have an existing relationship

18    that you knew of with Crossroads or Mr. DeCesare?

19          A.    Not at that time I don't believe so.  I

20    know that subsequently they leased space on his

21    other tower a couple of miles up Route 9.

22          Q.    Okay.  Any other wireless cellular

23    carriers that you can remember potentially having

24    interest?

25          A.    No others had interest.

```
 1        Q.    Did you -- any projections as to how

 2   much you might expect to receive in rent from

 3   Verizon and/or T-Mobile or Omnipoint?

 4        A.    No projections, no.

 5        Q.    Is it fair to say that you had a

 6   general idea at that time what the going rate was

 7   for placement on a tower, such as the one you

 8   were looking to construct?  You were in the

 9   business.

10        A.    Yes.

11        Q.    Okay.  What's your best estimate, as

12   you sit here now, of what the going rate or

13   market rate was for say a Verizon renting space

14   on a tower such as this back in 2001?

15        A.    Approximately 1,800, 2,000 dollars a

16   month.

17        Q.    How about T-Mobile, does it vary?

18        A.    It would have been the same.

19        Q.    Are there factors that -- let me ask

20   you this.  What factors contribute, if any, to a

21   variation in price for a cellular tenant on a

22   tower?  Is location of the tower one factor?

23        A.    Location, kind of height on the tower

24   can be a factor, just how badly a carrier needs a

25   site, kind of our relationship with them, the
```

1   number of sites that they're trying to lease up

2   at any one time.  The kind of -- over the years,

3   the rate has kind of gone up and down, depending

4   on the financial health of the carriers and what

5   they're willing to pay.

6       Q.   Is proximity to a major interstate

7   highway an asset that potentially makes the price

8   of space more expensive?

9       A.   Typically, yes.

10      Q.   All right.  You had a lot of

11  negotiations back and forth on the Crossroads

12  agreement but you don't recall any particular

13  terms that led to special disagreement or

14  difficult wrangling between you and Crossroads?

15      A.   My general recollection is that there

16  were many.

17      Q.   Well, at that point, you had had

18  substantial experience in negotiations such as

19  this, with other persons like Crossroads or other

20  entities like Crossroads, right?

21      A.   Yes.

22      Q.   You had been down this road many times

23  before; is that correct?

24      A.   Yes.

25      Q.   Is it fair to say that the negotiations

```
 1    leading up to the Tower Ventures/Crossroads deal
 2    were more extensive and more involved than was
 3    typically case in prior deals you had made?
 4         A.   Maybe slightly above average.
 5         Q.   Ultimately, after -- well, do you
 6    recall the negotiations covering a period of
 7    months?
 8         A.   Yes.
 9         Q.   And ultimately, the deal was signed at
10    some point in September 2001, right?
11         A.   Correct.
12         Q.   And at that point, you were -- you
13    obviously agreed with whatever had been hashed
14    out between the parties?  You were satisfied to
15    the point that you felt that it could be signed
16    on behalf of Tower Ventures, right?
17         A.   I signed it.
18         Q.   You wouldn't have signed it if you
19    weren't content with what you had been able to
20    negotiate, right?
21         A.   That's correct.
22         Q.   We'd always like a little more perhaps
23    in anything we negotiate, but there was extensive
24    discussion, you had looked at it, studied it, and
25    you felt comfortable signing it on behalf of your
```

```
 1    company; is that correct?

 2        A.    Yes.

 3        Q.    Let me show you, Mr. Maccini, a copy of

 4    what's been marked as Exhibit 2, at a prior

 5    proceeding in this matter.  Do you recognize

 6    that?

 7        A.    It appears to be the agreement that we

 8    signed.

 9        Q.    And the full agreement contained a

10    number of exhibits and attachments of proposed

11    leases and so on, correct?

12        A.    Yes.

13        Q.    Do you remember that?

14        A.    Yes.  That's correct.

15        Q.    Exhibit 2 is just the agreement itself,

16    with the attached exhibits omitted, right?

17        A.    Yes.

18        Q.    If you look at the final page of

19    Exhibit 2 that I've handed you, am I correct that

20    that bears your signature?

21        A.    That's correct.

22        Q.    I notice under your name, it says,

23    "President, Tower Ventures, Inc."

24              Did you tell me before that Mr.

25    Gallagher was president?
```

Page 52

```
 1        A.    Mr. Gallagher was president.

 2        Q.    So that's simply a mistake?

 3        A.    That's correct.

 4        Q.    Your title back in September 2001 was

 5   the same as it is now, chief operating officer,

 6   chief financial officer?

 7        A.    Yes.

 8        Q.    Okay.  Without regard to whether the

 9   title is correct or not, there's no question that

10   you had the authority to sign on behalf of the

11   company, right?

12        A.    Correct.

13        Q.    Mr. Gallagher was aware of the deal,

14   right?

15        A.    Yes.

16        Q.    Did you discuss with Mr. Gallagher the

17   Crossroads deal at all prior to its being signed?

18        A.    Yes.

19        Q.    Tell me what you recall about those

20   discussions.  Are there any particular subjects

21   you recall discussing with Mr. Gallagher?

22        A.    No.  Just a kind of broad outline of

23   the deal.

24        Q.    The situation with the Raycee financing

25   was a little bit unusual, compared to your
```

 1    typical deal, right?

 2        A.    That's correct.

 3        Q.    Do you remember discussing that

 4    particular issue with him?

 5        A.    I probably mentioned it.  But I offhand

 6    don't recall that.

 7        Q.    Now, you said normally the two of you

 8    broke things up along geographic lines so there

 9    was no overlap.  What was it that led you to

10    discuss this deal, the Crossroads deal, with Mr.

11    Gallagher?

12        A.    We typically -- you know, we kind of

13    function as a two-part partnership so we kind of

14    typically discuss the larger picture, you know,

15    company type events, so he probably would not

16    know all the details, but would know some of the

17    highlights.

18        Q.    Okay.

19        A.    And vice versa, on things that he was

20    working on.

21        Q.    So if you're close to finalizing a

22    deal, or in the process of negotiating a deal,

23    you might mention to him generally, "Gee, we've

24    got this site down in Connecticut that we're

25    close to closing a deal on," right?

1      A.    Yes.

2      Q.    And if a sticky point or some point of

3   disagreement arose during the negotiations, is

4   that something you'd go to Mr. Gallagher to talk

5   through, to seek his input as to whether you

6   should either agree to something or refuse to

7   agree to a particular demand?

8      A.    On occasion.

9      Q.    Do you remember doing that at all in

10  connection with the Crossroads agreement?

11     A.    No.

12     Q.    Now, you said that you've had an

13  opportunity to review Exhibit 2, the agreement,

14  in preparation for your testimony today, right?

15     A.    Yes.

16     Q.    The page before your signature page

17  bears Mr. DeCesare's signature, right?

18     A.    Yes.

19     Q.    And the agreement is dated the 20th of

20  September 2001?  If you look at the first

21  paragraph on the first page.

22     A.    Yes.

23     Q.    Now, is it fair to state, Mr. Maccini,

24  that under this agreement, the responsibility for

25  acquiring necessary approvals, permits, consents

1    or any other form of approval, the responsibility

2    for doing that in connection with the development

3    of the communications facility fell to Tower

4    Ventures, Incorporated?

5              MR. HUMPHREY:   I think the

6    document speaks for itself.

7              But go ahead and answer it.

8        Q.   Okay.  Answer that if you can.

9        A.   Primarily, although with the assistance

10   of Mr. DeCesare, because Mr. DeCesare represented

11   that he was an upstanding member of the

12   community, and knew a lot of people in the Old

13   Saybrook community, and also that he knew many of

14   the members of the board and had interacted with

15   them on the Chamber of Commerce, which I think he

16   served on or was a part of, and that he could

17   help perhaps with those members of the board in

18   trying to influence them, and doing what else he

19   possibly could.

20             At one time, there was some

21   discussion about the town maybe placing some

22   communications equipment on the tower, which

23   typically would help in the prospective

24   development of the tower.  So although it was our

25   primary responsibility, Mr. DeCesare was going to

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 56

1    assist in that fashion.

2         Q.    He told you he had substantial goodwill

3    within the community or he thought he had

4    substantial goodwill within the community, right?

5         A.    Correct.

6         Q.    And he promised that he would --

7    Withdrawn.

8               He told you verbally that he would

9    use whatever goodwill he could to try to help

10   your common goal of getting a communications

11   facility approved and developed, correct?

12        A.    Correct.

13        Q.    And, in fact, he did that, didn't he?

14        A.    To my knowledge, yes.

15        Q.    Now looking at the agreement itself,

16   Exhibit 2, is it your understanding that under

17   this agreement, TVI bears the responsibility to

18   apply for and obtain all necessary approvals or

19   other permitting -- other permits in connection

20   with development of the communications facility?

21        A.    As I stated, it was primarily us, but

22   in conjunction with Mr. DeCesare.  I believe Mr.

23   DeCesare had to sign certain applications that we

24   had to submit as the owner of the property.

25        Q.    Well, let's look at paragraph one of

 1    the agreement.

 2        A.    Uh-huh.

 3        Q.    Okay.  The final sentence of that

 4    paragraph says, "Crossroads shall reasonably

 5    cooperate with TVI --"

 6        A.    Where are you reading?

 7        Q.    The final sentence of paragraph one.

 8        A.    Okay.

 9        Q.    It says, "Crossroads shall reasonably

10    cooperate with TVI in connection with TVI's

11    acquisition of the approvals provided that all

12    fees, costs and expenses incurred with regard to

13    the approvals shall be borne exclusively by TVI,"

14    right?

15        A.    That's what it says, correct.

16        Q.    And was it your understanding that that

17    obligated Crossroads and Mr. DeCesare to

18    cooperate where needed, correct?

19        A.    That's correct.

20        Q.    But also under this paragraph, was it

21    your understanding that the main responsibility

22    for acquiring -- applying for and acquiring

23    necessary approvals and permits was the

24    responsibility of Tower Ventures, Incorporated?

25        A.    Yes.  I think I had stated that.

Page 58

1         Q.    And was it your further understanding

2    that under paragraph one, TVI had to do that as

3    quickly as possible but in no event -- had to

4    apply as quickly as possible but in no event

5    later than 45 days after the execution of the

6    agreement?

7         A.    That's what it says, yes.

8         Q.    And that was your understanding,

9    correct?

10        A.    Yes.

11        Q.    Okay.  I'm not asking you whether I've

12   read it correctly.  I'm asking you what did you

13   understand Tower Ventures, Incorporated's

14   obligations to be in regard to permitting?

15        A.    That we were going to prepare the

16   necessary applications and to the best of our

17   abilities, try to file it within a 45-day

18   period.

19        Q.    Well, the agreement required you to do

20   it no later than 45 days, to apply, correct?

21        A.    Yes.  That's what it states.

22        Q.    Do you remember there being any

23   discussion in the course of the negotiations

24   leading up to execution of the agreement, about

25   the 45-day period we're talking about now,

```
 1   whether it was higher, lower, whether you folks

 2   were asking for a longer period of time, whether

 3   Crossroads at any point was asking for a shorter

 4   period of time?

 5        A.   All I recall is that Mr. DeCesare was

 6   concerned that we were just going to sign this

 7   agreement and then not proceed, you know, with

 8   filing the various things that we needed to file

 9   to develop the tower.  So I think it was put in

10   there because of his concern, that we wouldn't

11   just sit on it and not do anything.

12        Q.   You recall it being in response to a

13   specific request or expressed concern of Mr.

14   DeCesare, that this 45-day requirement was

15   inserted into the agreement; is that right?

16        A.   I believe it came from Mr. DeCesare,

17   yes.

18        Q.   Without regard to the 45-day window,

19   having responsibility for obtaining permitting

20   that falls on Tower Ventures, that was something

21   that you were familiar with from prior similar

22   deals that you had done, right?

23        A.   Yes.

24        Q.   It was common -- if you're going to

25   come in and develop or build a communications
```

1    tower, typically one of the things Tower Ventures

2    undertook to do was to take responsibility for

3    getting whatever approvals were necessary, right?

4         A.   Yes.

5         Q.   So that in that respect, this was a

6    common clause or term of an agreement like this;

7    is that fair, without regard to the time window?

8    The idea that Tower Ventures bore the

9    responsibility to get whatever approvals are

10   needed, that was pretty common, in your

11   experience, correct?

12        A.   Yes.

13        Q.   Okay.  What approvals, permits,

14   variances or other approvals of any kind did

15   Tower Ventures apply for between September 20th

16   of 2001 and 45 days later, which I think would

17   have either been November 4th or 5th of 2001?

18        A.   I don't recall.

19        Q.   No recollection whatsoever?

20        A.   All I know is that initially we wanted

21   to replace the existing tower with a similar type

22   lattice tower at the exact same location, which

23   is typically much easier to do and in many

24   instances, a building permit can just be pulled.

25   So it's my recollection that Keenan Brinn, who

 1    was charged with doing all of the work on this

 2    project, had discussions with the building

 3    inspector -- his term might not be building

 4    inspector in Old Saybrook but an equivalent type

 5    position -- about being able to pull a building

 6    permit as opposed to going through the long kind

 7    of approval process.

 8        Q.    Do you know that based upon a

 9    conversation you had with Mr. Brinn?

10        A.    Yes.

11        Q.    Do you remember when it was that he

12    told you he spoke with a building official in Old

13    Saybrook about obtaining a building permit?

14        A.    No.

15        Q.    After the agreement was signed, Mr.

16    Maccini, you said the responsibility was on Mr.

17    Brinn from that point forward to implement the

18    agreement; is that fair?

19        A.    Yes.

20        Q.    What involvement, if any, did you have

21    on a day-to-day basis after the agreement was

22    executed with Tower Ventures fulfilling its

23    obligations under the agreement?

24        A.    Very little.  Keenan would report to me

25    from time to time as to his progress or what he

```
 1    was currently working on.

 2         Q.   Can you identify for me any permit that

 3    was applied for or any approval that was applied

 4    for by Tower Ventures in connection with the

 5    development of the communications facility within

 6    the 45-day window after September 20th, 2001?

 7         A.   I don't know exactly the legal

 8    definition of "applied for."  I'm not sure, you

 9    know, if you ask a town official to -- to -- if

10    you submit a building permit or an application

11    for a building permit, will it be considered to

12    be granted, given the certain set of

13    circumstances that they were kind of submitting,

14    whether that would qualify or not.  So those

15    conversations, I'm not sure whether those would

16    qualify as an application, per se.

17         Q.   In any event, I think you told me that

18    you're not sure when these conversations with

19    Mr. -- that Mr. Brinn was telling you about

20    occurred, correct?

21         A.   Correct.

22         Q.   So you don't even know -- even if they

23    did fit within your definition, you don't even

24    know whether those occurred within a 45-day

25    window after execution of the agreement, correct?
```

June 22, 2004

Page 63

```
 1        A.    I don't know the exact time frame, no.

 2        Q.    Did you ever discuss with Mr. Brinn the

 3   question whether the 45-day deadline was going to

 4   be met or whether anything needed to be done

 5   concerning the 45-day deadline?

 6        A.    I don't recall.

 7        Q.    Do you recall any discussion with Mr.

 8   Brinn, let's say within the first six months

 9   after the agreement was executed, concerning the

10   45-day window referenced in paragraph one of the

11   agreement, Exhibit 2?

12        A.    I imagine we --

13        Q.    I don't want you to imagine.

14        A.    Okay.

15        Q.    I want your best recollection.

16        A.    Uh-huh.

17        Q.    Do you recall any discussion with Mr.

18   Brinn in the six months following September 20th,

19   2001, concerning the 45-day window for

20   applications referenced in paragraph one of

21   Exhibit 2?

22        A.    Yes.

23        Q.    Tell me what discussions you recall and

24   when they occurred.

25        A.    No specifics, but just the realization
```

1    that there was a 45-day period, and that he was

2    trying to do everything he could to meet that

3    45-day period.

4        Q.   Do you remember whether this discussion

5    occurred before or after the 45-day period had

6    run?

7        A.    I don't recall.

8        Q.    Do you recall ever discussing with Mr.

9    Brinn requesting an extension from Crossroads of

10   that 45-day deadline?

11       A.    No.

12       Q.    And would you agree that at no point

13   between September 20th, 2001 and August 7th,

14   2002, did Tower Ventures request an extension of

15   the 45-day deadline for application for approvals

16   and permits?

17       A.    Not to my knowledge, no.

18       Q.    Do you recall --  Withdrawn.

19              How frequently would you speak

20   with Mr. Brinn about the progress of the Old

21   Saybrook tower project?  By "Old Saybrook tower

22   project," I'm talking, of course, about the

23   Crossroads agreement and the communications

24   facility contemplated being developed under that

25   agreement.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 22, 2004

Page 65

```
 1        A.    It would vary, but maybe once a week.

 2        Q.    Are you principally in your office most

 3   days?

 4        A.    Principally being --

 5        Q.    Well, let me ask it this way.  I gather

 6   from your -- from your summary of Mr. Brinn's job

 7   description, that he's on the road a lot --

 8        A.    Correct.

 9        Q.    -- riding around checking out sites on

10   various projects the company has going; is that

11   correct?

12        A.    Yes.

13        Q.    Are you primarily based in your Rhode

14   Island office?

15        A.    Yes.

16        Q.    Okay.  So how would you typically

17   communicate with Mr. Brinn?  By e-mail,

18   telephone?  Would you have a weekly meeting where

19   he was present in your office?  How did that

20   work?

21        A.    Sporadically via telephone.  If he was

22   in the office, then I may catch up with him when

23   he was in the office.

24        Q.    Was there any formal practice or custom

25   you had in place of regular meetings to discuss
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 66

1    the status of open projects?  You know, would you

2    meet every week, every month?  Anything like

3    that?

4         A.    No.

5         Q.    So you just talked to him from time to

6    time about, you know, what's going on with this,

7    what's going on with that, right?

8         A.    Correct.

9         Q.    And one of the subjects that would come

10   up in those discussions was this Old Saybrook

11   project, right?

12        A.    Correct.

13        Q.    Do you remember learning at some point

14   that permits from local agencies were going to be

15   required?

16        A.    Well, it's in the agreement.  So --

17        Q.    Well, you spoke earlier that -- well, I

18   phrased it poorly.

19              Do you remember learning at some

20   point that apparently something more than a

21   building permit was going to be necessary in

22   order to pursue the tower project that you were

23   contemplating?

24        A.    Yes.

25        Q.    Do you remember when it was that you

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                           June 22, 2004

Page 67

 1    learned that?

 2        A.    No.

 3        Q.    Are you familiar with a gentleman named

 4    Kenneth Spigle?

 5        A.    Spigle, yes.

 6        Q.    Who is Mr. Spigle?

 7        A.    Mr. Spigle was an attorney that we had

 8    primarily retained to assist us in various zoning

 9    matters in federal district court cases, where,

10    if we were denied by a town, we would appeal that

11    under the telecommunications act which grants you

12    standing if you have a licensed FCC carrier.  And

13    today Mr. Spigle is actually an employee of Tower

14    Ventures II.

15        Q.    For how long has he been a Tower

16    Ventures II employee?

17        A.    Since January of this year.

18        Q.    So back in December of '01, he was an

19    outside lawyer, doing work for Tower Ventures,

20    correct?

21        A.    Correct.

22        Q.    Let me show you a copy of what was

23    marked as Exhibit 4 at a prior proceeding and ask

24    you to take a look at that letter and tell me

25    whether you recognize it?

Page 68

1      A.    Yes.   It's an unsigned letter that

2   bears the kind of Ira Spigle's signature line.

3      Q.    Do you remember having seen it before,

4   Mr. Maccini?

5      A.    I'm aware of the general contents, but

6   I don't believe I've ever read it fully before.

7      Q.    How are you aware of the general

8   contents?

9      A.    Just that I know that Keenan had

10  consulted Attorney Spigle on some zoning issues

11  which may have been before Mr. Childress was

12  actually retained in the case.

13     Q.    You knew -- it's fair to state that you

14  knew Mr. Spigle had gotten involved in some

15  fashion in the Old Saybrook Crossroads issue, but

16  you had never seen this letter in full before; is

17  that correct?

18     A.    Correct.

19     Q.    You mentioned Mr. Childress being

20  retained.  You're talking about William

21  Childress; is that right?

22     A.    Yes.

23     Q.    He's a lawyer based in Old Saybrook,

24  Connecticut?

25     A.    Yes.

Page 69

1      Q.    Do you recall when Mr. Childress was

2  retained in connection with the Old Saybrook

3  tower project?

4      A.    I don't recall the exact date.  I know

5  that at one point Keenan and I went to Old

6  Saybrook and actually met with Attorney Childress

7  prior to his engagement, but I have no idea when

8  that date was.  And actually Mr. Childress was

9  recommended by Mr. DeCesare.

10     Q.    You had no prior dealings with Mr.

11  Childress, correct?

12     A.    None.

13     Q.    You were not even familiar with who he

14  was, right?

15     A.    Not at the outset, no.

16     Q.    And how did you come to learn that Mr.

17  DeCesare had recommended him?  Was that through

18  Mr. Brinn?

19     A.    That was through Mr. Brinn.

20     Q.    And do you remember discussing with Mr.

21  Brinn the fact that Mr. DeCesare had recommended

22  that you engage a local lawyer in Old Saybrook to

23  assist with the tower project?

24     A.    Well, it's something that we do on

25  occasion, where we think there's going to be a

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 22, 2004

Page 70

1    bit more of a fight regarding the kind of zoning

2    issues.  We will on occasion hire a local

3    attorney who is familiar with the ins and outs,

4    and knows some of the board members, and perhaps

5    is treated a little differently than someone

6    coming from the outside.

7        Q.    Okay.  And it's been your experience

8    that where there is potential opposition to one

9    of your projects, it is generally an asset to

10   have an experienced local land use lawyer to

11   assist in obtaining the approvals that you need

12   to obtain; is that fair?

13       A.    Yes.

14       Q.    And while you had never had specific

15   dealings with Mr. Childress before, you had had

16   successful dealings with people, you know, like

17   Mr. Childress, local land use or zoning

18   attorneys, who are familiar with the local

19   players and can help get something approved,

20   correct?

21       A.    Some wins and some losses.  Doesn't

22   always work.

23       Q.    Right.  Such is the nature of our

24   business.

25             And you said you don't recall when

June 22, 2004

Page 71

1    it was that you met with Mr. Childress?

2         A.   No.

3         Q.   Am I correct, Mr. Maccini, that you and

4    Mr. Brinn met with him prior to hiring him,

5    because you wanted to assess Mr. Childress before

6    you made a decision to engage him in connection

7    with the Old Saybrook project?

8         A.   I believe so, yes.

9         Q.   And you recall at least one meeting

10   with Mr. Brinn.  Do you recall any others with

11   either yourself and Mr. Childress or yourself,

12   Mr. Brinn and Mr. Childress, before you decided

13   to hire him?

14        A.   That was the only time that I had met

15   Mr. Childress, and have since met Mr. Childress.

16        Q.   Just that one time --

17        A.   Correct.

18        Q.   -- from then until today's date?

19        A.   Correct.

20        Q.   And after that meeting, you decided to

21   hire him, right?

22        A.   Yes.  Although we may have already

23   hired him.  I'm not sure exactly the course of

24   events.

25        Q.   I take it after that meeting, you were

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 22, 2004

Page 72

1    sufficiently impressed with Mr. Childress to feel

2    comfortable having him represent Tower Ventures'

3    interests in connection with the Old Saybrook

4    tower project, right?

5        A.    Yes.

6        Q.    If you hadn't have been comfortable

7    with him, notwithstanding Mr. DeCesare's

8    recommendation, you would not have hired him to

9    represent Tower's interests, correct?

10        A.    Yes.

11        Q.    And, in fact, although Mr. DeCesare was

12    going to be providing whatever assistance he

13    could, it was Tower Ventures that was going to be

14    footing the bill for Mr. Childress, right?

15        A.    Yes.

16        Q.    And Tower Ventures indeed did pay Mr.

17    Childress' fees in connection with the Old

18    Saybrook project; is that correct?

19        A.    Yes.

20        Q.    Now, you had these periodic discussions

21    with Mr. Brinn that we've been talking about.

22    You remember a meeting with Mr. Childress.

23    What's the next step that you can recall

24    concerning the Old Saybrook tower project?  Is

25    there a time line that stands out in your mind?

1          A.    Well, just kind of in general, that the

2      building inspector failed to view this as a

3      replacement and one that he could just sign-off

4      on and issue a building permit, that we were

5      going to have to go through the full approval

6      process, which involved going to the zoning board

7      and the planning board.

8          Q.    I think you testified earlier that at

9      some stage there was a plan to put up a new

10     lattice tower; is that correct?

11         A.    Well, initially the feeling was, again,

12     that if we replaced the current tower, the one

13     that I believe still exists today, with a similar

14     lattice guyed tower that looked about exactly the

15     same but was capable of holding more, that there

16     was a possibility of just pulling a building

17     permit.

18              When it became apparent that that

19     was not the case, then we started looking at

20     other alternatives, and also potentially moving

21     the tower slightly, lowering the height, and

22     eventually went to a monopole tower because one

23     of the ground anchors for the guy wire that was

24     supporting the existing lattice tower was

25     actually on another -- an abutting property

 1   owner's piece of land, and he actually stared off

 2   his porch right into the tower and into the guy

 3   wires.  And it's been quite common for neighbors

 4   to come out in opposition of the tower,

 5   especially when it's literally right in their

 6   backyard, as this one was.  And we felt that we

 7   would buy some goodwill from this neighbor, from

 8   removing the guy wires, and also the easement

 9   which allowed us -- or allowed Mr. DeCesare, at

10   the time, to maintain that guy anchor and pier

11   concrete footing on his piece of property.

12                 So that's one of the reasons why

13   we switched to a monopole tower.  And I believe

14   that neighbor actually attended one of the

15   hearings and came out in support of the tower.

16       Q.   I don't know if you said it explicitly,

17   but the present structure is what we call a

18   lattice tower; is that correct?

19       A.   A guyed lattice tower, yes.

20       Q.   And the initial plan was to replace the

21   guyed lattice tower, with another lattice tower?

22       A.   Another guyed lattice tower.

23       Q.   Was the reason you initially planned to

24   replicate as closely as possible the existing

25   structure, was the prime reason for that to try

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 75

1    to expedite approvals from whatever local

2    agencies needed to approve it?

3        A.    Yes.

4        Q.    A lattice tower would not have been

5    your primary choice, but for that consideration;

6    is that a fair statement?

7        A.    No.  It was the primary choice because

8    there was an existing tower and we wanted to

9    exactly mirror that tower.

10        Q.    And the reason you wanted to exactly

11    mirror it was because you thought it enhanced

12    your chances of getting speedy approvals from the

13    local agencies or boards, correct?

14        A.    Yes.

15        Q.    Once it became apparent that was not

16    going to happen, there was a change in plans, in

17    favor of a monopole tower; is that correct?

18        A.    Yes.

19        Q.    Do you know whether there were ever

20    formal drawings prepared of a replacement guyed

21    lattice tower?

22        A.    I don't know.

23        Q.    At some point, clearly there were

24    formal drawings prepared of a proposed

25    replacement monopole tower, right?

 1       A.    I believe so, yes.

 2       Q.    Do you remember ever seeing them?

 3       A.    No.

 4       Q.    And that wouldn't have been one of your

 5    prime responsibilities --

 6       A.    No.

 7       Q.    -- obtaining drawings like that?

 8       A.    No.

 9       Q.    Would that be within Mr. Brinn's area

10    of responsibility and expertise?

11       A.    Yes.

12       Q.    Did there come a point in time when you

13    began to grow concerned about the progress of the

14    Old Saybrook tower project?

15       A.    Yes.

16       Q.    Do you remember when you first began to

17    grow concern --   Withdrawn.

18              Do you remember when you first

19    became concerned about the progress of the Old

20    Saybrook tower project?

21       A.    I don't recall the date, no.

22       Q.    Do you recall the year?

23       A.    Well, we're in 2002.

24       Q.    Do you recall learning from Mr. Brinn

25    at some point that the approval process was

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 22, 2004

Page 77

1    underway?

2         A.    Yes.

3         Q.    Do you recall hearing that Tower

4    Ventures had filed applications or at least an

5    application with a local board or agency whose

6    approval was needed?

7         A.    Yes.

8         Q.    Do you recall this coming to your

9    attention as part of your normal discussions with

10   Mr. Brinn as to the status of this and other

11   projects?

12        A.    Yes.

13        Q.    Did you discuss with Mr. Brinn what

14   timetable he projected for obtaining necessary

15   approvals for the tower, the new tower?

16        A.    Not necessarily a timetable, more just

17   what the steps were going to be.

18        Q.    Do you recall discussing that with Mr.

19   Childress --

20        A.    No.

21        Q.    -- "How long is this going to take,"

22   something of that nature?

23        A.    No.

24        Q.    Now, you said you can't pinpoint in

25   2002 when it was that you first became concerned

1    about the timetable of the Old Saybrook project.

2    Do you remember if there was a particular event

3    that caused you concern?

4         A.    No.   Just seemed to be a very, you

5    know -- first we thought we had a good chance of

6    pulling, you know, a building permit.   And that

7    didn't happen.   And then there are at least two

8    different boards that -- with a couple of

9    meetings, you know, potentially at one or both of

10   them.   And then I remember being told that the --

11   one board, I think it was the planning board, had

12   the right to appeal the zoning board decision,

13   and that they actually tried to do that but

14   procedurally were a day or two late in doing

15   that.

16              So the general kind of idea or my

17   feelings were that, gee, this is very

18   contentious, not that each zoning kind of

19   processes aren't involved, you know, but very

20   involved, and I started wondering whether this

21   was going to get approved or not.

22        Q.    When you began to wonder if the project

23   was going to be approved or not, did you inquire

24   concerning what approvals had been obtained to

25   that point, and if there had been any dissenting

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 79

```
 1   votes in connection with those approvals?

 2       A.   Again, kind of just generally following

 3   the process along the way and, you know, I'm

 4   aware of at least one or two members on -- I

 5   forget exactly what board it was, that was

 6   vehemently opposed to the project, but again I

 7   don't recall whether that was the zoning board or

 8   the planning board.

 9       Q.   Now, under the terms of the agreement,

10   once various conditions were satisfied and the

11   deal was going to go forward, Tower Ventures was

12   going to be obligated to pay Crossroads a

13   one-time fee of $150,000; is that correct?

14       A.   Yes.  Once a number of conditions were

15   met, correct.

16       Q.   And there was a ground lease that was

17   going to be executed that would also -- it was

18   going to be for an initial term of 10 years,

19   correct?

20       A.   Correct.

21       Q.   And the ground lease called for initial

22   rent payments of $1,500 a month; is that right?

23       A.   Yes.

24       Q.   With an annual four percent increase in

25   rent, right?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 80

```
 1      A.    Yes.

 2      Q.    And that four percent increase, as you

 3 understood it, was to compound every year over an

 4 initial 10-year lease term, correct?

 5      A.    Correct.

 6      Q.    And there were provisions for five-year

 7 renewals of the lease, right?

 8      A.    I believe so, yes.

 9      Q.    And either party could opt out of those

10 renewals provided they adhered to certain

11 procedures in order to get out; is that how you

12 understood it?

13      A.    No.  I believed that only we had the

14 ability to terminate.  Mr. DeCesare did not have

15 that ability.

16      Q.    And again upon various conditions being

17 satisfied under the agreement, Tower Ventures was

18 also going to be required to pay off the Raycee

19 mortgage, right?

20      A.    Correct.

21      Q.    And to assume the role of collecting,

22 in essence, mortgage payments from Crossroads,

23 right?

24      A.    Correct.

25      Q.    Do you remember what the payoff
```