Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 81

1        A.    I don't believe I used those words per se.    I

2    certainly expressed frustration, concern,

3    disappointment, what have you, about the slowness of

4    the process and my continued desire to get on with it

5    and to get it approved.

6        Q.    And as you were working with Tower Ventures

7    in very late 2001, December 2001 and through the first

8    five or six months of 2002, did you have a belief that

9    they were working in good faith to get this project

10   approved?

11       A.    Believe me, I don't want to split hairs

12   semantically inclined with you, but those words sound

13   legalistic to me and I don't usually think in

14   legalistic terms.   I don't think good faith/bad faith,

15   generally speaking.

16            I felt they were being very slow about it.    I

17   expressed that concern frequently.   I also expressed

18   concern that we do whatever we could to get this thing

19   going.

20       Q.    And you had made such statements to Bill

21   Childress?

22       A.    Yes.

23       Q.    And what did Bill say to you?

24       A.    Bill is a very smart man.   Essentially, he

25   said to me I'm doing the best I can and, you know, just

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 82

1    bear with me.

2        Q.    Did he say things, something like these

3    things take time and you're just going to have to wait

4    until the commissions meet and we get a chance to be

5    heard?

6        A.    I'm not sure he put it in exactly those

7    terms.  I'm certain that he said to me, you know, just

8    bear with me, I'm doing this the way it needs to be

9    done, something to that effect.

10       Q.    Now, in or as of July 31, not all approvals

11   had been obtained; is that correct?

12       A.    July 31 of 2002?

13       Q.    2002.

14       A.    Yes.  That was my understanding, yes.

15       Q.    And, in fact, if you look at paragraph, I

16   think it is 23 of your complaint --

17       A.    Okay.  I have 23 in front of me.

18       Q.    -- it alleges that as of early August 2002 an

19   application for approval remained pending before the

20   Old Saybrook zoning board, and you understand that

21   approval was necessary before you could construct,

22   Tower Ventures could construct the tower?

23       A.    Yes.

24       Q.    So there was at least that approval still

25   outstanding?

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 83

1      A.   Yes.

2      Q.   Now, because there was that approval still

3   outstanding in early August, could, in your belief,

4   Crossroads have terminated this agreement?

5      A.   Well, I don't know that I ever thought about

6   it in that way in early August so I don't know how to

7   answer --

8      Q.   I'm not asking if you thought about it.  But

9   did Crossroads have the right to terminate, I just

10  refer you to the Section 8 of the agreement, you want

11  to take a moment to review that section?

12     A.   Well, Section 8 says what it says.  Your

13  question to me is did I think that Crossroads --

14     Q.   Did Crossroads --

15     A.   -- did Crossroads have the right to terminate

16  that agreement under the contract.  You know, I don't,

17  I can't really answer that without having -- if that

18  thought were to enter my mind, I would seek opinion

19  from counsel.

20     Q.   Now, I want to just try to clarify one thing

21  with that.  It refers to, in Section 8, refers to, has

22  a sentence, "This Section 10," now, is there any

23  section 10 in the agreement?

24     A.   I don't see one.

25     Q.   And it says -- we're reading from Section 8;

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 84

1   is that correct?

2       A.   Yes.

3       Q.   Now, as you look at that, would it be your

4   understanding that that is a typographical error and it

5   should say "This Section 8"?

6       A.   Boy, I don't want to comment on that.  I will

7   simply say it looks like sloppy legal work.

8       Q.   For the record, I am going -- maybe it will

9   be disputed later -- but state that my question is

10  going to assume that that is a typo and that the

11  reference, especially when the clause says "This

12  section," it should be "This Section 8" and not 10

13  since there is no 10.

14      A.   You are way past my expertise.

15      Q.   Let's look at that section.  What are -- in

16  order for Crossroads to have had the right to terminate

17  in early August, what had to be, what conditions had to

18  be in place?

19      A.   Well, in my mind, sitting here with you today

20  and thinking about it here today, the first and most

21  important thing would be my desire to terminate.

22      Q.   I'm just -- whether you do it or not, isn't

23  it fair to say that Crossroads, since there are two

24  conditions, one is that not all the conditions

25  precedent have been satisfied by July 31, 2002, then

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 85

1    either Crossroads or TVI may terminate.

2         A.    Well, you stopped a sentence before it

3    finishes.

4         Q.    I'm going -- but the first condition is that

5    not all conditions precedent and all of the approvals

6    or conditions precedent.

7         A.    I'm really extremely uncomfortable trying to

8    interpret --

9         Q.    I'm not asking you to interpret --

10        A.    -- the law.

11        Q.    -- just asking you about that section.

12        A.    I'm looking for the definition of "conditions

13   precedent."

14        Q.    It's in Section 4-A, three lines from the

15   bottom.  I'll read, quote, "Conditions precedent shall

16   mean, (i) TVI's receipt of all the approvals.  TVI's

17   receipt of all the nondisturbance agreements."

18        A.    If any.

19        Q.    If any.  And it continues.

20        A.    Yes.

21        Q.    But the only one that we need to look at is

22   the approvals, and you've alleged in your complaint

23   that not all approvals had yet been received, correct?

24        A.    Yes.

25        Q.    So that is one condition.

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                    Don DeCesare

Page 86

1          The second condition is, "So long as the

2    terminating party has not been in material breach of

3    this agreement."  Was Crossroads in material breach of

4    the agreement in early August of 2002?

5          A.   No.  Not in my opinion.

6          Q.   So Crossroads in early 2002 could have

7    terminated since not all approvals had been received

8    and since Crossroads was not in material breach?

9          A.   Accepting your statements at face value, yes.

10         Q.   Accepting the contract's statements.

11         A.   Well, this is the part that I'm having a

12   little trouble with is that I don't, I don't practice

13   contract law and so there may very well be legal

14   reasons why that is the case and there may even be

15   legal reason why it's not the case, I can't offer a

16   legal opinion here.

17         Q.   I'm not asking for a legal opinion.  I'm just

18   asking for what Crossroads' rights were in the first

19   week of August, and isn't it correct that one of their

20   rights was they could terminate this contract?

21         A.   I'll accept what you're saying exactly as I

22   accepted it a second ago.

23         Q.   And that whatever right Crossroads had, TVI

24   had the same right under this section; is that correct?

25         A.   Presuming the same sets of conditions.  I

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 87

1    mean, it seems to say that we each have the same

2    rights.

3        Q.    What do you mean "seems to," why do you --

4        A.    Again, I'm, I'm hesitating only because I

5    don't, I don't practice contract law.

6        Q.    Well, what is it that makes you hesitate when

7    it says, quote, "Then either Crossroads or TVI may

8    terminate this agreement," close quote?

9        A.    Everything around it is what causes -- for

10   example, the term "conditions precedent" is one which

11   may have legal implications of which I'm not aware.

12       Q.    If it doesn't have any legal implications

13   beyond what could be outstanding as of July 31 had not

14   been accomplished, what is it that would have barred

15   Crossroads from terminating the contract?

16       A.    Short of a desire to terminate it, nothing.

17       Q.    So is it fair to say that if Crossroads got a

18   $5 million offer on August 5 to purchase that property,

19   it could have given notice to terminate the contract?

20       A.    It's an interesting hypothesis.  I suppose,

21   yes.

22       Q.    And that if it did, if Crossroads took that

23   action, this Section 8 provides that "The parties

24   should not have any further obligations or liabilities

25   hereunder and this agreement shall be null and void and

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                           Don DeCesare

Page 88

1    have no further force and effect"; do you see that?

2        A.    I do.  I see it, yes.

3        Q.    So if Crossroads had terminated the

4    agreement, and assuming they weren't in material breach

5    and not all the approvals had been received, TVI would

6    have had no claim against Crossroads?

7        A.    That's a lot of assumptions, but I suppose if

8    you follow them to their logical conclusion, that would

9    be the case.

10        Q.    And that's what the parties wanted when they

11    negotiated, the right to terminate if they met these

12    conditions?

13        A.    I would suppose that, yes.

14        Q.    And, in fact, TVI didn't even have --

15    withdrawn.

16              In fact, Crossroads didn't even need to have

17    a reason, it could just terminate?

18        A.    If all the conditions precedent have not been

19    satisfied and so long as the terminating party is not

20    then in material breach.  Yes.

21        Q.    So if you just woke up in the morning and you

22    said I feel like I want to terminate, the first week of

23    August, you could have done that?  At least in your

24    belief you were not in material breach of anything.

25        A.    Again, following your logic, I would say yes.

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 89

1        Q.    So it's also correct that Tower Ventures

2   could have terminated if they were not in material

3   breach?

4        A.    Well, yes, if they were not then in material

5   breach.

6        Q.    Because we agree, do we not, that not all

7   approvals had been obtained, so that condition has been

8   met?

9        A.    Well, I say that not all approvals have been

10  received.  I don't know, are you saying that they --

11       Q.    You said that in your complaint.

12       A.    I did.

13       Q.    So you're admitting that not all the

14  approvals had been received, correct?

15       A.    I'm saying that, yes.

16       Q.    So that's one condition?

17       A.    Yes.

18       Q.    Not all approvals.  The only other condition

19  is that you're not in material breach?

20       A.    Correct.

21       Q.    So TVI, if it wasn't in material breach, had

22  the right, the first week of August, to terminate?

23       A.    If both conditions were fully correct, yes.

24       Q.    And --

25       A.    Again, remembering, I'm not an attorney, and

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 90

1  I don't -- you know, you gentlemen get paid very large

2  amounts of money to debate things like conditions

3  precedent.  In any event, that's why -- I'm not trying

4  to resist your thought, I'm just concerned about words

5  like that for which I may not be fully aware of the

6  implications.

7      Q.   And if TVI was not in material breach, then

8  Crossroads would not have any claim against it if it

9  terminated?

10     A.   Well, we're going back around the same bend

11 here, but if all of the conditions precedent have not

12 been satisfied, so long as the terminating party is not

13 then in material breach, is what it says.

14     Q.   Now, did, in fact, TVI attempt to exercise

15 its right to terminate under this section?

16     A.   Yes.

17     Q.   And Crossroads received a communication

18 advising it that TVI was terminating the contract under

19 Section 8 of the contract?

20     A.   Yes.

21     Q.   As of August 1, were you aware of any other

22 approvals being -- besides the zoning commission that

23 needed to be obtained before construction of a tower

24 could begin?

25     A.   No.

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 91

1        Q.    Were you aware that the FAA approval was

2   required?

3        A.    No.

4        Q.    And had not been obtained?

5        A.    No.

6        Q.    Were you aware that siting council approval

7   was required?

8        A.    No.

9        Q.    Were you aware of any issues with respect to

10  the Connecticut Siting Council and the construction of

11  this tower?

12       A.    No.

13       Q.    Subsequent to September, October 2002, did

14  you learn of any issues with respect to the Connecticut

15  Siting Council and the construction of a new tower?

16       A.    I learned that Tower Ventures was saying that

17  that was required.  I don't know it from any other

18  source.

19       Q.    You personally don't know whether it was or

20  it wasn't required?

21       A.    That's correct.

22       Q.    Now, what was the status in terms of

23  economics of the wireless industry in the spring,

24  summer of 2002, was it getting better or worse than it

25  had been in 2000 and 2001?

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 92

1      A.    I'm in no position to answer that.  I don't

2    know.

3      Q.    Today, do you have any recollection of what

4    it was, what was happening in the wireless industry?

5      A.    No, I don't.  I mean, I know what I was told

6    by Bob Maccini, but that's all I know.

7      Q.    But I take it from that you weren't reading

8    journals in the wireless industry?

9      A.    No, I was not.

10     Q.    You didn't own stocks in any of the wireless

11   companies?

12     A.    Did not.

13     Q.    Weren't following them as potential

14   investments?

15     A.    Was not.

16     Q.    Had you had any discussions with any of the

17   people who might be lessees if the tower was

18   constructed, potential, coming on in 2002, -3 or -4?

19     A.    I offered to try to get the town of Old

20   Saybrook to become a customer on the tower once it was

21   built.

22     Q.    You mean the police and fire?

23     A.    Exactly, the emergency service.  And Keenan

24   said go for it and I did make some inquiries with the

25   town about whether they might have some interest in

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                              Don DeCesare

Page 93

1    that facility.

2         Q.   And did, in fact, the town of Old Saybrook

3    get alternate coverage or whatever as far as towers was

4    concerned?

5         A.   Not to this date they have not, but they have

6    now approved a plan to do something alternatively, yes.

7         Q.   Since the notification or the communications

8    from Tower Ventures terminating the contract, what has

9    Crossroads done with regard to the tower, has it made

10   any improvements to the tower?

11        A.   No.

12        Q.   Has it replaced the tower?

13        A.   No.

14        Q.   Does it have any plan, did it develop any

15   plans, further plans, for replacing or removing the

16   tower?

17        A.   No.

18        Q.   What efforts, if any, has it made, like you

19   did earlier to gain a broker, to find lessees or

20   tenants or purchasers of the tower?

21        A.   I have made several inquiries with people in

22   the industry to see whether there might be an

23   opportunity for someone else to partner with Crossroads

24   to develop this property, but to date, nothing has come

25   of those inquiries.

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 94

1        Q.    Is there anything in writing, did you

2    communicate with any industry associations, any

3    brokers, put anybody under contract to work on getting

4    leases for this property?

5        A.    No, I did not.

6        Q.    So what you testified to is what you've done

7    is all been by word of mouth or oral?

8        A.    Correct.

9        Q.    Have you had any inquiries since October of

10   2002?

11       A.    Not about this site.  I'm talking about the

12   auxiliary site.

13       Q.    Yes.

14       A.    Not about the auxiliary site.

15       Q.    I may have asked this, I apologize, but as

16   you understand Section 8, is it fair to say that

17   neither party, if they were not in material breach, had

18   to have a reason to terminate, had the absolute right

19   to terminate?

20       A.    Again, you're asking me for --

21       Q.    Your understanding.

22       A.    -- for my understanding.  Presuming that I'm

23   advised, and I would seek advice on such terms as

24   "conditions precedent," presuming that I'm advised that

25   that term has been properly met, then I would say that

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                Don DeCesare

Page 95

1    the condition, that the way that one would terminate

2    the agreement would be to see to it that both parts of

3    that sentence are, in fact, true and correct.

4        Q.   And if both parts are true and correct, all

5    you need to do is send a letter and say "I hereby

6    terminate"?

7        A.   Well, you have to send a letter subsequent to

8    9-A by, whatever it says you have to do, personally

9    serve or mail by certified or registered mail, that's

10   what you have to do.

11       Q.   And that's all.  You don't have to state a

12   reason why, just send that letter saying "I hereby

13   terminate"?

14       A.   Again, assuming that everything that is said

15   in number eight is, in fact, correctly achieved, yes.

16       Q.   Now, are you familiar with the term "due

17   diligence"?

18       A.   I know that it exists; I've heard it.

19       Q.   When you were -- well, what does it mean to

20   you?

21       A.   It means, in a business sense --

22       Q.   Yes, I'm talking about a business acquisition

23   or investment sense.

24       A.   Again, I can't say what it means in a

25   contract sense, but in a business sense, if I say to

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                Don DeCesare

Page 96

1    somebody I think I'll go do my due diligence, that

2    means that I'm going to make inquiries, I'm going to

3    consult experts, if I think I need them, to see that I

4    know everything there is to know about a deal that I

5    might wish to do.

6        Q.    And when you were looking into purchasing the

7    radio stations in '95, '96, or whenever it was, did you

8    perform due diligence or have somebody on your behalf

9    perform what you would think of as due diligence before

10   you bought those assets?

11       A.    Well, again, I probably would not have used

12   that term, even in my mind let alone to anybody else,

13   but I certainly made inquiries and asked to see any

14   contracts that might be in force when I might take

15   over, things of that sort, yes.

16       Q.    Would the word "investigate" be synonymous to

17   you with due diligence?

18       A.    Oh my.

19       Q.    I'm just looking for a word that might --

20   you're fighting the word "due diligence" -- that you

21   might feel more comfortable using.

22       A.    Well, let me think for a second and see if I

23   can find one for you.  I guess in the general sense of

24   the word "investigate," I would be okay with it, or

25   seriously inquire, something of that sort.

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 97

1       Q.    And you did that with regard to -- before you

2   purchased the radio station?

3       A.    Yes.

4       Q.    I mean, you didn't just negotiate with

5   somebody and say okay here's "X" dollars and I own it?

6       A.    I wish I had, but, no, I didn't do it that

7   way.

8       Q.    Did you look at things like study the

9   marketplace?

10      A.    You mean the radio marketplace?

11      Q.    Yes.

12      A.    Sure.

13      Q.    In fact, you had been doing that for awhile,

14  had you not, looking at various opportunities?

15      A.    Yes.

16      Q.    Were you familiar with the Connecticut valley

17  marketplace, in general?

18      A.    In general, yes.

19      Q.    And did you become very familiar with it in

20  specific as you were looking into those stations?

21      A.    As I was looking into the stations, I did

22  look into the market; I did make inquiries about the

23  market; I looked at publications; I spoke to different

24  people who were business people in the marketplace.

25      Q.    Did you look at their financials?

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 98

```
 1        A.    Whose financials?

 2        Q.    The radio stations' financials.

 3        A.    Yes.

 4        Q.    Did you touch base with any of the, their

 5   listeners, do any surveys?

 6        A.    Not specifically the listeners.  I did speak

 7   to a number of business leaders in the valley region.

 8   I did -- well, I already said I looked at publications

 9   and so on.

10        Q.    Did you look to see whether you thought there

11   was a chance for increasing their market penetration?

12        A.    Who's "their"?

13        Q.    The radio station market penetration,

14   advertising revenues.

15        A.    Well, I felt, based on the inquiries that I

16   was making, that there was opportunity to increase the

17   revenues for the stations, yes.

18        Q.    Was that of importance to you in the decision

19   of whether or not to go through with the purchase?

20        A.    I could be cute and say it was more important

21   to my wife, but it was more important to me, yes.

22        Q.    Would you agree that -- withdrawn.

23              There's a due diligence section in your

24   contract with TVI, is there not?

25        A.    Yes.
```

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 99

1        Q.    And Section 4?

2        A.    Two.

3              MR. GRUDBERG:   Two, I believe.

4        Q.    And were you aware of TVI doing any of this

5   due diligence?

6        A.    Well, I'll take them one by one as they're

7   listed here.  It says, "TVI may order with respect to

8   the property, one, the title commitment for lessees

9   title insurance;" I don't have any knowledge of whether

10  they did that.  Two, "a survey and/or," then comes    ·

11  three.  My sense is that they were doing the survey,

12  that's what some of those gentlemen were doing when

13  they were out there; although, again, I didn't -- it

14  wasn't presented to me as these are the gentlemen doing

15  the survey, these are the gentlemen doing something

16  else, but there were various folks looking over the

17  property and making notations about it.  Then three, "A

18  phase one environmental assessment and NEPA screen."

19  Again, I don't have any specific knowledge of whether

20  they did that or they didn't do that.

21       Q.    However, with regard to the environmental,

22  weren't those requirements that had to be met in order

23  to get the approvals from the zoning --

24       A.    I don't know.

25       Q.    -- commission?

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 100

```
 1        A.    I don't know.

 2        Q.    And so is it fair to say you don't recall in

 3   May and June TVI and Crossroads getting the necessary

 4   National Environmental Profile Act approval?

 5        A.    May and June of what year?

 6        Q.    2002.

 7        A.    We may have, I don't recall it that way,

 8   specifically.

 9        Q.    Environmental assessment approval, also

10   getting that in May or June of 2002?

11        A.    Could be, I don't know.

12        Q.    Do you recall that as being part of that long

13   process to get the approvals?

14        A.    Again, you know, various documents were going

15   to be filed, Bill was in charge of all of that, and

16   Bill was talking with TVI about what was needed and

17   when it was needed and sometimes I was asked to

18   participate, sometimes I wasn't.  I don't have a

19   specific recollection of being told on such and such a

20   date we are filing the phase one environmental

21   assessment.  Someone may have said it, I just don't

22   recall.

23        Q.    During this period of time, would you have

24   considered as part of the due diligence that TVI would

25   be looking into the marketplace and the financials and
```

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                    Don DeCesare

Page 101

1   what it looked like for prospects for tenants on the

2   tower?

3        A.    It was my understanding that they had already

4   done that prior to making the agreement.

5        Q.    And would you agree that if the, if their due

6   diligence showed that -- withdrawn.

7              Would you agree that a continuing assessment

8   of the marketplace would be part of the due diligence?

9        A.    Now you're asking me to imagine what TVI

10  would do in its business practice, and I just don't

11  know.

12       Q.    Would you believe it would be good business

13  practice to continue to be assessing the market as part

14  of due diligence?

15       A.    I guess I would think of it more in the

16  opposite, that is to say, if I were -- I would be

17  making a mistake if I wasn't keeping in touch with the

18  market.  But, again, I don't know what their business

19  practices are.

20              (Letter from Keenan Brinn to

21         Mr. DeCesare, 10/26/01 marked Defendant's

22         Exhibit 6 for identification)

23              MR. HUMPHREY:  For the record, Exhibit 6

24  for identification is a letter dated October 26, 2001

25  from Keenan Brinn to Mr. DeCesare.

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                          Don DeCesare

Page 102

1    A.    Okay.

2    Q.    Does that refresh your recollection when you

3    first received the tower survey?

4    A.    Well, it says here, and I certainly see that

5    it says here, that on October 26 he sent to me a

6    preliminary survey for the tower site and he's asking

7    me to note changes and prepare comments so he can

8    finalize it.

9    Q.    And is it fair to say, just looking at this

10   exhibit, you cannot recall whether that was the first

11   lattice, the second lattice or the first monopole?

12   A.    Yes, it's fair to say I cannot recall which

13   it was.

14                 (Letter of 5/2/02 marked Defendant's

15                 Exhibit 7 for identification)

16   Q.    Showing you a letter dated May 2, 2002, just

17   ask you to look at that and see if you recall having

18   seen a copy of that before today.

19   A.    I do recall this document.

20   Q.    Okay.  And you previously testified that

21   Tower, you had been told by Tower Ventures that the

22   tower needed additional strength to house other

23   tenants?

24   A.    No, I had been told by them that we should

25   replace it because the present one wouldn't be capable

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 103

1    of accommodating additional tenants.

2         Q.   So this letter is consistent with that?

3         A.   Yes.

4         Q.   Now, going back to Exhibit 6 for a moment,

5    what did you do --

6              That's the one with the plans, the one

7    paragraph letter.

8         A.   Okay.

9         Q.   -- what did you do with the plans?

10        A.   I don't recall, specifically.  I'm sure I

11   looked at them, he asked me to do it, and I don't doubt

12   that I did, and I'm sure that I gave him some comments

13   about them, but, you know, as to what exactly I said, I

14   don't know.

15        Q.   After looking at those first sets, few sets

16   of plans, did you have any further -- and the comments

17   you may have made regarding those and suggestions, did

18   you ever have any further changes, comments or

19   suggestions as the process went on with respect to the

20   location or height or anything else of the tower?

21        A.   No, I didn't make any recommendations about

22   it.  I was told that, you know, that it would be a

23   better idea to move it into, I'm calling it into, away

24   from the property line where it presently was and that

25   that would make it more likely to be approved, because

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 104

1    I think I said earlier I don't know whether Keenan said

2    that to me or whether Bill said it to me or whether

3    they both said it to me together, but I would certainly

4    acknowledge to you that I didn't object.

5                MR. HUMPHREY:  Would you mark this 8.

6                (Letter from Mr. Maccini to

7           Mr. DeCesare, 8/7/02 marked Defendant's

8           Exhibit 8 for identification)

9        Q.    Showing you Exhibit 8, which is a letter

10   dated August 7, 2002, which you've already testified,

11   but this is the actual letter; do you recall receiving

12   this letter?

13       A.    Yes, I do.

14                MR. HUMPHREY:  I have one more for you.

15                (Letter from Attorney Brown to Attorney

16           Wolfe, 8/9/02 marked Defendant's Exhibit 9

17           for identification)

18       Q.    Now, also showing you Exhibit 9, which is a

19   letter from Michael K. Brown to John W. Wolfe, and

20   we've had testimony that Mr. Brown was your business

21   attorney --

22       A.    That's correct.

23       Q.    -- and Mr. Wolfe was the attorney

24   representing TVI in connection with this acquisition or

25   the lease agreement which you had.

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 105

1      A.    Yes.

2      Q.    Showing you Exhibit 9, a letter dated August

3  9, do you recognize that, have you seen a copy of that

4  before today?

5      A.    Yes, I have.

6      Q.    And what is that letter?

7      A.    This is a letter from Attorney Brown to

8  Attorney Wolfe in effect responding to the letter of

9  August the 7th from Mr. Maccini to me.

10     Q.    And is that letter responding to the

11 purported termination by TVI in its August 7 letter?

12     A.    I think you can characterize it that way,

13 yes.

14     Q.    If you look at the last full paragraph, which

15 starts "TVI is in material breach"?

16     A.    Yes.

17     Q.    It cites to the 45 day time limit that is in

18 the agreement?

19     A.    Yes.

20     Q.    Was there anything else that you claim TVI

21 was in breach of in the agreement as of August 1, or

22 the time of this letter, 2002?

23     A.    This letter is August 9.

24     Q.    I'm talking about that general two-week time

25 period.

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                        Don DeCesare

Page 106
1        A.    Michael is stating that we believed TVI to be

2    in, as he puts it, material breach for violating the 45

3    day condition within the agreement.

4        Q.    Okay.  Is there anything else which you claim

5    was a material breach by TVI?

6        A.    Let me review the language here, if you don't

7    mind.

8                  (Pause in the proceedings)

9        A.    Well, there are several other things here

10   that Mr. Brown, Attorney Brown, references, and I guess

11   I would have to say that they are a part of what we are

12   saying because they're included here.

13       Q.    What do you claim are, besides the 45 days,

14   the material breach by TVI?

15       A.    Well, if you go to page two of Attorney

16   Brown's letter and you come to the second full

17   paragraph, the one that begins, "With respect to,"

18   Mr. Brown is saying that in Mr. Maccini's letter of

19   August the 7th Mr. Maccini says that the required

20   applications will be denied and Attorney Brown says

21   that Mr. Maccini's remark to that effect is simply not

22   true, that's a quote.

23       Q.    How is that relevant to a material breach?

24       A.    Well, you've got me now.  Again, I'm not

25   capable of defining material breach in legal terms.  So

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                Don DeCesare

Page 107

1   Attorney Brown felt it was important to include this

2   paragraph and I will defer to his expertise.

3        Q.   But in your words, what do you -- withdraw

4   the question.

5             What is it about this statement that the

6   application will be denied which would make TVI in

7   material breach of your agreement?

8        A.   I don't know.

9        Q.   Okay.  What else, if anything?

10       A.   Then additionally, Attorney Brown goes on to

11  say in the fourth full paragraph, the one that begins,

12  "Should the pending application be withdrawn," he says

13  that my personal reputation would be damaged as would

14  Crossroads.

15       Q.   And, in fact, did TVI continue to process the

16  application through its approval?

17       A.   In fact, after some back and forth subsequent

18  to this letter, TVI did agree to continue the approval

19  process to its conclusion and did so.

20       Q.   And, in fact, they did do it?

21       A.   Yes, they did.

22             (Letter from Robert Maccini to Don

23             DeCesare, 8/16/02 marked Defendant's Exhibit

24             10 for identification)

25             (Letter of 11/25/02 marked Defendant

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 108

1              Exhibit 11 for identification)

2        Q.   Showing you what has been marked as Exhibit

3    10, I ask you if you would take a look at that, and why

4    don't we take a lunch rest and you can read it during

5    that.

6              (Luncheon recess:   12:56 - 1:42)

7        Q.   A number of times during your testimony

8    you've referred to your frustration of the time, length

9    of time that it was taking to process the application

10   or applications, is there anything that you recall that

11   TVI did that was unnecessary to be done?

12       A.   Well, the answer is I wouldn't really be able

13   to say for sure because I'm not intimately familiar

14   with all of the different aspects of how you apply to

15   get one of these things built, and when we did the

16   deal, I was of the view that TVI was expert in all of

17   this.

18       Q.   So you're not aware of anything Childress or

19   TVI did that was unnecessary and caused a delay of the

20   process?

21       A.   Again, I really can't say.  No, I can't point

22   to one thing and say "ah-ha."  I was incredibly

23   frustrated with the length of it and that frustration

24   materialized in frequent comments about it.

25       Q.   And to the best of your knowledge, what TVI

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 109

1    and Childress were doing was complying with Old

2    Saybrook requirements in order to get whatever permit

3    approvals that were necessary?

4         A.    I suppose, yes.

5         Q.    Now, the Exhibit 4, which is the December 26

6    letter --

7         A.    Yes.

8         Q.    -- and if I can characterize that as another

9    attempt to get, goes to the building permit process,

10   which then, as you've testified, led to your meetings

11   in early January with the zoning commission and

12   Chester.  If Mr. Spigle had been successful in

13   convincing the town that a building permit was adequate

14   in this instance and they got a building permit about

15   that time, would you still have thought in your mind

16   that TVI was in breach of its agreement with you?

17        A.    Oh, I would, yes.

18        Q.    Why would you have thought that?

19        A.    Because that's well after the 45 days

20   expired.

21        Q.    Now, I think you testified that you were not

22   aware what documents, surveys or other material was

23   necessary to be filed to get a building permit; is that

24   correct?

25        A.    Yes.

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                                Don DeCesare

Page 110

```
 1        Q.    I think you testified that you also, when it

 2   came to the zoning application, you weren't aware,

 3   either, what documents were necessary for that project?

 4        A.    Specifically speaking, yes, I was not aware.

 5        Q.    Is it fair to say that in the fall of 2001

 6   you did not know how long it would take to get the

 7   documents that were necessary to be filed?

 8        A.    I, again, I guess I would look at it in the

 9   reverse.  We had agreed that 45 days would be adequate

10   and the 45 days expired and nothing had been done.

11        Q.    But you at that time did not know what was

12   necessary -- withdrawn.

13              And that period of time, October, November of

14   2001, you didn't know what was necessary to obtain to

15   file?

16        A.    I never presented myself as an expert in

17   obtaining those things.

18        Q.    So it's fair to say you didn't know what was

19   necessary?

20        A.    That's correct.

21        Q.    Nor did you know how long it would take to

22   get whatever was necessary?

23        A.    That's correct.

24        Q.    So is it fair to say in point of fact that 45

25   days didn't have any real meaning to you?
```

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 111

1        A.    No, it's not fair to say that at all.  It had

2    a definite meaning to me.  We negotiated it into an

3    agreement.  Tower Ventures negotiated long and hard on

4    getting different clauses into the agreement, including

5    that one.  So when I agreed to it, I took it to be

6    meaningful.

7        Q.    Are you saying Tower Ventures wanted the 45

8    days in the agreement?

9        A.    I'm saying in the negotiations to get the

10   agreement, just about every clause that's in there was

11   negotiated long and hard, back and forth, and I would

12   include that one among them.

13       Q.    And was that a clause that you wanted, that

14   Crossroads wanted in the contract?

15       A.    I don't know who initiated the idea of having

16   an expiration clause, but we certainly did go back and

17   forth about it.

18       Q.    But when you signed the contract, and for the

19   60 days after you signed the contract, you had no idea

20   whether or not it was possible to even comply with that

21   45 day period?

22       A.    No, I would have to say quite to the

23   contrary.  I had been told that 45 days would be

24   adequate and I took that to be the case.

25       Q.    Okay.  And had you been told that 45 days

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 112

1    would be adequate if, was able to be done by obtaining

2    a building permit?

3        A.    No, it wasn't characterized in ifs or maybes,

4    it was characterized as we can get this done in 45 days

5    and that's the amount of time that we want to put into

6    the agreement.

7        Q.    And yet at no time, even though you've now

8    testified you consider that a breach of the agreement,

9    did you ever say anything or communicate in writing

10   anything to Tower Ventures about it being a breach?

11       A.    That's correct.   I said earlier that I did

12   not specifically use the word "breach" or the term

13   "material breach" either orally or in writing.

14       Q.    And you did not have your attorney send any

15   notice to Tower Ventures that the 45 days having

16   passed, Crossroads considered them to be in breach?

17       A.    I did not.

18       Q.    Did you discuss it with your attorney?

19       A.    I did.

20       Q.    And you decided not to send any notice?

21       A.    After our discussions, as I think I said

22   earlier today, I decided to proceed and see what, if

23   any, damages might occur.

24       Q.    So even though the 45 days had passed, you

25   were willing to, Crossroads was willing to proceed and

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                           Don DeCesare

Page 113

1    try to make a tower be a reality?

2         A.    Yes.

3         Q.    And was willing to do that January, February

4    of 2002, June of 2002?

5         A.    Yes.

6         Q.    July of 2002?

7         A.    Yes.

8         Q.    Okay.  Looking at Exhibit 10, which we marked

9    just before the --

10        A.    Yes, I have it.

11        Q.    And Exhibit 10 is what?

12        A.    This is a letter dated August the 16th, 2002

13   from Robert J. Maccini to me.

14        Q.    And you previously testified, talked about,

15   and your lawyer requested, that TVI continue the

16   application process and not drop the ball on the

17   approval?

18        A.    I sure did.

19        Q.    And you've testified, also, that they did

20   that?

21        A.    Yes, they did.

22        Q.    Did you ever sign, as requested by

23   Mr. Maccini, Exhibit 10 and return it to him?

24        A.    I'm sorry, where are we looking now?  What

25   are we looking at?

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                    Don DeCesare

Page 114

```
1        Q.   Page two.

2        A.   Page two.  I'm looking for the reference to

3   Exhibit 10.  You mean this is Exhibit 10?

4        Q.   This is Exhibit 10, I'm sorry.

5        A.   I'm sure I did.  I don't see a signature on

6   this document that I have in front of me, but I feel

7   confident that I did.

8        Q.   Well --

9             MR. HUMPHREY:  Off the record.

10            (Remarks off the record)

11       A.   I'm sorry, can you repeat whatever question.

12       Q.   Is it your recollection that you signed this

13   letter?

14       A.   I still think that I did, but I can't say.  I

15   mean, I don't see a signature here.

16       Q.   And I don't think we have a copy in our file

17   with one showing your signature.  But whatever it is,

18   either you did or you didn't and the fact will show

19   some place.

20       A.   I guess so.

21       Q.   Now, looking at Exhibit 11, are you familiar

22   with that one?

23       A.   Yes.

24       Q.   Is that your signature on Exhibit 11?

25       A.   Yes, it is.
```

Brandon Smith Reporting

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 115

1        Q.    And what was the purpose for this letter?

2        A.    This is a letter dated November the 25th of

3    2002 and the purpose of this letter is to seek from

4    Tower Ventures the approved plans and drawings, as it,

5    in fact, states in that exact language, for the

6    approved telecommunications facility for 77 Spring

7    Brook Road, Old Saybrook.

8        Q.    Now, when -- the approval was obtained from

9    the zoning commission, is there a period of time in

10   which you have to, the permittee has to take some

11   action in order to, so that permit doesn't expire?

12       A.    I was concerned about that and I did not know

13   what the specific period of time might be, but I

14   thought that, prudently, we ought to get on with it now

15   that it had been approved.

16       Q.    Were you -- or did you become aware that the

17   approval is good for six months so it would have

18   expired in April of 2003 if nothing was done at the

19   site?

20       A.    I don't think anyone ever put it to me that

21   way, but I was very much concerned about the prospect

22   that there would be an expiration on an approval.

23       Q.    Okay.  Assuming, however, the expiration time

24   is a year or less in Old Saybrook, Crossroads didn't do

25   anything to keep the permit active, didn't start any

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                           Don DeCesare

Page 116

1    construction or do anything or attempt to renew the

2    approval process with the town?

3         A.    We couldn't, we felt, without the plans.

4         Q.    Weren't the plans a public file?  They're all

5    of public record, are they not?

6         A.    Well, you know, sir, that is a very good

7    point.  I wondered about that myself, and after seeking

8    advice, I was told that the plans belong to Tower

9    Ventures and that I should seek permission to use them

10   from Tower Ventures, which is what caused this letter

11   to be written.

12        Q.    Permission to use, but you could get copies

13   of the record, they were on file with the town,

14   correct?

15        A.    Right.  But we're splitting hairs about

16   getting copies for purposes of intellectual

17   understanding and using them for purposes of actually

18   building something.  And that was an area that I was

19   very much concerned about.

20        Q.    But is it fair to say that in November of

21   2002 you were aware that you could obtain, readily

22   obtain copies of these materials at the town hall?

23        A.    It is fair to say that I thought that I could

24   get copies of them, but it is also fair to say, as I

25   just did, that I sought advice on that point and I was

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                          Don DeCesare

Page 117

1    advised that --

2              MR. GRUDBERG:  Don't go into

3    attorney/client privilege.

4              THE WITNESS:  I apologize.

5         Q.   Did you ever find out from the town what was

6    necessary, if anything, further to be done in order to

7    start construction now that you had the approval?

8         A.   No.

9         Q.   Did you know then or do you know now what the

10   next step would have been?

11        A.   The next step, as described on the approval

12   document, is to seek a building permit.

13        Q.   And did Crossroads ever seek a building

14   permit?

15        A.   No.

16        Q.   Okay.  If you would get Exhibit 3, if you

17   would turn to paragraph 44, which is on page 10.

18        A.   I have page 10 in front of me.

19        Q.   Okay.  And we're now in count three of the

20   complaint, which is the breach of implied covenant of

21   good faith and fair dealing.

22        A.   Yes.

23        Q.   Do you understand that your complaint as it

24   now exists is in three counts, a breach of contract,

25   count three, which we talked about, I just mentioned a

**Brandon Smith Reporting**

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 118

1    breach of covenant and good faith and fair dealing, and

2    a Connecticut Unfair Trade Practices violation?

3         A.   Yes.

4         Q.   Now, looking at count 44 --

5         A.   Yes.  Paragraph 44?

6         Q.   Paragraph 44, it's your allegation that Tower

7    Ventures tried to coerce Crossroads to agree to revised

8    contract terms?

9         A.   Yes, that's what it says.

10        Q.   And what do you consider or why do you

11   consider that to be a breach of good faith to try to

12   get somebody to agree to a different contract?

13        A.   Because it was my view that Tower Ventures,

14   having already been in breach of the agreement, looked

15   to benefit from the delay that was subsequent to the

16   breach.

17        Q.   Okay.  If we assume that Tower Ventures was

18   not in breach, not in breach, would you consider it

19   then to be bad faith to try to negotiate different

20   terms in a contract?

21        A.   I don't know.  I mean, you're making a

22   gigantic assumption that I'm not sure I can accept.

23        Q.   I'm asking you to make that assumption and

24   accept it.

25        A.   Hypothetically, using the subjunctive, if

Brandon Smith Reporting

f248a4e5-5c39-4ec8-b669-3a1511329e81

Crossroads vs Tower Ventures, Inc.

6/3/2004

Don DeCesare

Page 119

1    Tower Ventures were not in material breach or breach or

2    whatever the appropriate legal term is for breaching

3    the agreement and if they had approached me to revise

4    the deal, I would have been willing to hear whatever

5    they asked me to do and I would have made a judgment

6    whether I was willing to do it or not.

7        Q.    So you wouldn't consider that to be something

8    that's being done in bad faith?

9        A.    Again, I don't usually think in that "bad

10   faith" terms.

11       Q.  ` Or improperly?

12       A.    Again, presuming the very large assumption

13   that we're making here, business people often try to

14   amend deals.

15       Q.    And it's your testimony that to your belief

16   Crossroads was never in violation of this agreement?

17       A.    Yes, that is my testimony.

18       Q.    So would it have been bad faith or improper

19   for Crossroads to go to TVI and say, geez, I need to

20   renegotiate this or I've got another deal for $2

21   million, yours isn't quite up to that, I'd like to get

22   more money, would that be bad faith?

23       A.    I don't know that I would ever do it that

24   way.  Again, with these gigantic assumptions being

25   made, you know, if we were in a situation where both

Crossroads vs Tower Ventures, Inc.

6/3/2004                                                      Don DeCesare

Page 120

1    parties were moving forward appropriately under the

2    agreement and one party or the other decided to offer a

3    different option, I guess either party could have done

4    that.

5         Q.    You have been in business now privately for

6    eight years or more?

7         A.    Yes.

8         Q.    Don't you make assumptions practically every

9    day on what things will happen, what the market

10   conditions will be?

11        A.    Assumptions.   I certainly often have to

12   review decisions, sometimes I look to change them and

13   sometimes I don't.

14        Q.    But assumptions are common, it's a common

15   thing that you do in business all the time, isn't it?

16        A.    I guess it depends on what you're, you know,

17   on what you're assuming.   If you're assuming something

18   that's of no significance, then it has little

19   significance, or if your assuming something of large

20   significance, than it has large significance.

21        Q.    What I'm trying to get at is why you're

22   having such a problem dealing with the assumption that,

23   in a hypothetical question, that Tower Ventures was not

24   in breach?

25        A.    Because I --