Case 3:03-cv-00459-PCD    Document 44-5    Filed 10/29/2004    Page 1 of 40
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                           June 22, 2004

Page 81

 1    figure -- approximately what the anticipated

 2    payoff figure was for the Raycee mortgage?

 3        A.    It was 150,000 or less.

 4        Q.    Did there come a point in time, Mr.

 5    Maccini, when you concluded that the terms of the

 6    September 2001 agreement with Crossroads were not

 7    economically beneficial to Tower Ventures,

 8    Incorporated?

 9        A.    Yes.

10        Q.    Do you remember when you first reached

11    that conclusion?

12        A.    No.

13        Q.    Do you remember what it was that led

14    you to reach that conclusion?

15        A.    Basically the two carriers that had

16    expressed interest in going on the tower were no

17    longer interested in leasing space, nor was

18    anyone else interested in leasing space on the

19    tower.

20        Q.    You have a clear recollection of that?

21        A.    Yes.

22        Q.    How was it -- let's start with the

23    first carrier that you mentioned, which was

24    Verizon.

25        A.    Yes.

Page 82

1      Q.    How is it that you learned that

2   Verizon -- is it Verizon Wireless, by the way?

3      A.    Yes.

4      Q.    How was it that you learned that

5   Verizon Wireless was no longer interested in

6   leasing space on the tower that you were looking

7   to get approved and built in Old Saybrook with

8   Crossroads?

9      A.    From a telephone conversation with

10  someone representing Verizon.

11     Q.    When you say "someone representing," is

12  this an agent or is this someone who is a Verizon

13  Wireless employee?

14     A.    Well, typically in the tower industry,

15  you have site acquisition companies that do work

16  for the carriers.  And they're the ones that go

17  out, look at potential tower sites and lease up

18  those tower sites.  So sometimes they will be a

19  direct employee but more often they're a site

20  acquisition company representing a carrier.

21              So offhand, I don't remember

22  whether this person was an employee or a member

23  of a site acquisition company.

24     Q.    Do you remember what his or her name

25  was?

Page 83

1       A.    I don't.

2       Q.    Just so I have it clear in my head,

3   when you talk about a site acquisition company,

4   would that be the cellular tower equivalent of a

5   real estate agent?  Similar function?

6       A.    To some extent, yes.

7       Q.    They would -- their function would be

8   to work for the potential tenant on the one side,

9   and you've got potential landlords, if you will,

10  on the other, with space to rent, and they're

11  helping theoretically to facilitate a deal

12  between those two segments of the market; is

13  that -- do I have it right?

14      A.    Not quite.  They actually represent the

15  cell phone company.  So in this case, they work

16  for Verizon and they are paid by Verizon for the

17  various leases and sites that they locate.

18      Q.    All right.  So Verizon, rather than

19  have some in-house department that is responsible

20  for finding good spots to put their antennae or

21  electronics or whatever it is, they've got an

22  outside company that helps them do that and

23  pinpoint ideal locations for new equipment and

24  help make deals for them to place such equipment;

25  is that right?

1       A.    Yes.

2       Q.    You don't remember who it was that you

3    spoke to in this phone conversation, and you

4    don't remember when it was; is that right?

5       A.    Sometime during 2002.  But the exact

6    period of time, no.

7       Q.    Tell me as precisely as you can

8    remember it -- and I realize it's a couple years

9    ago, as precisely as you can remember it, what

10   the person said about Verizon's interest or lack

11   thereof in the tower you were thinking of

12   developing in Old Saybrook.

13      A.    Well, this is during a period of time

14   when the cell phone industry was in decline, and

15   all the carriers were cutting back their building

16   programs.  And a lot of sites that they were

17   thinking about building were basically defunded,

18   and I believe that's why they decided not to

19   pursue this thing.

20      Q.    Is that what was told to you?

21      A.    I believe so, yes.

22      Q.    Okay.  Had you spoken with this person

23   before about the possibility of Verizon Wireless

24   renting space on this Old Saybrook tower that you

25   planned to develop?

Page 85

1    A.    Those conversations were primarily with

2  Keenan Brinn.

3    Q.    But Mr. Brinn had told you --

4  subsequently told you about them, right?

5    A.    Well, they were kind of ongoing

6  discussions about Verizon going on this tower

7  that Mr. Brinn initiated in his effort to secure

8  tenants for the tower.

9    Q.    This decline of the cell industry that

10  you talked about, do you remember when that

11  began?

12    A.    Roughly in 2001, and continued really

13  up till this past year.

14    Q.    Had it begun when this agreement was

15  signed, September 2001?

16    A.    To some extent, yes.  I'm not sure of

17  the actual, you know, degree it had begun, but --

18    Q.    It was your understanding that Mr.

19  Brinn was having ongoing discussions with someone

20  at an acquisition company about the prospect of

21  Verizon as a tenant on the Old Saybrook tower; is

22  that correct?

23    A.    Yes.

24    Q.    This person who you remember speaking

25  to directly later on, was this the same person,

 1    to your understanding, that Mr. Brinn had been

 2    talking with?

 3         A.    One of the people, yes.

 4         Q.    So do you remember the names of any of

 5    the people that Mr. Brinn had been speaking with?

 6         A.    I don't.

 7         Q.    But they were, as best you remember,

 8    affiliated with the site acquisition company?

 9         A.    Yes.

10         Q.    Okay.  Who initiated this conversation

11    we're talking about, Mr. Maccini, was it you or

12    the person with the site acquisition company?

13         A.    The site acquisition company.

14         Q.    Do you know why it was that they had

15    called you directly rather than speaking with Mr.

16    Brinn?

17         A.    Because I think we may have sent them a

18    draft lease, and that's a province of what I do,

19    so I believe that person was calling to tell me

20    that, you know, they were not going to go forward

21    and negotiate the lease and go in the tower.

22         Q.    Do you remember whether this

23    conversation took place before or after August of

24    2002?

25         A.    Before.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                        June 22, 2004

Page 87

1        Q.   Okay.  Now, you wrote a letter in early

2    August of 2002 -- which we'll get to in a little

3    while -- to Mr. DeCesare and Crossroads,

4    purporting to exercise a right to terminate the

5    agreement with Crossroads, right?

6        A.   Yes.

7        Q.   And was this conversation with Verizon

8    Wireless representative a factor in your decision

9    to try to terminate the deal with Crossroads?

10       A.   Yes.

11       Q.   Let's talk about T-Mobile or what was

12   the other one, Omni --

13       A.   Well, they're the same.  Today it's

14   T-Mobile but at the time, it was Omnipoint.

15       Q.   You said earlier it was your

16   understanding, prior to entering into the

17   Crossroads deal, that Omnipoint expected to be

18   renting space on the tower, right?

19       A.   Yes.

20       Q.   And did that expectation change at some

21   point?

22       A.   Yes.

23       Q.   Do you remember when it changed?

24       A.   During early part of 2002.

25       Q.   So certainly prior to early August of

Page 88

1    2002, right?

2         A.    Yes.

3         Q.    What, if any, communication did you

4    have directly with Omnipoint or a representative

5    of Omnipoint?

6         A.    I don't recall any directly.  I believe

7    it came through Keenan.

8         Q.    What do you remember Mr. Brinn telling

9    you concerning his conversations on the subject

10   of Omnipoint's interest in space on the tower?

11        A.    That they were no longer interested in

12   leasing space on the Old Saybrook tower.

13        Q.    Do you remember whether Mr. Brinn told

14   you who it was he had talked with?

15        A.    No.

16        Q.    Do you remember whether it was

17   information -- whether this information came to

18   Mr. Brinn from a site acquisition company, such

19   as the ones we've been talking about, or whether

20   it was directly from an Omnipoint employee?

21        A.    I don't.

22        Q.    I know you don't remember an exact

23   date.  Can you give me even an approximate date

24   when this information was conveyed to you by Mr.

25   Brinn?

Page 89

```
 1        A.    All I can tell you is that it occurred
 2   prior to the date of my termination letter.
 3        Q.    Now, back in 2002, there were certainly
 4   more cellular carriers operating than Verizon and
 5   Omnipoint/T-Mobile, correct?
 6        A.    Correct.
 7        Q.    We've got Cingular back then; is that
 8   correct?
 9        A.    Yes.
10        Q.    AT&T Wireless?
11        A.    Yes.
12        Q.    Sprint PCS?
13        A.    Yes.
14        Q.    Nextel?
15        A.    Yes.
16        Q.    Who else?
17        A.    That's it.
18        Q.    What efforts, if any, did Tower
19   Ventures undertake to see whether any of those
20   other possible tenants would be interested in
21   space on the Old Saybrook tower?
22        A.    I believe Keenan contacted all of them,
23   and the others weren't interested in leasing
24   space on the tower.
25        Q.    And is it your recollection that these
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 90

1    communications occurred prior to your termination

2    letter of August 7?

3         A.    Yes.

4         Q.    So is it your recollection that -- Mr.

5    Maccini, that as of August 7th, 2002, when you

6    wrote the termination letter, Verizon had told

7    Tower, either directly or indirectly, that it was

8    not interested in space, right?

9         A.    Uh-huh.  Yes.

10         Q.    Omnipoint/T-Mobile had taken the same

11    position, right?

12         A.    Yes.

13         Q.    And the other four carriers we listed

14    had indicated that they were not interested in

15    space either, right?

16         A.    Yes.

17         Q.    So you thought -- as of the date you

18    wrote that letter, you thought you had zero

19    potential cellular tenants at your disposal to

20    take occupancy on that tower even if you got it

21    built; is that correct?

22         A.    That's correct.

23         Q.    What other source of revenue would

24    there be for Tower Ventures, if you couldn't put

25    cellular carriers up there?

1        A.    Almost none.   There would be the

2    potential for two-way type businesses, but for

3    the most part, those businesses have all been

4    around for a while, and if they had a

5    communication need, they would have already have

6    found a location.   And those types of businesses

7    need far fewer tower sites because typically they

8    go out 15, 20 miles, whereas a cell phone carrier

9    may go out just a couple of miles in terms of the

10   coverage area of their signal.

11       Q.    Under the proposed -- or under the deal

12   with Crossroads, Tower would have been receiving

13   mortgage payments, right?

14       A.    Correct.

15       Q.    And Tower would have owned the tower

16   itself, right?

17       A.    Yes.

18       Q.    And the other revenue to Tower would

19   have been from prospective tenants, right?

20       A.    Correct.

21       Q.    And that revenue was going to be shared

22   with Crossroads, correct?

23       A.    That's correct.

24       Q.    Why don't we go back to the agreement.

25            MR. GRUDBERG:   Off the record.

Page 92

```
 1                 (Discussion off the record.)

 2                 (Recess:  1:05 to 1:15 p.m.)

 3   BY MR. GRUDBERG:

 4        Q.    Before we broke, Mr. Maccini, we were

 5   talking about the changes in the cellular

 6   telephone climate generally, and specific changes

 7   that had come to your attention concerning the

 8   prospects for the Old Saybrook site, and you

 9   recalled a termination letter that you sent to

10   Mr. DeCesare, right?

11        A.    Yes.

12        Q.    And that was purporting to exercise a

13   right of termination under the agreement with

14   Crossroads; is that right?

15        A.    Yes.

16        Q.    And now you still have the agreement,

17   Exhibit 2, in front of you, correct?

18        A.    Yes.

19        Q.    And do you recall what provision of the

20   agreement it was that you were invoking in

21   attempting to terminate the agreement with

22   Crossroads?

23        A.    Well, I believe in the letter I stated

24   that the failure to obtain all the necessary

25   approvals by -- I believe it was July 30th,
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 22, 2004

Page 93

1    2002.

2         Q.    Let me help you along.  If you'd turn

3    to the third page, and check out paragraph

4    eight.

5         A.    Yes.

6         Q.    Does that refresh your memory?

7         A.    Yes.   There were a number of conditions

8    precedent to entering into or to kind of closing,

9    if you will.  One of them was obtaining all

10   approvals.  The other -- I believe there's a

11   definition of "conditions precedent," but one of

12   those is our satisfactory completion and approval

13   of our due diligence, which based on some of the

14   things that I've told you relative to there not

15   being any tenants, we also elected to terminate

16   because without any tenants, it's not much of a

17   business.  So I think there were a number of --

18   you know, there were also some issues relative to

19   the underlying property.

20              There was a utility easement that

21   was not assignable, which is the way the power

22   comes into the site, and that was an issue.

23   There was another mortgage on the property

24   from -- I believe it was Webster Bank, where we

25   had tried to secure an SNDA, a subordination and

1    nondisturbance agreement, without which we would

2    never develop a tower, because -- I don't know if

3    you want me to -- do you want me to continue?

4        Q.    Let me cut you off and we'll loop back

5    on some of the things you said.

6              Would you agree with me that any

7    right to terminate that either party might have

8    had under this agreement, under this paragraph

9    eight that we've been talking about, was

10   dependent on that party not being in material

11   breach of the agreement?

12       A.    No.

13       Q.    That's not how you understood it?  Let

14   me ask it this way.  Suppose as of August 7,

15   2002, Tower Ventures, Incorporated had been in

16   material breach of its agreement with

17   Crossroads.  As you understood paragraph eight,

18   would Tower Ventures have had the right to

19   terminate the agreement?

20       A.    Well, it does say "so long as the

21   terminating party is not then in material breach

22   of this agreement."

23       Q.    So did that -- did you understand that

24   to mean that if the terminating party was then in

25   material breach of the agreement, it did not have

1      the right to terminate?  Is that how you read

2      that?

3          A.   Yes.

4          Q.   So if Tower Ventures was in material

5      breach of the agreement, then it did not have a

6      right to terminate as of August 7, 2002,

7      correct?

8                   MR. HUMPHREY:  I'll object to the

9      form.

10                  But you can answer it.

11         Q.   Answer it if you can.

12         A.   Yes.

13         Q.   Now, you mentioned certain conditions

14     precedent, that, in your view, back in August

15     2002 had not been met, right?

16         A.   That's correct.

17         Q.   One of them that you mentioned was the

18     receipt of all of the approvals, as that term is

19     defined in the agreement, right?

20         A.   Yes.

21         Q.   Now, there were some others that you

22     also mentioned.  You referred to a due diligence

23     review; is that correct?

24         A.   That's right.

25         Q.   And in the category of due diligence,

1    you placed the fact that you hadn't been able to

2    find any tenants for the tower; is that right?

3         A.    Well, we thought we had two tenants,

4    and then those two tenants went away.  So that

5    was one of the factors, yes.

6         Q.    Prior to entering into the agreement in

7    September of 2001, Tower Ventures investigated

8    the potential profitability of a tower at that

9    site, right?

10        A.    Generally, yes.

11        Q.    And more than generally, one of the

12   specific things that I think you said you looked

13   into was what tenants might be available, right?

14        A.    Correct.

15        Q.    And you felt comfortable, in September

16   2001, when you signed the agreement, that you had

17   at least two tenants lined up to rent space on

18   the tower, right?

19        A.    At that time, but the agreement does

20   not stipulate any end period for the due

21   diligence process, so due diligence was ongoing

22   and continuing throughout this whole process.  We

23   did not just do the due diligence before we

24   signed the agreement, and then did not continue.

25   Otherwise, that due diligence provision would not

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 97

1    have been in the agreement.

2        Q.    What's your understanding generally of

3    the term "due diligence," Mr. Maccini?

4        A.    In this instance, you would look at the

5    ownership of the property, look at the liens and

6    encumbrances surrounding the property, the

7    business prospects for the tower in terms of

8    being able to lease out space on the tower, the

9    expenses in operating the tower, the kind of

10   general competition for other tower space or

11   other tower -- competing towers in the area, the

12   general condition of the wireless industry.  I

13   mean, a number of factors.

14       Q.    So is it your understanding that under

15   the due diligence clause of the Crossroads

16   agreement, if at any point after the execution of

17   the agreement, Tower Ventures became concerned

18   about either the availability of tenants or any

19   issue at all, it had the right to say, "Sorry,

20   our due diligence review has indicated to us that

21   this isn't a good deal and we have a right to get

22   out"?

23       A.    Absolutely.

24       Q.    And it was your understanding that that

25   right extended not just to environmental issues

1    relating to the property or title issues relating

2    to the property, but to broader issues such as

3    the potential profitability of the deal to Tower

4    Ventures?

5        A.    Yes.

6        Q.    Am I correct, Mr. Maccini, that under

7    that interpretation of the due diligence

8    provision, if at any point prior to signing the

9    ground lease Tower Ventures wanted to get out of

10   the deal, it could; that's how you viewed it?

11       A.    Yes.

12       Q.    No matter what the reason?  If you

13   didn't like the deal, you could get out, right?

14       A.    Correct.

15       Q.    Okay.  You did not view due diligence

16   being limited to issues such as a phase one

17   environmental assessment, a NEPA screen, or title

18   insurance or inspecting the property?

19       A.    Those are some of them.  And it also

20   says, "other investigations as it reasonably may

21   deem appropriate. "

22       Q.    And in your view, that phrase, "other

23   investigations as it reasonably may deem

24   appropriate," would have extended to something

25   like investigation about whether it's still a

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 22, 2004

Page 99

```
1    good deal for Tower Ventures; is that correct?

2         A.   Yes.

3         Q.   You mentioned a mortgage that you had

4    discovered that Webster Bank apparently held on

5    the property?

6         A.   Yes.

7         Q.   Did you raise that by letter with

8    Crossroads and Mr. DeCesare?

9         A.   I don't recall, but that would have

10   been my attorney who was representing me, who

11   performed the title review.

12        Q.   Do you remember how it was that Webster

13   came to hold a mortgage on the property, what the

14   mortgage was in connection with?

15        A.   I think it related to Don DeCesare's

16   radio station businesses.

17        Q.   And would this have been what we would

18   commonly refer to as a second mortgage?

19        A.   I'm not sure.

20        Q.   It's your memory that the mortgage was

21   placed on the property by Mr. DeCesare, though,

22   in connection with his radio station businesses,

23   right?

24        A.   By the bank, correct.

25        Q.   And the initial mortgage that you were
```

1    going to step into the shoes of was the Raycee

2    mortgage that was on the property from the date

3    Mr. DeCesare purchased it, right?

4        A.   Well, I'm not sure "step into the shoes

5    of" is a correct characterization.  We were going

6    to refinance it.  I'm not so sure we were

7    stepping into the shoes of it.

8        Q.   But you didn't envision yourself having

9    any lesser rights than Mr. Raycee would have had,

10   as the present mortgage holder, correct?

11       A.   No.

12       Q.   So if we compare it to a home

13   refinancing, you would be like a bank refinancing

14   a first mortgage, right?

15       A.   Well, I believe -- again, I'm not a

16   lawyer, but I believe there's, you know, some

17   question as to that UCC filing would have been

18   removed, and the second, unless there was some

19   kind of a subordination agreement, which I don't

20   believe existed, would have been first of record,

21   and we would have potentially been behind them.

22       Q.   And you don't recall raising this in

23   writing with -- this concern about a Webster Bank

24   mortgage, you don't recall raising that with Mr.

25   DeCesare?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 22, 2004

Page 101

```
 1          A.    That would have been in the province of

 2     my attorney.

 3          Q.    So Mr. Wolfe would have done that?

 4          A.    Correct.

 5          Q.    And also within your notion of due

 6     diligence under the agreement with Crossroads,

 7     fell the general health of the cellular phone

 8     industry, that was also something that, you know,

 9     a change in, in your mind, would warrant you

10     saying on behalf of Tower, "We're not satisfied

11     with our due diligence review and we want to get

12     out of the agreement"?

13          A.    Absolutely.    Tower is a business.    And

14     all the factors that bear in that business, we

15     were going to take into account.

16          Q.    Is it fair to state, Mr. Maccini, that

17     when you signed this agreement back in September

18     2001, as you interpret this due diligence

19     provision, if it was a good deal for Tower

20     Ventures, you could continue in it, and if it was

21     a bad deal, you believed you could get out of it

22     whenever you wanted?

23          A.    Under the terms*of the agreement, yes.

24          Q.    Notwithstanding your signature?

25          A.    Could you rephrase the question?
```

Page 102

1              MR. HUMPHREY:  It's leading in the

2    sense of because of his signature.

3         Q.   By signing the agreement, you

4    understood yourself to be entering into an

5    agreement that if you believed was favorable for

6    your company, you could continue in, but if you,

7    at any point prior to the signing of a ground

8    lease, believed it to be disadvantageous for your

9    company, you could get out of; is that fair?

10        A.   I think it's the -- those things that

11   bear on the business of operating a tower at this

12   location in Old Saybrook, Connecticut.

13        Q.   Now, there came a point in time, as

14   we've discussed, that you decided to exercise

15   what you believed to be a right to get out from

16   the agreement with Crossroads, right?

17        A.   Yes.

18        Q.   And that was done in a letter dated

19   August 7th, 2002, to Mr. DeCesare, right?

20        A.   Yes.

21        Q.   And showing you a copy of Exhibit 8

22   from a prior proceeding in this matter, that's

23   the termination letter that we've been talking

24   about, right?

25        A.   Yes.

Page 103

1      Q.   And in the first paragraph, you say

2   that "TVI hereby terminates the agreement due to

3   the fact that notwithstanding TVI's diligent best

4   efforts to obtain the same, TVI has not been able

5   to obtain all of the approvals, and thus, the

6   conditions precedent have not been satisfied,"

7   right?

8      A.   That's what it says.

9      Q.   You didn't make reference to the

10  absence of tenants, correct?

11     A.   Not in this letter, no.

12     Q.   Now, you then went on to talk about

13  some of the problems that you perceived with the

14  Saybrook tower project. "It appears we will be

15  denied locally and will have to go to the

16  Connecticut Siting Council." Is that right?

17     A.   Yes.

18     Q.   Was it your understanding if you

19  obtained approvals locally you would not need to

20  go to the Connecticut Siting Council?

21     A.   There were still some questions.  This

22  was right around the time the policy of the

23  Connecticut Siting Council changed, the PCS

24  carriers came under the province of the

25  Connecticut Siting Council, so the rules of the

 1    Connecticut Siting Council were in flux and were

 2    changing.

 3         Q.    I'm --

 4         A.    We would need approval from the

 5    Connecticut Siting Council for any carrier to

 6    locate on this tower.

 7         Q.    Okay.  But as far as the initial

 8    construction of the tower itself, it was your

 9    understanding that at that stage of the process,

10    Connecticut Siting Council approval was not

11    necessary; is that fair?

12         A.    For the -- for just the sheer

13    construction of the tower?

14         Q.    Right.

15         A.    I'm not sure.

16         Q.    Well, has it been your experience that

17    you need to go to the siting council when you

18    want to put a broadband tenant on an existing

19    tower?

20         A.    Yes.

21         Q.    But if you have -- if you're merely

22    building a tower that doesn't necessarily have a

23    broadband tenant on it, you don't need to go to

24    the siting council, correct?

25         A.    No.  You do.

1        Q.   Well, then why is it, Mr. Maccini, that

2    you wrote that sentence that I've been asking you

3    about, that "it appears that we will be denied

4    locally and would have to go to the Connecticut

5    Siting Council to obtain the necessary approvals

6    and permits"?

7        A.   Because the only issue that is

8    different here is this was an existing tower.

9    And there was a question as to whether the

10   Connecticut Siting Council, because this was an

11   existing tower, really was exempt or not.  But

12   it's my understanding that certainly today for

13   any new structure you want to build, unless it's,

14   you know, exempt for some reason because it's a

15   municipality, that you're going in front of the

16   Connecticut Siting Council.

17       Q.   Would you agree with me that as of

18   August 2002, if Connecticut Siting Council

19   approval was necessary for the Saybrook tower

20   project with Crossroads, it was Tower Ventures'

21   responsibility to get that approval?

22       A.   Yes.

23       Q.   What, if any, efforts had Tower

24   Ventures made as of August 7th, 2002, to obtain

25   Connecticut Siting Council approval for the Old

Page 106

1    Saybrook tower?

2        A.    You'll have to speak to Mr. Brinn about

3    that.

4        Q.    Are you aware of any?

5        A.    But I know there were some

6    conversations with some law firms that

7    specialized in Connecticut Siting Council's

8    matters, but before you actually go to the

9    Connecticut Siting Council, you have to obtain

10   local approval.

11       Q.    Okay.  So is it your testimony, Mr.

12   Maccini, that it was not your understanding when

13   you wrote this letter, Exhibit 8, that

14   Connecticut Siting Council approval would be

15   necessary only if you were denied locally?

16       A.    Restate the question, please.

17       Q.    I'm just trying to figure out what this

18   means.  You said, "It appears that we will be

19   denied locally and would have to go to the

20   Connecticut Siting Council to obtain the

21   necessary approvals."

22             I read that as saying that only if

23   you were denied locally. *You thought if you were

24   denied locally, your next step would be to try to

25   go to the siting council, and that they were

1    exclusive.

2        A.    No.    I mean I think there's a

3    possibility that we would have -- even if we got

4    local approval, we would still have gone to the

5    Connecticut Siting Council.    At the very minimum,

6    any cell phone carriers that wanted to locate on

7    this tower would have had to gain approval from

8    them.

9        Q.    That would have happened at a later

10   date after the tower was built, right?

11       A.    Not necessarily, no.

12       Q.    Or after --

13       A.    One of the things we would be concerned

14   about is that, again, are we going to have any

15   tenants on the tower, and we may have gone to the

16   Connecticut Siting Council to make sure that

17   those tenants could, in fact, gain approval to

18   locate on the tower, and then be able to pay us

19   rent.

20       Q.    Is it your experience, Mr. Maccini,

21   that the tenants themselves are generally the

22   ones who undertake responsibility for obtaining

23   siting council approval when they want to place

24   hardware on a tower?

25       A.    In assistance with the tower owner,

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 22, 2004

Page 108

1    yes.

2         Q.    But the responsibility falls -- the

3    direct responsibility falls on the tenant, the

4    AT&Ts, the Verizons of the world --

5         A.    Yes.

6         Q.    -- as opposed to the owners of the

7    tower?

8         A.    Correct.

9         Q.    So if you had gotten the local approval

10   to build a tower, you would have been hoping to

11   sign deals with say a Verizon, right?

12        A.    Correct.

13        Q.    And you would have anticipated that

14   under any such deal with a Verizon or a cellular

15   carrier, the carrier would have had the

16   responsibility to go to the siting council for

17   approval; is that correct?

18        A.    Correct.

19        Q.    If you were at that stage of the

20   project, you would have already signed the lease

21   with Crossroads, right?

22        A.    I mean we would always sign a ground

23   lease or the ability to use the real estate

24   before we signed a tenant lease.  In all

25   instances.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 22, 2004

1        Q.    Am I correct, Mr. Maccini, that it's
2    your understanding that the Connecticut Siting
3    Council exists to override the possibility for
4    local opposition to projects such as the type of
5    tower we are talking about under this agreement?
6        A.    I don't think it was created to
7    override the local municipalities, no.
8        Q.    We were talking before about the
9    gentleman who had the guy wire literally in his
10   backyard.  I mean you're familiar with the term
11   "not in my backyard," right?
12       A.    Yes.
13       Q.    And is it -- which apparently in this
14   case had some literal application, correct?
15       A.    Correct.
16       Q.    Am I correct that in your experience, a
17   local agency or board which solely has local
18   interests in mind is more likely to stand in the
19   way of a project than a statewide agency charged
20   with similar responsibilities?
21       A.    In general, yes.
22       Q.    And has it been your experience that if
23   you obtained local approval for a tower project,
24   that that is sufficient in order for the project
25   to go forward?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                              June 22, 2004

Page 110

1              MR. HUMPHREY:  Objection in terms

2    it implies a legal conclusion.

3              But go ahead.

4       A.   No.  We've actually had cases where the

5    local municipality has approved it and the

6    Connecticut Siting Council has denied it.

7       Q.   Can you recall what municipality was

8    involved with the project or projects that you

9    just talked about?

10      A.   Actually, I think Andover and it was

11   one other community.

12      Q.   Do you remember when this was?

13      A.   In the last couple of years.

14      Q.   But you do recall some uncertainty

15   about whether it would be necessary to go to the

16   siting council before any broadband tenants were

17   proposed, right?

18      A.   Correct.  This was an evolving area

19   that was, again, because of the decision that the

20   siting council had jurisdiction not only over the

21   wire line and non-wire line cell phone carriers,

22   but for everything.  This was right around that

23   same time period.

24      Q.   In the letter, Exhibit 8, you go on to

25   say, "The economic environment has changed

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 111

```
 1    dramatically and the wireless carriers are not
 2    building out new sites as they have in the
 3    past."  Right?
 4         A.    Correct.
 5         Q.    That's consistent with what you said
 6    before, that as of the date you wrote this
 7    letter, Exhibit 8, there had been a downturn in
 8    the cellular industry, right?
 9         A.    Most definitely, yes.
10         Q.    That dated back to some point in 2001,
11    correct?
12         A.    Yes.
13         Q.    And when you say wireless carriers are
14    not building out new sites, what were you talking
15    about there?
16         A.    They're not spending money on locating
17    on structures, to expand their network.
18         Q.    It's your recollection that as of the
19    date you wrote this letter, what had happened was
20    the two principal tenants you thought you had
21    lined up for the Old Saybrook tower had told you
22    they were no longer interested?
23         A.    Right.  That's correct.
24         Q.    You didn't say that in your letter to
25    Mr. DeCesare, did you?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 22, 2004

Page 112

1        A.    Well, I didn't list every single reason

2    for termination, no.

3        Q.    You didn't say that in your letter to

4    Mr. DeCesare, right?

5        A.    No.

6        Q.    Why not?

7        A.    I just wanted to keep it short and I

8    felt we were notifying them that we were

9    terminating, that we had the right to terminate,

10   and didn't need to give him the 56 reasons why we

11   were doing that.

12       Q.    But you also told him that you would be

13   happy to discuss revised terms for the

14   transaction, right?

15       A.    Yes.

16       Q.    So in your mind, although the present

17   deal, present as of August 2002, was no longer

18   advantageous to Tower Ventures, it might be

19   possible in your mind to revise the terms so that

20   it would be advantageous for Tower, correct?

21       A.    Correct.

22       Q.    And that's why you put that line in

23   there, right?

24       A.    That's right.

25       Q.    And you wrote that even though, as of

June 22, 2004

Page 113

1  this writing, you saw no prospect for placing

2  broadband tenants on the tower; is that right?

3      A.    Right.

4      Q.    Why did you think that revised terms

5  might be beneficial to Tower, if you further

6  believed that there were no tenants out there to

7  place on this tower?

8      A.    In the future, that may not have been

9  the case.  And the time frame, you know, would

10  have been a factor, in terms of when we were

11  required to actually construct the tower.  How

12  many tenants we would gain and in what time

13  period.

14      Q.    The lease that was contemplated under

15  the agreement as we said was for at least the

16  term of 10 years, right?

17      A.    Correct.

18      Q.    So is it fair to state that it was your

19  belief that although the economic climate for

20  wireless carriers in 2002 might be bad, that that

21  might turn around?

22      A.    We certainly hoped.

23      Q.    Okay.  And that's why you were

24  interested in potentially going forward with the

25  deal under revised terms, notwithstanding your

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 22, 2004

                                                                                   Page 114

1    belief that there were no current prospects for

2    tenants, right?

3         A.    Yes.

4         Q.    Now, your lawyer received a response to

5    your letter of August 7th, right?

6         A.    I believe so, yes.

7         Q.    Let me show you what's been marked as

8    Exhibit 9 in a prior deposition, and ask you to

9    take a look at that.  And tell me, first of all,

10   whether you've seen it before?

11        A.    Yes.

12        Q.    If you turn to page two of the letter,

13   Mr. Maccini, the second full paragraph beginning,

14   "with respect to the statement" in the second

15   paragraph, do you see that?

16        A.    Yes.

17        Q.    There's reference to the statement in

18   your August 7th letter that we were just

19   discussing concerning the possibility that local

20   approvals would be denied?

21        A.    Uh-huh.  Yes.

22        Q.    And you see, "Mr. Brown says that is

23   simply not true," right?  *

24        A.    Yes.

25        Q.    And the letter goes on to say that "TVI

1    has made application to four boards and

2    commissions in Old Saybrook, three of the

3    applications have been unanimously approved, the

4    fourth is to be heard beginning August 19th," you

5    see that?

6        A.    Yes.

7        Q.    And then it says, "Mr. Maccini is well

8    aware of these facts," right?

9        A.    That's what it says.

10       Q.    Were you, in fact, aware of those facts

11   prior to receiving this letter?

12       A.    I was aware that we had applied to

13   certain boards and that we had received some

14   approvals, yes.

15       Q.    Did you know there was a fourth

16   scheduled to be heard within two weeks of the

17   drafting of your August 7th letter?

18       A.    I knew there were additional hearings.

19   I don't recall if I knew the exact dates of those

20   hearings.

21       Q.    When you wrote your August 7th, 2002

22   letter, did you think you were close to getting

23   the -- all the approvals you needed?

24       A.    No.

25       Q.    What other approvals did you understand

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 116

1    to be necessary as of August 7th, 2002?

2         A.    Well, besides that additional approval,

3    there was FAA approval that we would have

4    needed.  And also there is a provision, I forget

5    exactly what it's termed, some kind of additional

6    State of Connecticut review.  This is outside the

7    Connecticut Siting Council.  The other approval

8    would have been what's called a NEPA approval,

9    which I believe stands for the National

10   Environmental Policy Act, which would have been a

11   letter from the state historic preservation

12   officer that stated that the project complied.

13   I'm not sure whether we had obtained that or

14   not.

15        Q.    Now, following the letter Mr. Brown

16   sent dated August 9th, there was some discussion

17   about Tower Ventures continuing to pursue the

18   pending approvals, notwithstanding the position

19   that you had taken that terminating the

20   agreement -- that of terminating the agreement,

21   right?

22        A.    I'm sorry?

23        Q.    After this August 9th letter that we've

24   been talking about from Mr. Brown, who you knew

25   represented Crossroads, there was discussion

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 22, 2004

Page 117

1    about the Tower Ventures continuing to pursue any

2    pending permit applications, even though you had

3    already taken the position that we're terminating

4    the agreement?  Do you remember discussion along

5    those lines?

6         A.   Yes.

7         Q.   And showing you what's been marked as

8    Exhibit 10 in a prior deposition, do you remember

9    that document?

10        A.   Yes.

11        Q.   I don't want to go over each and every

12   term of this, but it's fair to say that Exhibit

13   10 bears your signature, Mr. Maccini; is that

14   right?

15        A.   Yes.

16        Q.   And do you recognize the letter?

17        A.   Yes.

18        Q.   Do you remember generally what it

19   addresses?

20        A.   Yes.

21        Q.   Is it fair to state that generally what

22   this letter is intended to do is set forth an

23   agreement that Tower will continue to pursue

24   pending approvals and you won't waive any rights

25   you might have concerning possible termination of

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 118

1      the agreement with Crossroads; is that right?

2          A.    Yes.   We wanted to obviously try to

3      help Mr. DeCesare, and if he wanted to continue

4      to develop the site himself, or if he wanted to

5      try to enter into a transaction or a deal with

6      someone else, that we would try to help him do

7      that, as opposed to just withdrawing our

8      application.

9          Q.    Now, your termination letter, the

10     August 7th letter, refers to you calling Mr.

11     DeCesare to discuss possibly revised terms,

12     right?   I think it was the last sentence of the

13     letter.

14         A.    Yes.

15         Q.    And you did, in fact -- did you, in

16     fact, do that?

17         A.    I don't recall.

18         Q.    Do you remember meeting with Mr.

19     DeCesare at any point to discuss possible revised

20     terms of an agreement?

21         A.    Yes.

22         Q.    When do you remember that happening?

23         A.    I don't remember the date, although I

24     remember that Keenan Brinn and I did meet with

25     Mr. DeCesare.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 119

1          Q.    Do you remember where the meeting took

2    place?

3          A.    In Connecticut, at a coffee shop

4    somewhere.

5          Q.    Do you remember whether, prior to that

6    meeting, you had had any discussions by phone

7    with Mr. DeCesare, about possible revised terms

8    for an agreement?

9          A.    I don't recall.

10         Q.    Do you remember whether there had been

11    any other communication of any kind with Mr.

12    DeCesare, about possible revised terms of an

13    agreement?

14         A.    There may have been.  I don't recall.

15         Q.    What do you remember discussing with

16    Mr. DeCesare at this meeting that you and Mr.

17    Brinn had with him at the coffee shop in

18    Connecticut?

19         A.    Trying to renegotiate the terms and

20    conditions, but Mr. DeCesare was pretty

21    inflexible, and was not willing to really change

22    any of the terms, other than potentially allowing

23    us to try to find someone else to refinance the

24    Raycee note, other than Tower Ventures, which we

25    did, in fact, try to do.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 22, 2004

Page 120

1          Q.    Did you attempt it or did Mr. DeCesare?

2          A.    Actually, both of us tried to do that.

3     I would say more Tower Ventures in terms of

4     talking to some financing sources about

5     refinancing the note.

6          Q.    And why would that have been attractive

7     to Tower Ventures?  It would have relieved the

8     need to come up with immediate cash to pay off

9     the Raycee note; is that right?

10         A.    Correct.  Because we would have been

11    borrowing the $150,000, paying interest on it,

12    and really we weren't making any profit, if you

13    will, on the refinance of the Raycee note.  That

14    was originally done really as an accommodation to

15    Mr. DeCesare because the prior owner of the

16    property who took back the mortgage, I was told

17    by Mr. DeCesare that they had a very acrimonious

18    closing, and we -- or he did not want us to

19    approach him about paying off that note or

20    regarding Mr. Raycee entering into a

21    subordination and nondisturbance agreement, which

22    would have been totally acceptable to us, and

23    would have precluded our need to refinance the

24    Raycee note.

25         Q.    Well, Mr. DeCesare and Crossroads took