1   the position throughout, even before the

2   agreement was signed, that no agreement with Mr.

3   Raycee was necessary, correct?

4       A.   No.

5       Q.   They indicated to you that -- well,

6   Withdrawn.

7            Did Mr. DeCesare indicate to you

8   that in his view, under the terms of his deal

9   with Mr. Raycee, he did not need Mr. Raycee's

10  consent to enter into a ground lease such as the

11  one contemplated with Tower Ventures?

12      A.   No. That was not the issue.

13      Q.   Well, explain to me what the issue then

14  was.

15      A.   The issue was we would have preferred

16  to obtain a subordination and nondisturbance

17  agreement, which is surely an agreement with Mr.

18  Raycee. But Mr. DeCesare did not want us to

19  approach Mr. Raycee about entering into such an

20  agreement.

21      Q.   Why did you believe a subordination and

22  nondisturbance agreement was necessary with Mr.

23  Raycee?

24      A.   Because he had a first lien on the

25  property.

1   Q.   But if under the terms of that lien,
2   Crossroads had the right to lease, am I correct
3   that such an agreement would not have been
4   necessary?
5   A.   Incorrect.  He could have -- if he, Mr.
6   Raycee, had foreclosed under that note, he could
7   invalidate the -- our lease.
8   Q.   And it was based on that concern that
9   Tower Ventures had decided to, in essence, step
10  into Mr. Raycee's shoes as the mortgage holder
11  for the Springbrook Road property, correct?
12  A.   There was no way else to do it if we
13  wanted to proceed.
14  Q.   And after this meeting in -- you think
15  it was September 2002, after this meeting with
16  Mr. DeCesare at a coffee shop, you --
17  A.   I know again it was after the
18  termination letter but I don't know what the date
19  was.
20  Q.   Fair enough.  I don't want to hold you
21  to a specific date.
22          After this meeting, you said you
23  made inquiry into alternate sources of financing
24  to buy out the Raycee note, right?
25  A.   Correct.

1     Q.   What, if anything, did you discover
2 based upon your efforts?
3     A.   That at that time, we could not find
4 anyone who was willing to do it.
5     Q.   And do you recall why that was?
6     A.   Primarily, it was just too small.
7     Q.   Were the terms of the --
8     A.   It was --
9     Q.   I'm sorry.
10    A.   It was commercial property. And it was
11 just too small for anyone to really want to mess
12 with.
13    Q.   Do you recall Mr. DeCesare telling you
14 that he would likewise make inquiry with bankers
15 he knew to see whether he could obtain alternate
16 financing?
17    A.   Yes.
18    Q.   And do you recall what, if anything, he
19 told you about the results of those inquiries?
20    A.   I don't recall.
21    Q.   Do you recall anyone telling you that
22 the terms of the Raycee note were very favorable,
23 and a substitute lender would not be able to
24 duplicate those terms?
25    A.   No.

1     Q.  Now, at this point, Mr. Maccini, you're
2  about to close a deal on Tower Ventures II, LLC,
3  right?
4         MR. HUMPHREY: What point are you
5  referring to?
6         MR. GRUDBERG: August 2002.
7     A.  Yes.
8     Q.  How far back did the discussions with
9  Seaport begin, that ultimately culminated in the
10  August 28th, 2002 deal?
11    A.  Probably the end of 2001.
12    Q.  And one of the significant components
13  of that deal was the assets of Tower Ventures,
14  Incorporated, right?
15    A.  Correct.
16    Q.  What, if any, examination had there
17  been of the Crossroads deal in connection with
18  the contemplated Tower Ventures II deal with
19  Seaport?
20    A.  By who?
21    Q.  By anyone, you, Seaport, by bankers
22  acting on their behalf?
23    A.  Well, it was an agreement that Tower
24  Ventures, Inc. had entered into. It had been
25  terminated and so it was not assigned.

1      Q.    Well, the initial discussions dated
2   back prior to termination, correct, discussions
3   with Seaport about this Tower Ventures II,
4   correct?
5      A.    Right.
6      Q.    So am I correct that someone did due
7   diligence on Tower Ventures, Incorporated in
8   connection with the proposed Seaport deal?
9      A.    Yes.
10     Q.    Do you remember who it was that
11  performed the due diligence?
12     A.    Members of Seaport.
13     Q.    Do you remember any discussions about
14  the deal in place with Crossroads concerning the
15  Old Saybrook tower?
16     A.    No.
17     Q.    No discussion whatsoever?
18     A.    I don't recall any.  I could conjecture
19  but I'm not going to do that.
20     Q.    Do you recall any discussion with
21  anyone related to the Tower Ventures II Seaport
22  investment?  Do you recall any discussion with
23  anyone prior to August 7th, 2002, on the subject
24  of the Old Saybrook Crossroads deal?
25     A.    With my attorneys.

```
 1        Q.   Okay.  Anyone besides your attorneys?
 2        A.   No.
 3        Q.   Did the pending deal with Seaport
 4   concerning Tower Ventures II, LLC factor into
 5   your decision to terminate the Crossroads deal?
 6        A.   No.
 7        Q.   Were you concerned at all about the --
 8   what impact, if any, the Old Saybrook Crossroads
 9   deal had on the Tower Ventures II/Seaport
10   investment?
11        A.   No.
12        Q.   Did you discuss it at all with Mr.
13   Gallagher?
14        A.   Potentially.  I don't recall.  But I
15   may have.
16        Q.   Did you discuss with Mr. Gallagher
17   getting out of the Crossroads deal?
18        A.   The fact that we were sending the
19   termination notice?
20        Q.   Yes.
21        A.   Yes.
22        Q.   Did you talk with him -- prior to
23   sending the August 7th termination letter, did
24   you talk with him about whether that letter
25   should be sent, whether you should try to get out
```

1   of the deal?
2       A.   I just think I told him that I was
3   sending it.
4       Q.   And there was no further substantive
5   discussion that you can remember about the
6   question for instance of whether it was a good
7   idea to back out of the deal?
8       A.   I don't recall.
9            MR. GRUDBERG:  Can you mark
10  these?
11           (Plaintiff's Exhibits 12 and 13
12           marked for identification.)
13      Q.   Mr. Maccini, let me show you what's
14  been marked as Exhibit 12 for identification.
15  I'd ask you to tell me if you recognize that.
16  Take a look at it and tell me if you recognize
17  it.
18      A.   Appears to be an e-mail from me to Mr.
19  Gallagher.
20      Q.   Can you review the attachment and tell
21  me if you recognize that?
22      A.   It's a letter dated October 4th, 2002,
23  to Mr. DeCesare, outlining some terms of a
24  revised agreement.
25      Q.   In this draft letter, you set forth two

1    different options, correct?
2        A.    Yes.
3        Q.    Take a moment to read through it, if
4    you would, Mr. Maccini, so we can have you
5    refresh your recollection.
6                  (Pause in the proceedings.)
7        A.    Okay.
8        Q.    Now, is it fair to state that this --
9    well, this is a draft letter, Exhibit 13, right?
10   It's attached to your e-mail to Mr. Gallagher?
11   Exhibit 12, I'm sorry.
12       A.    I believe so.  It's not signed.
13       Q.    I know you don't remember the dates
14   exactly, but based upon what you read, is it fair
15   to state that this letter is after the coffee
16   shop meeting with Mr. DeCesare that we talked
17   about, that you and Mr. Brinn had?
18       A.    I would assume so, yes.
19       Q.    And here you're proposing revised terms
20   of a deal that Tower would be willing to go
21   forward with, notwithstanding all the things that
22   had happened, right?
23       A.    Correct.
24       Q.    Now, the first -- under option one, the
25   first point that you list is Tower paying

1   Crossroads $150,000, and Crossroads paying off
2   the Raycee note, right?
3       A.   That's what it says, yes.
4       Q.   Now, that is different than the
5   original -- the original deal, Tower would have
6   been obligated to pay Crossroads $150,000, and
7   also pay out of Tower's own pocket, pay off the
8   Raycee note, right?
9       A.   Yes.
10      Q.   So here you're kind of collapsing that
11  into one, say we'll pay you the 150,000 but you
12  pay off the Raycee note, right?
13      A.   Yes.
14      Q.   So it was your recollection that the
15  Raycee note payoff figure was somewhere between,
16  what, 130 and 150 thousand dollars?  Does that
17  sound right?
18      A.   Yes.
19      Q.   So instead of, in effect, Crossroads
20  getting somewhere between 280 and 300 thousand
21  dollars of payoff, either direct or to one of its
22  debtors, it would have only got the 150, right?
23      A.   No.  Because our 150 would have still
24  been debt.  So he still would have owed us the
25  $150,000 so he'd still be netting the same

1    $150,000, and rather than making the mortgage
2    payments to Raycee, he would have made them to
3    us. So from an economic standpoint, he really
4    was in the same position.
5        Q.   Well, you're assuming that --
6    Withdrawn.
7                 This proposal did not take into
8    account the time value of the money that Mr.
9    DeCesare would have received by paying off the
10   remaining balance on the Raycee mortgage over
11   time, right?
12       A.   Well, he actually would have saved a
13   considerable amount in interest expense if he
14   paid off the Raycee mortgage.
15       Q.   Was it your belief that the proposal
16   you were making under option one was more or less
17   favorable to Mr. DeCesare than the terms of the
18   initial agreement that you signed?
19       A.   Well, it's less favorable because the
20   co-location payments or the percents that we
21   split on the additional carriers are less, and I
22   will also admit that perhaps the payoff of the
23   Raycee note with the proposed $150,000 might not
24   be as quite attractive to Mr. DeCesare. Perhaps
25   he might have been able to invest those funds in

1   other entities that might have returned more than

2   six percent.

3       Q.   And the percentage splits that you

4   talked about for proposed tenants on the tower

5   are reduced from the percentages in the ground

6   lease, under the original deal that you had with

7   Crossroads, correct?  The original deal provided

8   for a 25 percent share to Crossroads of the first

9   three tenants; is that right?

10      A.   That's correct.

11      Q.   And then 30 percent for the fourth and

12  any other carriers beyond that, right?

13      A.   Correct.

14      Q.   You knocked that down to 15 to 20 in

15  this draft, correct?

16      A.   Yes.

17      Q.   And then you propose -- we've got

18  option two A, and option two B.  I won't take you

19  through all the terms of that, but they pretty

20  much speak for themselves, right?

21      A.   Yes, there are two other options.

22      Q.   Is it fair to state, Mr. Maccini, that

23  in your view, both of these options that you were

24  thinking about proposing to Mr. DeCesare were

25  more economically advantageous to Tower Ventures

1  than the initial agreement you signed back in
2  September 2001?
3      A.   It would depend on the assumptions one
4  used.
5      Q.   Well, is there any doubt in your mind
6  when you were constructing this draft, Mr.
7  Maccini, that what you were thinking about
8  proposing to Mr. DeCesare in early October 2002,
9  was more advantageous -- was a better deal for
10 Tower Ventures than the deal you had just got out
11 of, or you thought you got out of, back in August
12 of the same year?
13     A.   It was a better deal for Tower Ventures
14 in the short-term, but conceivably could have
15 been worse in the longer term, depending on the
16 lease-up of the tower.  What we were trying to do
17 was to recognize the fact that over a long-term
18 basis, yes, the tower might attract additional
19 tenants.  But in the short-term, we've got a
20 problem because we don't have at this point any
21 tenants.  So if we back-weighted it or made more
22 of the payments kind of further out in time, that
23 would give us time to lease up the tower, and Mr.
24 DeCesare potentially could have been better off
25 financially in the long term than our proposal

1  that we had executed the initial deal with.

2    Q.   How could he have been better off if

3  the percentage he got on each of the tenants was

4  reduced from the original deal that you had tried

5  to get out of?

6    A.   Because we talk about paying an

7  additional fee for each broadband tenant that

8  goes on the tower. So the more tenants that go

9  on the tower, the more he would get.

10    Q.   At this point, October 2002, your deal

11  with Seaport and Tower Ventures II, LLC has been

12  consummated, correct?

13    A.   Yes.

14    Q.   Tower Ventures, Incorporated doesn't

15  have $150,000 sitting in its bank account, does

16  it?

17    A.   No.

18    Q.   Doesn't have $100,000 sitting in its

19  bank account, right?

20    A.   No.

21    Q.   Certainly doesn't have 280 to 300

22  thousand dollars sitting in its bank account,

23  right?

24    A.   No.

25    Q.   So it did not have, at this point, the

1    financial wherewithal to make the up-front
2    payments that would have been required under the
3    deal with Crossroads dated September 2001,
4    correct?
5            MR. HUMPHREY:  Object to the
6    form.
7       A.   It could have obtained the necessary
8    financing to do this.
9       Q.   Was the fact that at this point Tower
10   Ventures, Incorporated's assets had been
11   transferred to another entity, substantially
12   transferred, was that a factor in Tower Ventures,
13   Incorporated's efforts to get out of its deal
14   with Crossroads?
15      A.   No.
16      Q.   Let's move on to Exhibit 13.  I'd ask
17   you to take a look at that, please, and tell me
18   if you recognize Exhibit 13.
19      A.   Yes.
20      Q.   And this is also an e-mail that you
21   sent to Mr. Gallagher; is that right?
22      A.   Yes.
23      Q.   And it's four days after the preceding
24   e-mail, Exhibit 12, right?
25      A.   Correct.

1   Q.   And you attach a revised letter, right?
2   A.   Yes.
3   Q.   Take a moment, if you would, to review
4   the revised letter.
5        (Pause in the proceedings.)
6   A.   Okay.
7   Q.   Do you remember any comments Mr.
8   Gallagher might have conveyed to you about the
9   preceding draft, Exhibit 12?
10  A.   He may have.  I don't recall.
11  Q.   No memory.  In any event, by October
12  8th, you've changed the earlier draft that we had
13  attached to Exhibit 12, right?
14  A.   Correct.
15  Q.   And you've taken out option one, and
16  you've taken out option two essentially, right?
17  A.   Could I see the --
18  Q.   There's 12.
19  A.   Okay.  Yes.  It appears that option two
20  is gone.
21  Q.   And you're still proposing to pay the
22  150,000, and require Crossroads to take that 150,
23  and pay off the Raycee note, right?
24  A.   Yes.
25  Q.   But in the new draft, you say that if

1    you can get a subordination and nondisturbance
2    agreement, then they don't have to pay it off,
3    right?
4        A.   Correct.
5        Q.   And then in this October 8th letter,
6    you've even further reduced the amount you're
7    proposing to share with Crossroads of any
8    tenants, right?
9        A.   Correct.
10       Q.   For the first and second carrier, we
11   went from 25 in the original agreement, down to
12   15 in your draft of October 4th, down to zero in
13   the October 8th one, right?
14       A.   Yes.
15       Q.   And then third and fourth carriers, you
16   dropped the proposed percentage from 20 to 15,
17   right?
18       A.   Yes.
19       Q.   And the other carriers, we went from 30
20   percent down to 20 percent; is that right?
21       A.   That's correct.
22       Q.   It's fair to state that the proposals
23   set forth in this October 8th letter was more
24   advantageous to Tower Ventures than the proposals
25   set forth in the draft of October 4th, right?

1    A.   Yes.

2    Q.   And do you remember whether the October 8th letter is ultimately what was sent to -- what was proposed to Crossroads and Mr. DeCesare?

5    A.   I don't recall.

6    Q.   Again, there's no doubt in your mind, is there, Mr. Maccini, that the terms set forth in the October 8th, 2002 draft that's attached to Exhibit 13 were more advantageous for Tower Ventures than the terms of the original deal entered into with Crossroads?

12    A.   State that again.

13    Q.   There is no doubt in your mind, is there, Mr. Maccini, that the proposed terms set forth in your draft letter dated October 8th, to Mr. DeCesare were more advantageous to Tower Ventures than the terms of the original September 2001 agreement that you tried to terminate back in August of 2002?

20    A.   Yes. They were more advantageous. I cannot envision a scenario where we'd send something that was less advantageous.

23    Q.   Right. You got out -- to put it simply, in August you got out of what you thought was a bad deal, and you were willing to go

```
 1    forward with it, if you could make a better deal
 2    for yourself, right?
 3                MR. HUMPHREY:  Object to the
 4    form.
 5         Q.   You can answer.
 6         A.   Yes.
 7                MR. GRUDBERG:  Can you mark this?
 8                (Plaintiff's Exhibit 14 marked
 9           for identification.)
10         Q.   Take a look at Exhibit 14, please, Mr.
11    Maccini, and tell me if you recognize that?
12         A.   Yes.
13         Q.   Now, you had spoken earlier about some
14    additional authorizations that, in your view,
15    were necessary?
16         A.   Yes.
17         Q.   And am I correct that Exhibit 14 is a
18    letter from you to Don DeCesare?
19         A.   Yes.
20         Q.   Your signature appears on the letter,
21    Exhibit 14?
22         A.   Yes.
23         Q.   And you attach a letter from a Julie
24    Donaldson from Hurwitz & Sagarin?
25         A.   Uh-huh.
```

```
 1        Q.   Do you recall when Ms. Donaldson was
 2   engaged to work for Tower Ventures, Incorporated?
 3        A.   No, I don't.
 4        Q.   It was your view there was some
 5   approval needed from the FAA, right?
 6        A.   Correct.
 7        Q.   Now, as of the date of this letter,
 8   September 10th, 2002, had any approval been
 9   sought from the FAA?
10        A.   I believe we had done an FAA study.
11        Q.   Do you remember when that was done?
12        A.   No, I don't.
13        Q.   Do you remember if it was within 45
14   days after September 20, 2001?
15        A.   I don't recall.
16        Q.   Do you recall if any FAA study was
17   filed within 45 days after September 20th, 2001?
18        A.   I don't recall.
19        Q.   You also make reference to the
20   Connecticut Siting Council again, right?
21        A.   Yes.
22        Q.   We talked about that a little bit
23   before.  I think you said to your knowledge there
24   had been no application filed with the
25   Connecticut Siting Council as of September 10th,
```

```
 1    2002, right?
 2         A.    I don't think I said that, but yes,
 3    that's correct.
 4         Q.    And you said there was some confusion
 5    in your mind about whether siting council
 6    approval would be necessary or not?
 7         A.    Yes.
 8         Q.    And you said that in this letter,
 9    right, you were assessing their requirements?
10         A.    Yes.
11              MR. GRUDBERG:  Can you mark this?
12              (Plaintiff's Exhibit 15 marked
13               for identification.)
14         Q.    Do you recognize Exhibit 15, Mr.
15    Maccini?
16         A.    Answer and affirmative defenses, yes.
17         Q.    Do you remember seeing this document
18    before?
19         A.    Yes.
20         Q.    And do you recognize this as the answer
21    that was filed on behalf of your company, Tower
22    Ventures, in this action?
23         A.    Yes.
24         Q.    Okay. I'd ask you to turn to page
25    eight of Exhibit 15.
```