1      A.   Yes.

2      Q.   You see the heading "Second Affirmative

3   Defense"?

4      A.   Yes.

5      Q.   And reading the first sentence of that

6   affirmative defense, it says, "Plaintiff's claims

7   are barred in whole or in part because plaintiff

8   failed to provide copies of all the property

9   documentation within 20 days after the execution

10  of the September 2001 agreement, as required by

11  the September 2001 agreement --"

12     A.   Yes.

13     Q.   "-- which severely hampered Tower

14  Ventures' ability to prepare the applicable

15  applications for approval that were to be filed

16  pursuant to paragraph one."

17     A.   Yes.

18     Q.   Do you see that?

19     A.   Yes.

20     Q.   What property documentation do you

21  allege Crossroads failed to provide you with?

22     A.   All of the underlying documents

23  surrounding the property in question.

24     Q.   Well, we talked about some of those

25  before.  You told me earlier I think that prior

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 142

1    to signing the deal, you had obtained a copy of

2    the Raycee mortgage, correct?

3         A.   Correct.

4         Q.   And you had obtained a copy of the

5    Raycee note, correct?

6         A.   Correct.

7         Q.   And you had obtained a title search,

8    correct?

9         A.   I'm not sure at what point the title

10   search was actually done.

11        Q.   Well, if you were proposing to enter

12   into a lease of a property, would it have been

13   your business practice to commission a title

14   search of that property before you signed an

15   agreement that included a proposed lease?

16        A.   Typically we would not do that until

17   after we had decided to go ahead with the

18   project, and actually construct the project.

19   Most of our leases, if not -- probably 95 percent

20   of our leases have the ability to terminate at

21   any time.  This is a transaction that was

22   significantly outside the scope of anything that

23   we had done before.

24        Q.   Explain to me what you mean by that, by

25   significantly outside the scope of anything you

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 22, 2004

Page 143

1  had done before.

2      A.   Something like pay off the Raycee

3  note.  Certainly that had never occurred before.

4  Paying Mr. DeCesare an up-front payment of

5  $150,000, we had never done that before.

6      Q.   Okay.  Going back to the Raycee note

7  for a moment, I gather that because it was an

8  unusual agreement for your company to enter into,

9  that you would have investigated it thoroughly

10  before entering into the agreement, right?

11      A.   Well, we did have the copy of the two

12  documents relative to Raycee, because the issue

13  of the subordination and nondisturbance agreement

14  came up and the inability to even -- Mr. DeCesare

15  wanting us to try to approach Mr. Raycee to see

16  if we could get that, so we did have those two

17  pieces of information.

18      Q.   Can you recall any other property

19  documentation that you claim Crossroads failed to

20  provide?

21      A.   Things like surveys, which would have

22  been very beneficial to us in locating the

23  tower.

24      Q.   Did you request surveys, either prior

25  to or after the execution of the agreement?

Page 144

1        A.    I believe Mr. Brinn did.  Basically we

2   requested everything in -- that Mr. DeCesare had

3   regarding the property.

4        Q.    When was that request made?

5        A.    I don't recall.

6        Q.    Do you recall whether it was before or

7   after the agreement was signed in September 2001?

8        A.    I believe after.

9        Q.    Do you recall whether the request was

10   made orally or in writing?

11        A.    I don't recall.

12        Q.    Do you recall whether it was made by

13   you, Mr. Brinn, or someone else associated with

14   Tower Ventures?

15        A.    I believe Mr. Brinn.

16        Q.    What discussions, if any, did you have

17   with Mr. Brinn concerning any additional property

18   documents that, in his view, were necessary but

19   had not been provided?

20        A.    One of the other issues, you know,

21   you're always looking for other restrictions and

22   easements that may be on the property, to the

23   extent that Mr. DeCesare had those in his

24   possession, would have assisted us.  Any prior

25   approvals, kind of land use approvals that might

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 22, 2004

Page 145

1    have been obtained.

2        Q.    Did Tower Ventures undertake a search

3    of the public land records in Old Saybrook

4    concerning the Springbrook Road property?

5        A.    At some point, yes, we did.

6        Q.    Do you know whether that was done

7    before or after the September 2001 agreement was

8    signed?

9        A.    I don't recall.

10       Q.    Am I correct, Mr. Maccini, that under

11   the terms of the agreement itself, the obligation

12   to apply for all necessary permits or approvals

13   is not tied in any way to receipt of property

14   documentation?

15       A.    I don't believe it's directly tied.

16   But there is a cooperation provision in the

17   agreement.

18       Q.    All right.

19       A.    And there also is a requirement.  So to

20   the extent that Mr. DeCesare didn't provide that

21   information in that time period, may have caused

22   us to potentially not file within the 45 days.

23       Q.    Can you identify a single document that

24   you did not receive from Mr. DeCesare that

25   prevented Tower Ventures from filing any

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 146

1    application for approval within 45 days after

2    executing the agreement?

3        A.    If we had had a survey, that would have

4    saved a considerable amount of time, especially

5    in applying for the replacement tower.  We had to

6    send out a survey crew to actually survey the

7    property, and come up with a site plan.  If that

8    had already been submitted to us, that may have

9    enabled Mr. Brinn to go in and actually pull a

10   building permit, if a building permit could have

11   been issued for the replacement tower.

12       Q.    Do you know, as you sit here, whether

13   Mr. DeCesare and Crossroads were in possession of

14   a survey for the Springbrook Road property?

15       A.    I'm not sure.

16            MR. GRUDBERG:   Let's take a short

17   break.

18            (Recess:   2:28 to 2:50 p.m.)

19   BY MR. GRUDBERG:

20       Q.    I believe when we broke, Mr. Maccini,

21   we were discussing the second affirmative defense

22   in Tower Ventures' answer, and specifically the

23   issue of property documentation that you claim

24   was not provided by Crossroads within 20 days of

25   the September 2001 agreement.  You mentioned a

CROSSROADS COMMUNICATIONS v. TOWER VENTURES

June 22, 2004

Page 147

```
 1    survey, I think you said you don't recall --
 2    you're not sure whether Crossroads or Mr.
 3    DeCesare had a survey.  Is there any other
 4    property documentation, specific documentation
 5    that you are aware of, as you sit here now, that
 6    Crossroads failed to provide that you're talking
 7    about here in this second affirmative defense?
 8         A.    A copy of their FAA approval, which
 9    they would have had to have had for the tower
10    which would have given the coordinates -- the
11    precise coordinates of where the existing tower
12    was located.  I think I also mentioned other
13    property type information.
14         Q.    When you say "other property type
15    information," please give me an example of
16    specifically what you're talking about there.
17         A.    If Mr. DeCesare had any land use
18    approvals, special land use approvals, if he had
19    recently been in front of any of the zoning
20    boards for, you know, various things he might
21    have tried to accomplish with the property.
22    Also, any types of restrictions or easements or
23    other kind of land agreements.
24         Q.    Do you know, as you sit here now,
25    whether there was any such documentation in
```

Page 148

1    Crossroads' possession?

2        A.   Well, from again the FAA, he would have

3    had to have had.

4        Q.   Why do you say that?

5        A.   Because every tower over 200 feet is

6    required to be registered with the FCC --

7    actually with the FAA, and also has to have an

8    FCC registration number.

9        Q.   It was my understanding that the

10   existing tower was 186 feet.  Would that not

11   necessitate registration with the FAA?

12       A.   It -- it depends on the proximity to an

13   airport.  It may not have.  But the other -- from

14   FCC records, your -- by the FCC you're licensed

15   for a specific set of coordinates to broadcast,

16   so at the very least, he could have supplied us

17   with the exact coordinates of the tower.

18       Q.   Well, let's stick with FAA for the

19   moment.  You said earlier that your belief that

20   he had to have had an FAA approval was based upon

21   your understanding that any tower above 200 feet

22   would necessarily have to have such an approval,

23   right?

24       A.   Right.

25       Q.   So would it follow from that that if

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 149

```
 1    the existing tower was less than 200 feet, then
 2    you would not be so convinced that there would be
 3    FAA documentation?
 4         A.    You're right.   The tower -- the tower
 5    is under 200 feet so it would depend on a number
 6    of circumstances, whether an FAA study number
 7    would have been kind of required.
 8         Q.    All right.   Now, you talked about --
 9    you gave examples of other property
10    documentation, like zoning matters, or land use
11    matters.
12         A.    Right.
13         Q.    Do you know, as you sit here now,
14    whether there was any such documentation in
15    Crossroads' possession?
16         A.    No.
17         Q.    Did Tower Ventures write at any point
18    to Crossroads and request either zoning or land
19    use documentation, FAA documentation, FCC
20    documentation, to your knowledge?
21         A.    I don't recall.
22         Q.    Okay.   And do you recall the absence of
23    such documentation hindering Tower Ventures in
24    any way in its obtaining of approvals for the
25    tower project?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES

June 22, 2004

Page 150

1      A.    I'm not so sure it hindered us but it

2    just could have slowed us down.

3      Q.    Well, without regard to could have, as

4    you sit here now, you don't recall any specific

5    instance where the absence of some property

6    documentation hindered Tower Ventures' process of

7    obtaining approvals for the tower?

8      A.    That would be more Keenan's domain in

9    terms of his conversations with Mr. DeCesare and

10   what he requested and what he did not get.

11     Q.    I'll be asking him questions later on,

12   but as far as you go, Mr. Maccini, you can't

13   point to any specific instance where the absence

14   of property documentation slowed down Tower

15   Ventures' effort to obtain approvals for the

16   tower project?

17     A.    No.

18     Q.    Okay.

19             MR. GRUDBERG:    Can you mark this?

20             (Plaintiff's Exhibit 16 marked

21           for identification.)

22     Q.    Mr. Maccini, you indicated before that

23   you would communicate from time to time with Mr.

24   Brinn on the status of the Old Saybrook tower

25   project, correct?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 151

```
 1      A.    Correct.

 2      Q.    Now, Exhibit 16, do you recognize what

 3  that is?

 4      A.    Yes.

 5      Q.    And what is it?

 6      A.    It's an e-mail correspondence from

 7  Keenan Brinn to myself.

 8      Q.    And do you remember receiving it?

 9      A.    No.

10      Q.    Do you question whether you received

11  it?

12      A.    No.

13      Q.    So to the best of your knowledge, you

14  did receive this e-mail?

15      A.    Yes.

16      Q.    And it's your practice to review the

17  e-mails you receive, certainly from Mr. Brinn?

18      A.    Yes.

19      Q.    So to the best of your knowledge, you

20  read this e-mail, Exhibit 16?

21      A.    Yes.

22      Q.    And the subject of this is Old

23  Saybrook, right?

24      A.    Correct.

25      Q.    And dated April 11th, 2002, right?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 22, 2004

Page 152

```
 1        A.    Correct.

 2        Q.    I won't read the entire e-mail with

 3   you, but is it fair to state that Mr. Brinn

 4   summarizes for you the result of a meeting in Old

 5   Saybrook concerning the tower project, right?

 6        A.    Correct.  The previous evening.

 7        Q.    And is it fair to state that he is

 8   reporting good news in this e-mail, Exhibit 16?

 9        A.    That's correct.

10        Q.    He says all four of the variances that

11   apparently were requested were granted, right?

12        A.    Yes.  For that particular hearing,

13   yes.

14        Q.    And so as of this date, April 11th,

15   2002, as far as you knew, the approval process

16   was proceeding along successfully, correct?

17        A.    Correct.

18        Q.    There's certainly no statement in this

19   e-mail that either in Mr. Brinn's view or in the

20   view of Mr. Childress, that Tower Ventures is

21   likely to be turned down at the local level,

22   right?

23        A.    Well, he says, *The only wrinkle is

24   that the zoning enforcement officer could send us

25   back to the full building commission for a full
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 22, 2004

Page 153

1    site plan review.  I don't know if this will

2    present a problem."

3        Q.    But he talks about possibilities, but

4    it's fair to state that the picture painted here

5    you viewed as a positive one, correct?

6        A.    Well, it's a step along the way.  On

7    that prior evening he was very happy because he

8    had just obtained approval.  But there are

9    additional steps that have to be gone through,

10   and approvals obtained.

11       Q.    But it's a step having been reported to

12   you that went as well as it could; is that

13   correct?

14       A.    Yes.

15       Q.    I think you also told me earlier, Mr.

16   Maccini, that the problem with the prospective

17   tenants for the tower was a contributing factor

18   to your sending of the termination letter on

19   August 7th of 2002, right?

20       A.    Correct.

21       Q.    And by that point, both Verizon and

22   Omnipoint had backed out, and you didn't think

23   you had any tenants for the tower, right?

24       A.    Correct.

25       Q.    And that included the other four

June 22, 2004

Page 154

1    potential wireless carriers besides Verizon and

2    Omnipoint, right?

3        A.    Correct.

4        Q.    You had no prospects at that point?

5        A.    Correct.

6        Q.    At the time you wrote the termination

7    letter, things looked real bad, right?

8        A.    Yes.

9            MR. GRUDBERG:  Can you mark this?

10           (Plaintiff's Exhibits 17, 18 and

11           19 marked for identification.)

12       Q.    Mr. Maccini, let me show you what's

13    been marked as Exhibit 17.  I'd ask you to take a

14    look at that and tell me if you recognize it?

15       A.    Yes.  It's an e-mail to Mark Cook from

16    me.

17       Q.    Who is Mark Cook?

18       A.    He, I believe, either works for Verizon

19    or is a site acquisition person at Verizon.

20       Q.    His e-mail address contains

21    "@verizonwireless.com," so he's certainly

22    affiliated with Verizon Wireless in some fashion,

23    correct?

24       A.    Correct.

25       Q.    And this is dated September 18th, 2002,

1    right?

2        A.    Right.

3        Q.    And this is more than a month after you

4    sent the termination letter, right?

5        A.    Correct.

6        Q.    What are you talking about in this

7    e-mail?

8        A.    Talking about a potential lease for the

9    site, for the Old Saybrook site.

10       Q.    And you're talking about a rent of

11   2,500 per month, right?

12       A.    Correct.

13       Q.    I think you indicated to me before that

14   your recollection was that the anticipated

15   monthly rental price for this site was 1,800 to

16   2,000 dollars a month; is that right?

17       A.    Well, that's what we would have liked

18   to have obtained.

19       Q.    But you would have settled for 2,500 a

20   month?

21       A.    No.   I mean we would have liked to have

22   received $2,500 per month.   But the question was

23   Verizon was not willing to pay 2,500 a month.

24       Q.    Well, it was your testimony I think

25   earlier, Mr. Maccini, that by this point,

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                     June 22, 2004

Page 156

1    September 2002, Verizon had given you an initial

2    commitment at some monthly rental figure,

3    correct?

4         A.    Correct.

5         Q.    But had since backed out, correct?

6         A.    Correct.

7         Q.    Does this e-mail, Exhibit 17, cause you

8    to revise your recollection in any way?

9         A.    In part.  Depending on -- I guess I'll

10   put this that there was kind of a period of

11   transition, where at times Verizon, you know, was

12   interested, then they were not interested, and

13   then they were only interested under certain

14   terms and conditions.  So this appear --

15   obviously appears to be a time frame where we're

16   still trying to see if Verizon is interested.

17   We're still dealing with Mr. DeCesare, to see if

18   we could salvage a deal.

19        Q.    Okay.  Well, you told me before that as

20   of August 7th, 2002, you thought that the deal

21   that -- deals with Verizon and Omnipoint were

22   dead, as well as any prospective deal with any

23   other cellular carrier, right?

24        A.    Correct.

25        Q.    Does not Exhibit 17 suggest to you that

CROSSROADS COMMUNICATIONS v. TOWER VENTURES

June 22, 2004

Page 157

1    maybe that testimony was incorrect, or your

2    recollection there was incorrect?

3        A.    Not fully.  I still believe that kind

4    of -- Verizon kind of came back and forth in

5    terms of their interest in the site, and whether

6    they were willing to actually commit to doing

7    anything.

8        Q.    Was $2,500 a month the figure that you

9    were requesting for payment by a cellular carrier

10   for this Old Saybrook tower?

11       A.    Well, at that time, Verizon would

12   typically pay more than -- Verizon and Cingular

13   would pay more than a PCS carrier, which would

14   have been an Omnipoint, in this market, AT&T or

15   certainly Nextel seems to be the lowest, they

16   seemed to be more in the range of $1,500 a

17   month.  But in Connecticut, for Verizon and

18   Cingular, we would try to get more than -- a

19   history of paying more than the PCS carriers.  In

20   the end though, I know for other sites, we

21   typically settled on $2,000 a month.  But --

22       Q.    Well, as of -- let's --  Withdrawn.

23             Let's talk about other sites.  As

24   of September 2002, you had deals with Verizon to

25   be tenants on multiple towers that Tower Ventures

CROSSROADS COMMUNICATIONS v. TOWER VENTURES

June 22, 2004

Page 158

1    owned, correct?

2        A.    Correct.

3        Q.    Do you recall what the highest monthly

4    rental was that you were getting from Verizon on

5    any tower as of September 2002?

6        A.    In Connecticut?

7        Q.    In Connecticut, and elsewhere in New

8    England.

9        A.    Well, it matters because region plays a

10   large part in terms of lease rates.  At that

11   point in time, we didn't have any other towers in

12   Connecticut.  And I don't recall whether we had

13   any leases for sites that we were in the process

14   of developing.

15       Q.    All right.  Well, so your memory is

16   that as of September 2002, you have no deals in

17   place with Verizon anywhere in the state of

18   Connecticut for space on a cellular tower,

19   correct?

20       A.    We may have.  I don't recall.

21       Q.    All right.  How about deals with

22   Verizon elsewhere in New England?

23       A.    Yes.

24       Q.    Do you recall what the highest monthly

25   rate you were getting from Verizon on any of your

CROSSROADS COMMUNICATIONS v. TOWER VENTURES

June 22, 2004

Page 159

```
 1    towers was as of September 2002?

 2         A.    Exactly, I don't recall.

 3         Q.    Do you recall ballpark?  Was it more

 4    than $2,500?

 5         A.    No.  Definitely not.  I mean there's

 6    never been an instance -- I shouldn't say never,

 7    but very, very rare where we would get more than

 8    2,500.  But average, $2,000.

 9         Q.    Would any of them have been as high as

10    $2,500 a month?

11         A.    There could have been some.

12         Q.    And certainly you were trying to get

13    2,500 a month on a prospective Old Saybrook tower

14    as of September 18th, 2002, correct?

15         A.    That's correct.

16         Q.    When we were talking earlier about the

17    communication you received from Verizon where

18    they told you "we're not interested anymore," you

19    had a specific memory of talking with one of

20    these site acquisition people, but you couldn't

21    remember the name, right?

22         A.    Yes.

23         Q.    Was it Mark Cook?  Does this jog your

24    memory?

25         A.    Could have been Mark.  There were I
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 160

1    think more than one individuals that Keenan had

2    been dealing with.

3        Q.    Okay.

4        A.    So it could very well have been Mark.

5        Q.    Well, Mr. Cook was someone familiar to

6    you as of September 18th, 2002, right?

7        A.    Well, I sent him the e-mail, so

8    obviously, but in terms of prior dealings with

9    Mr. Cook, I don't believe I had had any prior

10   dealings with Mr. Cook.

11       Q.    You addressed the e-mail "Mark."

12       A.    Yes.

13       Q.    Would it be your custom to address

14   business correspondence or business e-mail in

15   that fashion, if it were not someone with whom

16   you were familiar either by reason of prior

17   correspondence or actual face-to-face or

18   telephone dealings?

19       A.    Always.  I never use last names.

20       Q.    So it's your recollection, from looking

21   at Exhibit 17, that at least at that point there

22   was still some possibility of a deal with Verizon

23   at $2,500 a month for the Old Saybrook site,

24   right?

25       A.    For a period of time, yes, there was.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 22, 2004

Page 161

```
 1        Q.   When you say "for a period of time,"
 2   I'm --
 3        A.   Again, Verizon's interest kind of waxed
 4   and waned, and during this period of time, yes,
 5   they were potentially interested.  I'm not sure
 6   what, you know, sparked me to write this e-mail,
 7   but obviously there must have been some interest
 8   because I did send it to them.
 9        Q.   All right.  But you said before back in
10   August, that as far as you thought, it wasn't
11   waxing and waning, it had wind and it was gone,
12   right?  When you wrote the termination letter to
13   Crossroads --
14        A.   Right.
15        Q.   -- you told me before that it wasn't a
16   matter of uncertainty, that you had been told in
17   no uncertain terms Verizon wasn't interested and
18   you had been told in no uncertain terms Omnipoint
19   wasn't interested, and you had been told that any
20   of the other four potential cellular carriers
21   were not interested, and that's what -- part of
22   what went into your decision to write the
23   termination letter, correct?
24        A.   At the time that I wrote the
25   termination letter, I believed we did not have
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 162

```
 1      any carriers for this tower site.

 2           Q.   Let me show you Exhibit 18.  Ask you to

 3      take a look at that and tell me if you recognize

 4      it.

 5           A.   Yes.  It's a letter to me -- from me to

 6      Tony Miller.

 7           Q.   Who is Tony Miller?

 8           A.   Tony Miller is the -- is with a company

 9      that performs site acquisition services for

10      Cingular.

11           Q.   And does he work exclusively for

12      Cingular?

13           A.   No.  He works for other carriers as

14      well.

15           Q.   So he would be more of the broker

16      example that we were talking about before?

17           A.   Yes.

18           Q.   Of the site acquisition people?

19           A.   Yes.

20           Q.   This is September 24th, we're talking

21      about September 24th of 2002 on Exhibit 18,

22      right?

23           A.   Yes.

24           Q.   Okay.  And you indicate to Mr. Miller

25      that you recently obtained approval to construct
```

June 22, 2004

Page 163

1    a new 175-foot monopole on Route 95, literally

2    almost on top of it, in Old Saybrook,

3    Connecticut, right?

4         A.    Right.

5         Q.    You pointed out in parentheses, that

6    the pole was literally almost on top of I-95; is

7    that right?

8         A.    Yes.

9         Q.    And I take it the reason you did that

10   is because you perceived that to be an asset for

11   the tower that you were contemplating building;

12   is that right?

13        A.    Definitely.

14        Q.    What about pointing out that it was a

15   replacement of an existing radio tower?  What

16   significance did you think that might have to Mr.

17   Miller?

18        A.    None.  I mean I'm not sure why I put

19   that in there.

20        Q.    But no question, though, at this point

21   you're reaching out to Mr. Miller, trying to get

22   information for who you should talk to about

23   maybe making a deal with Cingular for the Old

24   Saybrook tower, right?

25        A.    Correct.  We were trying to see if

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 22, 2004

Page 164

```
 1    there was any renewed interest in finding any

 2    other tenants besides, you know, Verizon or

 3    Omnipoint who had been interested.  If there were

 4    any carriers that would be interested in going on

 5    the tower.

 6         Q.    And is it your testimony or your

 7    recollection, Mr. Maccini, that prior to August

 8    7th of 2002, you had made similar inquiries to

 9    Cingular about potential placement on the Old

10    Saybrook tower that had been unsuccessful?

11         A.    That wasn't my purview.  It would have

12    been Keenan's to market the tower.  I just

13    happened to have a relationship with Tony Miller,

14    and felt that maybe Tony could help us out.

15         Q.    But in any event, as of September 24th

16    of 2002, notwithstanding your termination letter,

17    you are clearly thinking about still going

18    forward with the tower project, correct?

19         A.    We're still negotiating with Mr.

20    DeCesare on potentially trying to salvage a deal,

21    and one of my bases for going forward and my

22    level of what I would be willing to do with Mr.

23    DeCesare in any revised new deal would be if all

24    of a sudden I had a carrier that was interested.

25         Q.    Okay.  So would it be fair to say, Mr.
```

Page 165

1    Maccini, that notwithstanding whatever you

2    thought about tenant prospects when you wrote the

3    termination letter back in August of 2002, you

4    held out more hope about a month and a half

5    later, on September 24th, that you might well be

6    able to get a tenant or tenants on a tower in Old

7    Saybrook?

8         A.   Yes, but then I can tell you those

9    hopes were dashed.

10        Q.   But it's fair to state, that based upon

11   Exhibit 18, the Miller e-mail, and Exhibit 17,

12   the e-mail to Mr. Cook, that you were still

13   hoping to do this deal under revised terms more

14   favorable to Tower Ventures, correct?

15        A.   I'd be willing to if the circumstances

16   and, you know, business conditions were favorable

17   or adequate.

18        Q.   And if the business conditions were

19   unfavorable or inadequate, in your view, you

20   could get out of the agreement by saying that

21   your due diligence had revealed to you facts that

22   gave Tower Ventures good cause to pull out of the

23   agreement?

24             MR. HUMPHREY:  Object to the form

25   because it's already -- at this point in time --

June 22, 2004

1    the question is misleading because at this point

2    in time, the agreement has already been

3    terminated.

4        A.    Been terminated.

5        Q.    He's writing e-mails talking about the

6    potential of going forward.  And there's clearly

7    a possibility of still going forward.

8        A.    Correct, but there's no deal there.

9    The deal is terminated, and we're operating in a

10    kind of a new world.

11        Q.    Let me show you what's been marked as

12    Exhibit 19.  Ask you to take a look at that and

13    see if you recognize it.

14                (Pause in the proceedings.)

15        A.    Okay.

16        Q.    Do you recognize Exhibit 19?

17        A.    Yes.

18        Q.    What is it?

19        A.    It's an e-mail from myself to Mark

20    Cook.

21        Q.    And it's further discussion about a

22    lease with Verizon, correct?

23        A.    Correct.

24        Q.    And in this e-mail, Exhibit 19, you say

25    to Mr. Cook, "It is my understanding that Verizon

1    has agreed to $2,500 per month with a three

2    percent annual escalator and a rent start date of

3    24 months from full execution of the agreement,"

4    correct?

5         A.    Correct.

6         Q.    So was it, in fact, your understanding

7    as of Tuesday, October 1st, 2002, that Verizon

8    had agreed to a lease of $2,500 a month with a

9    three percent annual escalator, at a potential

10   Old Saybrook tower?

11                MR. HUMPHREY:  Object to the

12   form.  The lease attached is not Old Saybrook.

13                MR. GRUDBERG:  We'll get to that.

14        Q.    Let's take it from the top, Mr.

15   Maccini.  You're writing to Mr. Cook, right?

16        A.    Yes.

17        Q.    He's associated with Verizon, right?

18        A.    Yes.

19        Q.    And you're attaching for him a copy of

20   a lease that you had used in Stafford,

21   Connecticut, right?

22        A.    Correct.

23        Q.    And that lease was similarly with

24   Verizon, right?

25        A.    Yes.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                              June 22, 2004

Page 168

1      Q.    And apparently it was executed in

2    mid-August of 2002, right?

3      A.    No.

4      Q.    Look at the body of the e-mail.  The

5    first paragraph of the e-mail.

6      A.    That's what I say, yes.

7      Q.    Okay.  And you go on to say that you

8    would like to use this form and we can plug in

9    the specifics for the Old Saybrook site, right?

10     A.    That's correct.

11     Q.    So am I correct that it was your

12   intention, in attaching the Stafford lease, to

13   use this -- use that lease as a model for the

14   contemplated Old Saybrook site lease?

15     A.    Yes.

16     Q.    And as to the particulars of the Old

17   Saybrook site lease, you further stated your

18   understanding that Verizon had agreed to $2,500 a

19   month as a price, right?

20     A.    That's what I state in my e-mail, yes.

21     Q.    With a three percent annual escalator,

22   right?

23     A.    That's correct.

24     Q.    Now having reviewed Exhibit 19, does

25   that refresh your recollection at all concerning

1    whether Verizon had agreed to rent space as a

2    tenant on the Old Saybrook tower, if the tower

3    project had, in fact, gone forward?

4        A.    On October 1st, they were still

5    interested in potentially leasing the tower

6    space.

7        Q.    Well, that isn't what you say in the

8    e-mail, though, is it?

9        A.    I say it is my understanding that

10   Verizon has agreed to 25 per month with a three

11   percent annual escalator and a rent start date of

12   24 months from full execution of this agreement.

13       Q.    But you don't say it's my understanding

14   you're still potentially interested in renting

15   space, you say it's my understanding that you've

16   agreed to rent, right?

17       A.    That's what I said in the e-mail, yes.

18       Q.    Right.  And the reason you're attaching

19   an agreement to be used as a model is so that you

20   can reduce that $2,500 per month agreement to

21   writing, correct?

22       A.    Yes.  But I'm also saying that

23   subsequently they informed me that they were not

24   going to proceed and would not lease this site.

25       Q.    Do you have any e-mail or communication

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 170

1    from Mr. Cook reflecting that communication?

2        A.    I don't know.

3        Q.    From anyone else at Verizon?

4        A.    Not to my knowledge.

5        Q.    I'll tell you just for the record, I've

6    received none from your document production.  Now

7    again, having reviewed this October 1st, 2002

8    e-mail, Mr. Maccini, does that cause you to

9    revisit your recollection in any way of what the

10   state of business was with potential cellular

11   tenants as of August 7, 2002, when you wrote your

12   termination letter to Crossroads?

13       A.    No.  We had no definitive agreement

14   with any carrier.  We were trying to find

15   tenants, and then the day that I wrote that

16   letter, we had no tenants.

17       Q.    Do you stand by your statement that as

18   of August 7th, 2002, Verizon had indicated that

19   they were not interested and had backed out of a

20   commitment to the Old Saybrook tower?

21              MR. HUMPHREY:  My recollection --

22   you used the term once before, "backed out of the

23   commitment."  My recollection is not that there

24   was any commitment, if that means in terms of

25   something signed, in writing.  So I think that's

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

```
 1    a mischaracterization of the testimony as to

 2    where Verizon or anybody else was at that point

 3    in time.

 4         A.    We are dealing with a site

 5    acquisition -- site acquisition people, who, you

 6    know, for their own purposes sometimes will lead

 7    you astray.  And, you know, as Steve said, there

 8    was no commitment.  It was just, you know, "We're

 9    interested, we're not interested."  Sometimes

10    they were, sometimes they weren't.  And again,

11    until I have a signed agreement, and I have been

12    trying my best to -- and certainly Mr. Brinn

13    was -- to obtain a signed lease with a carrier,

14    which we were -- certainly on the date of

15    termination, which we were unable to do, and even

16    subsequently when we continued on, and when Mr.

17    DeCesare I thought there was a potential of

18    reviving a deal, you know, continued to try to

19    market and lease up the space on the tower, and I

20    could not conclude a deal with anyone.

21         Q.    The record of your prior testimony will

22    speak for itself, but it's my memory that you

23    said at one point Verizon had indicated an

24    interest in renting space on the Old Saybrook

25    tower, and then there came a point in time when
```

Page 172

1    you had a communication with a site

2    acquisition -- or site specialist with Verizon,

3    who told you that Verizon was no longer

4    interested.

5         A.    Right.

6         Q.    And that that was the state of affairs

7    when you wrote the August 7th, 2002 letter.

8    Correct?

9         A.    Correct.

10        Q.    And is it your testimony now that

11   Verizon's interest wavered back and forth?

12        A.    It wavered back and forth.  The terms

13   also wavered.  You know, Verizon went from the

14   rent commencement would have been 30 days from

15   construction of the tower, to all of a sudden

16   well, you know, we want to delay things and we

17   don't want the rent commencement to start for,

18   you know, a year, then it became two years.  And

19   then it became, you know, open-ended, when we

20   pulled the building permit, and then to the point

21   of we're not interested anymore.

22        Q.    I think you testified earlier that your

23   memory of the price range that you were

24   discussing with Verizon for a potential leasing

25   of space on the tower was 1,800 to 2,000 dollars,

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 173

1    right?

2         A.    Right.

3         Q.    Does Exhibit 19 change your

4    recollection in any way that at least at one

5    point in time Verizon had agreed to a price of

6    $2,500 per month?

7         A.    Well, I'm not sure they ever agreed to

8    2,500.  I was trying to get 2,500, and even

9    though I may have stated that in my e-mail, until

10   they sign a piece of paper saying that they will

11   pay $2,500, -- well, actually sign a commitment

12   to pay $2,500, they haven't agreed to pay

13   $2,500.

14        Q.    I understand that as of the date of

15   this October 1st, 2002 e-mail, Exhibit 19, they

16   hadn't signed anything, but do you stand by the

17   statement that you typed back then, which is that

18   they had agreed to $2,500 per month figure?

19        A.    I don't know.  Because I don't know --

20        Q.    Well, you wouldn't have just made that

21   up in an effort to deceive Mr. Cook, would you?

22        A.    No.  But I don't know who I had been

23   talking to previously because it does not appear

24   that obviously I agreed or Mr. Cook agreed that

25   they were going to pay $2,500.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 174

1          Q.    Going back, Mr. Maccini, to Exhibit 2,

2     the agreement itself, I think in our mass of

3     paper it's somewhere over here.

4          A.    Yes.

5          Q.    In paragraph one, which deals with

6     acquisition of approvals, you've noted a couple

7     of times that there's a provision in there that

8     requires Crossroads to reasonably cooperate with

9     TVI in connection with TVI's acquisition of the

10    approvals, correct?

11         A.    Correct.

12         Q.    And, in fact, Crossroads did a number

13    of things to help TVI acquire the approvals,

14    correct?

15         A.    You'll have to talk to Mr. Brinn about

16    that.

17         Q.    All right.  Well, let me ask you about

18    some specifics.  Do you know whether -- well, Mr.

19    Brinn was the person at Tower Ventures who was

20    involved on a day-to-day basis in working with

21    Crossroads to obtain necessary approvals,

22    correct?

23         A.    Correct.

24         Q.    Do you know whether Crossroads allowed

25    the applications to be made to the local Old

1    Saybrook authorities in its name rather than

2    Tower Ventures' name?

3        A.    I don't know exactly how that was done

4    but typically the landowner would have to sign

5    any application.

6        Q.    Well, you indicated to me before that

7    Mr. DeCesare, in the course of your negotiations,

8    had spoken of his goodwill within the community

9    and the fact that he knew people and enjoyed a

10   good reputation within the community, correct?

11       A.    Yes.

12       Q.    Would you agree that Mr. DeCesare, as

13   far as you know, used that goodwill and good name

14   of both himself and the company, Crossroads, to

15   help TVI obtain approvals for the

16   telecommunications tower?

17       A.    I guess all I said before is that I'm

18   not aware of exactly what he did.  I'm not aware

19   of anything that he didn't do.  But I'm not also

20   aware of anything that he did.

21       Q.    Do you know whether he attended any

22   meetings in support of Tower Ventures' pursuit of

23   approvals?

24       A.    I don't recall.

25       Q.    Do you know whether he spent time with

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 22, 2004

Page 176

1    Mr. Childress in assisting him with the attempt
2    to acquire necessary approvals?
3         A.   I don't know.
4         Q.   Is it fair to state, Mr. Maccini, that
5    between September 2001, when the agreement was
6    signed, and shortly before August 7th, 2002, when
7    you sent the letter attempting to terminate the
8    agreement, is it fair to state that your
9    day-to-day involvement with the Old Saybrook
10   tower project was limited?
11        A.   Day-to-day involvement?
12        Q.   Yep.
13        A.   Yes.
14        Q.   Do you remember if you had any
15   discussions with Mr. DeCesare from September
16   2001, to August 2002?
17        A.   The date of termination?
18   —    Q.   The date you sent the letter.
19        A.   I believe I did.  But I don't recall
20   the substance or when.
21                   MR. GRUDBERG:  Just give me a
22   moment.
23                   (Pause in the proceedings.)
24                   MR. GRUDBERG:  That's all I have.
25                   MR. HUMPHREY:  I have no

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 22, 2004

Page 177

1    questions.

2              (Time noted:  3:33 p.m.)

3

4                   ROBERT MACCINI

5

6

7              SUBSCRIBED AND SWORN TO BEFORE ME,

8    the undersigned authority, on this

9    the      day of                    , 2004.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of

Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition

was by me duly sworn and thereupon testified as appears in the foregoing

deposition; that said deposition was taken by me stenographically in the

presence of counsel and reduced to print under my direction, and the

foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the

parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___1st___ day of

___July___, 20_04_

_____
NOTARY PUBLIC



My Commission Expires:

4/2008