```
 1    IN THE UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF CONNECTICUT

 3

 4

 5    -------------------------------x

 6    CROSSROADS COMMUNICATIONS OF
      OLD SAYBROOK, LLC,                      :
 7
                      Plaintiff,             :
 8                                               Civil Action
          -versus-                          : No. 3:03 CV 459
 9                                                    PCD
      TOWER VENTURES, INC.,                  :
10
                      Defendant.             :
11
      -------------------------------x
12

13

14

15             Deposition of KEENAN BRINN, taken

16    pursuant to the Federal Rules of Civil Procedure,

17    at the law offices of Robinson & Cole, LLP, 280

18    Trumbull Street, Hartford, Connecticut, before

19    James A. Martone, L.S.R. #00248, a Notary Public

20    in and for the State of Connecticut, on June 24,

21    2004, at 11:15 a.m.

22

23

24

25
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

Page 2

```
 1    A P P E A R A N C E S:

 2            For the Plaintiff:

 3            JACOBS, GRUDBERG, BELT & DOW, PC
              350 Orange Street
 4            New Haven, Connecticut  06503
              By:  DAVID T. GRUDBERG, ESQ.
 5

 6            For the Defendant:

 7            ROBINSON & COLE, LLP
              280 Trumbull Street
 8            Hartford, Connecticut  06103
              By:  MARION B. MANZO, ESQ.
 9

10    A L S O    P R E S E N T:

11            Laurie Kaufman

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     WITNESS INDEX

 2                                              PAGE

 3      Direct Examination by Mr. Grudberg        4

 4      Cross-Examination by Ms. Manzo          211

 5

 6

 7                     EXHIBIT INDEX

 8   PLAINTIFF'S          DESCRIPTION          PAGE

 9       29   Letter dated March 12, 2001        28

10       30   E-mail dated August 23, 2002      170

11       31   E-mails                           200

12       32   E-mails and Attached Lease        204
              Agreement

13

         33   E-mail dated October 1, 2002      204

14
         34   E-mail dated October 1, 2002      204

15

16
     NOTE:  Exhibits retained by counsel.

17

18   --

19

20

21

22

23

24

25
```

Page 4

```
 1   K E E N A N     B R I N N,

 2   31 Chesterfield Road, Milton, Massachusetts

 3   02186,

 4        called as a witness, having been first duly

 5        sworn by James A. Martone, L.S.R., a Notary

 6        Public in and for the State of Connecticut,

 7        was examined and testified as follows:

 8   DIRECT EXAMINATION

 9   BY MR. GRUDBERG:

10        Q.   Good morning, Mr. Brinn.

11        A.   Good morning.

12        Q.   My name is David Grudberg and I

13   represent Crossroads Communications of Old

14   Saybrook in connection with a lawsuit that it has

15   initiated against Tower Ventures, Incorporated.

16              Have you been through this process

17   before, having a deposition taken?

18        A.   No.

19        Q.   Let me go over some basic ground rules

20   that will hopefully make things go more

21   smoothly.  I'm going to be asking you a series of

22   questions today.  And the first thing I'd ask is

23   that you answer out loud rather than with a nod

24   of the head or a grunt or something like that,

25   because, as you see, we have a court reporter who
```

1     takes down everything that is said.  Okay?

2          A.    Yes.

3          Q.    I will try as best I can to allow you

4     to complete your answers before I initiate

5     another question, and I would ask you again to

6     please allow me to complete my question before

7     you begin to answer.  That will make the court

8     reporter's job much easier and it will make for a

9     cleaner record.  Is that all right?

10         A.    Understood.

11         Q.    If at any time you don't understand one

12    of my questions, please just let me know and ask

13    me to rephrase it and I'd be happy to do that.

14    Okay?

15         A.    Okay.

16         Q.    And if you go ahead and answer a

17    question without asking me to rephrase it, I'll

18    assume that you've understood it.  Is that fair?

19         A.    Understood.

20         Q.    Finally, if at any time you want to

21    take a break, for whatever reason, either to

22    speak with your lawyer or any reason at all,

23    please just let me know and I'll be happy to

24    accommodate you.  Okay?

25         A.    Okay.

```
 1        Q.   The only thing I would ask is that if
 2   there's a question pending at the time you ask to
 3   take the break, I'd ask you to please answer it
 4   before we break.  Is that fair?
 5        A.   Absolutely.
 6        Q.   Are you suffering from any physical
 7   problem today that you think would interfere with
 8   your ability to sit here and answer my questions?
 9        A.   No.  I think I feel pretty good.
10        Q.   Good.
11        A.   I do have a -- I'm wearing contacts and
12   I have a little bit of trouble.  That might be
13   the only reason I need to get up.
14        Q.   Fair enough.  Like I said, any reason
15   at all, just let me know and we'll be happy to
16   accommodate you.
17        A.   Thank you.
18        Q.   Let me just ask you some background
19   questions concerning your education and work
20   history.
21                  Did you attend college?
22        A.   I did.
23        Q.   And where did you go to college?
24        A.   I went to Miami of Ohio.
25        Q.   The cradle of coaches.
```

Page 7

```
 1        A.    That's right.

 2        Q.    When did you get out of there?

 3        A.    1983.

 4        Q.    What was your degree in?

 5        A.    Double major in economics and history.

 6        Q.    Did you go on to any further graduate

 7   education after getting out of Miami?

 8        A.    I did.  Not immediately, but I did.

 9        Q.    When was that?

10        A.    That would have been in 1990, I went to

11   the Ohio State University.  I finished up with an

12   MBA from Cleveland State -- I should know the

13   date -- 1990.

14        Q.    So you began the MBA work at Ohio State

15   and finished up at Cleveland State?

16        A.    Yes.

17        Q.    And that you said you began in 1990?

18        A.    No.  I went -- I'm sorry.

19        Q.    Let me ask it this way.

20        A.    1989.  1989 to 19 -- let's see.  I take

21   that back.  '91 I finished.

22        Q.    '91?

23        A.    '89 to '91, yes.

24        Q.    Okay.

25        A.    Apologize.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 24, 2004

Page 8

```
 1          Q.    Were you working at that time when you
 2    were pursuing your MBA degree?
 3          A.    I was not.
 4          Q.    All right.
 5          A.    Full time, no, I was not.
 6          Q.    Why don't we cover then your work
 7    background from '83, when you got out of college,
 8    to '89.
 9          A.    Sure.
10          Q.    Tell me what jobs you held and for how
11    long.
12          A.    Worked essentially the whole time as
13    a -- in the real estate appraisal business.
14          Q.    For whom did you work?
15          A.    Worked for myself, essentially as a
16    contractor, for the most part, subbing myself out
17    to actually banks as a fee simple appraiser.
18          Q.    Where were you based?
19          A.    Out of -- a couple different places,
20    but essentially Boston.
21          Q.    And was it the appraisal business that
22    you left when you went back to the Midwest to
23    attend --
24          A.    That's correct.
25          Q.    -- to graduate school?
```

Page 9

```
 1        A.    That's correct.  My folks are from
 2   there.
 3        Q.    Upon getting the MBA degree in '91,
 4   what job did you take?
 5        A.    Took a job back in Boston as a real
 6   estate consultant with a real estate valuation
 7   and real estate financial company.  Essentially
 8   the work at that time would have been buy-out,
 9   renegotiation and, you know, workout stuff, which
10   previously was the Bank of New England.  Did a
11   lot of work for clients down here.  Aetna.  A lot
12   of the insurance companies.
13        Q.    Okay.
14        A.    It's all real estate-related, with kind
15   of the emphasis on finance.
16        Q.    For whom were you working?  Were you an
17   independent consultant contracting yourself out?
18        A.    I worked for a company called Real
19   Estate Solutions, as an employee.
20        Q.    And for how long did you work for that
21   company?
22        A.    Almost two years.
23        Q.    Did that work involve any -- in any way
24   the telecommunications industry?
25        A.    Not at all.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

1        Q.    When you left Real Estate Solutions,

2    what was the next position you took?

3        A.    I left there and worked for a smaller

4    appraisal commercial valuation firm.  I don't

5    know if it was a firm or not, but it was a

6    gentleman that did a lot of real estate work.  I

7    went in there as a 1099 contractor.

8        Q.    Doing similar type work that you had

9    done with Real Estate Solutions?

10       A.    That's correct.

11       Q.    For how long did you stay with that

12   smaller firm?

13       A.    I did that until -- I can tell you when

14   I stayed there, until 1996.

15       Q.    All right.

16       A.    Early '96.

17       Q.    What was your next position?

18       A.    Went to work as a contractor for a

19   company called Next Wave Telecom, doing real

20   estate acquisition work for them.

21       Q.    Is that the first position you held in

22   the telecommunications industry?

23       A.    Yes.

24       Q.    You said Next Wave Telecom was the

25   company.  Were they based in the Boston area?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 11

```
 1        A.    They had a regional office in

 2   Billerica, B-i-l-l-e-r-i-c-a, Massachusetts.

 3        Q.    You said you were an independent

 4   contractor for them, you were a 1099?

 5        A.    Yes.

 6        Q.    A 1099 relationship?

 7        A.    Yes.

 8        Q.    For how long were you with Next Wave

 9   Telecom?

10        A.    Exactly one year.

11        Q.    And where did you go after that?

12        A.    Took a full-time position with a

13   company called Omnipoint Communications.

14        Q.    They're now known as T-Mobile; is that

15   correct?

16        A.    That's correct.  It was also -- in the

17   meantime, they were also Voice Stream, but either

18   way.

19        Q.    Okay.  What was the scope of your

20   duties with Omnipoint?

21        A.    They were running a regional office

22   there.  I was responsible for -- I did the -- a

23   lot of the -- what they would call bulk leasing

24   or master leasing with some of the state

25   departments, you know, departments of state in
```

1  Massachusetts, regional bodies, such as the

2  utility companies.  I did deals with the other

3  carriers.  I had a lot of familiarity with some

4  of the other carriers, you know, while working on

5  that job.  Essentially real estate-related and

6  with the emphasis on leasing.

7      Q.   Okay.  And when you're talking about

8  carriers, you're referring to cellular carriers?

9      A.   FCC licensed carriers.  Verizon,

10 Cingular.

11     Q.   And the leasing work that you were

12 focusing on there, what's being leased?  Are we

13 talking about tower sites?

14     A.   Could being a combination.  Rooftops,

15 tower sites.  A lot of it was related to towers.

16     Q.   But the general scope was placement of

17 whatever equipment is necessary --

18     A.   Yes.

19     Q.   -- in order to --

20     A.   To --

21     Q.   Let me finish before you answer.

22     A.   I'm sorry.

23     Q.   Placement of equipment necessary for

24 the carriers to effectively transmit whatever

25 they're supposed to be transmitting; is that

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 13

```
 1    correct?

 2         A.    Correct.

 3         Q.    For how long were you with Omnipoint?

 4         A.    April of '97 to September of '98.

 5         Q.    And the next post you held was what?

 6         A.    I went to work for a company called

 7    Tower Ventures.

 8         Q.    Now, we've had testimony over the

 9    course of the last few days, I know there are a

10    number of different entities with the Tower

11    Ventures name.

12         A.    Uh-huh.

13         Q.    Am I correct that the company that you

14    went to work for in 1998 was not Tower Ventures,

15    Incorporated?

16         A.    It was Tower Ventures, Inc.

17         Q.    Okay.  Is it the same Tower Ventures,

18    Inc. that --

19         A.    I don't --

20         Q.    Let me finish.

21         A.    I'm sorry.

22         Q.    Is it the same Tower Ventures, Inc.,

23    that, to your knowledge, is the party to this

24    lawsuit?  If you don't know, that's okay.

25         A.    Yeah.  I'm pretty sure it wasn't
```

1    because it was a -- Tower Ventures, Inc. of -- I

2    think it was Massachusetts, and there was a Tower

3    Ventures, Inc. of Rhode Island, and I worked for

4    both of them, so I'm pretty sure it was Tower

5    Ventures, Inc. of Massachusetts was the first one

6    I went to work for.

7        Q.    Okay.  Speeding it along, I've been

8    told that as of some point in the latter part of

9    2000, there was an entity called Tower Ventures,

10   that was merged into a different entity; is that

11   right?

12       A.    That is correct.  I think it's well

13   documented.

14       Q.    And the different entity that it merged

15   into was what?

16       A.    American Tower.

17       Q.    And then a new -- it's my understanding

18   that at that point a new Tower Ventures, Inc.,

19   which is a Rhode Island corporation, was formed;

20   is that correct?

21       A.    I believe, and again, I think it was

22   Tower Ventures, LLC at that point.

23       Q.    Okay.

24       A.    Okay.  And again, I'm pretty sure I

25   have this right.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 15

```
 1        Q.   Fair enough.  I'm not looking to hold
 2   you to this.
 3        A.   Okay.
 4        Q.   I'm just trying to nail it down a
 5   little bit.
 6        A.   Got you.
 7        Q.   At that point, when there was this new
 8   Tower Ventures entity, whatever its name was, did
 9   you become an employee of that company --
10        A.   Yes, I did.
11        Q.   -- as opposed to the company that was
12   merged into American Tower?
13        A.   Absolutely.  I went from one to the
14   other.
15        Q.   Just to complete the picture, it's my
16   further understanding that at some point in 2002,
17   an entity called Tower Ventures II, LLC came into
18   being; is that right?
19        A.   It did and I believe it was 2002, yes.
20        Q.   And by whom are you now employed?
21        A.   I am employed by Tower Ventures II,
22   LLC.
23        Q.   So when you get a paycheck --
24        A.   I get a paycheck every week, from Tower
25   Ventures II, LLC.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 16

1       Q.    And that began to be the case after

2    this transaction that you believe may have

3    occurred in 2002?

4       A.    That's correct, yes.

5       Q.    Let's backtrack a little bit.  When you

6    first signed on with the original Tower Ventures,

7    what was your job title?

8       A.    Arbitrarily I think I chose one, site

9    acquisition manager.  It's like development

10   manager -- site development manager, excuse me.

11      Q.    To whom did you report?

12      A.    Directly to Bob Maccini.

13      Q.    Did you have a specific geographic

14   territory to which you were assigned?

15      A.    Our concentration was New England.

16      Q.    So your territory at that point was not

17   limited in any way to part of New England; is

18   that right?

19      A.    Not at all.  As a matter of fact, I

20   think we did work in all of the New England

21   states, maybe save Vermont.

22      Q.    I'm not talking about the company

23   itself, I'm talking about you in your job scope.

24      A.    I was pretty much the company.

25      Q.    Covered the whole New England?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

1      A.    Yes.

2      Q.    So at that point when you come on

3  board, there are no other site development

4  managers; is that right?

5      A.    There was one fellow that was there for

6  about a month when I came on, yes.  That I knew,

7  yes.

8      Q.    And what were your job duties as a site

9  development manager?

10      A.    To go out there and try to -- two

11  things.  Develop and market the sites that

12  existed for the radio towers.  Trying to find

13  tenants, as I had mentioned before, these FCC

14  licensed carriers.  And also try to develop new

15  towers and buy, you know, existing towers.

16      Q.    The towers that you're looking either

17  to develop or to acquire, were they to be used

18  solely for the telecommunications industry or

19  also for the radio industry?

20      A.    Both.

21      Q.    What's your current title with Tower

22  Ventures II, LLC?

23      A.    It would be the same.  I don't think

24  it's changed.  I'm not -- I guess I could have

25  arbitrarily chose whatever I want, but it's

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 18

1    essentially a development position.

2         Q.   And your job duties remain the same?

3         A.   At Tower Ventures, yes, to try to

4    develop sites.

5         Q.   And how about territory?  Do you still

6    cover all of New England or are you responsible

7    for a subset of New England?

8              (Pause in the proceedings.)

9         Q.   I think I was asking you whether the

10   territory for which you're responsible remains

11   the entirety of New England or whether it's

12   limited in some way to a part of New England?

13        A.   Yes.

14        Q.   Does the company currently have other

15   people who do similar functions to you, who focus

16   on different parts of New England?

17        A.   Yes.

18        Q.   By practice, is there a particular area

19   in which you've come to concentrate

20   geographically?

21        A.   I live in Boston.  I spend a lot of

22   time in Eastern Massachusetts.

23        Q.   Do you still report to Mr. Maccini?

24        A.   Yes.

25        Q.   Has that been the case from the time

1    you went to work for the initial Tower Ventures

2    entity through to the present day?

3         A.    Yes.

4         Q.    Now, I know there's another principal

5    of the company named Joseph Gallagher.  Do you --

6    what regular contact or regular reporting

7    requirements do you have with respect to Mr.

8    Gallagher?

9         A.    I most certainly -- you know, we have

10   contact.  I have contact with him.  He's not in

11   the office, like Bob is.  Bob is in the

12   Providence office full time.  Joe I think works

13   more out of, you know, his home office.

14        Q.    He has an office in Newport, as I

15   understand it?

16        A.    Yes.

17        Q.    Does the company have regular meetings

18   of any kind at which -- well, let me back up.

19              You said Bob, Mr. Maccini, is

20   typically based in the company's Providence

21   office; is that correct?

22        A.    That's correct.

23        Q.    And from the job description you've

24   given me, I take it that you travel quite a bit?

25        A.    Sure, yes.

Page 20

```
 1        Q.    Your average workday does not entail

 2   showing up at the Providence office first thing

 3   in the morning and leaving at five o'clock; is

 4   that fair?

 5        A.    That's correct.  I'm on the road quite

 6   a bit.

 7        Q.    Does the company have periodic meetings

 8   where yourself and others who travel get

 9   together --

10        A.    Sure.

11        Q.    -- with the higher-ups at the company,

12   at the company's Providence office?

13        A.    Yes.  From time to time.

14        Q.    Is there any sort of set pattern for

15   those meetings?  Monthly?  Every other month?

16        A.    No.  Maybe quarterly.

17        Q.    Okay.  Did there come a point in time,

18   Mr. Brinn, when you became aware of a company by

19   the name of Crossroads Communications, or an

20   individual by the name of Don DeCesare?

21        A.    Yes.  Through Bob.

22        Q.    Tell me first when you remember first

23   becoming aware of them, and then second, how it

24   was that Mr. Maccini came to make you aware of

25   them.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 21

1        A.    I don't remember when exactly we -- I

2    first heard of them.  Bob, I believe, had some,

3    you know, I think it was a connection between Don

4    and Bob in the radio business.

5        Q.    It's my understanding that among --

6    that one of the entities in which Mr. Maccini is

7    involved owns a couple of radio stations; is that

8    right?

9        A.    That's my understanding, yes.

10        Q.    And it was your understanding that by

11    virtue of his involvement in that business, Mr.

12    Maccini had come into contact with Mr. DeCesare?

13        A.    That's my understanding.

14        Q.    What do you remember Mr. Maccini first

15    telling you about Crossroads and/or Mr. DeCesare?

16        A.    Initially, I can't recall.

17        Q.    Do you have any -- I'm not looking for

18    exact dates here, but do you have any general

19    recollection as to what time frame we're talking

20    about here?

21        A.    Best guess, Bob introduced me to Don at

22    a lunch in or near Don's office.  I think it's in

23    Middletown.

24        Q.    Okay.

25        A.    Maybe 1999.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 22

```
 1        Q.    Okay.

 2        A.    It could have been 2000, but --

 3        Q.    Okay.  Do you have a business practice

 4   of maintaining either a diary or a PDA or some

 5   log of your appointments?

 6        A.    Not at that time, no.  But I do that

 7   currently, yes.

 8        Q.    How do you keep track of your

 9   appointments and travels currently?

10        A.    Through Microsoft Outlook.

11        Q.    Is that maintained on a laptop or a

12   PDA?

13        A.    At one point I had a PDA.  Then I have

14   a -- now I have it on a laptop.

15        Q.    Okay.  The meeting that you recall --

16   Withdrawn.

17              You recall meeting at some point

18   in the late '90s in Middletown with Mr. DeCesare

19   and Mr. Maccini; is that right?

20        A.    Or 2000, yes.

21        Q.    And what do you recall being discussed

22   at that meeting?

23        A.    Just how we could possibly try to

24   develop a tower site in conjunction with Don,

25   either in Old Saybrook, you know, or anywhere
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 23

1    else that he may have an opportunity.

2        Q.    Were you familiar at that point with

3    Crossroads, as the name of Mr. DeCesare's

4    company?

5        A.    Probably not.  It was strictly Don was

6    my point of contact.

7        Q.    Did you become familiar at that point

8    with the real estate holdings that Crossroads, or

9    Mr. DeCesare, had?  You talked about meeting in

10   Middletown.  I guess --

11       A.    Yes.

12       Q.    I guess he had some property in

13   Middletown?

14       A.    He had -- he's got a radio station

15   there with a tower, so I was aware of that.

16       Q.    And do you remember any discussion

17   about -- the controversy that brings us here

18   today centers on a piece of land in Old

19   Saybrook.

20       A.    Yes.

21       Q.    Do you remember any discussion about

22   other parcels of land, other than the Middletown

23   property, at this initial meeting?

24       A.    I don't remember it specifically, no,

25   because the meeting did not take place at the Old

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                      June 24, 2004

Page 24

1    Saybrook site, it took place up in Middletown.

2        Q.    And at that point, what was Tower

3    Ventures potentially interested in doing if it

4    entered into a business deal with Mr. DeCesare?

5        A.    We would have looked to either, you

6    know, lease or purchase a tower or lease a piece

7    of land for development of a communications site,

8    such as a tower.

9        Q.    And do you remember whether there was

10   an existing radio tower on the Middletown

11   property that Mr. DeCesare owned?

12       A.    Oh, yeah, there definitely was.

13       Q.    And that would have been something that

14   was of general interest to your company?

15       A.    That one, no, not in particular, as I

16   recall.

17       Q.    Why was that?

18   --    A.    I would have had to do some more

19   research.  It seemed like it was somewhat off --

20   the idea is to have facilities on the main

21   roadways, you know, or covering downtown areas.

22   My thought on that tower was it would not -- it

23   wouldn't have been of a lot of interest.

24       Q.    It was too remote?

25       A.    Yeah.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 25

1        Q.    So when you're scouting out sites for

2    potential development or potential placement of

3    communications equipment, proximity to main

4    roadways is a significant factor that you focus

5    upon?

6        A.    Definitely.

7        Q.    And was this Middletown tower, was it

8    adjacent to the Connecticut River?

9        A.    I believe so, yes.

10       Q.    And it was your feeling that it was too

11   far from a main road?

12       A.    That was my initial -- now, again, I'm

13   not a radio frequency engineer, but I have a

14   pretty good sense of what made sense and what

15   didn't.

16       Q.    Well, part of doing your job involves

17   both assessing what might be attractive for Tower

18   Ventures, and assessing what might be attractive

19   to potential tenants that you're leasing space

20   to, right?

21       A.    Yes.

22       Q.    So to that extent, when you're looking

23   at a potential site, you are trying to factor in,

24   based on your own experience, whether a site

25   might be attractive to cellular companies who

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                              June 24, 2004

Page 26

 1    would rent space on it, right?

 2         A.    That's correct.

 3         Q.    And the main revenue source for Tower

 4    Ventures in its typical venture is lease revenue

 5    that it would get from a Verizon or from a

 6    Cingular or from another cellular carrier,

 7    correct?

 8         A.    Yes.  That's essentially -- that is

 9    the --

10         Q.    That's it, right?

11         A.    Yeah.

12         Q.    I mean if you pick a site they're not

13    interested in, then that's a bad pick, right?

14         A.    Uh-huh.  Yes.

15         Q.    Did anything come of this initial

16    meeting either in the late '90s or 2000?  Do you

17    remember any further discussion beyond the

18    initial meeting?

19         A.    No.  There may have been a follow-up

20    phone call.  And I don't recall.  May have been

21    between Bob and Don.  Or maybe there was a

22    thank-you.  I don't know.

23         Q.    Did Mr. Maccini*tell you that he had

24    spoken with Mr. DeCesare or are you just

25    speculating?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

```
 1        A.    I'd be speculating.

 2        Q.    Would it be fair to characterize this

 3   meeting as kind of a get acquainted type meeting?

 4        A.    Absolutely.

 5        Q.    And, you know, "Perhaps we can do

 6   business at some point down the road"?

 7        A.    I think that's a fair statement.

 8        Q.    When is the next contact that you can

 9   remember with Mr. DeCesare?

10        A.    I am pretty sure it was sometime in the

11   summer of 2001.

12        Q.    All right.

13        A.    There was definitely a lag.

14        Q.    All right.

15        A.    I wouldn't say it was the -- like I

16   said, I'm not sure on the dates of the first

17   meeting, but there was certainly a lag at some

18   point between contacts.  I think -- I'm going to

19   say it was 2001.

20        Q.    And whatever the specific date happened

21   to be, do you remember what it was that spurred

22   this renewed contact?  You said there was a lag

23   with no discussion, right?

24        A.    Yeah.  I think it may have been a phone

25   call from Don.
```

1        Q.    To whom?

2        A.    Directly to -- it could have been Bob

3    and he relayed it to me or it came directly to

4    me.   I'm not sure which.

5        Q.    But in any event, it's your

6    recollection that the contact was initiated by

7    Mr. DeCesare?

8        A.    Correct.

9                MR. GRUDBERG:   Can you mark this?

10               (Plaintiff's Exhibit 29 marked

11               for identification.)

12       Q.    Let me show you, Mr. Brinn, what's been

13   marked as Exhibit 29 for identification.   I'd ask

14   you to take a look at that and tell me whether

15   you recognize it.

16       A.    Looks like something I would have sent

17   out.   It's not signed, but --

18       Q.    Have you seen this letter before?

19       A.    I have seen it, yes.

20       Q.    Have you seen it recently?

21       A.    No.

22       Q.    Did you review documents to help

23   prepare for the deposition today?

24       A.    Yes.   I reviewed some of my own notes

25   and the contract.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 29

1        Q.    And the notes that you reviewed would

2    have been from what?

3        A.    Just --

4        Q.    Notes of conversations?

5        A.    Notes of the process that was

6    undertaken, you know, in Old Saybrook.

7                    MR. GRUDBERG:  Off the record.

8                    (Discussion off the record.)

9        Q.    Exhibit 29 appears to be a letter from

10   you to Mr. DeCesare, dated March 12, 2001; is

11   that correct?

12       A.    2001, okay.

13       Q.    It references, in the first sentence, a

14   discussion concerning a tower on Springbrook Road

15   in Old Saybrook, right?

16       A.    Correct.

17       Q.    Do you believe that you sent Exhibit 29

18   to Mr. DeCesare?

19       A.    I believe I did.

20       Q.    Having reviewed Exhibit 29 now, does

21   that refresh your recollection concerning when

22   discussions with Mr. DeCesare might have resumed?

23       A.    2001.

24       Q.    Okay.  At some point prior to March

25   12th, right?

Page 30

```
 1        A.    Exactly.
 2        Q.    Let's review the letter, Exhibit 29, if
 3   we could.   You talk about the potential
 4   replacement of an existing tower on the
 5   Springbrook Road site in Old Saybrook, right?
 6        A.    Correct.
 7        Q.    Now, had you been aware of that site
 8   back in '99 or 2000?
 9        A.    Yes.
10        Q.    And had there been any discussion with
11   Mr. DeCesare, that you recall, about that site in
12   your initial meeting?
13        A.    Yes.
14        Q.    What do you recall from the initial
15   meeting?   I'm talking about the Middletown
16   meeting.
17        A.    I don't recall that.
18        Q.    Just the fact that there was this site
19   in Old Saybrook, right?
20        A.    Yes.
21        Q.    Was there discussion about its
22   proximity to Interstate 95?
23        A.    Oh, yes.   Absolutely.
24        Q.    And that clearly would have been
25   something that was of interest to you, right?
```

```
 1      A.    On a main roadway, yes.
 2      Q.    Proximity to a major artery like I-95
 3  made it a more attractive site for Tower
 4  Ventures, correct?
 5      A.    Correct.
 6      Q.    Okay.  Now, there's reference to an
 7  existing radio tower on the site and potential
 8  replacement of it, in this letter of March 12th,
 9  right?
10      A.    Yes.
11      Q.    Then you go on to set forth a
12  development proposal.  That you say is after a
13  conversation with Bob Maccini, right?
14      A.    Correct.
15      Q.    Now, could you just review with me the
16  proposal you set forth, at least at this time?
17  You talk about a potential deal that -- let's
18  back up a little bit.
19      A.    Yes.
20      Q.    Do you recall a meeting with Mr.
21  DeCesare that preceded the sending of this
22  letter?
23      A.    I don't.
24      Q.    Do you recall some discussion?
25      A.    I recall some discussion, yes.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 32

1       Q.    But you're not sure whether you just

2   spoke by phone or whether you met in person?

3       A.    That's right.  I'm pretty sure we spoke

4   by phone.

5       Q.    And do you recall whether Mr. Maccini

6   met in person with Mr. DeCesare prior to the

7   sending of this letter, Exhibit 29?

8       A.    I don't recall.

9       Q.    In any event, your letter indicates

10  that you spoke with Mr. Maccini, correct?

11      A.    Yes.

12      Q.    What do you remember about that

13  conversation?

14      A.    You know, that we would make a

15  development proposal similar to the one that I've

16  laid out here.  This is kind of a standard deal

17  that we would propose to a landlord.

18      Q.    So let's review the terms of the deal.

19  Now, as things stood as of March 12th, 2001, you

20  knew that Crossroads owned this parcel of land,

21  correct?

22      A.    Yes.

23      Q.    And they owned an existing radio tower

24  on that parcel of land, correct?

25      A.    Yes.  I did obviously understood that.

```
 1    It's laid out here.  180-foot radio tower.
 2         Q.   And the -- take me through the
 3    preliminary deal you were setting forth in
 4    Exhibit 29.
 5         A.   The deal would be that he had an
 6    existing structure.  We would take over that
 7    structure, essentially, remove it and replace
 8    it.  And that there would also be a ground rent
 9    of $15,000 involved to Don, and that for each
10    additional -- you know, each additional tenant
11    that came on, there would be a sharing of
12    revenues.  The way we'd set that up is that if
13    Verizon came on and paid $20,000 a year, and
14    Cingular came on and paid 20, we would pay him 20
15    percent of that, I believe less expenses.  In
16    this case less the ground lease, which would have
17    been 15,000.
18         Q.   Then there's a statement in bold type
19    on the second page that "All financial expenses
20    relating to the permitting and construction
21    process would be the responsibility of TVI."
22    Correct?
23         A.   That's correct.*
24         Q.   Why did you highlight that in bold?
25         A.   Because a lot of people that I make
```

June 24, 2004

```
 1    this proposal to always were concerned that they

 2    would be involved somehow in the cost, so I just

 3    like to make that -- that would have been made in

 4    any statement because I like to make sure that

 5    they know that they weren't, they would not be

 6    responsible for any specific direct costs.

 7         Q.   And then there's a statement

 8    immediately preceding that where you say, "TVI

 9    would be responsible for securing the permit,

10    constructing the tower, and marketing the space"?

11         A.   This is a standard form letter that we

12    would have used.

13         Q.   TVI and its consultants, that is.

14         A.   Yes.

15         Q.   And that general arrangement, that TVI

16    undertaking responsibility in circumstances like

17    this, to secure whatever permits were necessary,

18    that was a standard term of similar deals that

19    you struck with respect to towers like this?

20         A.   Standard in the industry, yes.

21         Q.   And TVI was experienced in obtaining

22    whatever permitting was necessary for towers of

23    this nature, correct?

24         A.   Yes.

25         Q.   And that's why, in the typical deal
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 35

1    that you would discuss with someone, TVI would

2    undertake as its own responsibility, to obtain

3    whatever permits, approvals, et cetera, were

4    necessary to construct the tower, right?

5         A.    Correct.

6         Q.    So the landowner or the other party

7    that you're dealing with doesn't need to worry

8    about that, right?

9         A.    For the most part, yes.

10        Q.    Now, this letter is in March of 2001.

11   And I can tell you that the ultimate agreement is

12   dated September 20th, 2001.  So we've got more

13   than a six-month lag there.

14        A.    Okay.

15        Q.    Do you remember whether you got a

16   response to Exhibit 29 from Mr. DeCesare?

17        A.    I got a verbal response, which was --

18   he basically said, you know, "Not interested in

19   that deal.  Sorry."

20        Q.    All right.

21        A.    Specifically, "Thanks for the offer

22   but -- thanks but no thanks," or something along

23   those lines.

24        Q.    What did you do next after receiving

25   that verbal response from Mr. DeCesare?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 36

1        A.    I think I just left it as is.

2        Q.    What's the next step or next event that

3   you can recall toward the consummation of a deal

4   between Tower Ventures and Mr. DeCesare?

5        A.    I can just basically remember Bob and

6   myself, either getting a call -- to my best

7   recollection, I didn't call Don again.  There was

8   another either conversation between Bob and Don

9   to get this either started again, and I can't

10  remember exactly how that was, you know, kick

11  started, but there was -- at that point, Bob and

12  Don basically, you know, decided that, you know,

13  they could work something out.  At that point, I

14  was essentially out of the negotiations.

15       Q.    All right.  When you received the

16  response to the May letter, Exhibit 29, from Mr.

17  DeCesare, saying essentially, "Thanks but no

18  thanks," when you got that verbal response, did

19  you tell Mr. Maccini?

20       A.    I'm sure I did, yeah.

21       Q.    Do you remember any discussion you

22  might have had with Mr. Maccini when you conveyed

23  to him Mr. DeCesare's lack of interest in the

24  proposed deal you had set forth in the March 12,

25  2001 letter?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 37

1          A.    I don't recall anything specifically.

2          Q.    Do you recall whether Mr. Maccini said

3    anything about potentially revising the terms to

4    make them more attractive?

5          A.    I don't know if he would have said that

6    to me.  If anything happened, it would have been

7    at Bob's behest.  He would have been the one at

8    that point driving the negotiations.

9          Q.    When Mr. DeCesare told you he was not

10   interested in the initial written proposal, did

11   he indicate to you whether there might be other

12   terms that -- in which he would be interested?

13         A.    He may have.  He may have stated what

14   those were.  I don't recall exactly.

15         Q.    And the flip side of the same question,

16   did you ask him, in essence, you know, "Is there

17   anything that we could do to make it more

18   attractive?"  Did you explore with him whether

19   the deal that you had initially proposed might be

20   changed in some fashion that -- in order to

21   change his mind?

22         A.    I don't recall specifically, but

23   that -- you know, as a negotiating ploy, that

24   very well could have been something we explored.

25         Q.    As you sit here now, do you recall --

1    you don't recall any specifics?  If such a

2    discussion occurred, you don't recall any

3    specifics of it?

4         A.   Nothing specific that I would be able

5    to quote exactly.

6         Q.   All right.  So that you then convey to

7    Mr. Maccini Mr. DeCesare's response, which was,

8    in essence, "Thanks but no thanks"?

9         A.   Yes.

10        Q.   From that point -- do you think that

11   occurred shortly after this March 12th letter?

12        A.   I would say shortly.  You know, I would

13   say a couple weeks or a month, yeah.

14        Q.   From that point forward, up until

15   September 2001, what involvement, if any, did you

16   have in negotiations with Mr. DeCesare about a

17   possible tower project on the property in Old

18   Saybrook?

19        A.   Everything was pretty much -- you know,

20   this was the standard deal that I would have been

21   able to make.  After that, you know, if Bob

22   wanted to go above and beyond this, it would

23   certainly be up to him.

24        Q.   Is that typically how your business

25   works, Mr. Brinn, that there's a "standard deal"

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

1    that you're comfortable that your company would

2    offer, and that you would have authority yourself

3    to offer, and that anything that deviates from

4    that would have to be done by one of your

5    superiors; is that right?

6        A.    Yes.

7        Q.    So once it got to the point of your

8    "standard deal" not being accepted, Mr. Maccini

9    took over; is that right?

10       A.    He would have to be the one to make

11   that call, yes.

12       Q.    Okay.  You know now that ultimately a

13   deal was consummated and signed on September 20th

14   of 2001, right?

15       A.    That's correct.

16       Q.    Do you remember any conversations

17   between the one we've spoken about, where you

18   told Mr. Maccini that Mr. DeCesare was not

19   interested, do you remember any conversations

20   between that point and a deal ultimately being

21   consummated, that you may have had with Mr.

22   Maccini?

23       A.    I'm sure I had discussions with Bob.

24   And like I said, I may have -- if Bob had asked

25   me to convey something to Don, I may have done

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 40

```
 1   that.  But it strictly would have been, you know,
 2   at Bob's request.
 3        Q.   Do you remember anything specifically
 4   that Mr. Maccini might have or did ask you to
 5   convey to Mr. DeCesare during that time period --
 6        A.   Not specifically.
 7        Q.   Let me finish.  The time period
 8   March/April through September of 2001?
 9        A.   I can't recall.
10        Q.   Did Mr. Maccini ever -- do you recall
11   Mr. Maccini ever speaking with you again during
12   that time period about the site itself, and its
13   attractiveness, or lack thereof?
14        A.   Sure.  We would have had discussions
15   for him to try to assess the site itself.
16        Q.   Do you know whether Mr. Maccini visited
17   the site?
18        A.   The best of my knowledge, he did.
19        Q.   Do you know whether that visit occurred
20   with you as well?
21        A.   I don't remember.  He very well could
22   have done it on his own.
23        Q.   You visited the Springbrook Road site;
24   is that correct?
25        A.   I did.
```