CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

```
 1        Q.    On how many occasions?

 2        A.    Ballpark --

 3        Q.    I'm talking pre-deal, pre-September

 4   2001.

 5        A.    Twice.  You know, enough to -- I saw it

 6   twice, and that was probably enough.

 7        Q.    Okay.  Do you recall any conversations

 8   with Mr. Maccini about possible terms that Mr.

 9   DeCesare was asking for and whether the site was,

10   you know, "worth it"?  Do you recall any

11   discussions along those lines?

12        A.    Sure.  I don't recall specifically what

13   it was or -- but there were discussions in order

14   to try to bring this deal together.

15        Q.    I gather, from what you've said, that

16   Mr. DeCesare, in making this deal, was asking for

17   more than the typical landowner that you'd be

18   doing business with, asked for more in order to

19   cut a deal; is that correct?

20        A.    That we would typically deal with, yes.

21        Q.    He didn't take your "standard offer,"

22   he's looking for more, right?

23        A.    Uh-huh.  Yes.

24        Q.    So to that extent, this negotiation

25   involved issues above and beyond the type that
```

```
 1   typically arises in similar tower deals; is that

 2   fair?

 3       A.   That's a fair statement.  Yes.

 4       Q.   And do you remember there being any

 5   controversy or any questions raised about whether

 6   Tower Ventures should accede to Mr. DeCesare's

 7   demands in order to do this deal?

 8       A.   I'm sure there was some -- you know,

 9   some discussion that would have -- you know, I'm

10   sure it wasn't just a simple, "All right, we'll

11   do the deal."  I mean I think there was some

12   thought that went into it.

13       Q.   I guess what I'm trying to get a

14   picture of, Mr. Brinn, is that as you've

15   described it, Mr. Maccini, after the initial no

16   response, took over primary responsibility for

17   the negotiation, right?

18       A.   Correct.

19       Q.   And what I'm trying to get at is, do

20   you remember Mr. Maccini coming to you at any

21   point, in essence saying, "Gee, he's asking for a

22   lot, he's asking for A, B and C that we wouldn't

23   normally give.  What do you think?  Do you think

24   that's worth it for this site?"  Do you remember

25   any discussions of that general nature?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 43

```
 1        A.    Again, what I do is go out, present the
 2   evidence to Bob, tell him what I think about the
 3   site, what the potential for it is, and he would
 4   make the decision.  I'm the guy that does the
 5   legwork.  I go out, get the information, and he
 6   would make the decision.
 7        Q.    And Mr. Maccini typically relies on
 8   your -- in part at least, on your judgment about
 9   the site itself, right?
10        A.    I have a fairly extensive background in
11   this, in the business, sure.
12        Q.    One of the provisions in the deal that
13   was ultimately consummated called for payment of
14   $150,000 one-time upfront fee upon execution of a
15   ground lease, right?
16        A.    That's correct.
17        Q.    And am I correct that such a provision
18   is more than Tower Ventures would typically pay
19   in similar circumstances?
20        A.    I would just say in --
21        Q.    Let me ask it this way.  Your "typical
22   deal" that you offered in your March letter just
23   included monthly rent and not a one-time upfront
24   fee, correct?
25        A.    That's correct.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

1        Q.    Do you remember Mr. Maccini ever coming

2    to you during the April to September period

3    saying, "Hey, this DeCesare guy is looking for

4    150,000 up front.  Do you think that this site is

5    worth it?"

6        A.    I'm sure he asked my opinion, yes.

7        Q.    And do you remember what opinion you

8    gave him?

9        A.    I said -- I mean what I would have told

10   him was it's on a main road and I think there

11   would be some interest, you know, based upon that

12   alone.

13       Q.    Okay.  The existence or nonexistence of

14   interest in the site is something that we've

15   already agreed is very important to Tower

16   Ventures, right?

17       A.    Uh-huh.  Yes.

18       Q.    During this time period, were you asked

19   by Mr. Maccini to investigate interest by

20   potential cellular tenants in a tower at that

21   site if Tower Ventures were to go ahead and do

22   the deal?

23       A.    What time frame, if I can ask a

24   question?  What time frame are you talking

25   about?  What date?

1      Q.    Say the spring of 2001, up to the

2    signing of the agreement, when it's still in the

3    negotiation phase.

4      A.    Yes.  I would have investigated

5    possibilities, yes.

6      Q.    Because that's something that's very

7    important for your company?

8      A.    Sure.

9      Q.    You want to know what business is going

10   to be there.

11     A.    Yeah.

12     Q.    What investigation do you remember

13   undertaking into the question of are tenants

14   going to be interested in this site if we decide

15   to go ahead and develop it?

16     A.    I -- as I recall, we pinpointed --

17   well, Don had a kind of standing relationship

18   with Verizon at that time, about going on this

19   site.  That was part of the attractiveness of the

20   site to us, that Verizon was very interested in

21   the site and wanted to move ahead with it.

22     Q.    Am I correct that you had your own

23   contacts with Verizon during this period of time?

24     A.    I don't recall if I had any specific --

25   at this point, it was strictly speculation as to

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

```
 1   whether or not they would have come on.  I'm
 2   sorry, in general, did I have a Verizon contact,
 3   yes.
 4        Q.   In general, yes.
 5        A.   Yes.
 6        Q.   Did you reach out to your Verizon
 7   contact to inquire about possible interest in
 8   placement of equipment on a tower at this Old
 9   Saybrook site, if indeed Tower Ventures were to
10   develop it?
11        A.   I suspect I did.  I don't remember, you
12   know, who I would have talked to, but obviously I
13   confirmed that there was an interest there.
14        Q.   You don't remember the name of your
15   Verizon contact at that time?
16        A.   I don't.
17        Q.   Do you remember reaching out to try to
18   gauge interest from any other cellular carriers
19   during this negotiation period?
20        A.   Specifically Cingular, which I believe
21   was SNET at the time, had come and done a radio
22   frequency test at that site, and I followed up
23   with them.  They had no immediate interest.  But
24   the site had some potential to them.
25        Q.   Do you remember who it was you spoke
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 47

```
 1   with affiliated with either Cingular or SNET?
 2        A.   It would have been a consultant,
 3   somebody along those lines.  It wasn't a
 4   direct -- it was whoever was working the site for
 5   Cingular.  I don't recall.
 6        Q.   My understanding is that the cellular
 7   companies sometimes engage the equivalent of a
 8   real estate broker, to help them place equipment
 9   on particular sites; is that right?
10        A.   Yes.  That's what I did prior to this.
11        Q.   Okay.  You helped make "a marriage"
12   between a cellular carrier and a property owner?
13        A.   Yes.  As I mentioned, back in 1996 when
14   I broke in, that's essentially what I was doing.
15        Q.   And you don't remember the name of the
16   person at either Cingular or representing
17   Cingular with whom you spoke about possible
18   -interest?
19        A.   If you gave me a minute, I could
20   probably come up with it.
21        Q.   If you want to take a moment now, do
22   that.  If you want to ponder it, we're going to
23   be here for a little while.  If the name comes to
24   you later on in the day, you can give me that as
25   well.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 48

```
 1        A.    The guy worked for me, that's why I
 2   knew his name.  If you want to let me ponder it a
 3   minute, I will.
 4        Q.    All right.  Whatever you'd like.  If
 5   you want to move on --
 6        A.    We can move on.
 7        Q.    If you need some time -- we'll move
 8   on.
 9        A.    Fine.
10        Q.    We've covered Cingular and Verizon.
11   Did you speak with any other cellular carriers
12   during the negotiation period to gauge possible
13   interest in the tower site in Old Saybrook?
14        A.    Yes.  I made inquiries with -- and I
15   don't recall if this happened -- I know there
16   were continuing conversations before September
17   20th and after September 20th.  So I did make
18   inquiries with specifically T-Mobile and AT&T.
19        Q.    Do you remember who you spoke with at
20   T-Mobile about possible interest in the Old
21   Saybrook site?
22        A.    Mark Findley.
23        Q.    Was Mr. Findley a T-Mobile employee or
24   was he an independent consultant?
25        A.    He would have been a contractor working
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 49

1    out of the -- I believe it's their Glastonbury

2    office.

3         Q.    Do you know where Mr. Findley is today?

4         A.    Yes, I do.

5         Q.    Is he still based in Glastonbury?

6         A.    I do not believe he is there but he's

7    still working on the T-Mobile project.

8         Q.    Do you know where he is based?

9         A.    I believe he is in East Providence.

10        Q.    What do you recall of your discussion

11   with Mr. Findley about T-Mobile's possible

12   interest in the Saybrook tower site?

13        A.    My sense is he would have forwarded me

14   to the person to talk to and, at that point, he

15   would have been out of the discussion.

16        Q.    All right.  And did you then speak with

17   someone to whom Mr. Findley had forwarded you

18   about whether T-Mobile was interested in a

19   Saybrook tower placement?

20        A.    Yes.  At some point, I would have

21   spoken to someone at T-Mobile about it.

22        Q.    You do recall speaking with someone at

23   T-Mobile, correct?

24        A.    Yes.

25        Q.    And do you recall this conversation

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 50

1    having taken place before the deal was entered

2    into in September of 2001?

3        A.   I can't specifically say that, no.

4        Q.   What do you remember the person at

5    T-Mobile saying about whether they were

6    interested?

7        A.   At that point, they said they do not

8    have a search requirement there.

9        Q.   How about AT&T?

10       A.   They were represented by a company I

11   believe called WFI.  They would have had a

12   consultant there that I spoke to.

13       Q.   Who was that consultant?

14       A.   Again, I don't specifically know.  I

15   didn't have a relationship.  It would have been,

16   "You need to speak to this particular person."

17       Q.   So the consultant put you in touch with

18   a party at AT&T itself, who could talk to you

19   about their prospective interest in the Saybrook

20   tower site; is that correct?

21       A.   Yes.

22       Q.   You did, in fact, speak to someone at

23   AT&T?

24       A.   I did.

25       Q.   What do you recall about the response

1    you received from AT&T?

2        A.    It would have been similar to T-Mobile,

3    that they had no requirement there at that time.

4        Q.    We've got at least a few others --

5    other cellular carriers we haven't talked about.

6              Sprint PCS, did you contact them?

7        A.    The way they had deployed their network

8    in Old Saybrook, they've got some different tower

9    sites and they had something fairly close by,

10   which would have -- from my understanding and

11   from my familiarity, would have -- it was close

12   enough that it probably would have been a

13   redundant site for them.

14       Q.    And, again, do you recall -- let me

15   backtrack for a second.  Do you recall whether

16   the contact with AT&T took place before or after

17   the deal was signed on September 20th, 2001?

18       A.    I think it took place before and

19   after.

20       Q.    And how about NYNEX, they're also a

21   potential tenant at one of these tower sites,

22   right?

23       A.    Well, NYNEX became Verizon Wireless,

24   essentially.  That was their spin-off.

25       Q.    Okay.  Back in 2001, were they a

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 52

```
 1    separate entity?

 2         A.    No.   It became a company called Bell

 3    Atlantic NYNEX Mobile, and then Verizon became

 4    Bell Atlantic, and Verizon Wireless became -- so

 5    NYNEX basically migrated into Verizon.

 6         Q.    NYNEX is -- well, at least markets

 7    themselves still as a separate entity, correct?

 8         A.    Verizon -- NYNEX no longer exists.

 9         Q.    Okay.

10         A.    That was part of the deal, that that

11    name would go away.

12         Q.    Were there any other cellular carriers

13    with whom you spoke prior to September 2001 --

14         A.    No.

15         Q.    Let me finish.

16         A.    I'm sorry.

17         Q.    About possible -- possibly becoming a

18    tenant on a tower to be developed on the

19    Springbrook Road site?

20         A.    I did not.   I don't believe there was

21    anyone else that would have fit that coverage

22    plan.

23         Q.    And were there any other carriers of

24    any kind, noncellular, with whom you spoke prior

25    to September 20th, 2001, about possible interest
```

1    in the Old Saybrook Springbrook Road tower?

2         A.    Not that I recall.

3         Q.    Did you report the results of your

4    inquiry to Mr. Maccini?

5         A.    I'm sure that was included in our

6    discussions.

7         Q.    So if I understand it right, the result

8    of your inquiry was that Verizon might have

9    interest as a tenant in a tower to be developed

10   at Springbrook Road in Old Saybrook, correct?

11        A.    That was my understanding.

12        Q.    And that understanding was primarily

13   based upon what you heard from Mr. DeCesare; is

14   that right?

15        A.    And supported by the Verizon people.

16        Q.    Okay.    And other than Verizon, is it

17   fair to state that you had not received -- you

18   certainly hadn't received a commitment from any

19   other cellular carrier that "If you build a tower

20   there, we are very interested"; is that right?

21        A.    That's correct.

22        Q.    So is it fair to state, then, that as

23   of the signing of the agreement on September

24   20th, 2001, the investigation you had undertaken

25   on behalf of TVI had come to the conclusion that

Page 54

1    Verizon was the principal prospective tenant for

2    that tower, right?

3        A.    That's correct.

4        Q.    To your knowledge, was there anyone

5    else at TVI who would have undertaken an

6    investigation similar to what we're talking

7    about, specifically with respect to the Old

8    Saybrook tower site?

9        A.    I did, on one occasion, have another

10   employee come out with me to assess the site.

11       Q.    All right.  I'm not talking simply

12   about site assessment.  I'm trying to see about

13   whether prospective tenants might be interested.

14   You did a lot of legwork, talking to various

15   carriers, right?

16       A.    Yes.

17       Q.    Is there anybody else at the company,

18   to your knowledge, who also investigated that

19   specific question, namely, are there prospective

20   tenants out there who would be interested in a

21   tower if we built it at this site?

22       A.    I can't say specifically that that was

23   done.  There were other people at the company.

24       Q.    I understand there were other people at

25   the company.

1        A.    Okay.

2        Q.    Were there other people at the company

3    who you spoke with about, you know, potential

4    interest in the Saybrook tower site?

5        A.    I'm sorry, yes, there was another

6    individual who had also -- was working for us at

7    the time, that I asked obviously to engage in

8    discussions with the carriers to determine, you

9    know, who else might be interested in going on

10   here.

11       Q.    And who was that person?

12       A.    His name is Chris Ciolfi, C-i-o-l-f-i.

13       Q.    Is Mr. Ciolfi still employed by Tower

14   Ventures --

15       A.    Yes, he is.

16       Q.    -- or Tower Ventures II?

17       A.    Yes.

18       Q.    Do you know whether Mr. Ciolfi also

19   undertook an investigation into the availability

20   of prospective tenants for a tower to be built in

21   Old Saybrook?

22       A.    I suspect that I would have asked him,

23   and -- to look into it and give me his opinion as

24   to the viability -- what the viability would have

25   been for the various carriers.

1    Q.    Did he later give you his opinion on

2  this?

3    A.    Yes, he did.

4    Q.    And what do you recall his opinion

5  being?

6    A.    That it would have been viable for --

7  certainly I think the discussions we had

8  surrounded Verizon and Cingular.

9    Q.    You told me before that the feedback

10  you had gotten from Cingular was that there was

11  no immediate interest; is that right?

12    A.    That's correct, no immediate interest.

13    Q.    Did Mr. Ciolfi report anything

14  different based upon his own investigation?

15    A.    I don't recall that, no.

16    Q.    And when you say "no immediate

17  interest," did you -- what exactly were you told

18  by Cingular or their representative?

19    A.    That the -- they had done the drive

20  test out there, a test out there, you know, which

21  tells you that they're interested in the site,

22  and that the site would have worked for them.

23    Q.    Did they say anything about future

24  interest, notwithstanding the fact that they had

25  no immediate interest?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 57

1        A.    Again, at the time, you know, 2001, I'm

2    not sure exactly.  I was not privy to their

3    network deployment plans.  That would be

4    proprietary information.

5        Q.    Mr. Brinn, were there any other

6    investigations or studies, of which you are

7    aware, undertaken by or on behalf of TVI into the

8    economic viability of constructing a tower at the

9    Springbrook Road site in Old Saybrook prior to

10   the executing of the deal?

11       A.    I can't say that I'm aware of any.

12       Q.    Is it the company's practice to prepare

13   pro formas or income projections for each tower

14   project that it undertakes?

15       A.    It's really not that complicated.  I

16   mean there are spreadsheets and things like that

17   which show your rates of return and things like

18   that, but you're talking about potentially four

19   or five tenants on a tower.  You figure out what

20   the annual income is and, you know, what you're

21   paying out every year, and you try to make a

22   decision based upon that.

23       Q.    But it seems like the key factor is how

24   many tenants do you have, right?

25       A.    Exactly, and if it was that easy, then

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 58

1    every tower I knew I had, you know, X number of

2    tenants and I was going to make this amount of

3    money, it would be easy to do.  That's where the

4    tower business, that's where it gets difficult.

5    There's a risk in return.  Sometimes you have to

6    go -- you have to make judgments based upon what

7    you know.

8         Q.   Are leases customarily signed by the

9    tenants only after the tower is built?

10        A.   If they are signed before, they're

11   obviously -- not obviously, they're -- there's a

12   provision in there that they can terminate them

13   if they don't get the proper permitting

14   necessary.

15        Q.   All right.  Was there any effort

16   undertaken, as far as you know, to sign up

17   tenants for the prospective Old Saybrook

18   Springbrook Road tower in advance of its

19   construction?

20        A.   Outside of Verizon, we were pretty much

21   going ahead with that, you know, as the anchor

22   tenant.

23        Q.   And you were going ahead hoping that at

24   some point the tenant base would expand beyond

25   the one tenant that you expected to have there,

Page 59

1    right?

2         A.    Yes.

3         Q.    Just let me clarify on the lease

4    issue.  You are aware, though, of instances where

5    the company, your company, Tower Ventures, has

6    signed leases with cellular carriers that are

7    prospective in nature, even before a tower is

8    built; is that right?

9         A.    That's correct.

10        Q.    And such a lease would give the

11   cellular carrier an out if, in fact, there turns

12   out to be no tower; is that correct?

13        A.    That's correct.

14        Q.    Am I correct that it would be your

15   company's preference to get leases of that nature

16   signed before you proceed with a tower deal?

17        A.    That would be the preferred method,

18   yes.  But not in all cases.

19        Q.    I understand it's not all cases, but

20   ideally, if you've got a choice between

21   someone -- a cellular carrier saying to you,

22   "Build a tower, and gee, I might be quite

23   interested in that site," and option B is, "I

24   will sign a lease obligating me to that site

25   unless you turn out not to be able to build the

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 24, 2004

Page 60

1    tower," clearly option B would be preferable to

2    your company; is that correct?

3         A.    Absolutely, yes.

4         Q.    Based on your experience, Mr. Brinn,

5    what business arrangement is more common?  Is it

6    more common that you lock up one or more tenants

7    before the tower is even built, subject to

8    contingencies, or is it more common that you

9    build the tower based upon your informal

10   investigation into tenant interest?

11        A.    We'd prefer to have one tenant because

12   a lot of zoning requires us to have the FCC --

13        Q.    I'm sure you'd prefer to have a half

14   dozen tenants locked up beforehand.  I'm trying

15   to get a sense, based on your knowledge in the

16   industry, what's more common, to have a tenant

17   signed up subject to contingencies before you go

18   ahead to build the tower, or to have informal

19   commitments that you hope and expect you'll be

20   able to nail down and reduce to writing once you

21   actually have the tower to lease?

22        A.    I would say in this day and age, the

23   former.  That we would have people -- we would

24   have at least one tenant lined up.

25        Q.    How about back in the time frame we're

1    talking about, back in 2001?  What was more

2    common companywide back then for Tower Ventures

3    tower projects?

4         A.   It would have been more the other way.

5    We -- there were a number of speculative towers

6    and things that were built during that time

7    period and which have turned out to get tenants

8    on them.  I mean it's --

9         Q.   But it's your recollection, though,

10   that back in 2001, the majority of tower deals

11   that Tower Ventures went ahead with did not

12   involve signing up tenants to a commitment before

13   you went ahead with constructing the tower?

14        A.   Well, without taking stock of every

15   tower, I think it might have been 50/50 then.

16   But it's certainly changed.

17        Q.   Nowadays, it's the company's practice

18   not to go ahead with the tower unless you've got

19   a tenant signed up on a contingent lease

20   beforehand; is that correct?

21        A.   That's the preference of many towns as

22   well, yes.

23        Q.   So -- well, I'm just curious here.  The

24   town wants to know, I guess what?  The town wants

25   to be sure that if it's going to put up this

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 62

```
 1    structure that it might deem to be unsightly,

 2    that at least they know there's going to be some

 3    better cellular reception for at least some of

 4    the town's residents before they agree to it?  Is

 5    that your interpretation?

 6         A.    That would be my interpretation.

 7         Q.    I'm trying to understand your answer.

 8         A.    Yes.

 9         Q.    Is that why?

10         A.    That would be my explanation, they'd

11    like to see that, you know, that someone is

12    coming in there, yes.

13         Q.    The town wants some assurance that

14    someone is not going to be building a tower that

15    ends up with nothing on it and ends up being a

16    tower that nobody just doesn't want to look at?

17         A.    Right.

18         Q.    Can you recall any other involvement

19    that you had in the pre-deal, or pre-signing of

20    an agreement in this project?  Anything else you

21    did?

22         A.    I can't at this point.

23         Q.    Okay.  When you were speaking with

24    cellular carriers about potential interest in a

25    site like the Old Saybrook Springbrook Road site,
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 63

```
 1    was it your practice to prepare marketing

 2    materials or informational materials to be shared

 3    with them?

 4         A.    Certainly not for a site that I didn't

 5    control or own, no.

 6         Q.    So if you're conveying information,

 7    what was your practice?  How would you generally

 8    go about that?  Would you just tell them over the

 9    phone?

10         A.    In general?

11         Q.    Yep.

12         A.    For a site that I controlled?

13         Q.    Yes.

14         A.    There was people at the different

15    carriers that I would contact and say we have a

16    site that's either in zoning, has been approved,

17    that we've got, that's in place today.

18         Q.    Let's back up a second.

19         A.    Uh-huh.

20         Q.    A site that you don't control would

21    include the Springbrook Road site pre-September

22    2001, right?

23         A.    That would be my definition of control,

24    yes.

25         Q.    I just want to make sure we're speaking
```

 1    the same language.

 2         A.    Yeah.

 3         Q.    So in a situation like that, if you

 4    were speaking with let's say a contact from

 5    Cingular about a possible site, how would you go

 6    about pitching it or selling it to that person?

 7    What would you say?

 8         A.    For the Springbrook Road site or just a

 9    typical site?

10         Q.    Let's take Springbrook Road as an

11    example.  You had a number of conversations with

12    cellular carriers pre-September 2001, in an

13    attempt to gauge interest in renting space at a

14    tower on that site, right?

15         A.    Exactly.

16         Q.    How would a typical conversation with a

17    cellular carrier concerning this Springbrook Road

18    site have gone?

19         A.    I would have played the -- you know, I

20    would have found the contact person handling that

21    particular area, say Connecticut, Old Saybrook,

22    Route 95, who is working that area for you, who

23    is maybe the radio frequency engineer, and go at

24    it that way.  There's no foolproof way to get

25    somebody to approve it.  That tower was, as you

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

Page 65

 1   know, existing, so it was an easy landmark.  You

 2   could say, "At the intersection of 7 and 95,

 3   there's that tower, there's nobody on it," you

 4   know, "are you interested?"

 5       Q.   And once you find the person, the right

 6   person to talk to at the carrier, you would just

 7   be conveying information verbally about the

 8   prospective tower that you hoped to be renting

 9   space on?

10       A.   And today, you know, for a tower that,

11   as I said before that we controlled, we have a

12   marketing list of, you know, information that we

13   would send out that would detail, you know, the

14   tower, the location by coordinates, how tall it

15   is, what space is available on the tower.  And

16   typically these are on Excel spreadsheets, they

17   populate them into the database.  It's fairly

18   sophisticated.  And they can say, "Okay, we know

19   that this tower exists."  That's the way the

20   marketing would work today.

21       Q.   But back then, you're not conveying

22   information -- or you're not conveying

23   information in writing, as I understand it,

24   concerning the Springbrook Road property,

25   correct?

June 24, 2004

Page 66

1        A.    Before September 2001, yes.

2        Q.    And you're just telling them the good

3    points, the prospective good points about a tower

4    that would be placed there, correct?

5        A.    And I mean I can have the greatest site

6    in the world.  If there's not a search

7    requirement for that particular site at this

8    time, I might as well be talking to the wall,

9    because there's no -- there's nobody at that

10   company that can do anything to get that tower

11   moving ahead.  So a lot of this has to be based

12   upon what we think the site has for potential.

13       Q.    Okay.  You've used the term "search

14   requirement" a few times.  Please explain for me

15   what that means.

16       A.    As we talked about with these

17   contractors, or these site acquisition people,

18   the carrier would say that they needed an

19   additional coverage in such and such an area, 95

20   and 7, let's say, or Route 90 and 84, you know,

21   and they would contract with either an employee

22   or a real estate specialist, that can go out

23   there, find this particular area, you know, maybe

24   a mile in radius, it may be a half mile in

25   radius, and say, "We need to put some additional

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                              June 24, 2004

Page 67

 1    antennas on the air here.  Go get that, find a

 2    landlord, find a tower, find a rooftop, secure a

 3    deal for us, and get it zoned," and then they'll

 4    go ahead and place their antennas on it.

 5        Q.    Is that process driven by a perceived

 6    need by the cellular carrier to fill in an

 7    existing gap in its coverage or its service?

 8        A.    Yes.  Either expand, fill in or add

 9    additional radios that's taxed already by the

10    handsets in use.

11                    (Pause in the proceedings.)

12                    (Recess:    12:33 to 1:06 p.m.)

13    BY MR. GRUDBERG:

14        Q.    When we broke, Mr. Brinn, we had talked

15    quite a bit about the preexecution of the

16    agreement stage, the period from the spring of

17    2001 up to September 20th of that year, and I

18    just have a couple of follow-up questions on

19    that.

20                    Can you recall any further

21    discussions you had with Don DeCesare during that

22    period of time, from the time you wrote the

23    letter on March 12th, 2001, up until the final

24    execution of the agreement on September 20th?

25        A.    Not that I can specifically recall.

1        Q.   Do you ever remember being presented

2    with a draft of an agreement between Tower

3    Ventures and Crossroads during that period of

4    time?

5        A.   I'm not sure that I reviewed it or, you

6    know, if I was presented with it, I don't -- I'm

7    not sure.  It would have been probably -- it was

8    drafted by somebody outside of the office

9    probably, so I may very well not have seen it.

10       Q.   And was it your understanding that the

11   person within Tower Ventures who was taking

12   primary responsibility for reviewing the draft

13   agreements, if there were any, was Mr. Maccini?

14       A.   Undoubtedly.  I mean --

15       Q.   Okay.  Do you remember ever being asked

16   by Mr. Maccini to review a partial section of a

17   draft, maybe a page or two or a clause?  "Gee,

18   what do you think of this?"  Something along

19   those lines?

20       A.   I may have been copied on an e-mail or

21   something along those lines, but once the deal

22   was set in place and he was trying to make it

23   happen, we would have had our corporate attorney

24   work out the details.

25       Q.   I think you told me before that

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                     June 24, 2004

Page 69

 1    ultimately you did review the agreement, correct?

 2         A.    Yes, I did.

 3         Q.    I'll show you what's been marked as

 4    Exhibit 2 in a prior deposition in this matter

 5    and ask you whether you recognize that.

 6         A.    It looks to be the original document.

 7         Q.    And when you say "the original

 8    document," you're talking about the September

 9    20th, 2001 agreement between Crossroads and TVI?

10         A.    Yes.

11         Q.    When do you first recall getting a copy

12    of Exhibit 2?

13         A.    My -- I would have received the final

14    draft probably in e-mail form, and I probably

15    wouldn't have seen another document other than

16    the final draft.  I'm not sure I ever saw the

17    signed documents.

18         Q.    And do you have a specific memory of

19    receiving the final draft?

20         A.    Would have come in an e-mail.

21         Q.    So you have some recollection of

22    getting the agreement, final agreement, in an

23    e-mail.

24         A.    Yes.

25         Q.    From Mr. Maccini?

1        A.    Either from Bob, via -- you know,

2    either from John Wolfe directly or via Bob

3    Maccini.

4        Q.    And was there any request made of you

5    in connection with the e-mail providing you with

6    the final agreement?

7        A.    Not that I can remember.

8        Q.    The agreement contemplated Tower

9    Ventures to do a number of things in furtherance

10   of the final goal of developing and building a

11   tower, correct?

12       A.    For example, the mortgage, are you

13   referring to that?

14       Q.    The mortgage, obtaining permits, and so

15   on, correct?

16       A.    Yes.

17       Q.    And Tower Ventures had certain

18   obligations under the agreement, correct?

19       A.    Absolutely, yes.

20       Q.    Did you review the agreement when you

21   got it?

22       A.    Yes, I did.

23       Q.    Who was the person at Tower Ventures

24   who was given primary responsibility to

25   effectuate the agreement on Tower Ventures'

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 71

1    behalf?

2        A.    I would have been responsible for

3    certain portions of it and Bob would have been

4    responsible for certain aspects of it.

5        Q.    What aspects were you responsible for?

6        A.    I -- in general, the permitting at the

7    tower, and the -- you know, hopefully the -- you

8    know, overseeing the development of it and

9    marketing the tower.

10       Q.    And what aspects would Mr. Maccini have

11   been responsible for?

12       A.    He would have been involved with

13   delivering the mortgage discharge, the loan

14   repayments.  Let's call it the financial aspects

15   of it.

16       Q.    All right.  You've referenced the

17   mortgage and other financial aspects.  In fact,

18   the full agreement, that is Exhibit 2, contained

19   some additional draft documents that were to be

20   executed when certain other things happened --

21       A.    Yes.

22       Q.    -- is that correct?

23       A.    That's correct.

24       Q.    You understood that the Springbrook

25   Road property was subject to a mortgage, correct?

```
 1      A.   Yes.

 2      Q.   And that mortgage was held by a

 3   gentleman by the name of Del Raycee?

 4      A.   That names sounds familiar.  Never

 5   dealt with him myself.

 6      Q.   What was your understanding as to that

 7   aspect of the agreement relating to the

 8   mortgage?  What was going to happen?

 9      A.   That we would have had to -- I'm not

10   sure about the timing of it, but the mortgage

11   would have had to have been rewritten under Tower

12   Ventures' name.  They would have provided the

13   loan.

14      Q.   So did you understand that the

15   agreement, Exhibit 2, called for Tower Ventures

16   essentially to step into the shoes of the prior

17   mortgage holder?

18      A.   I didn't know all the specifics, but I

19   understood that to be the case.

20      Q.   Tower Ventures was going to be paying

21   off the existing mortgage and then from that

22   point forward, Tower Ventures would be collecting

23   mortgage payments from Crossroads under a new

24   note to be executed in favor of Tower Ventures;

25   is that correct?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 73

```
 1        A.    In essence, that's what I understood.

 2        Q.    You said you were to be responsible for

 3   the permitting process; is that right?

 4        A.    I would have been responsible for

 5   trying to oversee it.  In a case like this,

 6   depending upon the complexity, we may have -- we

 7   would sometimes -- in most cases bring an

 8   attorney in, yes.

 9        Q.    Well, under the agreement, the

10   responsibility fell to Tower Ventures to obtain

11   any necessary approvals, permits, or any other

12   authorizations that were necessary to proceed

13   with the tower construction; is that correct?

14        A.    That's correct.

15        Q.    And you had been involved in similar

16   projects where Tower Ventures had undertaken

17   similar obligations, correct?

18        A.    Correct.

19        Q.    I mean --

20        A.    This was a little bit different from a

21   lot of other projects.  A lot of them were more

22   along the lines where we were developing raw land

23   with a lease.  This one was -- this one was

24   somewhat different.  A lot of times we went

25   rewriting the mortgage and things like that.
```

 1        Q.    Let's focus just on the general idea or

 2   the general obligation that the agreement imposed

 3   on Tower Ventures to undertake responsibility for

 4   getting any necessary approvals, permits and

 5   authorizations.  That aspect of the undertaking

 6   you were familiar with from prior tower projects,

 7   correct?

 8        A.    Correct.

 9        Q.    At that point, in the fall of 2001, how

10   many tower projects would you estimate you had

11   been involved in where your responsibilities

12   extended to making sure that whatever approvals

13   were necessary to get a tower built were, in

14   fact, obtained?

15        A.    Ballpark?

16        Q.    Ballpark, yes.

17        A.    That I touched or, you know, had some

18   involvement with, with Tower Ventures, probably

19   something along the lines of, you know, 30 or

20   40.  And then obviously with my other companies,

21   that I indirectly was involved with, several

22   more.

23        Q.    So based on that experience, is it fair

24   to state that you were comfortable with the

25   obligation that was put on you to make sure that

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 75

```
 1    whatever was -- whatever needed to be done to

 2    acquire appropriate approvals was going to be

 3    done?

 4         A.    For the most part, yes.

 5         Q.    Now, if you'd look at paragraph one on

 6    the first page, numbered paragraph one --

 7         A.    Yes.

 8         Q.    -- on the first page of Exhibit 2,

 9    that's headed "Acquisition of Approvals."  Is

10    that correct?

11         A.    Yes.

12         Q.    Did you have a chance to review this

13    agreement within the last few days in preparation

14    for your testimony today?

15         A.    In the last 24 hours.

16         Q.    Okay.  So you've had a chance to

17    familiarize yourself with the entire agreement.

18    --              Am I correct that numbered

19    paragraph one deals, in part, with the obligation

20    that we've just been talking about, the

21    obligation of Tower Ventures to apply for all

22    approvals, permits, variances, consents, and so

23    on, that are necessary in order to facilitate the

24    construction of the tower?

25         A.    Repeat the question?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 24, 2004

Page 76

```
 1        Q.   It is numbered paragraph one on this

 2   agreement, Exhibit 2, that covers this general

 3   obligation that we've just been talking about,

 4   namely, the obligation of Tower Ventures to

 5   obtain whatever approvals, permits or

 6   authorizations are necessary in order to get a

 7   tower constructed, right?

 8        A.   Agreed.

 9        Q.   Now, there's also a time provision in

10   that numbered paragraph one, correct?

11        A.   Forty-five days.

12        Q.   And the agreement speaks for itself,

13   but just reading, it says, "TVI shall apply for

14   as expeditiously as possible but in no event

15   later than 45 days after the execution of this

16   agreement all approvals, permits, variances,

17   consents," and so on, correct?

18        A.   It does, yes.

19        Q.   And did you review that, specifically

20   the 45-day requirement?

21        A.   I was familiar with the 45 days.

22        Q.   When did you first become familiar with

23   the 45 days?

24        A.   Right around September 20th, in the

25   final stages of the document.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 77

```
1         Q.    So is it fair to state, Mr. Brinn, that

2    when you first were presented with and reviewed

3    the final version of the agreement, Exhibit 2,

4    one of the provisions that you noted was the

5    45-day obligation for seeking necessary approvals

6    and so on?

7         A.    I would agree with that.

8         Q.    Now, you told me you didn't recall

9    reviewing any drafts of this agreement prior to

10   its execution?  You may have but you don't have a

11   specific memory of it?

12        A.    No.  I mean it's not something I would

13   have done or I would have needed to do.  I mean

14   this -- it would have been left to our

15   attorney --

16        Q.    Okay.

17        A.    -- for the most part.

18        Q.    I can represent to you that among the

19   documents that have been produced in this case is

20   a draft of the agreement -- of this agreement

21   that apparently does not include this 45-day

22   provision that we've just been talking about.  Do

23   you remember any discussion, at any point prior

24   to the agreement, of the 45-day period and

25   whether, for instance, that was an appropriate
```

1    term to be included in the contract, and for

2    Tower Ventures to accept?

3         A.    That would have been between Bob and

4    Don, or, you know, Bob and the attorney and Don.

5         Q.    Okay.  Well, I understand that you

6    didn't have direct involvement, but I guess what

7    I'm trying to get at is, did Mr. Maccini ask you

8    at any point, prior to the execution of the

9    agreement, "Gee, is 45 days a reasonable period

10   for application for necessary approvals?"

11        A.    I don't recall that specifically.  But

12   I may have said yes, I may have said no.  But,

13   you know, what I said may not have had any

14   impact.

15        Q.    In any event, as you said, there's no

16   doubt that the 45-day requirement came to your

17   attention either on September 20th or shortly

18   after that, correct?

19        A.    Yes.

20        Q.    Was that an unusual provision in a

21   Tower Ventures agreement for construction and

22   development of a telecommunications tower?

23        A.    We have provisions in our leases which

24   call for, you know, certain action, you know,

25   within a specified time period.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 79

1       Q.    You said you have them within your

2    leases.

3       A.    Yes.

4       Q.    That is your leases with cellular

5    carriers?

6       A.    No.  With the landlords that own the

7    actual ground space.

8       Q.    So do I take it correctly from that

9    that the -- having the permitting application

10   process subject to some time requirement, was not

11   an unusual provision for you?

12      A.    We've done both.  We prefer not to have

13   any specific time periods.

14      Q.    Okay.  I'll ask it more simply.  Is it

15   correct that you had seen something similar to

16   the 45-day provision in Exhibit 2 in prior tower

17   deals that you had been involved with for Tower

18   Ventures?

19      A.    Somewhat, yes.

20      Q.    And you had to operate under similar

21   time constraints in prior deals you had been

22   involved in for Tower Ventures; is that correct?

23      A.    Yes.

24      Q.    Upon receiving Exhibit 2, the final

25   agreement and being given the responsibility to,

1    among other things, acquire necessary permits,

2    what was the first thing that you did?

3         A.    First thing we would have needed to do

4    was, you know, review the zoning, obviously.  I

5    had actually done that prior to at some point, I

6    believe, or I know I would have.  And the other

7    thing would be to set up -- the first thing I

8    needed to do before I could even make a file is

9    to get a survey started with a set of plans, just

10   like anyone doing any kind of construction

11   project would do.

12        Q.    You mentioned reviewing zoning, and I

13   think you said that you would have done that

14   prior even to the deal being signed; is that

15   right?

16        A.    Yeah.  I recall reviewing the statute.

17   Or the zoning bylaw.

18        Q.    And one of the things that your company

19   would have wanted to know before it embarked on a

20   deal such as the one it did with Crossroads would

21   have been what's the zoning status of this piece

22   of property --

23        A.    Sure.

24        Q.    -- that we're negotiating over, right?

25        A.    Yeah.