CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 81

1      Q.    So is it your recollection that you did

2   investigate, prior to September 20th, 2001, the

3   zoning status of the Springbrook Road property?

4      A.    That's correct.

5      Q.    And did you also investigate the status

6   of the title on the property?

7      A.    We would have investigated it.  Again,

8   that would have been handled by our corporate

9   attorney.

10     Q.    Well, without regard --

11     A.    I know we did because obviously we

12  found the mortgage.  We knew who the mortgagee

13  was and things like that.

14     Q.    And here your company is agreeing to,

15  in essence, take over a mortgage that's currently

16  in existence on the property, so based on that,

17  it's your belief that the company did investigate

18  the state of the title on the property?

19     A.    To the best of my knowledge, yes, they

20  did.

21     Q.    And that information was in its

22  possession as of September 20th, 2001, when it

23  made the final commitment to go forward with the

24  deal?

25     A.    Correct.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 82

```
 1        Q.   What other pre-deal investigation
 2   concerning property, title or zoning are you
 3   aware of?
 4        A.   Before the September 20th date?
 5        Q.   Yes.
 6        A.   Other than what we've already talked
 7   about?
 8        Q.   Correct.
 9        A.   Nothing comes to mind.
10        Q.   All right.  Now, you said you would
11   have wanted to get a survey and some plans,
12   correct?
13        A.   That's correct.
14        Q.   What steps did you undertake to get a
15   survey?
16        A.   Contracted with a, you know, typical
17   vendor that we had used.  Asked them to have a
18   site visit out there as quickly as we could,
19   and --
20        Q.   Describe for me what you mean by a
21   survey.
22        A.   It would be kind of a boundaries
23   survey, where a surveyor would come out,
24   delineate the boundary lines, the abutters
25   nearby, any structures on the property.  It would
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 83

1    give me some setback lines from where the tower

2    existed today, stamp the plan.  And he would also

3    provide kind of a tower schematic showing, you

4    know, what the proposed tower would look like and

5    what the equipment compound or the base of the

6    tower would be laid out as.

7         Q.    All right.

8         A.    Where the power would come in, the

9    electricity would come in.

10        Q.    Are we talking about a survey of the

11   property as it then existed; is that correct?

12        A.    As it existed, and then we would --

13   they would show kind of an -- as an existing

14   plan, with the tower on it, and then we had

15   another schematic showing I guess the proposed

16   tower.

17        Q.    Okay.  And would that second schematic

18   including a proposed tower be alternatively

19   described as a site plan?

20        A.    Site plan.

21        Q.    And I just want to make sure we're

22   speaking the same language.  A site plan, in your

23   mind, would deal with the future, what it is

24   contemplated that this site is going to look like

25   after construction?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 84

```
 1        A.    That's correct.

 2        Q.    And when we use the term "survey,"

 3   we're talking about either present or looking

 4   backwards?

 5        A.    Yeah.  Or the way the property sits

 6   today.  A couple different terms.  Sometimes they

 7   call them site surveys, which I think are less --

 8   they're something called a boundary survey, which

 9   I think maybe that's something more official.

10             As far as I know, we had property

11   lines delineated, showing the existing structure,

12   and the house on the property, they also do the

13   abutters' list, the properties nearby, and

14   basically a layout of the general area.

15        Q.    Was a survey obtained?

16        A.    Yes.

17        Q.    Do you remember what vendor you used to

18   obtain the survey?

19        A.    I know him as Andrew.  I'm not sure of

20   the official name.  It's listed on the plan.  I

21   believe it's Andrews Engineering or Andrews

22   Survey Company.

23        Q.    All right.

24        A.    Andrews Engineering, I believe it is.

25        Q.    Do you recall when you contacted
```

Page 85

 1    Andrews Engineering to request that they prepare

 2    a survey of the property?

 3        A.    My first contact would have been to

 4    discuss with them -- the last week of September,

 5    try to schedule a date to get out there.

 6        Q.    Did you have to be present with them

 7    when they entered upon the site?

 8        A.    Well, certainly I would have wanted to

 9    be, just so that I can tell them -- you know, to

10    discuss the site.  I wouldn't have to necessarily

11    be there while they're doing the survey, you

12    know, while they're doing the final survey.  But

13    I would go on the initial site walk which would

14    basically give them an idea of what I wanted them

15    to do on the property.

16        Q.    Did you, in fact, later accompany one

17    or more persons from Andrews Engineering to the

18    Springbrook Road site?

19        A.    Yes.  Scott Manderos.

20        Q.    Do you remember when that visit took

21    place?

22        A.    First week of October.

23        Q.    You seemed fairly certain about the

24    date, Mr. Brinn.  Have you consulted anything in

25    preparation for your testimony or otherwise that

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 86

1    has helped you refresh your memory as to when

2    certain things took place?

3         A.    I just know that it was that first week

4    in November, because --

5         Q.    First week of October you mean?

6         A.    Excuse me, October.  I just kind of

7    know where I was in on particular day, and what I

8    had scheduled, yes.

9         Q.    Okay.  But there's no whatever daily

10   planner or Outlook log that you've consulted --

11        A.    No.

12        Q.    -- to refresh your memory on that date?

13        A.    No.

14        Q.    Did you request any documentation of

15   Mr. DeCesare in furtherance of the work that you

16   were doing for Tower Ventures?

17        A.    Specifically what I needed from Don

18   would have -- obviously anything that he could

19   give me that would assist us in putting together

20   the survey would have been -- doesn't necessarily

21   shortcut anything, but -- because the surveyor is

22   always going to do their own work.  Obviously any

23   plans or plot plans he may have had would have

24   been helpful.

25        Q.    Did you ask Mr. DeCesare for such

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                      June 24, 2004

Page 87

1    plans?

2         A.    I did.

3         Q.    Do you remember when you made that

4    request?

5         A.    Right at the -- kind of the outset.

6    Sometime near or after September 20th.

7         Q.    Was the request done in writing or

8    orally?

9         A.    It would have been done on the phone,

10   orally.

11        Q.    Tell us as best you can recall

12   everything you remember about that conversation

13   with Mr. DeCesare, what you said to him, what he

14   said to you.

15        A.    I just remember us basically talking to

16   try to get this project kick started.  He did

17   provide me with what I recall was a plot plan,

18   which you would have -- most people would have

19   their properties, they would have done for a

20   mortgage or something along those lines.

21        Q.    And when do you recall him providing

22   that plot plan?

23        A.    Sometime on or about the survey date.

24        Q.    Sometime shortly after you made the

25   request of him?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 24, 2004

Page 88

1      A.    I would say so, yeah.  As I recall, I

2  was able to provide it to the surveyor.

3      Q.    Did you --

4      A.    And I don't know if it was on that day

5  or then or exactly right then.

6      Q.    Did you request or did you ask Mr.

7  DeCesare what other documents he had relating to

8  the property during this phone conversation?

9      A.    Specifically I needed the FAA hazard-no

10 hazard letter provided by the FAA.  No hazard to

11 air navigation, I believe is what they call it.

12     Q.    Did Mr. DeCesare indicate that he had

13 such a letter?

14     A.    Yes.

15     Q.    Did he provide it to you?

16     A.    He did not.

17     Q.    The request for the FAA hazard-no

18 hazard letter was done in this same phone

19 conversation?

20     A.    It had been done earlier.

21     Q.    When had you asked him for it?

22     A.    Prior to the September 20th.

23     Q.    So apparently Tower Ventures decided to

24 go ahead and sign the agreement in the absence of

25 this FAA letter that you're talking about; is

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

1      that correct?

2          A.    That's correct.

3          Q.    Did Mr. DeCesare give you this FAA

4      letter that you're referring to, at any point?

5          A.    No, he did not.

6          Q.    Did you ever ask him for it again?

7          A.    On a couple of occasions, yes.

8          Q.    How were those requests made?

9          A.    Orally.   The response I got was that he

10     had it and he would find it and get it to me.

11         Q.    How did the absence of an FAA letter

12     affect what you were doing for Tower Ventures?

13         A.    At this juncture, it was of particular

14     importance, because, A, I wanted to make sure

15     that the tower, if it needed to be registered --

16     and not every tower needs to be registered, but

17     the fact that he told me that it had to -- that

18     he had the letter, I certainly wanted to see it.

19     And it had been registered, that's fine.   That's

20     helpful information.

21                   There was actually an old light

22     that was no longer working at the top of the

23     tower, which was of concern to me.   So I just

24     wanted the make sure that we were in compliance

25     with the FAA.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 90

```
 1        Q.   All right.  What other documentation
 2   did you request of Mr. DeCesare?
 3        A.   One other issue with the FAA.
 4        Q.   All right.  You want to expand on one
 5   of your prior answers?
 6        A.   Yes.  There were two issues.  A, I
 7   wanted to be sure that we were in compliance, and
 8   eventually, I think I ended up having to refile
 9   myself, or consulting with the FAA to make sure I
10   did -- you know, that was at a later point.  And
11   secondly, the FAA certification letter gives you
12   the exact location of the tower.  Which was very
13   important to the surveyor, because he generates
14   the tower location with a latitude and longitude,
15   and those are provided on the FAA letter.  And
16   the fact that I thought I was going to get that,
17   I had presented to the surveyor that I was going
18   to be able to provide that, and at that point he
19   was waiting for me to provide these coordinates,
20   which I never provided him.
21        Q.   And was it your understanding that
22   those coordinates were necessary in order for the
23   surveyor to prepare his survey?
24        A.   Yes.  Definitely.  I mean there's no
25   way that you can -- these towers -- everything is
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 91

1    based on the lat and long coordinates.

2        Q.    So again, as you understood it, it

3    would have been impossible to prepare a survey

4    without someone having had these coordinates that

5    would have been contained in the FAA letter?

6        A.    Not impossible but he wouldn't have had

7    to have come back for a third time.  There was a

8    time delay.  And I basically said, "No, I have

9    the FAA letter, don't worry about trying to

10   triangulate," or however they have to go about

11   determining the exact location.

12       Q.    Let me show you what's been marked as

13   Exhibit 15 in a prior deposition in this matter.

14   I would ask you to take a look at that and tell

15   me if you recognize it.

16       A.    I don't particularly recognize it.  I'm

17   not even sure what paragraph 15 refers to.

18       Q.    I'm sorry, it's Exhibit 15.  I'm just

19   asking you to look at the document as a whole --

20       A.    Okay.

21       Q.    -- which was marked as Exhibit 15 at an

22   earlier deposition.  And my question is whether

23   you recognize Exhibit 15.

24       A.    I do not.

25       Q.    Do you think you've ever seen it

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                      June 24, 2004

Page 92

```
 1   before?
 2        A.    I take that back.   I have seen this,
 3   yes.
 4        Q.    I would ask you to turn to page eight
 5   of Exhibit 15, and under the heading section
 6   "Affirmative Defense," would you read that
 7   paragraph, please, to yourself, and let me know
 8   when you're done.
 9        A.    Okay.
10        Q.    There's an allegation there that
11   plaintiff, Crossroads, failed to provide copies
12   of property documentation within 20 days after
13   execution of the September 2001 agreement.   Do
14   you see that allegation?
15        A.    Yes.
16        Q.    And there's a further claim that that
17   severely hampered Tower Ventures' ability to
18   prepare the applicable applications for approval
19   that were to be filed pursuant to paragraph one
20   of the September 2001 agreement.   Do you see that
21   allegation?
22        A.    I do, remember.
23        Q.    What property documentation, to your
24   knowledge, did Crossroads fail to provide within
25   20 days after execution of the September 2001
```

1    agreement?

2         A.    As I said, this FAA -- the FAA letter.

3    If it existed, I would have expected to get it.

4         Q.    As you sit here now, you don't know for

5    sure whether it existed, right?

6         A.    I was just told that it did exist.

7         Q.    Other than the FAA letter that we've

8    discussed, is there any other property

9    documentation that, to your knowledge, Crossroads

10   failed to provide within 20 days after the

11   September 2001 agreement?

12        A.    I'm not sure of the documentation they

13   had, so I'm not sure what they didn't provide.

14        Q.    Well, you've told us about some

15   documents that you requested of Mr. DeCesare and

16   were provided to you, correct?

17        A.    Yes.

18        Q.    And there are other documents relating

19   to the property, such as the mortgage and the

20   note and other title information, that Tower

21   Ventures had in its possession even before the

22   agreement was executed, correct?

23        A.    That's right.

24        Q.    And that would have included a title

25   search, I believe, right?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

Page 94

1       A.   That's correct.

2       Q.   And also information relating to the

3    zoning on the property, right?

4       A.   Correct.

5       Q.   And those sorts of things were

6    available in the public records of the town, in

7    any event, right?

8       A.   No question.

9       Q.   So as you sit here now, can you recall

10   any other property documentation, other than this

11   FAA letter, that Crossroads failed to provide?

12      A.   Yes.  The documentation relating to the

13   existing tenant, which was an FCC-licensed

14   carrier, operating on the existing tower which I

15   needed to take down and replace.

16      Q.   And that existing tenant was whom?

17      A.   My understanding -- never got any

18   documentation on it, so I'll take -- my

19   understanding is that it was Verizon Paging.

20      Q.   And that is a different entity than

21   Verizon Wireless?

22      A.   Yes.  I think it was Verizon, you know,

23   bought a paging company which I think previously

24   ran Mobile Data or one of -- it was Verizon's

25   paging arm, yes, but separate from Verizon

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 95

 1    Wireless.  Two different entities altogether.

 2        Q.    How did the absence of the

 3    documentation relating to the existing tenant

 4    impair your ability to proceed with efforts to

 5    obtain approvals for the construction of the

 6    tower?

 7        A.    I'm not 100 percent sure that it did,

 8    but if there was documentation there that I

 9    needed to know if I was trying to design the new

10    tower for this tenant, then I certainly would

11    have wanted maybe contact name, what frequency

12    they were operating at, just basic information

13    that I may have needed at a zoning hearing.

14        Q.    As it turned out, did you, in fact,

15    need such information at a zoning hearing?

16        A.    It certainly did come up, yes.  I

17    needed to have some familiarity.  And we were

18    also going to replace them, also going to have a

19    lease -- we were going to have to be the leasing

20    entity.  We were going to be the, basically the

21    landlord for this Verizon Paging company.

22        Q.    Now, isn't it correct, Mr. Brinn, that

23    the issue you've just described, namely, that

24    Tower Ventures was going to be the landlord with

25    this paging company, that related to the

Page 96

```
 1    prospective business of the tower as opposed to

 2    the process of getting the tower approved for

 3    construction?

 4         A.   Not if -- not if a question was going

 5    to come up as to who is the tenant on the tower.

 6    You know, I needed to be up front and say there's

 7    an existing tenant on the tower as it is, you

 8    know, I needed to -- you know, basically to make

 9    sure I had permission to put that same tenant on

10    my tower.

11         Q.   To your knowledge, was the fact that

12    there was an existing tenant on the tower made

13    known to Old Saybrook zoning authorities during

14    the permitting process?

15         A.   It was -- I think it was, or I'm not --

16    I'm not sure it came up, but if it did, I wanted

17    to be able to make sure I had an answer.

18         Q.   Mr. DeCesare also permitted -- or

19    participated in the permitting process with Old

20    Saybrook, did he not?

21         A.   Absolutely, yes.

22         Q.   And he was familiar with whatever terms

23    of an agreement were in place with the current

24    paging tenant, correct?

25         A.   Yes.
```

1        Q.    And if any question arose concerning

2    the existing paging tenant on the existing tower,

3    Mr. DeCesare was available to answer those

4    questions, right?

5        A.    At the hearings, sure he was.

6        Q.    Let's go back to the FAA letter that

7    you said you requested and never received.  How

8    did that hamper Tower Ventures' ability to

9    obtain -- or to prepare applications for approval

10   of tower construction?

11       A.    Would have needed to know two things.

12   A, certainly would have helped to know the exact

13   location, whether or not we had FAA approval, and

14   whether or not that was in some sort of a flight

15   path.  It would have had to have been lit.  If it

16   had to be lit, I would have needed to show a

17   light out there.

18       Q.    To your knowledge, did the absence of

19   an FAA letter hamper Tower Ventures' ability to

20   file applications with local authorities that

21   were necessary in order to obtain permission to

22   build the tower?

23       A.    Would have certainly streamlined the

24   process.

25       Q.    I'm asking you, did it hamper?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 98

 1        A.    Yes, it did.

 2        Q.    Is it your testimony --  Withdrawn.

 3              What applications for approvals of

 4   any kind were filed within 45 days after

 5   September 20th, 2001, by Tower Ventures?

 6        A.    Applications with the town or anyone?

 7        Q.    With any agency, town, federal, state,

 8   local.

 9        A.    None, to my knowledge.

10        Q.    Ultimately a survey was prepared of the

11   existing site, correct?

12        A.    That's correct.

13        Q.    And you said that the FAA letter would

14   have helped pinpoint the location.  There are

15   other ways to pinpoint the location, correct?

16        A.    Yes, there are.

17        Q.    And if you got a survey company out

18   there on the site that is engaged to prepare a

19   survey or a drawing of the existing site, there

20   are ways that they can pinpoint everything on the

21   site, right?

22        A.    Yes, there are and I would have had

23   that done, had I -- I would have told them to do

24   it, but I -- if I had the FAA letter, I want to

25   use those exact coordinates.  I don't want

Page 99

1    somebody else providing separate coordinates.

2    That's why I would have relied on the FAA

3    letter.

4         Q.   Did you ask the survey company to, as

5    part of its work, to prepare an exact description

6    of where the current tower was located?

7         A.   Yeah.  Within -- like I said, they can

8    come up with the setbacks, based upon the

9    boundaries, but I still needed what they call the

10   2-C certification, which basically I think

11   mandates that the tower is -- that that exact

12   location is within so many feet, you know,

13   vertically and horizontally of where you say it

14   is.

15        Q.   Let me show you what's been marked as

16   Exhibit 6 in a prior deposition in this matter.

17   Do you recognize Exhibit 6?

18        A.   Looks like a letter that I would have

19   sent to Don, yes.

20        Q.   You said that was a letter that you

21   would have sent to Don?

22        A.   That's correct.

23        Q.   And it is a letter that you, in fact,

24   did send to Mr. DeCesare?

25        A.   It certainly looks like the one I would

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

 1    have sent, yes.

 2         Q.    And Exhibit 6 bears your signature?

 3         A.    That is definitely my signature.

 4         Q.    Okay.  And Exhibit 6 refers to an

 5    enclosure of a preliminary survey for the tower

 6    site, correct?

 7         A.    Yes.

 8         Q.    So am I correct that as of October

 9    26th, 2001, a preliminary survey for the tower

10    site had been prepared?

11         A.    Oh, yes.

12         Q.    And was it the Andrews entity that

13    prepared that survey?

14         A.    Yes.

15         Q.    Okay.  So whatever issues there were,

16    there's no question that by this date at least

17    you had a survey; is that right?

18    --    A.    That's correct.

19         Q.    October 26th, 2001, we're still within

20    the 45-day window post-September 20th, 2001?

21         A.    Right.  But at this point, I still

22    didn't have the -- this was a preliminary

23    survey.  Still without the proper coordinates.

24         Q.    Let me ask the question again.  You had

25    the preliminary survey within the 45-day window,

1    correct?

2        A.    The preliminary survey, yes.

3        Q.    Now, you told me before that no

4    applications for approvals were filed with any

5    entity within 45 days after September 20th.  Did

6    you request an extension on behalf of Tower

7    Ventures of that 45-day deadline?

8        A.    Did not.

9        Q.    Did you discuss with Mr. Maccini

10   requesting an extension on behalf of Tower

11   Ventures of the 45-day deadline?

12       A.    I did not.

13       Q.    Were you cognizant of the 45-day

14   deadline as it came and passed?

15       A.    Yes, I was.

16       Q.    Were you worried at all that in

17   allowing that 45-day deadline to pass without

18   having filed any applications for approval, that

19   Tower Ventures might be in violation of its

20   obligations under the September 20th, 2001

21   agreement?

22       A.    No.  Because I had been working

23   diligently and -- to try to put the necessary

24   documents together to make the application.

25       Q.    Well, the agreement didn't just require

1    diligent efforts, Mr. Brinn, it also required

2    actual filing of approvals; is that correct?

3         A.    That's correct.

4         Q.    And, in fact, it didn't set 45 days as

5    a minimum, it said the Tower Ventures was to act

6    as expeditiously as possible but in no event

7    later than 45 days; isn't that right?  I know I

8    haven't quoted it exactly --

9         A.    Again, I was making certainly diligent

10   efforts, in conjunction with Don, to get this

11   filed.

12        Q.    I'm not questioning that.

13        A.    Okay.

14        Q.    My question, though, is, the agreement

15   didn't say that diligent efforts were enough, the

16   agreement said, as you read it, that certain

17   things had to be filed no later than 45 days,

18   right?

19        A.    Yes.  And it also says that -- there's

20   a due diligence paragraph that says that

21   Crossroads was to deliver any necessary paperwork

22   that they had in that 45-day period as well.

23        Q.    And the two pieces of paperwork that

24   you've identified were the FAA letter that we've

25   talked about --

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 103

```
 1      A.   And the Verizon -- I'm sorry.

 2      Q.   -- and the documentation relating to

 3   the lease with the existing tenant; is that

 4   correct?

 5      A.   Correct.

 6      Q.   And it's your --  Withdrawn.

 7           Do you know whether the lease with

 8   the existing tenant was requested prior to

 9   consummation of the agreement on September 20th,

10   2001?

11      A.   Not even sure there was an existing

12   lease.  But I can't speak to that.

13      Q.   Well, if you're doing business with

14   someone and they tell you, "Gee, I've got this

15   site and I have an existing tenant on there,"

16   before entering into a deal with them, would it

17   be your business practice to investigate what

18   someone tells you about their current state of

19   business affairs?

20      A.   Again, I wanted all documentation on

21   it.  My understanding, Don was going to get all

22   the money from the Verizon -- I think it's

23   spelled out in the agreement, he was going to get

24   the money.  I think we were less concerned about

25   the business.  I just wanted to make sure that
```

June 24, 2004

Page 104

```
 1   everything was in compliance, and that would have
 2   had to have come from Don.  If somebody is up
 3   there operating without an FCC license, I would
 4   need to know that.
 5        Q.    Okay.  And again, how exactly did the
 6   absence of that lease prevent Tower Ventures from
 7   filing applications for approval or variance?
 8        A.    I'm not sure that it did.  What I
 9   thought you had asked me before is what documents
10   didn't you get that you needed.
11        Q.    Well, I guess -- we'll move on.
12        A.    All right.
13        Q.    Was there a site plan prepared for the
14   site, Mr. Brinn, at some point?
15        A.    Yes, there was.  There was a finalized
16   site plan.
17        Q.    Do you remember when the first draft or
18   the first version of a site plan was prepared?
19        A.    Well, I had a preliminary plan that I
20   had sent to Don on the 26th.
21        Q.    Right.  Again, let me make sure we're
22   using our terms right.  When you're talking about
23   preliminary survey, in Exhibit 6, are you
24   speaking of a survey of the land as it currently
25   existed or a preliminary drawing of what was
```

Page 105

1    contemplated to be built?

2        A.    It kind of comes as a package deal.

3    They do the survey initially.  If everything is

4    okay, they go ahead and just overlay that with

5    the tower and the compound layout.

6        Q.    Now, the existing tower on the piece of

7    property was what's known as a lattice tower; is

8    that correct?

9        A.    It's known as a guyed tower.

10        Q.    Was it also lattice construction?

11        A.    Yes, but typically referred to as guyed

12    tower because there's guy wires coming off.  A

13    lattice tower would be what they call a

14    self-supporting tower.

15        Q.    Free-standing, like the Eiffel Tower?

16        A.    If you will.

17        Q.    Nothing quite that elegant, but for

18    philistines like me, we understand.  No guy wires

19    on the Eiffel Tower, I don't think.

20                Do you remember whether the

21    preliminary survey that you forwarded on October

22    26th, 2001 included a design for a guyed tower or

23    a monopole tower?

24        A.    That one at that point was a guyed

25    tower.

1       Q.    Now, in your original proposal to Mr.

2    DeCesare back in March, that's set out on Exhibit

3    29, you talked about a proposed -- building a

4    180-foot monopole tower, right?

5       A.    Yes.

6       Q.    Exhibit 29, you talked about a proposed

7    building of a 180-foot monopole tower, right?

8       A.    That's correct.

9       Q.    So back then, the idea was build a

10   monopole, and at some later point, it shifted to

11   a guyed tower, right?

12      A.    Yes.  And then back to a monopole.

13      Q.    Do you remember why it was that the

14   initial post-September 2001 plan was to build a

15   guyed tower?

16      A.    Because that was in the existing tower

17   on the property at that time and because it was a

18   preexisting nonconforming use outside of a

19   wireless zone, we felt we needed to replace that

20   tower in kind, which was the exact replica

21   essentially, it wouldn't have been exactly the

22   same tower, as I mentioned before.

23      Q.    And you said at some point the plan --

24   that plan to replace the current guyed tower with

25   a comparable guyed tower was abandoned in favor

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

```
 1    of a monopole, right?

 2         A.   At the -- after some discussions with

 3    the town, we went to a monopole -- back to the

 4    monopole design, yes.

 5         Q.   What discussions did you have with the

 6    town?

 7              Let me back up.

 8         A.   Yeah.

 9         Q.   What's the first discussion you recall

10    having with any Old Saybrook official about the

11    tower construction project under the September

12    2001 agreement?

13         A.   October, spoke with the code

14    enforcement officer, Chester Sklodosky, on one of

15    my site visits there in October.

16         Q.   Did you speak with Mr. Sklodosky in

17    person or by telephone?

18         A.   In person.  Both in person and on the

19    telephone.

20         Q.   All right.  On the in-person visit, did

21    anyone accompany you?

22         A.   Not on that October visit, no.

23         Q.   Tell me everything you can recall about

24    that October conversation with Mr. Sklodosky.

25         A.   I recall picking up a building permit,
```

1    discussing the possibility of replacing that

2    specific tower and kind of trying to get some

3    direction as to, you know, where I start and how

4    I proceed.

5        Q.    What did Mr. Sklodosky tell you?

6        A.    He said put together an application,

7    and, you know, kind of just gave me a quick

8    description of what I would need to actually make

9    the application.

10       Q.    Was this an application for a building

11   permit he was talking about?

12       A.    At that point, Don and I were working

13   on the assumption that we were going to be able

14   to replace this tower as it was in its current

15   state.

16       Q.    Okay.  I gather from that answer that

17   you were consulting with Mr. DeCesare during this

18   time period?

19       A.    I mean I would hope he would agree that

20   we consulted on numerous occasions.

21       Q.    Is it fair to state, Mr. Brinn, that

22   you were working closely with Mr. DeCesare trying

23   to make this construction*project happen?

24       A.    That's the way I would characterize it,

25   yes.

1      Q.   How often were you in contact with

2   him?  Pretty much every time you were in the

3   area?

4      A.   I mean I -- I would say a week didn't

5   go by that we didn't speak.  And sometimes more,

6   depending upon -- you know, he was very much

7   involved and he was at most of the hearings, and

8   I tried to keep him abreast of what was going

9   on.  Most of our conversations -- I don't think

10  he ever had e-mail.  If he did, I don't recall

11  even dealing with him.  They were mostly in

12  person or telephone conversations.

13     Q.   In your view, was Mr. DeCesare

14  cooperative?

15     A.   I would certainly say so, yes.

16     Q.   And was he cooperative throughout the

17  entire process of trying to get the tower project

18  approved?

19     A.   I would say, with one caveat, saying

20  yes, he was.  Obviously towards the end, you

21  know --

22     Q.   I understand.

23     A.   Let's say up until the time --

24     Q.   Up until the attempt to terminate was

25  made in August of 2002, up to that point, Mr.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 110

1    DeCesare, in your view, was cooperative?

2         A.    I would say very cooperative, yes.

3         Q.    So he tells you to prepare an

4    application, Mr. Sklodosky?

5         A.    Yes.

6         Q.    Did he tell you at that point that a

7    variance would be necessary, in his opinion?

8         A.    We didn't get into any specifics on

9    that.  From the gist of the conversation, which

10   was pretty short, you know, he didn't want to

11   make a recommendation one way or the other.  He

12   wasn't going to tell me "yes" or "no" right

13   then.

14        Q.    And --

15        A.    My interpretation was that he could go

16   and make the recommendation to replace this

17   tower, if he had so -- was so inclined to do.

18        Q.    And as you understood it, that could be

19   done possibly without the need to go to either

20   the zoning board of appeals or the zoning

21   commission; is that correct?

22        A.    At that point, I realized that he was

23   going to need some advice from the zoning

24   commission.  He wasn't going to be able to do it

25   himself at that point.

1      Q.    Do you remember when in October this

2    conversation with Mr. Sklodosky took place, this

3    first conversation?

4      A.    Like I said, I had one telephone

5    conversation.    Then I -- with someone I believe

6    in the building inspector's office, his office,

7    and then another unannounced, you know,

8    unofficial visit, probably maybe late October.

9      Q.    And the general advice you recall

10   receiving from him was, "Put together an

11   application and I'll take a look at it" --

12     A.    Yes.    And I was still working on it --

13     Q.    -- is that correct?

14     A.    That is correct.

15     Q.    Okay.    And did you then put together an

16   application and submit one?

17     A.    I had an application prepared, yes.

18     Q.    Did you submit it?

19     A.    I did not submit it at that time.    We

20   were still working on the -- working through the

21   plan at that point.

22     Q.    Did you ever submit that application

23   that you had prepared?

24     A.    I appeared in front of the zoning

25   commission and, yes, I did submit that

June 24, 2004

1    application.

2         Q.    When?

3         A.    I don't remember the exact date, but I

4    would have had to submit the application in order

5    to get in front of the zoning commission.

6         Q.    Do you remember when you were in front

7    of the zoning commission?

8         A.    Yeah.   That's well documented.   I

9    believe it was January 7th or January 9th,

10   whatever night the zoning commission meets.   I

11   think it was a Monday night.

12        Q.    And this would have been January

13   of '02, correct?

14        A.    Yes.

15        Q.    Okay.   So is it your recollection

16   that -- do you know how often the zoning

17   commission meets?

18        A.    It was -- part of the problem was

19   around the holidays, I think -- you know, I want

20   to say they meet maybe every two weeks.   But I'm

21   pretty sure that they hadn't -- I think in

22   December they had only met once.   I was put on

23   the January agenda.

24        Q.    So is it fair to assume that you filed

25   the application that you're talking about

 1    sometime in the two to four weeks preceding your

 2    January '02 appearance before the zoning

 3    commission?

 4         A.    Yeah.  Because the thing that really

 5    actually -- Don and I had a meeting with Chester.

 6         Q.    I was going to get to that.

 7         A.    That's what really set that date up for

 8    us.

 9         Q.    Okay.  The -- you referred to a meeting

10    that you and Mr. DeCesare had.  I was just going

11    to ask you, did you and Mr. DeCesare ever go

12    together to meet with Mr. Sklodosky to discuss

13    the tower project?

14         A.    Yes, we did.

15         Q.    Do you remember when that meeting took

16    place?

17         A.    That meeting took place -- trying to

18    remember now.  I think we finally had a meeting

19    with Chester in early December.

20         Q.    Tell me as much as you can recall of

21    what was said at that meeting.

22         A.    Don and I went in there, he being kind

23    of the spokesperson, as the local person.  I was

24    the, I guess the agent for him, as it was

25    represented.  And he -- we went in to discuss our

1   proposal, to discuss that guyed tower be replaced

2   in kind.

3        Q.   Now, this written application that

4   you've referred to, had that been drafted at the

5   time of this meeting with Mr. Sklodosky in

6   December?

7        A.   I don't know if it actually had been

8   drafted at that point.  It's kind of a

9   formality.  You submit the building application

10  and Chester would have denied it.  If I went in

11  there wanting to put up a fence, he would have

12  approved that.  He said it has to go to the

13  zoning commission, it has to go before the

14  board.  There was an application that was

15  denied.

16       Q.   What else do you recall from that

17  meeting with Mr. DeCesare and Mr. Sklodosky?

18  _    A.   We had a set of plans.  We went over

19  with Chester to discuss it.  He wasn't

20  particularly thrilled about -- at that point, as

21  I expected, he wanted to push this thing onto the

22  zoning commission for them to make the ruling.

23       Q.   All right.

24       A.   That's pretty much what it came down

25  to.  Don was trying to work -- you know, much of

1    the meeting was discussing the actual project

2    itself.  I think Don brought up some of his

3    points, that he's the local radio operator in

4    town, we were working with the police department

5    to try to get them on the tower, and there was

6    some discussion about -- you know, I guess I

7    would describe it as politicking on Don's part.

8         Q.   All right.

9         A.   And there was some general discussion

10   about the project, and Chester -- I can't say the

11   meeting went, you know, much more than 20 minutes

12   or a half hour.

13        Q.   Was it your perception that as a local

14   businessman, Mr. DeCesare had a good reputation

15   and goodwill within the Old Saybrook community?

16        A.   Absolutely, yes.  Going forth with

17   this, that was one of the attractive aspects of

18   this, that Don, you know, was -- you know, he was

19   keyed into the local community.

20        Q.   And at least until a dispute developed

21   between Tower Ventures and Crossroads, is it fair

22   to state that Mr. DeCesare used his local

23   goodwill where he could, in an effort to get

24   Tower Ventures the necessary permission to build

25   the tower?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

Page 116

1          A.    I think that's a fair statement, yes.

2          Q.    Okay.   In fact, one of the things that

3     he allowed was for Tower Ventures to make

4     application to local authorities in the name of

5     Crossroads?

6          A.    He was the applicant, yes.

7          Q.    Okay.   Even though upon granting of

8     permission, it wasn't Crossroads that was going

9     to be building the tower, it was Tower Ventures,

10    right?

11         A.    Yes.   We were going to have the ground

12    lease with Don, and I forgot how it would have

13    worked, if the permit was going to be in both our

14    names or how it was going to work, if he would

15    have to assign it to us.   But he was the

16    applicant, yes.

17         Q.    Under the agreement, as we've

18    discussed, it was Tower Ventures' obligation, not

19    Crossroads, to obtain the necessary approvals,

20    correct?

21         A.    According to the document, yes.

22         Q.    And therefore, Mr. DeCesare's consent

23    was necessary in order to use Crossroads as the

24    applicant for the approvals rather than Tower

25    Ventures, right?

June 24, 2004

Page 117

1      A.    Yes.

2      Q.    And Mr. DeCesare granted that consent,

3  in the overall goal of trying to get the

4  necessary approvals granted by the local

5  authorities, correct?

6      A.    But he would have had to approve

7  anything that I did, as the co-applicant,

8  including the plans as the land owner, correct.

9      Q.    But the answer to the first question is

10  yes, he granted his consent to allow the

11  Crossroads name to be used in furtherance of

12  obtaining approvals for the tower project?

13      A.    Again, if he granted it verbally or in

14  some fashion, I guess he -- he was the

15  applicant.

16      Q.    Let's ask it more simply.  You couldn't

17  have used his name if he hadn't agreed to it?

18      A.    That's right.  Okay.

19      Q.    And, in fact, you used his name?

20      A.    That's correct.

21      Q.    So he must have agreed to it, right?

22      A.    Correct.

23      Q.    Okay.  Now, at the conclusion of this

24  early December meeting with Mr. Sklodosky, where

25  did things stand?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 118

```
 1        A.   We --
 2        Q.   Did Mr. Sklodosky give you instructions
 3   as to what you needed to do next?
 4        A.   Yes.  Two recommendations were made.
 5   First of all, to send him a letter discussing our
 6   proposal and the possibility of -- I believe the
 7   letter is an exhibit from Attorney Ken Spigle, as
 8   to what our plans were, you know, and what we
 9   wanted to do.  And his other recommendation was
10   to go to the zoning commission, and I think we --
11   at that meeting with Don, we discussed the
12   possibility of going to this monopole design.
13        Q.   You referenced a letter from an
14   Attorney Spigle, that's Kenneth Spigle, correct?
15        A.   Yes.
16        Q.   And one of the exhibits that we've had
17   at a prior deposition is a late December letter
18   from Mr. Spigle to Mr. Sklodosky, correct?
19        A.   I believe it was maybe December 27th.
20   Something like that.  Very late, yes.
21        Q.   And was that letter sent in response to
22   Mr. Sklodosky's request that you, in essence, set
23   forth your position concerning the tower?
24        A.   Yes.  That's -- I think you've
25   summarized it pretty well.
```

June 24, 2004

1        Q.   And have you had a chance to review Mr.

2    Spigle's letter recently?

3        A.   I know it pretty well.  I didn't review

4    it today.  When I -- I know it's in the packet.

5        Q.   Is it fair to state that Mr. Spigle's

6    letter sets out the argument that the new tower

7    should be permitted absent any special approvals

8    because it's simply replacing the existing

9    structure?

10       A.   Correct.

11       Q.   And apparently Mr. Sklodosky did not

12   subscribe to or agree with that position as set

13   forth by Attorney Spigle; is that correct?

14       A.   That's correct, yes.  Well, as

15   evidenced by the fact that I ended up in front of

16   the zoning commission on the subsequent

17   hearings.

18       Q.   So it was some point after the meeting

19   with Sklodosky in December, that you set the

20   wheels in motion that brought you before the

21   zoning commission in January of '02, right?

22       A.   There was one other conversation.  Don

23   had gone into the planning office sometime in

24   late November, around the 25th of November, and

25   had a discussion with the planner, a woman whose

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 120

1    name I don't remember.  I never had a formal

2    meeting with her.

3         Q.    All right.

4         A.    And I think he alarmed her to some

5    extent, and I think he advised her to call me or

6    she wanted to call me.  I had a discussion with

7    her at that point as well.  And it was also at

8    that point that I realized, you know, this thing

9    may be problematic.

10        Q.    Do you remember Mr. DeCesare at some

11   point suggesting or recommending the retention of

12   local counsel to assist in the permitting

13   process?

14        A.    Oh, yeah.  That was -- we had discussed

15   that and had one -- I think one or two specific

16   recommendations, but I was always in favor of

17   using a local attorney wherever possible.  A lot

18   of times I'd use this Attorney Ken Spigle up in

19   Boston, which was, you know, fine, but I'd

20   rather -- I'm in Connecticut, specifically in Old

21   Saybrook, I would want to use a local person.

22        Q.    And that's consistent with your

23   experience that often when you're dealing with

24   local zoning matters, you are best served by

25   having someone acting on your behalf who knows