1    the ins and outs of the local process, right?

2         A.    Absolutely, yes.

3         Q.    And do you remember when it was --

4    well, one of the persons Mr. DeCesare recommended

5    was William Childress, correct?

6         A.    Yes.  Absolutely.  That was the person

7    we eventually retained.

8         Q.    And do you remember when it was that

9    Mr. DeCesare recommended that he be retained, Mr.

10   Childress be retained?

11        A.    Yeah.  I think it was -- we may have

12   had some discussions about it in December, but

13   we -- we had talked about it in December, and I

14   think we made a decision in January to go ahead

15   and -- after that first zoning commission meeting

16   that I had, I knew at that point we had no

17   choice.

18        Q.    It was apparent to you at that point

19   that the "easy route" was not going to be

20   permitted?

21        A.    That's correct.

22        Q.    And shortly after that, Tower Ventures

23   retained Mr. Childress; is that correct?

24        A.    That's correct.

25        Q.    Do you remember whether you met with

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

Page 122

1    Mr. Childress before retaining him?

2        A.    No.  I do not remember meeting with him

3    before we retained him.  I mean he came very

4    highly recommended by Don.  I was more than happy

5    to go with him.

6        Q.    Did you discuss with Mr. Maccini

7    whether it would be advisable or permissible to

8    retain local counsel to assist in this Old

9    Saybrook project?

10       A.    I certainly would have.  I would have

11   needed permission to spend the money.  I think we

12   had to send him a retainer and so forth, so I'm

13   sure that was disclosed.

14       Q.    Do you know whether Mr. Maccini ever

15   met in person with Mr. Childress before he was

16   retained?

17       A.    He did not.  Not to my knowledge.

18       Q.    And do you know whether Mr. Maccini

19   ever spoke by telephone with Mr. Childress before

20   he was retained?

21       A.    I suspect no.

22       Q.    So --

23       A.    I did, though. *

24       Q.    To the extent Mr. Childress needed to

25   be investigated or checked out, that was done by

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 123

1    you rather than Mr. Maccini; is that fair?

2         A.    That's fair, yes.

3         Q.    So you engaged Mr. Childress to act on

4    Tower Ventures' behalf and to help get whatever

5    approvals were necessary for the tower project.

6    What's the first thing you can remember Mr.

7    Childress doing toward that goal?

8         A.    He wanted to see a set of the -- I had

9    drawn up some additional plans, which were now

10   the monopole design.  I had those for the zoning

11   commission hearing.  I sent those to Bill with

12   any other additional documentation that, you

13   know, may have been pertinent.  I'm not sure

14   exactly.  Maybe that letter that Ken had drafted,

15   for example.  I don't specifically remember.  But

16   whatever I had that I felt was appropriate, I

17   would have sent him.  And he reviewed the

18   documents at that time, the plans.

19        Q.    I think you said that it was around

20   this time frame, December '01/January '02, that

21   the decision was made to go back to a monopole

22   construction; is that right?

23        A.    We had made that decision before we got

24   to the zoning commission hearing, yes.

25        Q.    But was it made before or after the

 1    December meeting with Sklodosky?

 2         A.    It was made basically at that time.

 3    When we drafted that letter, we were already

 4    poised to go ahead with this monopole design.

 5         Q.    When you say you drafted that letter,

 6    what letter are you referring to?

 7         A.    The letter of the 27th.  I think it --

 8         Q.    Why was it that you decided to go back

 9    I guess to the monopole at that point?

10         A.    I got the idea from -- a lot of this

11    was on the recommendation of Ken, with the zoning

12    bylaw, under the telecommunications provision of

13    the town, what it allowed was I think a 175-foot

14    monopole.  They didn't allow guyed towers.  The

15    other thing, the guy wires -- without getting

16    into the engineering aspects -- I think on two

17    sides, traveled into the abutting properties.  We

18    thought that if we could take the guy wires out

19    of the abutting properties, that that might be a

20    selling point in the zoning hearing, which I

21    think it was.  And we were also able to meet

22    properly I believe the setbacks.  We didn't meet

23    them all, but by having the monopole, obviously

24    we met some of the setbacks on that property.

25         Q.    All right.

1       A.   And it --

2       Q.   Was part of the thinking also that if

3  it would not be permitted to be reconstructed as

4  a guyed tower without additional permitting,

5  then --  Withdrawn.

6                One of the principal motivations

7  for initially proposing reconstruction of the

8  guyed tower was to replicate the existing

9  structure as closely as possible in the hope that

10  approval would be more quickly given, correct?

11      A.   That's correct.

12      Q.   By December of 2001, it was apparent

13  that, notwithstanding that plan, approval was not

14  going to be quickly given, correct?

15      A.   Correct.

16      Q.   So am I correct that at that point, the

17  preferred structure within your industry was a

18  monopole construction, right?

19      A.   Absolutely.  And that's preferred

20  because that's what a lot of the towns prefer.

21      Q.   Because it's less obtrusive, and

22  smaller?

23      A.   And they can hang less stuff on them

24  typically.  Yeah.

25      Q.   And by this point in December of 2001,

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

1    the main reason that had driven the initial plan

2    to build a guyed tower -- rebuild a guyed tower

3    had vanished, right?

4         A.    At that point, I was -- I can say I was

5    pretty sure that that had gone away.

6         Q.    So is it your recollection that the

7    first plans presented to Mr. Childress were for a

8    monopole tower?

9         A.    Absolutely, no question.

10        Q.    And Mr. Childress went ahead and --

11   Well, withdrawn.

12              What did Mr. Childress tell you

13   would be necessary to get, by way of approvals,

14   before the monopole tower could be constructed?

15        A.    The one thing I can recall with Bill,

16   he was very detail oriented, and he had some

17   specific requests about -- I mean he would have

18   this documented, I suspect.  You know, what kind

19   of changes he made and we went back and forth on

20   the plans.  Maybe moving it a little bit over

21   here, trying to meet setbacks, you know, phrasing

22   things in a certain way on the plan.  He had a

23   lot of recommendations.  There was a lot of back

24   and forth from my original set to what the final

25   product was that he eventually submitted for

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 127

1    application to the zoning board.

2        Q.    Okay.  When you first hired Mr.

3    Childress, did you discuss with him what entities

4    would need to approve this project before Tower

5    Ventures could go ahead and build the tower?

6        A.    Yes.  I'll admit that at this point he

7    took the thing over, and he said, "Hey, the

8    biggest issue is going to be the variance, and

9    whether or not they make us go in front of --" I

10   think there was an architectural review board,

11   which was -- I didn't expect that, but we knew we

12   had to go in front of the planning board and we'd

13   have go back in front of the zoning commission to

14   get the building permit, so we understood there

15   was potentially a long road here.

16       Q.    Was there any discussion in the early

17   stages of Mr. Childress' representation of Tower

18   Ventures, as to whether approval by the

19   Connecticut Siting Council would be necessary

20   before the tower could be built?

21       A.    There was -- I think at one point we

22   had to get a ruling from him and I don't know at

23   what point in the process that came up.  But I

24   asked him to look into it and he looked into it

25   for us, and I would defer to him as to what his

```
 1   findings were, but he looked into it, and he knew

 2   some people that did a lot of siting council work

 3   and I know, again, at this point I was letting

 4   him make the decision.  So he contacted the

 5   siting council and at this time the siting

 6   council was in some sort of flux as to whether or

 7   not they were going to be the sole approval

 8   authority for towers or whether certain towers

 9   were going to have to go in front of the siting

10   council.  You know, at that point there was

11   some -- it was kind of a gray area as to what the

12   siting council's oversight was and we asked Bill

13   to look into that for us.

14        Q.   What's your recollection as to the

15   conclusion that he later conveyed to you about

16   whether siting council approval would be

17   necessary?

18        A.   My recollection is vague, but I will

19   say that obviously he felt that going the local

20   route was the appropriate way, because that's

21   what we did.

22        Q.   Now, an application for variance was

23   later submitted to the zoning board of appeals,

24   correct?

25        A.   Bill would have made that.  I think in
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

1    February.

2         Q.   Did you assist in that application

3    other than in the ways you've already described?

4         A.   I assisted in the sense that if he

5    asked me for something, I provided it.  I think

6    there were -- I'm not sure at what points I

7    provided these, but if he asked me for a simple

8    color of what it was going to look like, I gave

9    it to him.  If he needed something changed to the

10   plans, I gave it to him.  Things along those

11   lines.  I did not -- I don't think I even had

12   much to do with the actual development of the

13   application itself.

14        Q.   Did you receive a copy of it, do you

15   remember?

16        A.   I don't remember that I did.

17        Q.   Ultimately, there was a hearing before

18   the zoning board of appeals in Old Saybrook,

19   correct?

20        A.   As I remember, it was in April.

21        Q.   April of '02, right?

22        A.   Yes.

23        Q.   Did you attend that hearing?

24        A.   I certainly did.

25        Q.   And what was the outcome of that

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 130

1  hearing?

2      A.   We were approved with the ZBA at that

3  one.

4      Q.   Did you speak at the hearing?

5      A.   I think I had some minimal input at

6  that point, as to, you know, if something came up

7  about maybe with regard to a fall zone or

8  something like that.  Bill's instructions to me

9  were, "I'll handle this.  If I need you to say

10  something, I'll let you know."

11     Q.   Is it fair to state that Mr. Childress

12  was the principal person who spoke on behalf of

13  the tower application?

14     A.   Yes.  I mean he did virtually all the

15  talking.  I think I may have contributed

16  something, maybe on the technical side, something

17  like that.

18     Q.   Do you remember whether Mr. DeCesare

19  was present at the April hearing?

20     A.   I remember him maybe not being there.

21  At one of the hearings he was not there.  I don't

22  remember which one it was, but he attended most

23  of the hearings.  He was there, I take that

24  back.

25     Q.   Okay.  Let me show you what was marked

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

 1    as Exhibit 16 in an earlier deposition.  I'd ask

 2    you to take a look at that and tell me if you

 3    recognize it.

 4         A.    Looks like an e-mail.

 5                   (Pause in the proceedings.)

 6         Q.    All right.  Mr. Brinn, you've had a

 7    chance to take a look at Exhibit 16 now; is that

 8    right?

 9         A.    Yes.  I have.

10         Q.    Do you recognize that document?

11         A.    Yes, I do.

12         Q.    What is it?

13         A.    It's an e-mail from Bob Maccini --

14    excuse me, from me to Bob Maccini.

15         Q.    All right.

16         A.    That he would have printed out

17    obviously.

18         Q.    And to Joseph Gallagher; is that right?

19         A.    Yeah.  It was sent to Joe too, excuse

20    me.

21         Q.    It looks like it was sent early in the

22    morning of April 11th, 2002?

23         A.    Yes.

24         Q.    Which was the morning after this zoning

25    board of appeals meeting we've just been talking

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    .    June 24, 2004

Page 132

```
 1    about, right?

 2         A.    Yes.

 3         Q.    And Exhibit 16 is you reporting to your

 4    immediate superior, Mr. Maccini, and the other

 5    principal of the company, Mr. Gallagher, of the

 6    results of that meeting, correct?

 7         A.    That's correct.  Which is pretty

 8    common.

 9         Q.    Sure.  You want to let the bosses know

10    what's going on, right?

11         A.    Especially when you can get them.

12         Q.    And in this case, one reason you were

13    happy to know -- let them know what was going on

14    is because you were reporting good news, right?

15         A.    The good and the bad, but yeah, this

16    was good news.

17         Q.    The good news was you were seeking --

18    you were seeking four variances?

19         A.    Yes.

20         Q.    And all four were granted, correct?

21         A.    Yep.  We would have needed all four to

22    get it approved.

23         Q.    And do you recall what the vote was on

24    each of the variances, whether it was unanimous

25    or whether there were any dissenters?
```

```
 1       A.    I think it was unanimous, yeah.

 2       Q.    All right.

 3       A.    I'm almost certain it was, but I'm sure

 4   that's documented.

 5       Q.    Okay.  So that aspect, as far as you

 6   were concerned, was good news on the overall

 7   status of the tower project in Old Saybrook,

 8   right?

 9       A.    Yes.

10       Q.    And then you referred to a possible

11   wrinkle with the zoning enforcement officer; is

12   that right?

13       A.    Yes.

14       Q.    And that is Mr. Sklodosky, that we've

15   been talking about?

16       A.    Yes.  Or I think he was replaced -- he

17   left at some point along the way.  But at that

18   point, I would assume it was him, or whoever the

19   zoning enforcement officer was.  I'm pretty sure

20   it was still him but it may have changed.

21       Q.    All right.  And you were expressing

22   some concern that you might be sent back to the

23   full building commission for a site plan review;

24   is that right?

25       A.    That's correct.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 134

1       Q.    What was your understanding, after the
2    variances were granted by the zoning board of
3    appeals, what the next step would be in order to
4    get all the approvals you needed to build the
5    tower?
6       A.    My understanding was that we would
7    potentially -- I kind of left it to Bill, you
8    know, to navigate the waterways and the local
9    boards and things like that.  This is what he had
10   told us that night.  Obviously then he found out
11   well, because of such and such -- I forgot.  For
12   whatever reason we had to go back to the
13   architectural review board, which I don't think
14   he would have even guessed that.  And then
15   whatever reason, you know, we had to go back to
16   the planning board, and, you know, that was --
17   obviously that night the only thing I expected
18   _was we would have to go back in front of the
19   building commission.  I was pretty certain that
20   that was going to have to happen.
21      Q.    Did you express concern at any point to
22   Mr. Childress about the length of time that the
23   approval process was taking?
24      A.    Absolutely, yes.  I was -- I was --
25   particularly back in January and February, and I

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 135

1    left it to him and he assured me that he was

2    doing the right thing.  He specifically did not

3    want to get on to either the -- I think it was

4    either the February or March hearing, because he

5    wanted to make sure that -- you know, I think

6    there were some -- some of the regular board

7    members were on vacation, or something along

8    those lines.  He was pretty strategic in the way

9    he went about this.

10        Q.   Do you remember having any discussions

11   with Mr. DeCesare about the subject of delays and

12   the length of time it was taking to get necessary

13   approvals to begin construction on the tower?

14        A.   I think we did have some.  I was as

15   frustrated as Don was.  I was trying to move this

16   thing ahead.  I think we both agreed that, you

17   know, Bill was his guy and I was happy with him,

18   so if he was trying to move this thing ahead, I

19   can't say that we missed a hearing or anything

20   like that.  From this point on, you know, from

21   January on, we certainly were moving along.

22              MS. MANZO:  Is this a specific

23   time frame?  Are you talking throughout the whole

24   thing or once Bill came in?

25              MR. GRUDBERG:  I can pin it down.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 136

1      Q.   Let's expand on your answer.  You've

2    indicated that from time to time between let's

3    say December of '01, and the summer of 2002, you

4    had conversations with Mr. DeCesare in which one

5    or both of you expressed frustration at the

6    length of time it was taking to obtain approvals

7    necessary to construct the tower, right?

8      A.   Yes.  From the time Bill came on, yes.

9    I mean because at that point, like I said, I was

10   trying to see this thing through and Don

11   certainly wanted to see it through.

12     Q.   And your memory is that Mr. Childress

13   came on in January of '02?

14     A.   I think that's when he was retained.  I

15   know that's when he was retained, yes.

16     Q.   And although you did feel some

17   frustration at the delays and expressed some

18   frustration at the delays, it was your perception

19   that Mr. Childress was moving things along as

20   best he could?

21     A.   Uh-huh.

22     Q.   Do you ever remember being requested to

23   provide information to Mr. Childress that you

24   were unable to provide to him?

25     A.   I remember, you know, providing -- you

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

Page 137

1    know, if he asked me for a photo, I would have

2    provided it.  I don't think he missed any -- to

3    my recollection, I don't think he missed any

4    hearings or submission dates because I didn't

5    provide him with proper information.

6         Q.    And likewise with Mr. DeCesare, are you

7    aware of any consideration or any filings or

8    necessary steps that were delayed because Mr.

9    DeCesare had failed to provide information that

10   was necessary?

11        A.    Not from the time Bill Childress came

12   on.

13        Q.    You've talked before about some

14   documents, FAA documents.  Other than that, from

15   Childress forward?

16        A.    I thought Don -- you know, we were

17   working in step, I thought, to move ahead.

18                    (Pause in the proceedings.)

19        Q.    Is it fair to state, Mr. Brinn, that

20   from January of '02 through September of '02, Mr.

21   Childress was primarily in charge of determining

22   what approvals were necessary in order to get

23   permission to build the tower, and doing what was

24   done in order to get those approvals?

25        A.    Yes.  From my standpoint, I was giving

1    him full reign to try to bring this home.

2          Q.    And you cooperated with him and you

3    gave him whatever he asked for, correct?

4          A.    As far as I'm concerned, I did, yes.

5          Q.    And to your knowledge, Mr. DeCesare

6    cooperated with him and he gave Mr. Childress

7    whatever Mr. Childress asked for, correct?

8          A.    I would agree with that, yes.

9          Q.    At any point between January 2002 and

10   September of 2002, did Mr. Childress ask you for

11   a copy of the FAA letter that you referenced

12   earlier in your testimony?

13         A.    I don't remember that he did.

14         Q.    Okay.  Did he ever tell you that, in

15   words or substance, that "The zoning commission

16   or the zoning board of appeals cannot consider

17   our application unless we have this FAA letter"?

18   In words or substance?

19         A.    I don't think so.

20         Q.    Did Mr. Childress, between January

21   of '02 and September 2002, ever ask you for a

22   copy of the agreement with the existing paging

23   tenant on the radio tower?

24         A.    No reason that he would have, no.

25         Q.    He did not, correct?

1          A.    He did not.

2          Q.    Did he ever tell you, in words or

3     substance, that the zoning commission, the zoning

4     board of appeals, or any other local agency

5     couldn't consider the request for approval to

6     build the tower unless that documentation

7     concerning the paging tenant was provided?

8          A.    I don't remember that, no.

9          Q.    To your knowledge, did he ever make

10    such a request of Mr. DeCesare, either for the

11    FAA letter or the documentation relating to the

12    paging tenant lease?

13         A.    No.

14         Q.    Did he ever tell you, in words or

15    substance, Mr. DeCesare's failure to provide

16    either the FAA letter or the documentation

17    concerning the paging tenant lease on the

18    existing tower was impeding his efforts to obtain

19    necessary approvals for construction of the

20    communications tower in Old Saybrook?

21         A.    No.

22         Q.    Let me show you, Mr. Brinn, what's been

23    marked as Exhibit 7 in an earlier deposition.  I

24    would ask you to take a look at that exhibit and

25    tell me if you recognize it.

1      A.    Yes, I do.

2      Q.    What's Exhibit 7?

3      A.    Want me to read it or just describe

4   it?

5      Q.    I don't need you to read it out loud.

6      A.    It's basically a structural letter, you

7   know, we had someone draft, who is a registered

8   engineer, that discusses the tower itself.  Which

9   was this 180-foot tower.

10      Q.    This is the existing tower; is that

11   correct?

12      A.    That's correct.

13      Q.    And do you remember what it was --

14   Well, withdrawn.

15            Did you contact Mr. Adair and ask

16   that he write to you to address the issues that

17   he addresses in Exhibit 7?

18      A.    I did not.

19      Q.    Do you know who, if anyone, did?

20      A.    At the time, we had a construction

21   supervisor that did all our kind of engineering

22   type studies, and he would have been the one that

23   handled this.

24      Q.    Do you remember what it was that led to

25   the creation, if you will, of Exhibit 7?  Did

 1   some issue arise in the project?

 2        A.   I think it was either a direct

 3   request -- a direct request of Bill Childress,

 4   during the process.  He wanted to get some

 5   statement as to the viability of this tower.

 6   That's my best recollection.  You know, it was

 7   driven that they wanted something stating -- in

 8   other words, if we were going to try to bring a

 9   carrier on, wanted something to say, "Hey, what

10   about the existing one?"  We wanted to have

11   something to say, "Hey, the thing isn't going to

12   fall over."

13        Q.   So in your view, Exhibit 7, the letter

14   from Mr. Adair of May 2nd, supported the position

15   that a new tower was appropriate because the

16   existing tower was not safe or appropriate for

17   cellular equipment to be placed on?

18        A.   Yes.  And I won't speak for Bill

19   Childress, but the request came from him, to say,

20   you know, we need this for our documentation, I

21   guess.

22        Q.   Okay.  Do you know whether Exhibit 7

23   was ultimately part of the package that was

24   submitted to the zoning commission?

25        A.   With 100 percent certainty I don't

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 142

1    know, but it was given to Bill to have it at his

2    disposal for his use.

3         Q.    What's the next local Old Saybrook body

4    you can remember having to be approached in

5    connection with obtaining approvals for the tower

6    project?

7         A.    It was the architectural review board,

8    and -- you know, like I said, I have no idea why

9    we were in front of them.  It was never disclosed

10   to me that we would need to go in front of them.

11   I guess they have some sort of say in these

12   matters somehow.  They wanted to know what color

13   the monopole was.  I think he provided them some

14   paint samplings.

15        Q.    They asked for a nice pastel?

16        A.    They wanted an industrial, you know,

17   color chart of what the different options were,

18   and -- you know, I didn't go to the hearing.  I

19   did not go to that hearing, Bill did.  It was a

20   pretty quick and simple hearing, I guess, but

21   that was the essence of it, they wanted to know

22   about the color of the pole and the aesthetics.

23   I may have provided a picture, I'm assuming,

24   something along those lines.

25        Q.    Do you know whether Mr. DeCesare

1    attended that hearing before the architectural

2    review board?

3        A.    I don't know.  I know I sent, in my

4    place, Hal Giglio, G-i-g-l-i-o, just to go there

5    and represent -- it was more of a construction

6    issue as anything.

7        Q.    Do you know whether the architectural

8    review board operated in an advisory capacity

9    versus a "yes" or "no" approval needed capacity?

10       A.    I think -- again, that would be a

11   question for Bill.  In some towns, I know it's

12   more an advisory.  But, you know, if you got to

13   get these boards checked off, everybody wants

14   their say, so --

15       Q.    Okay.  What do you recall the outcome

16   of the appearance before the architectural review

17   board being?

18       A.    I don't recall.  I know there was a

19   favorable approval, and if it was three to two or

20   five to nothing, I don't recall.

21       Q.    What's the next local Old Saybrook

22   board or commission that you recall having to

23   appear before in order to obtain permission to

24   build the tower?

25       A.    The planning board.

1        Q.    Did you attend that meeting?

2        A.    As I remember, I did.  And it was a

3    pretty straightforward hearing.

4        Q.    Do you remember when the planning board

5    meeting occurred?

6        A.    I remember the architectural review and

7    the planning were both pretty close to each

8    other.

9        Q.    Do you remember what month?

10       A.    July.

11       Q.    July of '02?

12       A.    Yes.  It was before the -- I know we

13   went back in front of the zoning commission in

14   August, so they both took place before that.

15       Q.    Did you speak at the planning board

16   hearing?

17       A.    No.

18       Q.    Was Mr. DeCesare present?

19       A.    I'm pretty sure he was, yes.

20       Q.    Do you recall whether Mr. DeCesare

21   spoke?

22       A.    I don't.

23       Q.    Do you recall the outcome of the

24   planning board meeting?

25       A.    I can't -- I'm sure it's documented.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 145

1    It was a favorable finding.

2        Q.    Now, during this period of time, Mr.

3    Brinn, the first half let's say of 2002, what, if

4    anything, were you doing on the issue of possible

5    tenants for the tower?

6        A.    Strictly working with Verizon to

7    negotiate an agreement with them to go on there.

8    And marketing this to some of the other carriers,

9    the ones I had mentioned before.  Specifically

10   SNET, which is Cingular now, AT&T, T-Mobile.

11       Q.    With whom did you speak at Verizon

12   in '02 about possible placement of equipment on

13   the tower that you planned to build in Old

14   Saybrook?

15       A.    We had been dealing with a consultant,

16   guy by the name of Mark Cook.  Was -- he had

17   definite interest in the site.  You know, at that

18   point we were trying to negotiate a lease with

19   him, which, the way these things work, we could

20   only push it as fast as they want to go with it.

21       Q.    When we spoke about Verizon earlier,

22   you said that you relied, in significant part, on

23   information from Mr. DeCesare, but you had

24   confirmed interest through your own contacts; is

25   that right?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 146

```
 1        A.    Yes.   Absolutely.

 2        Q.    Was Mr. Cook someone you spoke with,

 3   back in the fall of '01 before the agreement was

 4   signed, in order to gauge Verizon's prospective

 5   interest?

 6        A.    I'm not sure if I spoke to him

 7   specifically.

 8        Q.    But in any event, you certainly spoke

 9   with him in 2002 about Verizon renting space on

10   the tower that you planned to build; is that

11   correct?

12        A.    Yes, and Bob Maccini did as well, in

13   trying to close -- Bob did a lot of the leasing

14   work, so he was in contact with him as much as I

15   was.

16        Q.    How is it that you know that Mr.

17   Maccini spoke with Mr. Cook?

18        A.    Because I know they had spoken in

19   trying to negotiate the lease itself.  I had put

20   Mark in touch with Bob about the lease terms.

21        Q.    Did Mr. Maccini then tell you he had

22   spoken with Mr. Cook?

23        A.    Absolutely.

24        Q.    And was Mr. Cook a Verizon employee?

25        A.    He was a contractor to Verizon.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 147

```
 1        Q.    I've seen documents with his name on it

 2    with a Verizon Wireless e-mail address.

 3        A.    Uh-huh.

 4        Q.    Is that --

 5        A.    It's not uncommon.

 6        Q.    It's not uncommon for someone who has a

 7    consultant/1099 relationship with a company to

 8    have e-mail?

 9        A.    Yes.

10        Q.    And Mr. Cook indicated that Verizon

11    still had an interest in renting space on the

12    tower that you were planning to build in Old

13    Saybrook, correct?

14        A.    Certainly I was working on that

15    assumption, yes.

16        Q.    Well, I don't want to talk about what

17    assumptions you were working on, I want to know

18    what he said.

19        A.    He was definitely interested in being a

20    tenant on that tower.

21        Q.    And do you remember whether, as of

22    July '02, he had told you he was interested in

23    being a tenant on that tower?  When I say "he,"

24    I'm talking about Verizon Wireless.

25        A.    And again, just trying to know the
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                     June 24, 2004

Page 148

1    general time frames.  We had established a rent

2    price, we had a document back and forth between

3    us.  So I mean I don't know how much further I

4    could have taken it without -- you know --

5         Q.   I'm sorry.

6         A.   -- without getting the lease executed,

7    which, you know, I kind of left to Bob at that

8    point.

9         Q.   What was the rent price that you had

10   discussed?

11        A.   Which was in my mind agreed upon, I

12   believe, was $2,500.

13        Q.   Per month?

14        A.   Per month, I'm sorry.

15        Q.   And do you recall what the term of the

16   lease that you thought Verizon had agreed to?

17        A.   They're typically written with

18   five-year terms with say five-year renewals.

19   Five five-year renewals.

20        Q.   And did the lease that you thought you

21   had negotiated include any increase in the $2,500

22   monthly figure during the initial five-year term?

23        A.   They typically did, yes, which would

24   have been two, three, four percent.

25        Q.   That would be somewhere between two and

1    four percent annual increase over the five-year

2    term?

3         A.    Yeah, and they varied a little bit

4    depending upon the negotiations.

5         Q.    And it was your understanding that Mr.

6    Cook, on behalf of Verizon, had agreed in

7    principle to this lease on the tower that you

8    planned to build in Old Saybrook?

9         A.    Had agreed in principle to the terms.

10        Q.    Okay.  Now, you know that in early

11   August of 2002, there was a letter sent by Mr.

12   Maccini in which he said that Tower Ventures was

13   terminating the tower deal, correct?

14        A.    That's correct.

15        Q.    As of that date, August 7th, 2002, do

16   you know whether Verizon had --  Withdrawn.

17              As of August 7th, 2002, had anyone

18   from Verizon indicated to you that they were no

19   longer interested in renting space on the tower

20   that you planned to build in Old Saybrook?

21        A.    They had not indicated that to me.  At

22   some point in time, and we can probably pinpoint

23   this, Verizon said they were no longer interested

24   in renting on the tower, or at that point, you

25   know, they didn't have any interest at that

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 150

1    immediate time.

2        Q.    But you don't know whether that was

3    before August 7th, 2002?

4        A.    I don't.  I definitely can't remember

5    the time frames on those.

6        Q.    Whenever that communication was made,

7    do you know whether it was made to you or to

8    someone else?

9        A.    Made directly to Bob, because he was

10   the one that relayed it to me, and I just can't

11   for the life of me remember, you know, when that

12   happened.

13       Q.    Now, as of July of '02, you had

14   continued to try to attract possible tenants to

15   the Old Saybrook tower that you were planning to

16   build, such as SNET/Cingular or AT&T, you said?

17       A.    Yes.

18       Q.    What was the status of those efforts?

19   Had you received any more of a commitment from

20   let's say Cingular than you had back in September

21   of '01, when the deal was originally signed?

22       A.    No.  Definitely no change.  If

23   anything, in general, I noticed an overall

24   decline in the interest of the towers that we

25   owned, and across the industry.  And the issues

1    in Old Saybrook weren't a lot different than they

2    were across the board.  I mean it's tough to

3    create demand for these towers.

4                    As I mentioned before, with these

5    search rings, if they're not out there looking

6    for them, I can't make anyone go on the specific

7    site.  They're very expensive to go out and build

8    and provide the radios for them.  If the carriers

9    don't have the money, I can't certainly do

10    anything to attract them to that tower.  If I

11    called them five times a day, or, you know,

12    whatever.  It's a very limited number of users.

13    If they're not interested, there's not a whole

14    lot I can do in order to put them on there.

15        Q.    Had AT&T's position changed at all as

16    of July '02 from its position in September '01,

17    concerning a possible interest as a tenant in the

18    Old Saybrook tower?

19        A.    I'd say no.

20        Q.    Had the positions of any other cellular

21    carrier changed that you spoke with as of July

22    '02 from their position in September '01,

23    concerning interest as a tenant in the Old

24    Saybrook tower?

25        A.    Everything was pretty much the same.

1        Q.    Except things with Verizon had advanced

2    to the point -- well, as of September '01, you

3    had what you thought was a commitment from

4    Verizon, but you did not have an agreed term of a

5    lease, you didn't have an agreed price, and so

6    on, correct?

7        A.    That's correct.

8        Q.    So by July '02, you have made steps in

9    a positive direction with Verizon, in that you've

10   agreed tentatively on a five-year lease, at

11   $2,500 a month, with somewhere between a two and

12   four percent annual increase in the rent,

13   correct?

14       A.    Those are the business terms that had

15   been discussed, and whether or not they were

16   finally agreed upon by Verizon, remains to be

17   seen.

18       Q.    Okay.

19       A.    Those were the terms that we were

20   talking about.

21       Q.    Let me sidetrack for a second on one of

22   the issues you brought up.

23              On the question of these gaps

24   with -- in service and that being one of the

25   factors that could be a selling point with the

June 24, 2004

Page 153

1    carrier, is it something that you folks do to

2    explore the quality of service along say a major

3    road?

4        A.    Sure.

5        Q.    And if you see a spot that -- you know,

6    where calls are chronically dropped by a

7    particular carrier, do you do your own

8    experiments?

9        A.    Yes, we do.

10       Q.    And if you see a spot where there's

11   clearly a gap, will you, knowing that, target a

12   nearby area for possible development and

13   subsequent marketing to the carrier that seems to

14   have a gap in its coverage?

15       A.    That would be one of the factors that

16   we would employ to try to find one of these

17   sites.

18       Q.    So it's more proactive -- it's

19   something proactive that your company does --

20       A.    Uh-huh.

21       Q.    -- rather than simply putting up towers

22   where it seems like it would be a nice place and

23   hoping a carrier will come to you and see, "Gee,

24   we have a hole in our coverage, we could use

25   space there"?

Page 154

1        A.    And the carriers use a more scientific

2    approach, but for the most part, I can -- you

3    know where the problems are going to be --

4    arise.  It's -- obviously a major intersection,

5    that's a good location.  If you have a harbor

6    nearby, or a densely-populated area where people

7    congregate and be using phones, those are

8    typically good areas to try and go and certainly

9    develop a tower.

10        Q.    And I gather that was one of the

11    selling points for the Old Saybrook site,

12    correct?

13        A.    That was certainly a factor, yes.

14        Q.    You had a harbor nearby, right?

15        A.    Yes.

16        Q.    And you had a major interstate artery

17    going directly by the property, correct?

18        A.    Yes.

19        Q.    And you had another limited access

20    divided highway intersecting nearby, Route 9,

21    correct?

22        A.    Yes.

23        Q.    After the July appearances before the

24    planning commission and the architectural review

25    board, what was your understanding as to what

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 155

```
 1    further approvals, if any, were necessary before
 2    Tower Ventures could obtain a building permit and
 3    begin construction on the communications tower?
 4         A.   We -- no question the zoning
 5    commission.  I knew we'd be back in front of
 6    them.  The zoning enforcement officer also would
 7    need to give us the permit.  Those two.  And then
 8    we would also, at that time -- at that time, we
 9    had been trying to just confirm with the siting
10    council that -- you know, what was our status
11    with them as to whether or not we would need
12    approval from them.
13         Q.   When you say "we," are you talking
14    about Mr. Childress?
15         A.   Bob and myself.  Tower Ventures.
16         Q.   Had you consulted with Mr. Childress on
17    that subject?
18         A.   Initially we had talked to Bill and he
19    had looked into it for us as far as going through
20    local zoning.  But we at that time -- I think I
21    had mentioned earlier in this conversation, that
22    siting council issue was still in flux at this
23    point, and this was six, seven, eight months
24    later.  You know, we just needed to confirm that
25    the siting council did not or -- know, did not
```

Page 156

1    require some sort of final certification.

2        Q.    Well, was it your understanding that if

3    telecommunications equipment was going to be

4    placed on the tower, that certainly at that point

5    siting council approval would be needed?

6        A.    We were putting telecommunications

7    equipment on that tower.

8        Q.    You hoped to be, correct?

9        A.    The agreement calls for us to put

10   Verizon Paging on there.  And that was the FCC

11   issue that I foresaw.

12       Q.    You don't know, as you sit here now,

13   whether Verizon Paging is treated differently

14   from a cellular carrier by the Connecticut Siting

15   Council, do you?

16       A.    That was certainly something we wanted

17   to find out.

18       Q.    The tower that was in existence and was

19   planning to be replaced, was, in fact, a radio

20   tower, correct?

21       A.    Not at the present time it's not.  In

22   its former life, my understanding was that was an

23   AM radio tower.

24       Q.    And wasn't it the auxiliary radio

25   tower, the backup radio tower for WLIS in Old

1    Saybrook?

2         A.    That's what Don said, yes.

3         Q.    And as presented to the Old Saybrook

4    authorities, it was to be a replacement of the

5    auxiliary radio tower, correct?

6         A.    I think that's documented, yes.

7         Q.    There was no question that there was a

8    hope in the future that cellular phone carriers

9    would rent space on the tower, correct?

10        A.    I think that was understood, that the

11   potential was there for a cellular

12   telecommunications company to come along and rent

13   space there.

14        Q.    And did you have any understanding as

15   to whether Connecticut Siting Council approval

16   would be necessary for construction of a

17   replacement radio tower that did not, at that

18   time, have any cellular phone carriers on it?

19        A.    My understanding, again at the time, we

20   weren't sure.  So to answer your question, I

21   wasn't sure.

22        Q.    Well, did Mr. Childress say anything to

23   you about whether additional approvals would be

24   needed beyond the zoning commission?

25        A.    He did not say that, no.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 158

1      Q.    And you mentioned earlier the zoning

2    enforcement officer and having to get a permit

3    from him.  Was it your understanding that if you

4    had the variances from the zoning board of

5    appeals, and you had zoning commission approval,

6    you could walk into his office and the granting

7    of a permit would be a routine ministerial act?

8      A.    Just like any other town, he's got the

9    right to -- I think he has up to 60 days to grant

10   the permit after he reviews it.  Or less.  I

11   think that would have been it, and then we would

12   have been, I believe, free and clear to go and

13   construct the tower.

14     Q.    Now, in early August of 2002, Mr.

15   Maccini wrote a letter to Mr. DeCesare purporting

16   to exercise a right to terminate the agreement,

17   correct?

18     A.    Correct.

19     Q.    And are you familiar with that letter?

20     A.    Yes, I am.

21     Q.    All right.  Have you reviewed it within

22   the last day or so to prepare for the deposition?

23     A.    Yes.

24     Q.    What discussion, if any, did you have

25   with Mr. Maccini prior to his sending of that

Page 159

1    letter?

2        A.    The discussion went something like, you

3    know, "I'm not sure I want to go ahead with the

4    project.  I'm going to send Don a letter. " And

5    that was basically his decision, his decision

6    alone.

7        Q.    Did Mr. Maccini ask your advice on any

8    issue in connection with the question of whether

9    a termination letter should be sent?

10       A.    I think he made the decision on his

11   own.  And I think -- to get an exact answer, it

12   would be from him.  I think it had a lot to do

13   with Verizon's decision not to go ahead with the

14   project at this time.

15       Q.    So it's your recollection that at or

16   about the time of the sending of that August 7th,

17   2002 termination letter, Verizon had backed out

18   of its commitment to lease space on the tower?

19       A.    That's my recollection, yes.

20       Q.    You don't recall, I think you told us

21   before, any conversation you had with

22   representatives of Verizon around this time,

23   correct?

24       A.    Bob had been dealing with Mark

25   directly.  I think the word came from Mark, you

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 160

1    know, the Verizon representative, to Bob.

2         Q.    Just let me get the answer to the

3    question I asked.

4              You don't recall any

5    communications you yourself had with Verizon on

6    the subject of interest or lack of interest in a

7    lease around the time of the termination letter,

8    August 7th, 2002, correct?

9         A.    I don't recall anything.

10        Q.    It was your understanding that Mr.

11   Maccini had had some communications from Verizon

12   in which they expressed -- in which they pulled

13   out of their commitment; is that fair?

14        A.    That's a fair statement, yes.

15        Q.    Was it your understanding that they

16   were wavering in their commitment or that they

17   had told Mr. Maccini, "That's it, we've changed

18   our mind, we're not interested"?

19        A.    They were not interested at that

20   point.

21        Q.    When you say "at that point" --

22        A.    Again, I -- it sounded to me, and

23   without having had the conversation, you know,

24   this is secondhand, is that they were --

25   potentially could be interested in the site later