CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

Page 161

1   on, but right now their interest in the site had

2   waned.  I suspect that had to do with, you know,

3   capital expenditures and whatnot at the time.

4       Q.   And it's your understanding that Mr.

5   Maccini was dealing with Mr. Cook -- was

6   communicating with Mr. Cook on that subject?

7       A.   Yes.  I can only say that because I

8   was -- it was relayed to me from Bob, that he was

9   the one who told me of the situation.

10      Q.   After Mr. Maccini told you that Verizon

11  had said they weren't interested at that time,

12  did he later tell you that they had changed their

13  mind and now they were interested?

14      A.   Like I said, I don't remember

15  specifically, you know, what his reasons were for

16  sending the letter.  I got to believe there was

17  some effect that Verizon would have had on it.

18  To say that we're not interested, you know, Bob

19  got the idea that they weren't interested

20  anymore.

21      Q.   The time frame you're talking about

22  there is at or about August 7th, 2002?

23      A.   Exactly.

24      Q.   When he sent the letter.

25      A.   Yes.

Page 162

1      Q.    My next question concerns say the two

2    or three months after that.  Do you recall Mr.

3    Maccini ever telling you that -- in words or

4    substance, that "Hey, Verizon may have changed

5    their mind, now they've indicated to me that they

6    are interested in leasing space on the tower"?

7      A.    I just don't remember, really if there

8    was a change.  I just know that they backed out

9    at least one time.  And that's my recollection of

10   the situation.

11     Q.    But you don't remember Mr. Maccini

12   saying anything about a deal being back together?

13     A.    I just can't say that I do.

14     Q.    What else do you recall in your

15   discussions with Mr. Maccini prior to the sending

16   of the termination letter?  What do you remember

17   him saying, other than what you've already told

18   us?

19     A.    It was -- it was a pretty, you know,

20   definitive conversation.  You know, "I'm going to

21   go ahead and send this termination letter."

22     Q.    Did he ask you to summarize for him the

23   state of -- the state of the approval process?

24     A.    I think he had a pretty good idea where

25   we stood in it and I think I conveyed to him that

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                     June 24, 2004

1    I think we had -- maybe you can help me out, the

2    timing, I think we had gotten all the approvals

3    except for the zoning commission at that point.

4         Q.    I think the record will support that

5    statement.

6         A.    And I think that -- I think he had

7    asked my opinion, you know, it looks like we

8    can -- the zoning commission certainly is not a

9    guarantee, but, you know, Bill Childress would

10   tell you that he felt comfortable or somewhat

11   confident that the zoning commission would be a

12   favorable outcome.

13        Q.    And did you communicate that fact to

14   Mr. Maccini prior to his sending of the letter?

15        A.    I'm sure I did.  With the caveat saying

16   that there's no guarantee.  You know, because I

17   had been in front of them once before and I said

18   they were a rather tough board, but Bill

19   Childress, you know, certainly would be a more

20   compelling figure than I would, given his local

21   ties, so I would defer to his opinion.

22        Q.    I'm just trying to nail down, Mr.

23   Brinn, as precisely as we can, what you said to

24   Mr. Maccini.  Did you convey to him that in Mr.

25   Childress' opinion, although there's no such

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 164

1    thing as a sure thing, he was optimistic about

2    the prospects for approval before the zoning

3    commission?

4         A.    I would agree with that statement, for

5    the most part, yes.

6         Q.    What part of it don't you agree with?

7         A.    I'm not sure exactly what I said to

8    him.  I think the general --

9         Q.    The gist of it?

10        A.    The gist of it, if you will.

11        Q.    And at this point in early August, you

12   were actually scheduled to appear before the

13   zoning commission later that month, correct?

14        A.    And I believe I did, yes.

15        Q.    August 19th, I think it was?

16        A.    Yes.

17        Q.    So at the time the termination letter

18   was sent, it was what, 12 days before the

19   scheduled appearance before the zoning

20   commission, right?

21        A.    Yes.

22        Q.    Did Mr. Maccini seek your general

23   advice or opinion about whether it was in Tower

24   Ventures' interest to attempt to back out of the

25   deal with Crossroads?

1        A.    I think he made his mind up for

2    himself, to be honest with you.

3        Q.    So do I take that as a "no"?

4        A.    Yeah.  I --

5        Q.    He didn't ask you, in words or

6    substance, "You know, Keenan, do you think I am

7    making a mistake backing out of this deal?"

8        A.    I think if I had made a compelling case

9    to him, and -- you know, and had some supporting

10   evidence to say that I got all these tenants out

11   there that are banging on the door to get at the

12   tower, you know, I think maybe that would have

13   been a different situation, but I think he knew,

14   based upon the state of the industry, he was

15   going to make the decision on his own, and I'm

16   not sure I was going to have a lot of input into

17   that.

18       Q.    Well, back when the company signed the

19   deal, you had a commitment from Verizon and only

20   Verizon, right?

21       A.    Yes.

22       Q.    And then in the months that followed,

23   the commitment from Verizon became more concrete,

24   although it was not reduced to an actual lease,

25   correct?

Page 166

1      A.   Correct.

2      Q.   And then it's your understanding that

3   something happened prior to the sending of the

4   termination letter, that caused Verizon to

5   indicate that they were no longer interested at

6   that time in the Old Saybrook tower?

7      A.   Uh-huh.  Yes.

8      Q.   And at that point, the company did not

9   have any other prospective cellular telephone

10  tenants lined up to rent space on an Old Saybrook

11  tower, correct?

12     A.   Correct.

13     Q.   After the termination letter was --

14  Withdrawn.

15          Did Mr. Maccini ask you to review

16  a draft of the termination letter before he sent

17  it?

18     A.   I don't recall.  He certainly may have

19  asked me.  I don't recall if I reviewed it, but I

20  have seen it.

21     Q.   Did you play any role in drafting the

22  August 7th, 2002 termination letter?

23     A.   I did not have any role at all.

24     Q.   And do you recall whether you saw it

25  before it went out?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 167

1        A.    I did not see it before it went out.

2        Q.    Now, after that letter was sent, did

3    you have any -- what discussions did you have

4    with Mr. DeCesare?

5        A.    The next discussion I think I had with

6    Don was at the zoning hearing on the 19th.    In

7    other words, I -- can I take that back?

8        Q.    Sure.

9        A.    There was a conference call with Bob,

10   myself, and Don, I think Don got on the phone the

11   next day to Bob and, you know, wanted to have a

12   conversation.  We did have a conversation that

13   day, at which time we agreed to put together a

14   letter saying that we would continue to prosecute

15   this project right through to the end.  I would

16   believe that letter is in -- is an exhibit.

17   That's as a result of the conversation I had with

18   Don.  And like I said, two weeks later was the

19   next conversation I probably had with him, I'm

20   guessing, at the zoning hearing on the 19th.

21       Q.    And the letter you're talking about,

22   the subsequent letter you're talking about is a

23   letter in which it was agreed that Tower Ventures

24   would continue to prosecute the application

25   before the zoning commission, notwithstanding the

```
 1    position it had taken that the agreement itself

 2    was terminated, and that doing so would not

 3    prejudice anybody's rights concerning what was

 4    done to that point; is that a fair summary of

 5    what you understood it to be?

 6         A.    I think that's a good summary, yes.

 7         Q.    And I believe that's Exhibit 10 from a

 8    prior deposition, if I can read it upside down.

 9                   MS. MANZO:   Yes.

10         Q.    And one reason that agreement was

11    reached, Mr. Brinn, was that as -- you were very

12    close to the finish line, right?

13         A.    I'm not going to -- wasn't my

14    decision.  I'm not going to speak.  Yes, we were

15    close to the finish line on the permit, yes.

16         Q.    Well, let me ask it this way.  Mr.

17    DeCesare was taking the position that "We are

18    very close to obtaining the final approval that

19    is necessary in order to build this tower, and I

20    don't want you to walk away from this thing right

21    now with the final approval being so close to

22    being obtained"; is that fair?

23         A.    That was part of the conversation that

24    I was involved with, yes.

25         Q.    And, in fact, you did, as you've said,
```

June 24, 2004

                                                                                         Page 169

 1    go forward before the zoning commission on August

 2    19th of 2002, correct?

 3        A.    Yes, we did.

 4        Q.    And Mr. Childress was at that hearing?

 5        A.    Yes, he was.

 6        Q.    Do you remember Mr. DeCesare ever

 7    having to present at one of the meetings, either

 8    the planning commission or the architectural

 9    review board?

10        A.    I think it might have been at -- I

11    think it was at the architectural review board.

12    That he was there with this other person, Hal

13    Giglio.  You know, spoke to -- I was not there.

14    I sent Hal in my place.  I think he spoke -- you

15    know, the color of the tower.

16        Q.    Is that because Mr. Childress had a

17    conflict?

18        A.    Yes.  He didn't seem to think this

19    architectural review board was going to be a big

20    issue.

21        Q.    So at the August 19th zoning commission

22    meeting, Mr. Childress spoke on behalf of the

23    application?

24        A.    Yes, he did.

25        Q.    And did you speak at all?

1       A.    I did.

2       Q.    What do you remember speaking to?

3       A.    I think we talked about the -- possibly

4    the fall zone of the tower.  Without getting into

5    specifics, I think it was the type of

6    construction, the access road.  I remember there

7    was -- on the conditions, there was some

8    discussion about the road and how the road was

9    going to be put in, you know, and they had some

10   specific needs in that requirement that they

11   wanted us to observe.  And I think they may have

12   talked about landscaping, and that type of

13   thing.  I'm just -- I'm not saying those were the

14   exact items, but we talked about, you know, more

15   technical issues.  And Mr. Childress again did

16   the majority of the talking.

17                 MR. GRUDBERG:  Can you mark this?

18                 (Plaintiff's Exhibit 30 marked

19            for identification.)

20       Q.    I want to show you what's been marked

21   as Exhibit 30, Mr. Brinn.  I would ask you to

22   review that and tell me if you recognize it.

23       A.    Yes, I do.

24       Q.    What is Exhibit 30?

25       A.    Thirty is an e-mail from myself,

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 171

 1    Friday, August 23rd.

 2         Q.    Directed to Mr. Maccini?

 3         A.    Yes.

 4         Q.    And the subject of the e-mail is what?

 5         A.    The Old Saybrook zoning commission.

 6         Q.    This is the meeting we've just been

 7    talking about, correct?

 8         A.    Yes, it is.

 9         Q.    Is this your recap or summary of the

10    meeting for Mr. Maccini, similar to one of the

11    earlier e-mails we reviewed following the zoning

12    board of appeals hearing?

13         A.    Yes.

14         Q.    You make reference to a militant board

15    member; is that right?

16         A.    Yes.

17         Q.    Am I correct there was one gentleman

18    present on the zoning commission who seemed to be

19    opposed to this tower project, or any other tower

20    project that might come before the commission any

21    time soon?

22         A.    Yes.

23         Q.    If you read through the e-mail, in the

24    longest paragraph, you say, "At the ZBA hearing

25    Don represented that he needed this tower as his

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 172

1    auxiliary site in case of a problem with his main

2    site."  Is that right?

3         A.    Yes.

4         Q.    Does that refresh your memory that, in

5    fact, the tower was presented, at least in part,

6    as an auxiliary radio tower for WLIS AM radio

7    station?

8         A.    In the event that he needed this, yes.

9    That's -- like it was represented that it would

10   be an auxiliary tower at the time the rusted

11   tower was not, to my knowledge, serving as an

12   auxiliary tower.

13        Q.    At least in theory, it was an auxiliary

14   radio tower, correct?

15        A.    Yes.  To my knowledge, and I was around

16   a lot.  It -- if it was, in fact, to be used in

17   the event of emergency, then I guess you could

18   represent it as the auxiliary tower.

19        Q.    All right.  And you go on to say, "We

20   may have to amend the plans to show some sort of

21   antenna.  The board doesn't buy this argument and

22   they see this as nothing more than a guise to

23   place cell/PCS equipment in a zone that doesn't

24   allow it."

25              Do you remember what your thought

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 173

 1    process was there when you wrote that sentence or

 2    those statements?

 3         A.    Yes.  The town attorney was trying to

 4    figure out a way for us -- you know, here we are

 5    representing that we're replacing this radio

 6    tower, and yet we don't have any radio equipment

 7    on it for the radio.  Regardless of what we

 8    intended to use it for down the line, we needed

 9    to show that this was going to have some sort of

10    radio use, if that's the reason that we were

11    going to replace it, and that's what we did on

12    the plans.  I amended it to show -- I think we

13    called it some sort of transmitter link, which

14    was a simple dish, that would connect, you know,

15    this tower to Don's downtown station.  In the

16    event, you know -- all he was looking for was

17    some validation that this was going to be a radio

18    tower.  And that's what he told us to come back

19    with, which we did.

20         Q.    You say, at the conclusion of the

21    paragraph, that "the town attorney tended to side

22    with us," meaning you, "on this issue for the

23    most part," correct?

24         A.    Again, to my point that he was almost

25    trying to help us, you know, get to what we

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 174

1    needed, but he's saying, "If you're renting this
2    as a radio tower, you know, convince us that it's
3    being used for radio station purposes."
4         Q.    Do you recall any discussion from the
5    counsel for the zoning commission as to whether
6    this application was one that required siting
7    council approval at this stage when there was no
8    cellular equipment to be placed on it?
9         A.    I don't recall that that -- the siting
10   council came up, but I don't recall that there
11   was a concise answer at that meeting.
12        Q.    Do you recall ever seeing a memo from
13   the town attorney or from the zoning commission
14   attorney addressing, in part, the issue of siting
15   council jurisdiction?
16        A.    I don't remember seeing it.  If anyone
17   saw it, it probably would have been Bob and Bill
18   Childress.  Those were -- that was really an
19   issue that they were undertaking at that point.
20        Q.    Okay.  Let me show you what's been
21   marked as Exhibit 27 at an earlier deposition.
22        A.    Okay.
23        Q.    I would ask you to review that and tell
24   me if you've ever seen it before?
25        A.    It doesn't -- I don't recall seeing

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 175

1   this.

2        Q.    Okay.  So at the conclusion of the

3   August 19th zoning commission hearing, what did

4   you understand needed to be done further in order

5   to get permission for Tower Ventures to begin

6   construction on a tower?

7        A.    That we would have to go back in front

8   of the building commission.

9        Q.    Was a date set for that when you

10  adjourned?

11       A.    Yes.  September 3rd.  And I was to -- I

12  think to modify the plans, you know, to show

13  it -- whatever radio equipment, you know, that

14  Don was proposing to put on the tower, on the

15  tower, and then I was supposed to provide them

16  with some RF, technical emissions.  I'm not sure

17  what I supplied to Bill, but it's in the record

18  as to what I provided.  Probably maybe some

19  public health statements or something along those

20  lines.

21       Q.    RF stands for radio frequency; is that

22  right?

23       A.    Yes.

24       Q.    So did you assemble the materials that

25  you believed were further necessary between

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                      June 24, 2004

Page 176

```
 1   August 19th and September 3rd?

 2       A.    I certainly believe I did.  I mean I --

 3   I'm sure I did only because I know I redrafted

 4   the plans, and obviously I must have given them

 5   what they needed, as far as the RF information.

 6       Q.    Did you have any discussion with Mr.

 7   DeCesare at the August 19th hearing or after

 8   that, about the subject of termination of the

 9   agreement?

10       A.    I can't specifically recall.

11       Q.    You had been working with him on at

12   least a weekly and sometimes more frequently --

13   more frequent basis for the better part of a year

14   at this point, right?

15       A.    Yeah.  You know, to give you the

16   exact -- yes, we did have a discussion relating

17   to this, obviously.  It was a subject that I

18   was -- that was going to get brought up.  From my

19   perspective and Don's perspective, it was

20   strictly a friendly discussion.  I don't think

21   there was any ill will towards me, and again, I

22   was prosecuting this thing all along as quickly

23   as -- as expeditiously as I could.

24       Q.    What can you recall Mr. DeCesare saying

25   to you on the August 19th hearing or after that,
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 177

1    about the subject of termination and/or Mr.

2    Maccini's position?

3        A.    The one thing I do remember him saying

4    is, "Gee, I wish you guys had called me directly

5    rather than sending a letter."  That was one

6    thing I do recall, which, you know, maybe he has

7    a point there.  That's one thing that I remember,

8    you know, sticks out in my mind.  Maybe, you

9    know, it would have been the -- I'm not saying

10   what we did was wrong, but maybe the more

11   courteous thing would have been to put a phone

12   call in.

13       Q.    Did you discuss with him maybe there

14   might be alternate terms of an agreement that

15   would be acceptable to Tower Ventures?

16       A.    I did have that discussion with him.  I

17   don't recall if it was on the 19th.

18       Q.    Did you discuss with Mr. Maccini at or

19   about the time the termination letter was sent,

20   whether Tower Ventures might still be willing to

21   proceed with the Crossroads deal except under

22   different, more favorable terms?

23       A.    I think we did have that conversation.

24       Q.    What do you recall Mr. Maccini saying

25   and what do you recall you saying?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

Page 178

```
 1        A.   Obviously I think Bob was still open to

 2   the project going forward.  He asked me if I

 3   could set up a meeting with Don to possibly

 4   discuss some renegotiated contract.

 5        Q.   Was this at or about the time the

 6   termination letter was sent?

 7        A.   I think it must have been -- it was

 8   after the termination letter was sent, but maybe

 9   even before the September 3rd hearing, or

10   thereabouts.

11        Q.   All right.

12        A.   We had a meeting in Old Saybrook.  I

13   don't remember specifically what day it was.

14        Q.   I'm showing you, Mr. Brinn, a copy of

15   Exhibit 8, the termination letter.  I would call

16   your attention to the second to the last sentence

17   of the letter, where Mr. Maccini says, "I would

18   be happy to discuss a revision in the terms of

19   the transaction taking into account TVI's added

20   expense."  Do you see that?

21        A.   I do, yes.

22        Q.   So it's clear, at least as of August

23   7th, Mr. Maccini was speaking to Mr. DeCesare

24   about possible willingness to proceed on revised

25   terms, correct?
```

Page 179

1      A.    Absolutely.

2      Q.    And do you remember any discussion with

3    Mr. Maccini at or about August 7th, of what

4    revised terms might be acceptable to Tower

5    Ventures?

6      A.    I think the general discussion, and

7    this was just kind of in early -- just kind of a

8    general framework, was to try to offload some of

9    the upfront costs, towards the back end.  In

10   other words, rather than a large, you know, sum

11   payment up front, possibly we could spread that

12   out over the term by increasing Don's revenue

13   share, which I believe was 20 percent.  Maybe we

14   could have increased that to get him -- you know,

15   while we're trying to get the tower up and going,

16   we take away some of the upfront cost and put it

17   towards the back.

18     Q.    Did Mr. Maccini express concern about

19   the upfront cost of the deal as of around August

20   7th, 2002?

21     A.    I mean I think that was the -- I mean

22   these projects are generally capital intensive at

23   the beginning, you know, to build.  And I think

24   the issue would have been, you know, from my

25   standpoint -- to be honest with you, it was the

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 24, 2004

Page 180

1    whole package, it wasn't one thing.  We had the

2    mortgage, this upfront payment, and we had this

3    additional lease on top of a, you know, a fairly

4    difficult build, given the terrain out there.  So

5    it was a combination of the factors, is the

6    answer.

7        Q.   The building cost would be present in

8    any project, right?

9        A.   Correct.

10       Q.   Understanding they can vary from

11   project to project, correct?

12       A.   Correct.  And a monopole would be more

13   expensive on this project than a guyed tower.

14       Q.   But under the Crossroads agreement,

15   there were other very substantial upfront costs

16   that would be incurred; is that correct?

17       A.   Oh, yes.  Yes.

18       Q.   Upon obtaining a final approval, the

19   appeal periods running, there would have been an

20   obligation to pay Crossroads a one-time fee of

21   $150,000, correct?

22       A.   Correct.

23       Q.   And TVI would also have been obligated

24   to come up with cash to pay off the Raycee

25   mortgage, correct?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 181

1      A.    Correct.

2      Q.    And that figure was somewhere in the

3   neighborhood of 130 to 150 thousand dollars?

4      A.    Uh-huh.

5      Q.    Yes?

6      A.    Yes.  I'm sorry.  150,000 is my

7   recollection.

8      Q.    So TVI was looking at -- without regard

9   to building cost, TVI was looking at somewhere in

10  the neighborhood of 280 to 300 thousand dollars

11  that it would have had to come up with upon final

12  approvals being issued to build the tower, and

13  appeal periods running, correct?

14     A.    Correct.

15     Q.    And is it fair to state that Mr.

16  Maccini expressed concern about having to come up

17  with that kind of upfront money?

18     A.    I think that's a fair statement.  He

19  made that statement to Don, so I would say that

20  yes, that is a fair statement.

21     Q.    He later made that statement to Don,

22  correct?

23     A.    Yes.

24     Q.    And before sending the letter, did he

25  make that statement or express a similar

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 24, 2004

Page 182

1    sentiment to you?

2         A.    I don't think specifically, you know, I

3    think it was more the whole picture.   It wasn't

4    specifically the upfront costs, but obviously

5    those are the -- that's the biggest burden on

6    this project.

7         Q.    And looking at the big picture, the

8    thing that troubled Mr. Maccini most, according

9    to what he told you, was the upfront cost,

10   correct?

11        A.    Yeah.   I would say that's a fair

12   statement.

13        Q.    And during this period of time, was the

14   company undergoing a structural change with the

15   Tower Ventures II, LLC concept?

16        A.    If you wouldn't mind just pinpointing

17   the time?

18        Q.    August 2002.

19        A.    There were some talks in place to

20   secure some financing with a -- I think you would

21   describe it as a venture capital company.

22        Q.    Did anyone from the venture capital

23   company or acting on behalf of the venture

24   capital company speak with you about the status

25   of the Old Saybrook tower project?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                           June 24, 2004

Page 183

```
 1        A.     Never discussed it with anybody from
 2    Seaport.
 3        Q.     And just for the record, Seaport is a
 4    venture capital company; is that correct?
 5        A.     Yes.    That's the entity on -- the
 6    financing entity.
 7        Q.     Did Mr. Maccini ever express to you any
 8    concern about the status of the Old
 9    Saybrook/Crossroads project, and Tower Ventures'
10    obligations under the Crossroads agreement and
11    its potential impact on the deal with Seaport?
12        A.     He did not.
13        Q.     Did anyone else from Tower Ventures
14    discuss that subject with you?
15        A.     The subject of the Crossroads influence
16    on the Seaport deal?
17        Q.     The Crossroads deal, the looming
18    potential significant cash obligations and what
19    impact, if any, that had on the Seaport deal?
20        A.     I would say no, as a general answer.    I
21    did not have anything really to do with the
22    Seaport investment talks or that whole
23    restructuring.
24        Q.     You next appeared before the zoning
25    commission on September 3; is that correct?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 24, 2004

Page 184

1      A.    Yes.

2      Q.    And was Mr. DeCesare present?

3      A.    Yes, he was.

4      Q.    And you were present and Mr. Childress

5    was present, correct?

6      A.    Yes, we were.

7      Q.    Mr. Childress spoke further on behalf

8    of the application?

9      A.    Yes, he did.  Trying to address the

10    outstanding issues.

11      Q.    Did you speak at all at that meeting?

12      A.    I think I may have had a very limited

13    role.  Just my recollection of the two meetings,

14    I think I had a limited role in each one of

15    them.  In trying to address a couple of things

16    like I mentioned, the road going in, maybe the

17    landscaping or something along those lines.  I

18    may have put some -- they put some conditions on

19    there that you basically had to agree to.

20      Q.    Do you recall whether Mr. DeCesare

21    spoke in support of the application at the

22    meeting?

23      A.    I certainly know he spoke at the first

24    one.  I suspect that he had something to say at

25    the second one.  Bill pretty much handled the

Page 185

1    bulk of the talk.

2        Q.    Do you recall how long the discussion

3    was at the September 3rd meeting of the

4    application?  Approximately?

5        A.    More than a half hour, less then an

6    hour.

7        Q.    And ultimately a vote was taken,

8    correct?

9        A.    Yes, it was.

10        Q.    And what was the result?

11        A.    It was -- in favor.  I believe the vote

12    was four to one.

13        Q.    And the one was the member that you had

14    referred to in your e-mail, your August 23rd

15    e-mail to Mr. Maccini; is that correct?

16        A.    That's correct.  Mr. Friedman.

17        Q.    Now, you indicated that there was a

18    meeting at some point, I believe, with yourself,

19    Mr. DeCesare, and Mr. Maccini, to discuss

20    possible revised terms of a deal, correct?

21        A.    Correct.

22        Q.    After the termination letter was sent,

23    Mr. Brinn, Mr. DeCesare and Crossroads had taken

24    the position that the termination was

25    ineffective, correct?

Page 186

```
 1        A.    That's correct, yes.

 2        Q.    And had --

 3              MS. MANZO:   Can you repeat that

 4    question?

 5        Q.    After the termination letter was sent,

 6    Mr. DeCesare and Crossroads had taken the

 7    position that the termination was ineffective,

 8    correct?

 9        A.    Yes.   That was their position, yes.

10        Q.    That position was communicated through

11    their counsel; is that right?  Do you remember?

12        A.    It was communicated to me through Bob.

13        Q.    All right.

14        A.    So I don't know who told him.

15        Q.    Did Mr. Maccini discuss the specifics

16    of Crossroads' position as to why they believed

17    the termination was ineffective?

18        A.    Yes.   He mentioned that there was a

19    material breach, I think is the term he used.

20        Q.    And did Mr. Maccini indicate to you

21    what the material breach Crossroads claimed was?

22        A.    Oh, yes.   It was the -- it had to do

23    with the first paragraph of the contract.

24        Q.    And the failure to apply for permits,

25    approvals and so on within the 45-day limit after
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 187

```
 1    the signing of the September 20, 2001 agreement,

 2    correct?

 3         A.    Correct.

 4         Q.    And Crossroads, in essence, had taken

 5    the position that if Tower Ventures hadn't acted

 6    within that 45-day period as required, then they

 7    couldn't avail themselves of an opt-out provision

 8    if approvals hadn't been obtained by July 31st,

 9    2002; is that correct?

10         A.    That was the explanation I was given,

11    yes.

12         Q.    Was there any further conversation

13    between you and Mr. Maccini, as to the position

14    Crossroads had taken in response to the

15    termination?

16         A.    Not outside of the initial

17    conversation.  I forgot some of the time lines

18    here, but the process was still going on.  I was

19    still -- I continued to prosecute this thing, you

20    know, regardless of the -- you know, their -- of

21    Crossroads' position.

22         Q.    Did Mr. Maccini ask you whether any

23    applications had been filed within that 45-day

24    window?

25         A.    Yes, he did.
```

Page 188

```
 1        Q.    And what did you tell him?
 2        A.    I told him that the applications had
 3   not been filed.
 4        Q.    And did he ask you why?
 5        A.    I think I set out the same explanation
 6   for him that I've set out here today, that I had
 7   been moving along as diligently as I could here
 8   to meet the time lines and give them what I had.
 9   Obviously the filing didn't happen, but as I
10   outlined here, I think I've given you the reasons
11   for the turn of events.
12        Q.    So the answer is yes, he did ask you
13   why, correct?
14        A.    Yes.
15        Q.    And the response you gave him is what
16   you just told me, correct?
17        A.    Correct.
18        Q.    What was his reaction to that?
19        A.    He's not the type of guy that is going
20   to scream at me.  I think he understood that I
21   had been diligently pushing this along, and, you
22   know, at the end of the day, I did get the permit
23   for the tower.
24        Q.    Did he express displeasure with the
25   fact that no applications had been filed within
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 189

1    that 45-day period, notwithstanding the contract

2    language?

3         A.    He did not -- not to me he didn't.

4         Q.    Did he discuss that question with you,

5    Mr. Brinn, before he sent the August 7, 2002

6    letter?

7         A.    Absolutely, positively not.  I was --

8    that conversation was a complete surprise to me.

9         Q.    "That conversation" being the

10   questioning about what happened, if anything,

11   within this 45-day period?

12        A.    With the accusation of the breach of

13   the contract, and the --

14        Q.    Did the conversation that you're

15   talking about with Mr. Maccini occur in person or

16   by telephone?

17        A.    The actual -- I specifically remember

18   the conversation.  That conversation happened via

19   telephone.

20        Q.    And where was Mr. Maccini, as you

21   understood it, when he called you?  Who called

22   who?

23        A.    Bob called me.

24        Q.    And was he in his office?

25        A.    It happened in the middle of a

CROSSROADS COMMUNICATIONS v. TOWER VENTURES

June 24, 2004

Page 190

```
 1    workday.  Typically I would say yes.  But I -- he
 2    could have called me from his cell phone.  Those
 3    are the two locations I would typically hear from
 4    him.
 5         Q.   And where were you, if you remember?
 6         A.   I was in Sutton, Massachusetts.
 7         Q.   All right.
 8         A.   Specifically I remember getting the
 9    call.
10         Q.   And is there a particular reason why
11    you remember that phone call?
12         A.   I was taken back by the, you know, the
13    breach, the accusation that there had been a
14    breach of the contract, when, you know, from my
15    standpoint, I had been working diligently to move
16    this thing along.
17         Q.   Was it an uncomfortable phone call for
18    you?
19         A.   Not at all.  I don't think I had
20    anything to feel uncomfortable about.
21         Q.   And you said Mr. Maccini isn't the type
22    to yell.  But did he express unhappiness in any
23    fashion during that phone call with the course of
24    action that had been taken and the absence of any
25    filing within the 45-day window?
```

June 24, 2004

Page 191

```
 1        A.    I would say absolutely not.

 2        Q.    How long was the phone call?

 3        A.    Not terribly long.  I would say five

 4   minutes.

 5        Q.    And do you know whether anyone else was

 6   on the line, on Mr. Maccini's end?

 7        A.    No.

 8        Q.    It wasn't like him sitting in his

 9   office in a conference call?

10        A.    It wasn't a speakerphone call or

11   something, no.

12        Q.    We were talking about the meeting that

13   you had with Mr. DeCesare and Mr. Childress at

14   which possible revised terms of a deal were

15   discussed.  Correct?

16        A.    I never said we had a meeting with --

17        Q.    I'm sorry, I misspoke.  I said Mr.

18   Childress instead of Mr. Maccini.

19        A.    Okay.  It was Bill and myself, and

20   Don --

21        Q.    Okay.

22        A.    -- at the meeting I'm referring to.

23   I'm sorry, Bob --

24        Q.    Now I got you confused.  Let's take it

25   in baby steps.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 192

```
 1                  Did this meeting occur before or
 2     after the final zoning commission appearance?
 3          A.    To the best of my recollection, I think
 4     it happened between the two.  In other words, we
 5     had a continuance on the 19th, I believe, and --
 6          Q.    Correct.
 7          A.    And between -- my sense was that the
 8     thing was still ongoing, and it was kind of a
 9     meeting of the minds there.  I'm not going to say
10     that 100 percent, but it certainly happened after
11     the first zoning hearing, and it could have
12     happened right after the approval.  I don't
13     know.
14          Q.    Where did the meeting happen?
15          A.    Not too far from the downtown Old
16     Saybrook -- kind of a coffee shop right there.
17          Q.    What do you recall being discussed at
18     the meeting?
19          A.    I recall the tone was -- the purpose of
20     the meeting was to kind of -- kind of try to see
21     if we could somehow, you know, come to terms on
22     some sort of renegotiation.  Bob is the principal
23     CFO of the company, he did the majority of the
24     talking.  I did the listening and Don was
25     certainly active in that, and I would describe
```

Page 193

1    the meeting as fairly cordial.

2        Q.    Do you remember any specific subjects

3    that were discussed concerning revisions of

4    particulars of the deal?

5        A.    The main point that I remember from

6    that meeting was trying for come up with another

7    way to try to get that note refinanced from the

8    Raycee note.  That would have been something that

9    we were working on.  In other words, to try to

10   get a commercial loan.  One of the action items

11   was to have Don, you know, either look into it --

12   or we were going to look into potentially a

13   commercial loan form.  And then the other thing

14   was what I had mentioned before, trying to take

15   that upfront payment and kind of spread that out

16   over -- you know, more evenly across the term.

17   Less at the front end, more at the back.

18       Q.    Okay.

19       A.    I don't think there was anything

20   specifically agreed to or -- it was kind of a --

21   just a -- kind of an open meeting session, I

22   guess.

23       Q.    Did you make any effort after the

24   meeting to investigate potential alternative

25   sources of financing to pay off or refinancing of

1    the Raycee note?

2        A.    Not my area but Bob is a former banker

3    and I believe that was something he looked into

4    and tried to put Don in touch with.

5        Q.    Is that belief based upon conversations

6    you had with Mr. Maccini?

7        A.    Yes.

8        Q.    Did you have any input in formulating

9    an alternative proposal to Mr. DeCesare for

10    continuing in the deal except under revised

11    terms?

12        A.    You know, I -- if I had something, I --

13    I honestly don't remember, but my suspicion is

14    that Bob would have been the one to try to draft

15    up something, and whether or not that got done,

16    I'm not 100 percent certain.

17        Q.    Do you remember whether Mr. Maccini

18    ever asked you to review a draft letter to Mr.

19    DeCesare setting forth alternate terms?

20        A.    That does sound familiar.  Like I said,

21    I know there was a specific -- there were some

22    terms discussed at that meeting, and whether or

23    not they were ever put in writing to Don, I'm not

24    100 percent sure, but I do know that either

25    verbally or, you know, in writing he wasn't

Page 195

```
 1   interested in whatever we proposed.

 2       Q.   Let me show you what was marked as

 3   Exhibit 12 at a prior deposition.  To save a

 4   little time, I'll tell you you're not copied or

 5   directed on the covering e-mail, but I'd ask you

 6   to take a look at both the e-mail and the

 7   attachment and tell me if you can recall seeing

 8   either at any point.

 9                (Pause in the proceedings.)

10       Q.   Do you remember seeing either the

11   covering e-mail or the attached draft letter to

12   Don DeCesare, dated October 4th?

13       A.   I can't say that I specifically saw it,

14   but I was very familiar with what terms had been

15   discussed.  And whether or not I saw the actual

16   final document, Bob may have asked my advice on

17   it or something like that.

18       Q.   Had you discussed with Mr. Maccini

19   potential revised terms that would be acceptable

20   to Tower Ventures for the Old Saybrook tower

21   project?

22       A.   I believe I did.  Certainly after

23   Don -- the meeting we had with Don, we would

24   have -- on the way back, you know, to Providence,

25   we probably would have had some discussion on it,
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 196

1    sure.

2        Q.    Are the proposals set forth in the

3    attachment to Exhibit 12 consistent with the

4    discussions you had with Mr. Maccini regarding

5    revised terms that would be acceptable to TVI?

6        A.    I think that was essentially what I

7    described earlier.

8        Q.    Showing you again what was marked as

9    Exhibit 13 at a prior deposition, I'd ask you to

10   take a look at the covering e-mail and at

11   attached letter and tell me if you've ever seen

12   either of those before.

13       A.    I can't say I've seen this myself.  But

14   I'm sure I was privy to, you know, Bob making

15   this overture to Don.  We may have discussed it

16   at some time.

17       Q.    Do you recall Mr. Maccini seeking your

18   advice about whether the revised terms set forth

19   either in Exhibit 12 or 13 would make sense for

20   the company?

21       A.    I think my conversation with Bob was

22   strictly limited to maybe the ride back after our

23   meeting.  And at that point, you know, Bob

24   doesn't need me to make the final say, you know,

25   I think it was essentially what we had talked

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                         June 24, 2004

Page 197

```
 1   about.

 2        Q.    Exhibits 12 and 13 are dated

 3   October 4th and October 8th.

 4        A.    Uh-huh.

 5        Q.    Does that refresh your memory at all as

 6   to when the meeting with Mr. DeCesare might have

 7   taken place?

 8        A.    Yes.  It would have been after that

 9   approval.  I would guess sometime mid- to late

10   September.

11        Q.    It was your understanding that as of

12   late September 2002, Tower Ventures had whatever

13   approvals were necessary to obtain a building

14   permit to construct the communications tower that

15   was the subject of the September 2001 agreement,

16   correct?

17        A.    We had the approvals necessary to --

18   assuming everything was good with the siting

19   council, we had all approvals to go and make

20   application for a building permit.

21        Q.    You said assuming everything was okay

22   with the siting council.  There was still

23   question in your mind about that?

24        A.    Again, there was an attorney that had

25   been contracted to work and make sure that we
```

Page 198

```
 1    were in compliance.

 2         Q.    And who was that?

 3         A.    You had an exhibit earlier about --

 4    from myself to Julie Donaldson.  She was

 5    resolving that for us.

 6         Q.    Do you know when Ms. Donaldson was

 7    engaged to work on Tower Ventures' behalf?

 8         A.    She had been working for us -- on this

 9    particular project or just in general?

10         Q.    On this particular project.

11         A.    Sometime on or about -- I think we just

12    called her up because she had siting council

13    experience, asking her to get us an opinion on

14    where the siting council stood at that particular

15    point in time.

16         Q.    Do you know whether you first contacted

17    Ms. Donaldson before or after the Old Saybrook

18    zoning commission approval was issued?

19         A.    I can't say that.

20         Q.    You had been dealing with this siting

21    council issue for at least eight, nine months at

22    this point, correct?

23         A.    Uh-huh.

24         Q.    Yes?

25         A.    Bob had been taking the point on the
```

1    siting council issues because we had some other

2    siting council issues within the state of

3    Connecticut, and again, I was just focused on the

4    building permit for the Old Saybrook project.

5    Whatever happened with the siting council was

6    going to be decided by Bob and, you know,

7    possibly Julie or somebody with familiarity with

8    the siting council.

9        Q.   Well, Mr. Childress had rendered advice

10   to the company concerning the siting council,

11   correct?

12       A.   That's correct, back in January.

13       Q.   And it was his position at this time,

14   based apparently on discussions with the siting

15   council, that siting council approval was not

16   going to be necessary in order to build the

17   structure that was contemplated under the

18   September 2001 agreement?

19       A.   That was his position, correct.

20       Q.   And between January of 2002 and

21   August/September 2002, you didn't seek advice

22   from anyone else, correct?

23       A.   I, myself, personally, no.

24       Q.   And to your knowledge, Tower Ventures

25   did not?