CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 24, 2004

Page 200

1       A.   I'm sure they did on various siting

2   council matters.

3       Q.   I'm asking you specifically about

4   siting council issues as they affected the Old

5   Saybrook tower that you were planning to build.

6       A.   Not to my knowledge.

7       Q.   Okay.

8                MR. GRUDBERG:  Can you mark this?

9                (Plaintiff's Exhibit 31 marked

10               for identification.)

11      Q.   Mr. Brinn, showing you what's been

12  marked as Exhibit 31, this is a succession of

13  e-mails, the most recent of which is from Chris

14  Ciolfi to Robert Maccini, correct?

15      A.   Correct.

16      Q.   If we work our way down the string of

17  e-mails, the initial one is from Mr. Ciolfi to

18  you, correct?

19      A.   Correct.

20      Q.   This is dated September 4, 2002,

21  correct?

22      A.   Correct.

23      Q.   And that's the day after the final

24  appearance before the Old Saybrook zoning

25  commission at which they approved the tower,

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 201

```
 1   correct?

 2        A.    Yes.

 3        Q.    Mr. Ciolfi apparently is advising you

 4   that he's been asked to get in touch with Ms.

 5   Donaldson about the Old Saybrook project,

 6   correct?

 7        A.    Correct.

 8        Q.    Having reviewed Exhibit 31, do you

 9   believe that this is the first time Ms. Donaldson

10   was asked to get involved, in any fashion, in the

11   Old Saybrook tower project?

12        A.    No.

13        Q.    Were you familiar with Ms. Donaldson at

14   this point, September 4, 2002?

15        A.    I believe -- I never met her.  I had a

16   conference call with her and Bob at some point.

17   And I also I think left her a note on -- a

18   telephone message, I mean, which you have in

19   there.  I'm not sure what date that was.  But I

20   had very little to do with her in regard to

21   this.  Chris Ciolfi spends a lot of time, you

22   know, on siting council issues.  And he has a

23   familiarity with Julie Donaldson.  Again, I

24   wasn't that actively involved in trying to make

25   this siting council determination.
```

1              Again, I -- when you asked me if I

2    had done anything with the siting council, I said

3    no.  But that doesn't -- we had been working with

4    the siting council all along to figure out what

5    our position would have been.  Not just on this

6    tower, but on other towers.

7         Q.    Well, can we agree that under the

8    Crossroads contract, as you understood it, if

9    indeed siting council approval was necessary, it

10   would have been Tower Ventures' obligation under

11   the agreement to get that approval?

12        A.    That's correct.

13        Q.    And as of September 4th, 2002, are you

14   aware of any applications that had been filed

15   with the Connecticut Siting Council concerning

16   the Old Saybrook tower project?

17        A.    I'm not familiar with any.

18        Q.    Now, ultimately, Mr. Brinn, a decision

19   was made not to go forward with the Old Saybrook

20   project under any terms, and there was another

21   termination letter sent, correct?

22        A.    Beyond the one that -- the first

23   termination letter?

24        Q.    Right.

25        A.    There was a second one, which I had

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 203

1    nothing to do with, yes.

2         Q.    Did you have any discussion with Mr.

3    Maccini prior to the drafting of that second

4    letter about whether the company, Tower Ventures,

5    should abandon once and for all the project?

6         A.    I don't recollect specifically, but it

7    wasn't my decision.  You have to understand.  It

8    was strictly Bob and Joe.  I'm not sure what

9    influence I was going to have at that point.

10        Q.    But you are the -- you had been the

11   person most intimately involved in the project,

12   correct?

13        A.    Absolutely.

14        Q.    Did either Mr. Gallagher or Mr. Maccini

15   seek your input prior to drafting or sending this

16   second letter?

17        A.    I don't specifically recollect any

18   conversation.  Not that it didn't happen, but --

19        Q.    Do you remember anything happening

20   concerning a potential Verizon lease at the Old

21   Saybrook site during this August/September time

22   period?

23        A.    I don't recall anything, that I was

24   made aware of.  Again, Bob would have been doing

25   most of the negotiations with Verizon.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 204

1          Q.    All right.  And was it your

2     understanding that nothing had changed concerning

3     Verizon's interest in a prospective Old Saybrook

4     tower site from the time of the first termination

5     letter being sent to let's say October of 2002?

6          A.    That was my understanding.

7                    MR. GRUDBERG:  Can you mark this?

8                    (Plaintiff's Exhibits 32, 33 and

9                    34 marked for identification.)

10         Q.    Mr. Brinn, showing you what's been

11    marked as Exhibit 32, I'd ask you to take a look

12    at that document and tell me if you recognize

13    it.

14         A.    Looks like the Verizon lease.

15         Q.    And the covering e-mail again is a

16    multiple e-mail, correct?

17         A.    That's correct.

18         Q.    And the top one is from yourself to Mr.

19    Maccini, correct?

20         A.    Yes.

21         Q.    And you are forwarding him an e-mail

22    exchange between yourself and Mark Cook from

23    Verizon Wireless; is that correct?

24         A.    That's correct.

25         Q.    And now starting at the bottom and

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 205

1    working up, the initial e-mail in this chain is

2    from August 29th of '02, correct?

3         A.    August 29th, yes.

4         Q.    And it appears to be Mr. Cook

5    forwarding to you a proposed lease or some

6    template for a lease --

7         A.    Yes.

8         Q.    -- between Verizon and Tower Ventures,

9    for the Old Saybrook tower site; is that correct?

10        A.    That's correct.

11        Q.    Now, you subsequently forwarded that

12   e-mail exchange to Mr. Maccini?

13        A.    To Bob, right.

14        Q.    Okay.  Now, would Exhibit 32 suggest to

15   you, Mr. Brinn, that at least as of September

16   2002, there were active ongoing discussions about

17   Verizon leasing space on the tower to be

18   constructed in Old Saybrook on the Springbrook

19   Road site?

20        A.    Still at this point there were, yes.

21        Q.    So does that cause you to reconsider

22   your earlier testimony that as of August 7th, or

23   approximately August 7th, 2002, Verizon had

24   backed out of their commitment to the Old

25   Saybrook tower site?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 206

```
 1       A.   I'm not sure officially when they

 2  backed out of it, but obviously they were still

 3  interested in September.  Obviously I'm assuming

 4  that they were still interested in August.  Or

 5  August 7th, whenever.

 6       Q.   Is it your recollection, then, that Mr.

 7  Maccini sent the termination letter in part

 8  because Verizon had recently indicated that they

 9  were no longer interested in the site; is that

10  testimony -- was that testimony now mistaken

11  based upon your review?

12       A.   Like I said, I don't recall exactly

13  when they pulled out of -- when they backed out

14  of -- you know, when their interest ceased on

15  this.

16       Q.   But having reviewed Exhibit 32 now,

17  your best belief now is that it happened at some

18  point after September of '02, correct?

19       A.   That's correct.

20       Q.   Because as of the date of this exhibit,

21  there's still ongoing negotiations back and

22  forth, correct?

23       A.   Correct.

24       Q.   All right.  Let me show you Exhibit 33

25  and ask you if you recognize that document.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                  June 24, 2004

Page 207

1      A.    Yes.

2      Q.    This is an e-mail from Mr. Maccini to

3   yourself, correct?

4      A.    That's correct.

5      Q.    And it's dated October 1st, 2002,

6   correct?

7      A.    That's correct.

8      Q.    And what is Mr. Maccini conveying to

9   you here?

10     A.    This was a -- someone that he had come

11  across that was a Cingular representative in the

12  Old Saybrook area, and -- you know, his

13  suggestion was, "Hey, if you haven't followed up

14  with this guy," you know, "please do so."  He was

15  the -- he was kind of a new name.  I think he

16  worked for a contractor that was representing

17  Cingular.  I can't recall off the top of my head

18  if it was WFI.  And I certainly did follow up

19  with him, to find out his interest in the site.

20     Q.    Do you recall what Mr. Shadler said

21  about his interest on the site?

22     A.    I don't recall specifically.

23     Q.    Would you agree, based on Exhibit 33,

24  it appears that as of October 1st, 2002, Tower

25  Ventures was still pursuing possible interest by

Page 208

1   Cingular as a tenant in the Old Saybrook tower?

2       A.   I know myself, I personally was still

3   pursuing this project.

4       Q.   All right.  And we'll -- since we have

5   this marked, I'll show this to you, Exhibit 34,

6   it may be superfluous at this point, but do you

7   recognize that document?

8       A.   I assume it's kind of a response to

9   the -- to the one that same day.

10      Q.   Right, it looks like Exhibit 34 is your

11  response to Mr. Maccini, in which he conveyed to

12  you the Cingular contact for Old Saybrook.  You

13  indicated to him that, you know, you would in

14  fact follow up on the contact, correct?

15      A.   And I did.  Correct.

16      Q.   And your recollection of Mr. Shadler's

17  response again was?

18      A.   No interest at this time.

19      Q.   Okay.  Finally, let me show you what

20  was marked as Exhibit 19 at a prior deposition.

21  I'd ask you to take a look at that and tell me

22  whether you've seen that before.

23      A.   I was cc'd on this.  We had been

24  working with Verizon in Connecticut.  Looks to me

25  that we were still trying to get this lease going

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

Page 209

1    with Verizon at this point.

2        Q.    All right.  And this Exhibit 19 is an

3    e-mail from Robert Maccini to Mark Cook, correct?

4        A.    Correct.

5        Q.    And Mr. Cook again was this gentleman

6    that you've indicated was the contact at Verizon,

7    that both you and Mr. Maccini were using during

8    most of 2002?

9        A.    Absolutely.  For the entire time that I

10   was pursuing this, Mark, to my best of my

11   recollection -- and there were points that, you

12   know, he was interested, he wasn't interested,

13   you know, but we continued to deal with him, and

14   obviously in October, we were still pursuing

15   this.

16       Q.    And, in fact, Mr. Maccini says that, in

17   Exhibit 19, that it is his understanding that

18   Verizon has agreed to $2,500 per month, with the

19   three percent annual escalator, and the rent

20   start date of 24 months from full execution of

21   the agreement?

22       A.    That's correct.

23       Q.    And those terms are consistent in fact

24   with the terms you testified to earlier as to

25   what Verizon, at least at one point, did agree

 1   to, right?

 2        A.    Absolutely.

 3        Q.    The 2,500 a month and I think you

 4   estimated it as a two to four percent annual

 5   increase and it turns out it was right in the

 6   middle, three percent, right?

 7        A.    Yes.

 8        Q.    So can we agree that at least at this

 9   point, October 1st, 2002, it appears that

10   Verizon -- the Verizon commitment that you

11   testified about earlier at this point, October

12   1st, 2002, was still in place and had not been

13   retracted?

14        A.    Was still in place.  There were times

15   in the previous 12 months where it seemed like it

16   had kind of come and gone, you know.  They were

17   interested, they weren't interested.  In October,

18   obviously they were still very much interested.

19        Q.    But again, does this change your

20   recollection as to the state of affairs with

21   Verizon back in or about August 7th, 2002, when

22   the first termination letter was sent?

23        A.    What I was referring to, at some point

24   they officially said they were going to walk away

25   from the site, and that's --

1      Q.   And having reviewed Exhibit 19, and the

2   earlier exhibits, 32, is it now your conclusion

3   that that walking away, if you will, happened

4   well after August 7th, 2002, when the termination

5   letter was sent?

6      A.   I don't know about well after, but it

7   happened after August or October of 2002.

8      Q.   Certainly at least at some point after

9   October 1st, right?

10      A.   Yes.

11      Q.   So at least approximately two months

12   after?

13      A.   Okay.

14           MR. GRUDBERG:  Give me a moment,

15   please.

16           MS. MANZO:  Sure.

17           (Pause in the proceedings.)

18           MR. GRUDBERG:  I have no further

19   questions.

20           MS. MANZO:  I do have a few

21   questions.

22   CROSS-EXAMINATION

23   BY MS. MANZO:

24      Q.   Mr. Brinn, you previously testified

25   that Mr. DeCesare was very cooperative throughout

Page 212

1    this entire process of application for the tower;

2    is that correct?

3         A.    Through the permit process.

4         Q.    Would you say that Mr. DeCesare was

5    cooperative when you had asked for certain

6    documents and he did not provide them to you?

7         A.    Prior to the permit process, we were

8    looking for some additional documents that I had

9    hoped Don could either provide or said he would

10   provide.

11        Q.    So is it your position that after that

12   initial hump, subsequent to that, Mr. DeCesare

13   was very cooperative?

14        A.    I thought we had a good working

15   relationship in this permit process.

16        Q.    Do you recall testifying previously

17   that you did not receive the FAA no hazard letter

18   from Mr. DeCesare?

19        A.    That's correct.  I did not receive it.

20        Q.    But you had asked for it?

21        A.    We had asked and I was told that he had

22   it.

23        Q.    Who told you he had it?

24        A.    Don did.

25        Q.    How many times would you say you asked

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 213

1    Mr. DeCesare for that letter?

2         A.   I would say two or three occasions.

3         Q.   And do you recall when you asked for

4    that letter?

5         A.   I had a discussion with him prior to

6    September 20th, and I would say at least once or

7    twice after September 20th.

8         Q.   Okay.  Do you recall whether the

9    individual from Andrews Survey asked you if you

10   had received the FAA no hazard letter from

11   Crossroads?

12        A.   I recall having a conversation with him

13   discussing that, and promising him the letter,

14   and we did at some point agree he wasn't going to

15   get it.

16        Q.   Do you have Exhibit 6 in front of you?

17             MR. GRUDBERG:  I have a bunch if

18   you don't want to use the original.

19             MS. MANZO:  I have it here.

20        Q.   I'm showing you what's been marked as

21   Exhibit 6.  That's a letter dated October 26th,

22   2001, correct?

23        A.   That's correct.

24        Q.   And now Attorney Grudberg was

25   questioning what this preliminary survey was.  Do

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 24, 2004

1    you recall that?

2         A.    It was the initial site survey of the

3    property that I sent to Don that I wanted him to

4    review, and either approve of the location, but

5    it was preliminary in the sense that I still had

6    not -- we still had not put the tower coordinates

7    on the particular map.  So it was preliminary in

8    the sense that it still needed some additional

9    work.

10        Q.    And the survey, as it stood at that

11   time on October 26th, would that have been

12   sufficient to send to the town along with an

13   application, without those coordinates?

14        A.    This wouldn't have been sufficient,

15   no.

16        Q.    It would not have been because you were

17   still waiting for those coordinates?

18        A.    Exactly, yes.

19        Q.    Do you recall ever sending a letter to

20   the FAA requesting the FAA no hazard letter?

21        A.    I did send a letter to the FAA.

22        Q.    Do you recall when that happened?

23        A.    It was in November.

24        Q.    Do you recall when in November?

25        A.    November 6th was the date of the

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 215

 1    letter.

 2        Q.    So it was subsequent to this Exhibit 6

 3    letter?

 4        A.    Yes.   I believe it was through the

 5    Freedom of Information Act.

 6        Q.    You testified previously that there

 7    were alternate ways to get these coordinates,

 8    aside from having this FAA no hazard letter,

 9    correct?

10        A.    That's correct.   Yes.

11        Q.    Okay.  And that was done -- that could

12    be done with the survey company doing some kind

13    of triangulation of the location?

14        A.    There's even more sophisticated

15    equipment using GPS satellites.

16        Q.    What does that mean, can you explain

17    triangulation?

18        A.    I think it's a surveyor's term, saying

19    they would need a point of reference and then

20    they could use that as a reference point to

21    determine exactly where they are on another point

22    that's in close proximity.   The best of my

23    understanding.

24        Q.    And is it your testimony that you did

25    not have the survey company perform that work

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                           June 24, 2004

Page 216

1    because you were under the impression that you

2    would receive that information from Mr. DeCesare?

3         A.    Right.  I had told him that I had the

4    FAA with the coordinates.

5         Q.    Would the survey have been completed

6    sooner had you had the no hazard letter sooner?

7         A.    I think it certainly could have been,

8    yes.

9         Q.    Do you recall when you received the

10   final survey plans?

11        A.    November 25th, thereabouts.

12        Q.    Okay.  Could those survey plans have

13   been completed earlier, had you had that no

14   hazard FAA letter back in September when you

15   requested it?

16        A.    I think without a doubt.

17        Q.    You had testified previously that in

18   November of 2001, you received a phone call from

19   the Old Saybrook town planner.  Do you recall

20   that?

21        A.    I remember the conversation, yes.

22        Q.    Okay.  Why did she call you?

23        A.    She had had a visit from Don, I believe

24   that same day.  Don had given my cell phone

25   number to her, and she had followed up to inquire

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

1   as to what we were proposing there, what we

2   wanted to do, and she also, you know, said that

3   she was in the planning department, that she

4   would have some say in the matter.  There was a

5   telecommunications bylaw, and I think I got the

6   idea that she was a little bit concerned about

7   it, you know, wanted to talk to me specifically

8   as to what we were planning.

9        Q.    Did she suggest to you that the guyed

10  tower be replaced as a monopole?

11       A.    She said that in their bylaw, that A,

12  two things, that's not in the correct zone, but I

13  said it was a preexisting structure.  And the

14  other issue was that their bylaw only allows for

15  monopoles.

16       Q.    Did you discuss the town planner's

17  recommendations of the monopole with Mr.

18  DeCesare?

19       A.    Yes.  We had had a conversation

20  subsequent to that, which led to our meeting with

21  Chester in early December, which we were both

22  present at, around I believe the 12th of December

23  or so, when we went in with our plans and

24  discussed with Chester the conversation we had

25  had with the planner, Don and myself.  And at

1    that point we had made the decision to go forth

2    with possibly this other design in front of the

3    building commission.

4         Q.    And was that change in the design

5    agreeable to Mr. DeCesare?

6         A.    I never -- I think Don was willing to

7    work with us as to whatever we thought the most

8    efficient process was to get this permitted.  So

9    to answer your question, I think Don was in

10   agreement with the change.

11        Q.    You had testified previously that you

12   had a conversation with Chester Sklodosky in

13   October 2001?

14        A.    Yes.

15        Q.    And that conversation was about this

16   process of applying for the permit?

17        A.    Yes.  That's correct.

18        Q.    And that was before the 45 days?

19        A.    That was within the 45 days, yes.

20        Q.    Okay.  And you received the preliminary

21   survey from Andrews Survey around October 26th,

22   right?

23        A.    That's correct.

24        Q.    And that's also within that 45 days?

25        A.    That's correct.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 219

1        Q.    But that survey was not complete?

2        A.    From my standpoint, it certainly wasn't

3    complete.

4        Q.    At any time before that 45-day mark, or

5    any time after that 45-day mark, in the year

6    2001, did Mr. DeCesare ever express to you that

7    Tower Ventures had breached its agreement with

8    Crossroads?

9        A.    Don never mentioned that to me at the

10   45-day mark or any time in the proceedings.

11   Until the first issue that I -- the first time I

12   really took note of the issue was when Bob

13   related it to me in a phone conversation one day,

14   that there was an accusation of a breach of the

15   contract.

16       Q.    And that telephone conversation with

17   Bob and the accusation of a breach in the

18   contract, when did that occur?

19       A.    After the termination letter had been

20   sent out.

21       Q.    So that was the first time that you

22   were aware of any concept of breach occurring?

23       A.    That's correct.

24       Q.    At any time prior to the 45-day mark,

25   or thereafter in 2001, did Mr. DeCesare express

June 24, 2004

1    to you any frustration as to Tower Ventures not

2    applying for the permit quick enough or not

3    acting quick enough in any way?

4         A.   I think I felt the same frustration as

5    Don.  So if he was frustrated, so was I.  More to

6    do with the process than anything else.  We

7    had -- you know, we had Don's local attorney

8    basically trying to drive that process.

9    Obviously it took a lot longer than either one of

10   us would have liked.

11        Q.   The local attorney, you're talking

12   about Bill Childress?

13        A.   Yes.

14        Q.   Prior to Mr. Childress coming into the

15   picture, did Don ever express to you any

16   frustration with Tower Ventures' application

17   process or any actions?

18        A.   I can't say that I remember a time

19   where he was visibly or verbally, you know, upset

20   with me in that window between the commencement

21   of the contract and until Bill came on.

22        Q.   And you talked to Mr. DeCesare on a

23   regular basis, correct?

24        A.   I would say probably more than --

25   certainly more than most people.  Certainly to

Page 221

```
 1    say a weekly basis, I don't think would be a
 2    stretch.
 3         Q.   And during that time in 2001, before
 4    Bill Childress became involved, he never
 5    expressed to you any exasperation with Tower
 6    Ventures' actions or yours?
 7         A.   Not specific to the 45 days, nor with
 8    any real -- I mean dissatisfaction.
 9              MS. MANZO:  No further questions.
10         A.   Certainly when we did talk on the
11    phone, it was always -- you know, when we moved
12    along, it was certainly -- there was certainly
13    some interest on his part, he was very involved.
14    CONTINUED RECROSS-EXAMINATION
15    BY MS. MANZO:
16         Q.   So he was regularly checking up on what
17    was happening?
18         A.   Yes.
19         Q.   You were calling him the --
20         A.   I was saying -- I would say I was very
21    responsive.
22         Q.   At no time did he express any
23    displeasure as to the state of what was happening
24    prior to Bill coming on board?
25         A.   I think if he had any dissatisfaction,
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 24, 2004

Page 222

1    it might have been with the whole process and not

2    so much with me.

3                    MS. MANZO:  No further questions.

4                    MR. GRUDBERG:  Nothing further.

5                    (Time noted:  4:35 p.m.)

6

7                         KEENAN BRINN

8

9

10                   SUBSCRIBED AND SWORN TO BEFORE ME,

11   the undersigned authority, on this

12   the        day of                    , 2004.

13

14

15

16

17

18   --

19

20

21

22

23

24

25

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____ 1st _____ day of

_____ July _____, 20 04

_____
NOTARY PUBLIC

My Commission Expires:

4/2008