```
 1    IN THE UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF CONNECTICUT

 3

 4

 5    ------------------------------x

 6    CROSSROADS COMMUNICATIONS OF
      OLD SAYBROOK, LLC,                  :

 7
                      Plaintiff,          :

 8                                          Civil Action
                                          : No. 3:03 CV 459
         -versus-                                   PCD

 9
      TOWER VENTURES, INC.,                :

10
                      Defendant.          :

11
      ------------------------------x

12

13

14

15                  Deposition of WILLIAM A.

16    CHILDRESS, taken pursuant to the Federal Rules of

17    Civil Procedure, at the law offices of William A.

18    Childress, 210 Main Street, Old Saybrook,

19    Connecticut, before James A. Martone, L.S.R.

20    #00248, a Notary Public in and for the State of

21    Connecticut, on June 23, 2004, at 3:00 p.m.

22

23

24

25
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 2

```
 1    A P P E A R A N C E S:

 2              For the Plaintiff:

 3              JACOBS, GRUDBERG, BELT & DOW, PC
                350 Orange Street
 4              New Haven, Connecticut  06503
                By:  DAVID T. GRUDBERG, ESQ.
 5

 6              For the Defendant:

 7              ROBINSON & COLE, LLP
                280 Trumbull Street
 8              Hartford, Connecticut  06103
                By:  STEVEN R. HUMPHREY, ESQ.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:03-cv-00459-PCD    Document 46-2    Filed 10/29/2004    Page 3 of 40
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 23, 2004

Page 3

```
 1                    WITNESS INDEX

 2                                              PAGE

 3        Direct Examination by Mr. Grudberg      4

 4        Cross-Examination by Mr. Humphrey      70

 5        Redirect Examination by Mr. Grudberg   80

 6

 7

 8                    EXHIBIT INDEX
         PLAINTIFF'S          DESCRIPTION         PAGE
 9
              21   Handwritten Notes              9
10
              22   Letter dated January 25, 2002  14
11
              23   Handwritten Notes dated        27
12                 April 10, 2002

13            24   Letter dated May 14, 2002      32

14            25   Handwritten Notes              42

15            26   Handwritten Notes dated 8/19/02 47

16            27   Memorandum dated August 19, 2002 51

17            28   Message Slips                  68

18
         NOTE:  Exhibits retained by counsel.
19

20

21

22

23

24

25
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 23, 2004

1   W I L L I A M   A.   C H I L D R E S S,

2   210 Main Street, Old Saybrook, Connecticut 06475,

3        called as a witness, having been first duly

4        sworn by James A. Martone, L.S.R., a Notary

5        Public in and for the State of Connecticut,

6        was examined and testified as follows:

7   DIRECT EXAMINATION

8   BY MR. GRUDBERG:

9        Q.   Mr. Childress, as you know, I'm David

10  Grudberg, I represent Crossroads Communications

11  of Old Saybrook, LLC, in connection with a

12  lawsuit that it has initiated against Tower

13  Ventures, Incorporated.

14               I know you're familiar with the

15  deposition process, so I will dispense with the

16  usual introductory ground rules.  The only thing

17  I'll tell you is if you need to take a break at

18  any time, just let me known and we'll do that.

19       A.   Okay.

20       Q.   Would you review with me briefly your

21  educational background, and then your background

22  in the practice of law?

23               Where did you go to college?

24       A.   I went to Princeton University.

25       Q.   And law school?

1          A.    University of Michigan.

2          Q.    What year did you get out of Princeton?

3          A.    '66.

4          Q.    And University of Michigan?

5          A.    '69.

6          Q.    And did you go immediately into the

7    practice of law then?

8          A.    No.  I clerked for two years.

9          Q.    For whom did you clerk?

10         A.    I clerked for Judge Blumenfeld in

11   Federal Court in -- Federal District Court in

12   Hartford.

13         Q.    And after completing the clerkship with

14   Judge Blumenfeld, where did you go to work?

15         A.    Wiggin & Dana.

16         Q.    For how long were you with them?

17         A.    About a year, I'd say.

18         Q.    From there where did you go?

19         A.    From there I went out on my own -- not

20   exactly on my own.  I went out with one partner.

21   And we practiced in Guilford primarily.

22         Q.    And you're currently based in Old

23   Saybrook obviously, correct?

24         A.    Correct.

25         Q.    How long have you had the practice here

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 6

1    in Old Saybrook?

2        A.    Well, we acquired a practice of a

3    deceased attorney in 1974.

4        Q.    This is you and the other gentleman you

5    set up shop with in Guilford?

6        A.    That's right.  And in 1983, I would

7    say, I went out strictly on my own, and almost

8    exclusively I would say in Old Saybrook.

9        Q.    So your practice has been almost

10   exclusively Old Saybrook-based for the last

11   20-plus years?

12       A.    Sure, yes.

13       Q.    And what focus is your practice?

14       A.    Real estate, primarily transactional

15   real estate, closings.  You know, residential

16   mortgage, some commercial work, but mostly

17   residential.

18       Q.    All right.

19       A.    Estate planning and settlement, and

20   land use law.

21       Q.    What percentage of your practice would

22   you estimate is comprised by the land use work?

23       A.    Twenty, 25 percent.

24       Q.    Okay.  And is the land use work here in

25   Old Saybrook or is it elsewhere in the

 1    surrounding towns?

 2         A.    It's primarily in Old Saybrook,

 3    although it certainly encompasses other shoreline

 4    towns.

 5         Q.    Would it be fair to say the majority of

 6    it is based in Old Saybrook?

 7         A.    Yes.

 8         Q.    Are you active in organizations within

 9    the Town of Old Saybrook?

10         A.    Yes.

11         Q.    Chamber of Commerce?

12         A.    Not currently but I was during the time

13    of this.

14         Q.    Okay.  You, I believe, know that the

15    principal of Crossroads is a gentleman by the

16    name of Don DeCesare?

17         A.    Yes.

18         Q.    Do you remember when it was you first

19    met Mr. DeCesare?  Ballpark?

20         A.    Probably sometime in the early to

21    mid-'90s.

22         Q.    And how would you characterize your

23    relationship with him?  Is he an acquaintance?  A

24    social friend?  Business acquaintance?  How would

25    you describe it?

     1        A.    He is an acquaintance.  He and I -- I

     2   consider him a friend.  We're not social friends,

     3   we haven't socialized together.  I served with

     4   him on the Chamber of Commerce Board of

     5   Directors.

     6        Q.    Prior to your involvement in the matter

     7   that brings us here today, had you done any work

     8   for either Mr. DeCesare or Crossroads

     9   Communications?

    10        A.    No.  Don, I think, had discussed with

    11   me -- before this came up had discussed with me

    12   in previous -- some previous years the need to do

    13   something about the tower and what his options

    14   were and kind of what the rules were.  But beyond

    15   that, that was about it.

    16        Q.    Now, did there come a point in time

    17   when you were retained to assist in the

    18   development of a radio tower or communications

    19   tower here in Old Saybrook?

    20        A.    Yes.  I was retained, as I understood

    21   it, to get a -- to seek a variance in connection

    22   with that proposal.

    23        Q.    By whom were you retained?

    24        A.    Well, I believe I was retained by Tower

    25   Ventures.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 9

1        Q.    Do you remember when it was that you

2   were retained?

3        A.    I believe it was January of '02.   When

4   I say I believe it was Tower Ventures, I -- I was

5   initially contacted by Mr. DeCesare, and then he

6   told me that -- summarized what the proposal was

7   going to be and said that he was going to

8   recommend to Tower Ventures that they talk to me

9   about doing it and would I be willing to do so.

10  And so my first contact was with him, although

11  the person who called me to go forward from that

12  point was Keenan Brinn.

13              MR. GRUDBERG:   Can you mark this?

14              (Plaintiff's Exhibit 21 marked

15              for identification.)

16       Q.    Mr. Childress, you were kind enough to

17  provide copies of your file to both sides prior

18  to our deposition today.   Let me show you what's

19  been marked as Exhibit 21, which is a copy of one

20  of the pages from your file.   Would you take a

21  look at that and tell me if -- first, do you

22  recognize the handwriting as your own?

23       A.    Yes.

24       Q.    And does Exhibit 21 look to be your

25  initial notes or notes of an initial contact?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 10

1      A.    Yes.

2      Q.    Okay.  And can you tell from the

3  exhibit who it was you spoke with first about

4  this project or this engagement?

5      A.    Well, not from these.  With respect to

6  this project, I heard from Don DeCesare first.

7  With respect to this engagement, I -- Keenan

8  Brinn called me directly about my representing

9  him -- representing Tower Ventures on the

10  variance.

11      Q.    And what do you remember Mr. Brinn

12  telling you he wanted to hire you to help

13  accomplish?

14      A.    To achieve a variance for the

15  property.

16      Q.    Do you remember whether he said

17  anything about why he believed it was necessary a

18  variance was needed for the property?

19      A.    Yes.

20      Q.    What do you remember him saying?

21      A.    He related to me that an attorney for

22  Tower Ventures, I think it was Kenneth Spigle,

23  had appeared before the zoning commission, and --

24  I believe it was December of '01, and had been

25  advised by the zoning commission that they felt a

1    variance was needed because it was a relocation

2    or an expansion or -- of a nonconforming use.

3        Q.    Okay.  And the notes that appear toward

4    the bottom half of Exhibit 21, are those notes

5    that you took during your conversation with Mr.

6    Brinn, as best you can remember?

7        A.    Yes.

8        Q.    It looks to be there a notation, "went

9    to ZC" -- I gather that's zoning commission?

10       A.    Yes.

11       Q.    "And they said variance needed"?

12       A.    Yes.

13       Q.    To the best of your recollection, Mr.

14   Brinn, that's what he told you?

15       A.    Yes.

16       Q.    Okay.  And there's a reference

17   "10.7.3."  What's that all about?

18       A.    10.7.3 would be a reference to the

19   zoning regulation respecting nonconforming --

20   either nonconforming uses or nonconforming

21   structures.  I would have to look it up.  But one

22   of those two.

23       Q.    Would you just read for me the final

24   couple of lines of Exhibit 21?

25       A.    "10.7.3-replace nonconformity,

June 23, 2004

                                                                          Page 12

1    structure."  So that section then must have

2    referred to nonconforming structures.

3        Q.   All right.

4        A.   "Will reduce nonconformity to 175," and

5    by that I meant 175 feet in height from the 182

6    feet, which Keenan then -- had previously told me

7    was the current height.  Then it says, "minimize

8    fall zone so would break at 90 feet.  Collapse on

9    itself."

10       Q.   All right.  Do you recall Mr. Brinn

11   saying something along those lines, or was that

12   something that you came up with on your own?

13       A.   No.  He told me that.

14       Q.   Do you remember meeting with either Mr.

15   Brinn or a Robert Maccini in person before you

16   were hired?

17       A.   No.

18       Q.   Do you remember meeting with Mr. Brinn

19   before you were hired?

20       A.   I don't think so.  The answer is no, I

21   don't recall it.

22       Q.   All right.  And was there any formal

23   engagement letter that would help pinpoint the

24   date of actual retention?

25       A.   No.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                     June 23, 2004

Page 13

1    Q.    And I don't see it but am I missing a

2    date on the notes here on Exhibit 21?  It looks

3    to be no date; is that correct?

4    A.    Correct.

5    Q.    Your recollection is that it was some

6    point in January of 2002, correct?

7    A.    Correct.

8    Q.    Okay.  Now, what is the next step that

9    you remember taking toward this tower project?

10    A.    I reviewed some information that was

11    given to me soon after this, including the letter

12    from Spigle to the zoning officer, and including

13    a recent letter, I believe to the First Selectman

14    from the Connecticut Siting Council.

15    Q.    Okay.  Showing you what was marked as

16    Exhibit 4 in a prior proceeding -- prior

17    deposition in this matter, is that the letter,

18    the Spigle letter that you're referring to?

19    A.    Yes.

20    Q.    And this was a letter he had written to

21    the zoning enforcement officer in Old Saybrook,

22    Chester Sklodosky, apparently; is that right?

23    A.    Yes.

24    Q.    Do you recall either seeing a response

25    from Mr. Sklodosky or hearing what Mr.

Page 14

1    Sklodosky's response had been?

2        A.    Certainly I don't recall seeing a

3    written response.

4                    MR. GRUDBERG:  Can you mark this?

5                    (Plaintiff's Exhibit 22 marked

6            for identification.)

7        A.    I can't say as I know exactly what Mr.

8    Sklodosky's response was.

9        Q.    Now, you made reference to a letter

10   from the Connecticut Siting Council to the First

11   Selectman.  Let me show you Exhibit 22, ask you

12   to take a look at that and tell me if that's the

13   letter that you recall?

14       A.    Yes.

15       Q.    And why was that relevant to the

16   engagement that you were undertaking for Tower

17   Ventures?

18       A.    There was an initial issue as to

19   whether the local zoning authorities or

20   regulations had any application to this project

21   at all.  And it was in a period when there was

22   some confusion, I think, about the jurisdiction

23   of the siting council and vis-a-vis local zoning

24   authorities.

25       Q.    Was that a question that you researched

June 23, 2004

1    at some stage of the representation?

2        A.    No, I didn't do much research on it.  I

3    did speak with Mr. Phelps, who was the author of

4    this letter.

5        Q.    Mr. Phelps being the executive director

6    of the Connecticut Siting Council?

7        A.    Correct.

8        Q.    Do you recall when it was,

9    approximately, that you spoke with Mr. Phelps?

10        A.    Early in the process.  January

11    probably.

12        Q.    And I gather the reason -- one reason

13    you did that was because you wanted to make sure

14    you were going to the right agencies or

15    authorities or councils for approval of the

16    project that was contemplated; is that right?

17        A.    Correct.

18        Q.    Tell me what you recall about your

19    discussion with Mr. Phelps on that subject.

20        A.    He said that based upon the information

21    that I was giving him about the use of the tower,

22    it was not a telecommunications tower, as defined

23    by the siting council.  Rather, it was a --

24    perhaps a radio tower, an auxiliary -- I think it

25    was an auxiliary radio tower with some paging

1   company antenna affixed to the pole.  And his

2   view was that inasmuch as it was not a

3   telecommunications tower, the siting council

4   didn't have jurisdiction.  But that at such later

5   time as anyone wanted to attach

6   telecommunications devices, then it would become

7   their jurisdiction.

8        Q.   Was there any discussion about the

9   attachment of -- well, let's back up a second.

10               The existing tower on the

11   structure, what was your understanding -- or on

12   the property, rather, what was your understanding

13   as to the function of that tower, the tower that

14   was sought to be replaced?  Was this a radio

15   tower?

16        A.   I understood that it was not the

17   principal radio tower for WLIS but it was a

18   backup tower in some sense.  But that its

19   effective everyday use was as -- it had some

20   antennae for a paging company.

21        Q.   Did you discuss the presence of a

22   paging company apparently on the existing

23   structure and whether that qualified as a

24   telecommunications facility or that made it a

25   telecommunications tower?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 23, 2004

Page 17

1        A.    Did I discuss that with Mr. Phelps?

2        Q.    Yes.

3        A.    I think so, but I'm not certain.

4        Q.    Okay.  In any event, the information

5    conveyed to you by Mr. Phelps was that the tower

6    you were describing was, in his opinion, an

7    auxiliary radio tower, which did not need siting

8    council approval; is that correct?

9        A.    Correct.

10       Q.    And it was your understanding that at

11    such time if ever that someone wanted to attach

12    telecommunications equipment to that tower, it

13    was at that point that the siting council's

14    jurisdiction would be triggered?

15       A.    Yes.

16       Q.    Did you discuss at all the issue of

17    exclusivity of the siting council jurisdiction?

18    In other words --

19       A.    At the future date, should the

20    telecommunications --

21       Q.    Either the future date or at present.

22       A.    No.

23       Q.    All right.  So at the conclusion of

24    this conversation with Mr. Phelps, what was your

25    belief as to whether Connecticut Siting Council

1    approval would be necessary in order to construct

2    the tower that you understood that Tower Ventures

3    wanted to construct?

4         A.   My understanding was that it was not

5    claiming any jurisdiction.

6         Q.   Okay.  What was the next step that you

7    can remember taking in furtherance of the tower

8    project for Tower Ventures?

9         A.   Well, probably concomitant with this, I

10   was reviewing the zoning regulations, trying to

11   understand what the zoning commission had said.

12   So I talked to the enforcement officer.  It was

13   one of these situations where arguably you didn't

14   need a variance.  And since I was hired to pursue

15   a variance, I was trying to explore the issue of

16   whether or not it would simply be approved

17   without a variance, because as a relocation of an

18   existing nonconforming use.

19        Q.   And who was it that you spoke with

20   about that subject?

21        A.   I spoke to the zoning officer.

22        Q.   And that was Mr. Sklodosky?

23        A.   Yes.

24        Q.   We all try to avoid saying this name as

25   much as we can.

1       A.    Chester.

2       Q.    That works for me.

3             When Mr. Brinn contacted you about

4    representing Tower Ventures in connection with

5    obtaining whatever approvals were necessary for

6    this project, do you remember whether there were

7    plans in existence at that point?

8       A.    Let me refresh my recollection here.

9       Q.    Sure.

10      A.    I believe there was -- there was a set

11   of plans.  Whether it was -- it certainly wasn't

12   this complete.  These are dated November of '01.

13   So this particular version I am looking at is

14   revised through May 22, '02, so what the exact

15   plan was that existed as of November 2, '01, I'm

16   not 100 percent sure.

17      Q.    All right.  But just for the record --

18   I know we've got all of these numbered from our

19   production, but for the record, you've referenced

20   a set of plans dated November 2, 2001, and

21   revised most recently as of 5/22/02, correct?

22      A.    Correct.

23      Q.    Okay.  We were talking about your

24   discussions with the zoning officer about whether

25   a variance would even be necessary.  Now, am I

1    correct that one reason you were exploring that

2    subject was that it would be easier and quicker

3    to proceed with this project without having to go

4    through the process of getting a variance?

5        A.    Yes.  In fact, my involvement would

6    have ended at that point because I thought I was

7    retained to pursue a variance.  If you didn't

8    need a variance, then presumably they would

9    proceed on their own to the next step.

10        Q.    And do you remember meeting with Mr.

11    Sklodosky in person to discuss this or talking

12    with him on the phone?

13        A.    It would have been in person, I think.

14        Q.    Okay.  Do you remember when it was that

15    you met with him?

16        A.    Not specifically.

17        Q.    Is it your custom to keep daily or

18    contemporaneous time records on the files you

19    work on?

20        A.    Not really, no.

21        Q.    So we don't have -- you don't have any

22    records within your possession, as far as you

23    know, that could help us reconstruct more exactly

24    what dates you had meetings or what dates you had

25    phone calls; is that right?

Page 21

```
 1      A.    That's right.   In terms of meeting with

 2  Chester, I'm at the town hall practically every

 3  day, sometimes twice a day, and I might have

 4  stopped in to see him in connection with other

 5  matters and brought that up.   I don't recall.

 6      Q.    Among the materials that were produced

 7  to us were bills that you periodically rendered

 8  to Tower Ventures that set forth tasks you

 9  performed and time spent and so on.

10      A.    Yes.

11      Q.    In comprising -- or in preparing those,

12  there weren't any time records that you relied on

13  specifically to set out the amount of time you

14  spent and what you did?

15      A.    Where I have specific notes of phone

16  calls or meetings or obviously commission

17  meetings, land use agencies, or letters that I've

18  written or received, then I tie those into the

19  dates, but not every task has a date to it.

20      Q.    Do you remember --  Withdrawn.

21            How many conversations do you

22  remember with Mr. Sklodosky on the question of

23  whether a variance was even necessary for the

24  tower project?

25      A.    Probably one.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                              June 23, 2004

Page 22

1      Q.   And what did he tell you?

2      A.   Well, what he told me was what he often

3   tells you, which is that "Why don't you play it

4   safe and get a variance, and then there won't be

5   any question about it and I won't have to answer

6   the question," and that was the typical

7   response.  And further, he said that Spigle had

8   already been to the zoning commission, and the

9   zoning commission had told him he did need a

10  variance.  So Chester was not going to overrule

11  the zoning commission.

12           And my further discussions with

13  the client was that the siting council is the

14  going -- if it's a siting council issue, they're

15  going to look for local approvals as well, or at

16  least local input.  You've already been told by

17  the zoning commission you need a variance.  We

18  can get on the variance agenda rather quickly, to

19  go some other route is going to be time-consuming

20  and probably a losing proposition.

21     Q.   You referenced a conversation with the

22  client.  Do you remember who specifically it was

23  you spoke with?

24     A.   It would have been Keenan.

25     Q.   That's, for the record, Keenan Brinn?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                              June 23, 2004

Page 23

```
 1        A.    Yes.

 2        Q.    Was he your principal contact

 3   throughout this process, your principal contact

 4   at Tower Ventures?

 5        A.    Yes.

 6        Q.    So was a conclusion reached to proceed

 7   with the variance application?

 8        A.    Yes.

 9        Q.    Do you remember approximately when it

10   was that that conclusion was reached?

11        A.    February '02.

12        Q.    What did do you next?

13        A.    Put together an application for

14   variance, which would have included a site plan.

15        Q.    And that was submitted to the zoning

16   board of appeals; is that right?

17        A.    Correct.

18        Q.    Now, at the risk of showing my

19   ignorance in land use matters, which is

20   considerable, we're going to be talking about

21   various boards today.  Could you explain to me

22   the difference between the zoning enforcement

23   officer, the zoning board of appeals, the zoning

24   commission, the planning commission, and their

25   respective jurisdictions, if you will, and the
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 23, 2004

Page 24

1    extent, if any, to which they overlap?

2        A.    Okay.   I'll do my best.

3        Q.    I know that's a big question, but it

4    will certainly educate me and I think it will

5    help clarify some things.

6        A.    Okay.   Let's start with a body of

7    regulations, which are the zoning regulations.

8    And those obviously break down into different

9    districts and the uses that are required in the

10   regulations with respect to structures in the

11   districts and how they may be used.

12                The zoning board of appeals exists

13   by statute to consider variances of those

14   regulations.  So they are the board before whom

15   you go and you say, "I know this project does not

16   comply with the zoning regulations, we're asking

17   you to let us do it anyway, and to vary the

18   regulations with respect to our project."  And in

19   that connection, you have to demonstrate to them

20   some hardship, which would justify them in

21   varying the regulations for your client.

22                The zoning commission is the

23   agency which not only enacts the regulations, but

24   also approves things like site plans and special

25   exception uses and things of that nature, so they

June 23, 2004

Page 25

```
 1    cannot approve an application or a plan which

 2    does not meet their own regulations.  So you

 3    can't go to them with a plan that doesn't meet

 4    their regulations and say, "Will you vary them?"

 5    You have to go to the ZBA first.

 6        Q.    So unlike my practice, where first I

 7    have to get my clients convicted and then I take

 8    an appeal, here you have to go to the appeal

 9    folks first, and then you come back and deal with

10    the commission itself; is that right?

11        A.    Well, that's sort of right, but see,

12    you're already convicted because you don't meet

13    the regulations, so by definition, you're in a

14    sense -- if that's the analogy.

15              So then the zoning commission has

16    charge of reviewing site plans and special

17    permits.  Some of the time they are required to

18    refer applications to the planning commission,

19    which in Old Saybrook is a separate commission.

20    Some towns have combined commissions.

21        Q.    All right.

22        A.    The purpose of that is for the planning

23    commission to then say that the proposal does or

24    does not conform to the town's plan of

25    development.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 26

```
 1        Q.   As of February of '02, when you

 2   conclude that we're not going to be able to do

 3   this without a variance and that a variance is

 4   going to have to be sought, what approvals did

 5   you think had to be obtained before Tower

 6   Ventures could go forward and actually begin

 7   construction of the tower itself?

 8        A.   I thought we had to get the variance,

 9   and that they would need a site plan approval

10   based upon the regulations as varied.

11        Q.   So that would have required approvals

12   by the ZBA, and then the zoning commission,

13   correct?

14        A.   Correct.

15        Q.   So you proceeded with the variance

16   application before the zoning board of appeals,

17   right?

18        A.   Correct.

19        Q.   Tell me how that proceeded.  You put

20   together an application, which is part of the

21   file that you've produced, correct?

22        A.   Correct.

23        Q.   And what was submitted in addition to

24   the several-page eight-and-a-half-by-11

25   application?  Was it a site plan you said?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 27

```
 1       A.   Yes.   A site plan would have to have

 2   been submitted.   This was dated March -- the

 3   application was dated March 14, and so I might

 4   have taken the version -- well, there was only a

 5   single revision prior to that time of

 6   January 2, '02.   What I filed precisely with the

 7   zoning board of appeals would be on file over

 8   there.   I may have done housekeeping in my own

 9   file.   As the revisions came in, thrown away the

10   earlier ones so that I wouldn't get the wrong

11   plan.

12       Q.   All right.   Now, the matter was set

13   down for hearing before the zoning board of

14   appeals; is that right?

15       A.   Correct.

16       Q.   And I believe that took place in April

17   of 2002; is that right?

18       A.   Correct.

19             MR. GRUDBERG:   Can you mark this?

20             (Plaintiff's Exhibit 23 marked

21             for identification.)

22       Q.   I believe, based upon the records that

23   you've provided, that the zoning board of appeals

24   considered the variance application on April 10th

25   of 2002?
```

Page 28

1       A.    Correct.

2       Q.    Now, Exhibit 23 appears to be some

3    notes also in your handwriting dated April 10th

4    of '02; is that right?

5       A.    Correct.

6       Q.    Now, why don't you tell me what these

7    notes are?  Is this presentation notes?  Is this

8    your notes of what happened at the meeting?  What

9    is it?

10      A.    These are presentation notes.

11      Q.    So this is something that you prepared

12   in advance of the meeting, to assist your

13   presentation on behalf of Tower Ventures?

14      A.    That's correct.

15      Q.    And to summarize the points that you

16   were going to be making on Tower Ventures'

17   behalf?

18      A.    That's correct.

19      Q.    And is that true for the entirety of

20   Exhibit 23?  In other words, there's no notes at

21   the end that are whatever jottings about things

22   that happened at the meeting versus the

23   presentation notes that you prepared beforehand?

24      A.    These are entirely presentation notes.

25      Q.    As best you remember, you presented it

Case 3:03-cv-00459-PCD    Document 46-2    Filed 10/29/2004    Page 29 of 40
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 29

 1    as you've got it laid out here in the exhibit,

 2    Number 23; is that correct?

 3         A.    Yes.

 4         Q.    Do you remember who else was present

 5    related to this project at that meeting, the

 6    April 10th meeting?  Do you remember whether Mr.

 7    DeCesare was there?

 8         A.    I don't.

 9         Q.    Do you remember whether Mr. Brinn or

10    anyone else from Tower Ventures was there?

11         A.    I don't remember.

12         Q.    Okay.  And what was the outcome of that

13    meeting?

14         A.    The variance was granted.

15         Q.    Do you remember whether there were any

16    dissenting votes on the board of appeals?

17         A.    I don't remember but I can find out

18    quickly.  No dissenting.

19         Q.    There was about a three-month period

20    that passed from when you were first retained to

21    when the matter was actually heard by the zoning

22    board of appeals.  Was that unusual, in your

23    experience, that sort of time lapse, and if so,

24    could you tell me what reasons, if any, were

25    there for the delay?

Case 3:03-cv-00459-PCD    Document 46-2    Filed 10/29/2004    Page 30 of 40
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                     June 23, 2004

Page 30

1          A.    Well, first of all, it was not at all

2     unusual, but it -- one of the months' delay is

3     that the filing deadline is roughly a month prior

4     to the hearing deadline, so there was a month of

5     that.  Other than that, I don't know when in

6     January I started this so I'm not sure it was --

7     I'm not sure it was a full three months, but

8     there was, of course, some time in discussing the

9     thing with the zoning enforcement officer, and

10    just deciding how to proceed.

11         Q.    As you sit here now, can you remember

12    any particular issue or special problem that

13    arose that caused the matter to be delayed for

14    any reason?  I'm talking now about between

15    January and April of '02.

16         A.    Well, I mean in between January and the

17    time I filed the application?  I had no control

18    over how long it took for them to get it on the

19    agenda.

20         Q.    Right.

21         A.    But no, I wouldn't have considered that

22    a delay, particularly.

23         Q.    In your experience, it was normal

24    course of business?

25         A.    Right.

Page 31

1      Q.    Normal time frame?

2      A.    Yes.

3      Q.    After the zoning board of appeals

4   approval comes through, what's the next step you

5   take to get permission to build the tower?

6      A.    I think at that point I thought I was

7   done.  Because I thought I was retained only for

8   the variance.

9      Q.    All right.

10      A.    And I was going through my file today,

11   and I see that -- it's labeled "Variance."

12   That's the title of the file.

13      Q.    All right.

14      A.    And I see that I wrote a letter to

15   Tower Ventures on May 3rd of 2002, enclosing the

16   official communication from the ZBA and kind of

17   signing off, and saying appreciate working with

18   you and here is my bill and let me know if

19   there's anything else, you know, that I can do.

20              And by the way, I see a PS, "I'm

21   returning some extra copies of the survey," which

22   may be why I don't have any of that in the file.

23      Q.    All right.

24      A.    But at that point, I think I thought I

25   was done.

1      Q.    And it turned out you weren't done,

2    right?

3      A.    Right.

4              MR. GRUDBERG:  Can you mark this?

5              (Plaintiff's Exhibit 24 marked

6              for identification.)

7      Q.    The letter you just referenced, Mr.

8    Childress, was dated May 3rd, to Mr. Brinn,

9    enclosing the ZBA approval.

10     A.    Right.

11     Q.    Okay.  Approval of the variance.

12     A.    Correct.

13     Q.    Let me show you Exhibit 24, which is

14   further correspondence appears from you to Mr.

15   Brinn --

16     A.    Yes.

17     Q.    -- dated May 14th, not too long later.

18     A.    Right.

19     Q.    Did you have a chance to review that

20   today?

21     A.    Yes.

22     Q.    So it would appear that if you thought

23   you were done by May 3rd, that that --

24     A.    Quickly turned around.

25     Q.    That quickly changed.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                              June 23, 2004

Page 33

```
 1        A.   Right.

 2        Q.   Do you remember what it was that led

 3   you to write the letter, Exhibit 24, dated May

 4   14th, 2002, to Mr. Brinn?

 5        A.   I could speculate.  I suspect he called

 6   me up and said, "We have to do a site plan," and

 7   I said, "Okay, where is the plan?"  And I got the

 8   plan and proceeded to critique it.

 9        Q.   Based upon the process that you

10   described before, once the ZBA variance approval

11   was obtained, it would have still been necessary

12   to get zoning commission approval; is that right?

13        A.   Correct.

14        Q.   But as of early May, when you wrote to

15   Mr. Brinn on May 3rd, it was your understanding

16   that your services would not be needed or wanted

17   in connection with obtaining zoning commission

18   approval; is that right?

19        A.   Correct.

20        Q.   Okay.  But were you later requested to

21   assist in obtaining zoning commission approval?

22        A.   Yes.

23        Q.   Okay.  And your comments on the site

24   plan to Mr. Brinn that are set out in Exhibit 24,

25   what application, if any, are they directed
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 23, 2004

Page 34

1    toward?

2        A.    They are directed toward an application

3    to the zoning commission for site plan approval.

4        Q.    So in order to get approval from the

5    zoning commission, one would have to submit in

6    this case the site plan, and would also have to

7    demonstrate that appropriate variances had

8    previously been obtained from the board of

9    appeals; is that right?

10       A.    Correct.

11       Q.    So you assisted in preparing submission

12   of a site plan for approval by the zoning

13   commission?

14       A.    Correct.

15       Q.    But as it turned out, the zoning

16   commission was not the next board before whom you

17   appeared in the quest to obtain approvals for

18   this tower project, correct?

19       A.    That is correct.  Let me amend what I

20   said.  It wasn't strictly a site plan

21   application, it was a special exception permit.

22       Q.    What's the significance of that?

23       A.    A special exception -- well, again,

24   it's -- under land use regulations, certain uses

25   are permitted as of right, subject to site plan

Case 3:03-cv-00459-PCD   Document 46-2   Filed 10/29/2004   Page 35 of 40
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 35

1    review.  So the commissioner says, "Yeah, we

2    understand that's a permitted use but we have to

3    see your site plan and look at your drainage and

4    your landscaping, and your trash removal and all

5    that, parking and all that stuff."

6         Q.   All right.

7         A.   Special exception says, "Yeah, the use

8    is permitted, but you have to come to us to get a

9    special exception to even do that use, and we

10   want to see your site plan."  So it's kind of a

11   little bit more of a different level.

12        Q.   But it would still be within the

13   purview of the zoning commission rather than the

14   board of appeals?

15        A.   Correct.

16        Q.   All right.

17        A.   Now, to answer your other question,

18   when you have a special exception application, it

19   is automatically referred to the planning

20   commission for an advisory report, so -- and they

21   kind of like to have the planning commission

22   report -- by "they" I mean the zoning

23   commission -- kind of likes to have the report

24   before they proceed to act on the zoning

25   application.

Page 36

```
 1        Q.   So at this point, May 14th, 2002, when
 2   you drafted Exhibit 24, what further approvals
 3   did you think were necessary in order to build
 4   the tower that Tower Ventures wanted to build?
 5        A.   It was still only the zoning permit.
 6        Q.   You just mentioned the planning
 7   commission.
 8        A.   Right.  They had only given an advisory
 9   report.  They can say, "We don't like this."  And
10   the -- it wouldn't -- I mean the zoning
11   commission could still approve it.  It's --
12   really the only approval you need is from the
13   zoning commission.
14        Q.   All right.
15        A.   They send it out to the planning for
16   recommendation, but they don't have to follow the
17   recommendation.
18        Q.   Okay.  So the planning commission is
19   purely advisory, and do you have to have the
20   planning commission's advisory input before you
21   appear before the zoning commission seeking
22   approval?
23        A.   They like to have it.  It is advisory,
24   yes.  It's purely advisory in this particular
25   context.  And the zoning commission, as a matter
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 37

1    of practice, likes to have it.  And I think they

2    give -- I know they give the planning commission,

3    I think it's by statute, 35 days to provide them

4    with an opinion, after which it's presumed that

5    the planning commission has no objection to it or

6    approves it.

7         Q.   Thirty-five days from what, from zoning

8    commission approval?

9         A.   No.  Thirty-five days from the

10   transmittal of the request for advice to the

11   planning commission.

12        Q.   Did you have to appear before the

13   planning commission in connection with this Tower

14   project?

15        A.   Didn't have to but I thought it prudent

16   to do so.

17        Q.   Did you, in fact, appear?

18        A.   Yes.

19        Q.   Do you remember when that was?

20        A.   That was July 17.  And by the way,

21   there was an initial appearance before the zoning

22   commission earlier than going to the planning

23   commission.

24        Q.   When was that initial zoning commission

25   appearance?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 23, 2004

Page 38

```
 1         A.   I think I need to check my billing.
 2    July 1.
 3         Q.   And do you remember what the outcome
 4    was of that initial zoning commission appearance?
 5         A.   Yes.  The initial appearance is to
 6    explain to the commission briefly what it is that
 7    you're seeking, and to request them to set a
 8    public hearing date.
 9         Q.   And was that done on July 1st of '02?
10         A.   Yes.
11         Q.   And what was the hearing date set?
12         A.   August 19.
13         Q.   Did the zoning commission indicate
14    anything else that needed to be done between July
15    1st and August 19th, in furtherance of the tower
16    project?
17         A.   No.  But it's quite typical of this
18    zoning commission to set public hearing dates far
19    out, and that's just the way they conduct their
20    business.
21         Q.   So then you appeared before the
22    planning commission on July 17th of '02, correct?
23         A.   Yes.
24         Q.   And do you recall what the outcome of
25    that appearance was?
```

Page 39

1        A.    Yes.   They recommended approval to the

2    zoning commission.

3        Q.    What was the next local board,

4    commission or agency before whom you and/or Tower

5    appeared in order to get approval for the tower

6    project?

7        A.    We had to go to the architectural

8    review board, which, again, is strictly advisory

9    and also, as is the planning commission's report,

10   it is an aid of the zoning commission making a

11   decision on the special exception permit.

12       Q.    Let's say hypothetically you had shown

13   up at the public hearing before the zoning

14   commission, set for August 19th, but you had not

15   received an advisory report from either of the

16   planning commission or the architectural review

17   board, would that have barred the zoning

18   commission from considering the application that

19   was put before it?

20       A.    No.

21       Q.    Would you have been required within an

22   a specified period of time after zoning

23   commission -- after the zoning commission

24   hearing, to then go before the architectural

25   review board and/or the planning commission?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 23, 2004

Page 40

1        A.    Well, I tried to answer your question

2   directly, which was would we have been barred

3   from a decision, and the answer to that is no.

4   But the commission I think would not have made a

5   decision without having those advisory reports

6   back.  So what they likely would have done is to

7   say, "Well, let's open the hearing on August 19th

8   and let's talk about it but we're going to

9   continue it, because we haven't heard from the

10  planning commission or you haven't been to the

11  architectural review board."  That's how it was.

12       Q.    And based on your experience here in

13  Old Saybrook, is it the case that the zoning

14  commission will not act finally on an application

15  that's before it without having the advisory

16  reports of either the architectural review board

17  and the planning commission, as the case may be?

18       A.    Yes.  That's the practice.

19       Q.    So the architectural review board, you

20  went before them when?

21       A.    We went before the architectural review

22  board -- let's see, I'm not sure.  Maybe I need

23  to send another bill.

24       Q.    Do you remember whether they reported

25  favorably on the application?