Case 3:03-cv-00459-PCD    Document 46-3    Filed 10/29/2004    Page 1 of 43
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 23, 2004

Page 41

1       A.   I'm sorry.  Let me -- I find it now.

2    It's July 22nd they were before the architectural

3    review board.

4       Q.   Do you remember whether the

5    architectural review board reported favorably on

6    the proposal?

7       A.   Yes.  I do remember, and yes, they did

8    report favorably.

9       Q.   Do you remember whether you were

10   present for that entire architectural review

11   board hearing?

12      A.   I think I was.  You mean as

13   distinguished from not being there or being there

14   for a partial?

15      Q.   Do you remember whether Mr. DeCesare

16   was there?

17      A.   Yes.  I'm pretty sure he was there.

18      Q.   Do you remember who presented on behalf

19   of the project?  In other words, whether it was

20   yourself or someone else?

21      A.   Seems to me that I had a conflicting

22   meeting that night somewhere.  I guess I can't

23   swear that I made the presentation.  I see in my

24   notes here brief appearance July 22 before that

25   board.  Whether I actually showed them the

Case 3:03-cv-00459-PCD    Document 46-3    Filed 10/29/2004    Page 2 of 43
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 42

1    pictures and the colors or simply talked to

2    Messrs. DeCesare and Brinn about it, I don't

3    honestly recall.

4                    MR. GRUDBERG:  Can you mark this?

5                    (Plaintiff's Exhibit 25 marked

6             for identification.)

7        Q.    Mr. Childress, I've put before you

8    Exhibit 25, which appear to be handwritten notes

9    similar to the notes that we had previously

10    marked in connection with the April zoning board

11    of appeals meeting.

12        A.    Yes.

13        Q.    Am I correct that these again are your

14    handwriting?

15        A.    Yes.

16        Q.    And are these notes of your

17    presentation before the -- this would have been

18    the planning commission, correct?

19        A.    Yes.  That's correct.

20        Q.    I'd just ask you to take a look through

21    the three pages of notes and tell me whether all

22    of the notes relate to the presentation or

23    whether there are some notes that relate to

24    things that happened before the commission that

25    evening?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 43

 1      A.   There's some end notes on the third

 2   page below a -- more or less a horizontal line.

 3      Q.   And do you have any memory as to what

 4   those notes relate to?  Are those notes that

 5   concern things that were said at the zoning -- or

 6   I'm sorry, the planning commission meeting rather

 7   than notes that you prepared in advance?

 8      A.   They definitely were notes of what was

 9   said at the planning commission meeting.  I don't

10   know that I could make sense out of them right

11   now.

12      Q.   Can you at least read them for us?

13      A.   Yes.  "Base dimension."  The second

14   line says, "Steel," s-t-e-e-l.  And the last one

15   says, "How many antennae can it serve?"

16      Q.   Okay.  Do you have any recollection of

17   what those notes related to or what prompted you

18   to write that down?

19      A.   No.

20      Q.   So as of July 22, you had approval from

21   the architectural review board, correct?

22      A.   Yes.

23      Q.   I don't think I asked you about the

24   architectural review board.  What exactly is

25   their jurisdiction, and what is it that

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 44

1    necessitates an appearance before the

2    architectural review board?

3        A.    Okay.   They, again, are an advisory

4    board, and the regulations require any project in

5    a commercial or industrial zone to be referred to

6    them for advice.

7        Q.    And was this tower project within a

8    commercial or industrial zone?

9        A.    No.   It was in a residential zone, I

10   believe.   But it was -- let me just double-check

11   that.

12                   (Pause in the proceedings.)

13       A.    I believe there was a split zone on the

14   property.   It's more than one zone.

15                   (Pause in the proceedings.)

16       A.    It was entirely in a B2 zone, which is

17   a business zone.   The residential zone comes

18   right at its border but it doesn't split the

19   lot.  So it's a B2 zone, which is a business

20   zone.

21       Q.    And, therefore, any project in such a

22   zone is required to go for advisory opinion

23   before the architectural review board; is that

24   correct?

25       A.    Correct.

Page 45

1      Q.   So as of July 22nd, '02, what further

2   approvals did you believe were necessary before

3   Tower Ventures could commence construction of the

4   communications tower or radio tower?

5      A.   Well, again, it's still the same

6   thing.  Those appearances before the planning

7   commission and the architectural review board did

8   not result in permits or -- nor were they

9   intended to.  So it was still the special

10   exception permit from the zoning commission,

11   after which of course they'd have to go get a

12   specific building permit for the structure.

13      Q.   The obtaining of a building permit

14   after one has obtained zoning board of appeals

15   approval and then zoning commission approval, is

16   that a further process that requires appearance

17   before a commission or is that something that is

18   a more routine procedure?

19      A.   It's more ministerial and you work

20   directly with the building official.

21      Q.   So let's say you walk into the building

22   official with your zoning commission approval and

23   your zoning board of appeals variance, what, if

24   any, problems would there be in obtaining a

25   building permit?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 46

1      A.    You would not anticipate any problems.

2      Q.    Okay.  So as of July 22nd, '02, there

3  is still a zoning commission meeting set for

4  August 19th, at which the tower project is going

5  to be considered; is that right?

6      A.    Correct.

7      Q.    Do you remember what was submitted --

8  what written submissions there were to the zoning

9  commission in connection with that project?  What

10  would have been submitted?

11      A.    A special exception permit on one of

12  their forms.  The site plan.  A statement of use

13  is required.  And I believe I requested a waiver,

14  which is different from a variance.  The zoning

15  commission has authority to waive some of its own

16  regulations.

17      Q.    Sounds like -- I'm afraid even to ask.

18      A.    But their regulations do allow them to

19  issue some waivers.

20      Q.    Perhaps I'll regret it, but let me dive

21  in.

22            Did the waiver you were seeking

23  differ from the variances you had sought and

24  obtained from the zoning board of appeals?

25      A.    Yes.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 23, 2004

Page 47

```
 1        Q.   What was the subject of the waiver that
 2   you were seeking with the zoning commission?
 3        A.   I was seeking a waiver of a provision
 4   which required a proposed tower to be set back
 5   200 feet from a property line.
 6        Q.   And that was not something that was
 7   taken up in the variance process?
 8        A.   That's correct.
 9        Q.   Did you appear before the zoning
10   commission on August 19th?
11        A.   Yes.
12        Q.   Do you remember who else, if anyone,
13   from either Tower Ventures or Crossroads was
14   present?
15        A.   I don't honestly recall.
16        Q.   Okay.
17             MR. GRUDBERG:  Can you mark this?
18             (Plaintiff's Exhibit 26 marked
19             for identification.)
20        Q.   Showing you what's been marked as
21   Exhibit 26, Mr. Childress, are these once again
22   notes in your handwriting?
23        A.   Yes.
24        Q.   And they're dated 8/19/02; is that
25   right?
```

Page 48

```
 1      A.   Yes.

 2      Q.   And the heading at the top says "WLIS

 3   Tower," is that right?

 4      A.   Yes.

 5      Q.   In the course of these presentations to

 6   both the zoning commission and the various other

 7   boards and commissions that you appeared before,

 8   was the project portrayed as a radio tower?

 9      A.   The project was portrayed as an

10   auxiliary radio tower, with the paging thing on

11   it, yeah.

12      Q.   That was to replace the existing

13   auxiliary tower?

14      A.   The strategy was to try to get a permit

15   to replace the existing tower, and should that be

16   approved, to then present the telecommunications

17   aspect of it.

18      Q.   And it was your understanding that the

19   telecommunications aspect of it would have to be

20   approved by whom?

21      A.   Siting council.  Siting council with

22   apparently some local input.  But, again, I think

23   the strategy was that if the local approvals had

24   already been obtained, it then would be kind of

25   self-approving, that they approved this
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 49

1    location.

2          Q.    The notes on Exhibit 26, would you take

3    a look at them and tell me whether they are

4    similar to the notes from prior meetings that

5    we've been talking about, namely, notes to assist

6    you in a presentation, or whether they go beyond

7    that?

8          A.    That's correct.  They're presentation

9    notes.

10         Q.    At the bottom of the first page of

11   Exhibit 26, you have a statement, "However, this

12   commission advised the applicant to seek a

13   variance for this activity and this was done in

14   April," is that correct?

15         A.    Yes.

16         Q.    And then read for me what it says below

17   that.

18         A.    Submit as an exhibit in this

19   proceeding, copies of the application, decision

20   and minutes of the ZBA proceeding.  A note to

21   myself.

22         Q.    To your memory, you did do that?

23         A.    Yes.

24         Q.    On the second page, there's reference

25   to a Section 68?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 50

```
 1      A.    Yes.

 2      Q.    What's that all about?

 3      A.    Section 68 is a section of the zoning

 4   regulations having to do with telecommunication

 5   towers.

 6      Q.    What relevance did that have to the

 7   zoning commission presentation?

 8      A.    Well, it -- that's a very good

 9   question.  It was of relevance to demonstrate to

10   them that even though that section didn't apply

11   to this tower, the standards that were set forth

12   in that section were met in certain particulars.

13   And so we're trying to say well, we don't come

14   under that, but you've set some standard for

15   towers so we've tried to abide by those physical

16   standards of height and monopole design, and

17   collapsible construction, so forth.

18      Q.    Okay.  Do you remember any questions

19   arising either before the zoning commission or

20   any other of the boards and commissions you

21   appeared before, about whether the proposed tower

22   was ultimately intended to be used for

23   telecommunications equipment?  Anybody ask about

24   it?

25      A.    Yes.  I believe so.
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 51

1        Q.    Do you remember what commission?

2        A.    I think the zoning commission did.

3        Q.    And what do you remember them asking?

4        A.    I don't recall specifically.  I mean I

5    think you could find that in the minutes

6    somewhere, or the transcript, but the gist of it

7    was, "What's going to become of this tower?  Are

8    you going to put stuff on it?"  And I think the

9    answer was, "Well, we probably will put some

10   stuff on it but we don't have anything -- we

11   don't have any leases in place at this time to

12   put anything on it.  And we understand that if we

13   do get leases, that we will have to go to the

14   siting council to get approval for that."  I

15   think that's how that all came out.  I'm pretty

16   sure it was addressed.

17       Q.    Okay.

18                  MR. GRUDBERG:  Can you mark this?

19                  (Plaintiff's Exhibit 27 marked

20              for identification.)

21       A.    I kind of now recall Mr. DeCesare was

22   at that meeting of August 19th, best of my

23   recollection.  I'm not yet sure about Mr. Brinn.

24       Q.    How often were you in contact with Mr.

25   DeCesare during this period, January through

Case 3:03-cv-00459-PCD    Document 46-3    Filed 10/29/2004    Page 12 of 43
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 52

1    August of '02?

2        A.    Not a lot.  I would touch base with him

3    every now and then if I saw him at a chamber

4    meeting or something, and just kind of discuss

5    the strategy that we adopted to get it through as

6    quickly as possible.

7        Q.    Did you have more contact during that

8    time period with Mr. DeCesare or Mr. Brinn.

9                Showing you what's been marked as

10   Exhibit 27, Mr. Childress, I'd ask you to take a

11   look at that and see if you recognize it.  I will

12   tell that you this was among the materials

13   produced from your file.

14       A.    Yes.  I do recognize it.

15       Q.    And what is this?

16       A.    This is a memorandum from the counsel

17   for the zoning commission to the zoning

18   commission about this application.

19       Q.    So is Mr. Knapp, is he the town counsel

20   or within the town counsel's office or do they

21   have a separate lawyer?

22       A.    The town has a separate lawyer.  This

23   is the zoning commission's own lawyer.  And the

24   firm is Branse & Willis.  He's one of the members

25   of the firm.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 53

```
 1        Q.    We talked a little about this issue of
 2   the Connecticut Siting Council and whether their
 3   approval was needed in order to get this tower
 4   built.
 5        A.    Uh-huh.
 6        Q.    I note that point one on this memo
 7   addresses that issue.  Do you remember -- when do
 8   you remember receiving Exhibit 27?
 9        A.    The day of the hearing.  That's what
10   it's dated.
11        Q.    I had noted the same date.  Didn't know
12   whether this was -- well, taking a look at the
13   top, it appears to bear a fax header of Monday,
14   11:12?
15        A.    Yes.
16        Q.    Does that tell you that maybe it was
17   faxed that morning?
18        A.    Yes.
19        Q.    Are the meetings typically in the
20   evening?
21        A.    Yes.
22        Q.    So you received this the day -- Exhibit
23   27, you received it the day of the hearing, but
24   somewhat in advance of the hearing; is that
25   right?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 23, 2004

Page 54

1      A.   Yes.

2      Q.   Do you remember how it was that you

3  came to be in possession of this document?

4      A.   Attorney Knapp faxed it to me, I

5  believe.

6      Q.   And did you request it of him?  Did he

7  call you?  Do you remember how that came about?

8      A.   I think I had a previous discussion

9  with Attorney Branse, who was the main partner,

10 who was the counsel for the commission.

11     Q.   And what did that discussion concern?

12     A.   We talked about some of these same

13 issues and, you know, why we were there, and what

14 some of these legal issues were, whether -- the

15 sort of confused jurisdiction between the local

16 ordinance, the telecommunications tower versus

17 the radio tower.  Different definitions between

18 the siting council's definition of a

19 telecommunications tower and the zoning

20 commission's definition.  And those sorts of

21 things.

22     Q.   Did you remember discussing with either

23 Attorney Knapp or Attorney Branse this issue of

24 whether the Connecticut Siting Council had

25 exclusive jurisdiction over the tower that Tower

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 55

 1    Ventures was proposing to build?

 2         A.    Yes.

 3         Q.    And which one of them do you remember

 4    talking about that issue with?

 5         A.    Branse.

 6         Q.    Okay.  What do you remember from that

 7    discussion, as best you can recall?  Tell me what

 8    he said, what you said.

 9         A.    Well, I'm not sure whether we talked

10    about this letter or certainly the concepts in

11    the letter.  By "this letter" I mean Exhibit 22.

12    And whether or not the siting council had

13    exclusive jurisdiction over it and I said, "Well,

14    it's not a telecommunications tower now, as I

15    understand it."

16              And then I relayed to him my

17    conversation with Mr. Phelps.  And the fact that

18    the zoning commission had felt that they wanted

19    some say in it, they wanted us to get a variance,

20    and so that's why we were here.  And I said,

21    "Yes, I think you can argue these other points,

22    but where do you go with that in the end?"

23         Q.    By "these other points," what are you

24    referring to?

25         A.    That we didn't need to be before the

Page 56

1    zoning commissions at all, for example, that we

2    didn't need a variance or we didn't need to be

3    before the zoning commission.

4         Q.   Well, as to the variance, at that point

5    it didn't matter because you had it as of August?

6         A.   Right, but we discussed it in any

7    event.  I mean I think you can see item number

8    two addresses the issue of whether we even needed

9    a variance.

10        Q.   And the first sentence of item two, am

11   I correct that that would summarize the position

12   that you initially pursued with Mr. Sklodosky,

13   that it was a relocation of an existing tower,

14   and therefore, no variance was required?

15        A.   Yes.

16        Q.   Did you speak with Mr. Knapp prior to

17   the preparation of this memo --

18        A.   No.

19        Q.   -- about these issues?

20        A.   No.  I don't recall that I did.  I did

21   speak with Mr. Branse.

22        Q.   Point three of the memo, Exhibit 27,

23   references that Section 68 that we were talking

24   about; is that correct?

25        A.   Yes.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 23, 2004

Page 57

1      Q.   And it says that all towers -- requires

2   that all towers have at least a 200-foot setback

3   from all property lines.  Is that correct?

4      A.   Yes.

5      Q.   If I understood you correctly before,

6   Section 68 actually only applies to

7   telecommunications towers; is that correct?

8      A.   Yes.  But I think if we read it

9   carefully, it will include a radio tower as a

10  telecommunication tower, which is part of the

11  convolution here.  If you want, I can get the

12  zoning regulations and clarify that.

13                  MR. HUMPHREY:  Off the record.

14                  (Discussion off the record.)

15     Q.   Do I understand from that response, Mr.

16  Childress, that the definition of a

17  telecommunications tower might have been

18  different for local zoning purposes than it was

19  for Connecticut Siting Council purposes?

20     A.   Yes.

21     Q.   And your understanding was that for

22  local zoning purposes it would embrace a radio

23  tower but for Connecticut Siting Council

24  purposes, telecommunications tower would not

25  include a radio tower; is that right?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 58

1        A.    That's correct.

2        Q.    Do you recall what the outcome was of

3    the August 19th zoning commission meeting?

4        A.    I believe they continued it for another

5    meeting.

6        Q.    Why was it continued?

7        A.    Zoning commission is constitutionally

8    unable to make a decision in one night.  But

9    other than that, the things they asked us to get,

10   they had a rather short list of things they

11   wanted, which are at page three of Exhibit 26.

12       Q.    Why don't you just read them over for

13   us so the record is clear.  At the top it says

14   public hearing?

15       A.    Yes.

16       Q.    The entries below that would be

17   notations you made at the hearing, rather than

18   notes you made for yourself to assist in your

19   presentation; is that correct?

20       A.    Correct.

21       Q.    Okay.  Why don't you read the notes?

22       A.    Okay.  "Show antennae."  Looks like it

23   says, "wire up and down."  They were not happy

24   with the initial depiction of the antennae, and I

25   can't recall exactly what it was, what more

Page 59

1    specificity they wanted, but it was something on

2    sheet C-3.  What I believe they were trying to

3    get at was to measure the height of the very top

4    of the tower antennae.  In other words, the

5    detail in the plan showed a height of 172.5.  But

6    the height kind of didn't go to the very top of

7    the antennae.

8                    MR. HUMPHREY:  Off the record.

9                    (Discussion off the record.)

10        A.    I believe that the initial plan may

11   have said 172 -- I'm sorry, 175 to that midpoint,

12   and the zoning commission said, "Well, then

13   you're going higher," so we had to revise that

14   detail.

15        Q.    So literally that just required some

16   person who did the drawings to extend the little

17   line to make it coterminous with the top of the

18   tower, as depicted on the drawing?

19        A.    Exactly.

20        Q.    The next item?

21        A.    "Radio interference, 63.9."  There's a

22   regulation, 61.9, which says that, you know,

23   that -- I don't think it's specific to towers,

24   but it says that any activity cannot create radio

25   wave disturbances that's going to interfere with

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 60

 1    other radio waves.  I'm not sure what it says but

 2    there's some regulation that needed addressing.

 3        Q.    All right.

 4        A.    Zoning commission, next line says

 5    "label fall zone."  Although there was a circle

 6    shown at 87 and a half feet, it wasn't

 7    specifically labeled as the fall zone.  So we had

 8    to do that.  They wanted us to submit a plan, and

 9    this would be kind of like a written plan, for

10    the removal of the facility in the event that it

11    fell down or in the event that it was

12    discontinued or abandoned.

13        Q.    Is this the new facility whose

14    construction was contemplated or was this the

15    older existing tower that they were talking

16    about?

17        A.    I think it was the new one.

18        Q.    And then what's the next line?

19        A.    "Estimate on restoration of site,

20    demolition of tower.  Engineer."  I've got those

21    exhibits which address those points, and I may --

22    it may help us to flush out what it was they were

23    looking for.  With respect the tower removal,

24    they were talking about the new facility.  I

25    gather the concern was if the tower needed to be

 1    removed, or was abandoned or discontinued, the

 2    town didn't want to bear any cost of removal, and

 3    so they wanted a bond to be posted for the cost

 4    of that.

 5        Q.   Included among the materials you

 6    produced in your file, Mr. Childress, I'll note

 7    for the record it's stamped CHILD 0070.  There's

 8    a letter dated August 27th to Mr. Brinn from a

 9    gentleman at Site Management Company, LLC,

10    setting forth an estimate of costs to restore the

11    site to original condition in the event service

12    at the site is discontinued.

13        A.   Yes.

14        Q.   Is that one of the items that was

15    obtained in response to the zoning commission's

16    request?

17        A.   Yes.

18        Q.   That had to do with a plan for the

19    facility removal that you were just talking

20    about?

21        A.   And the next line which is the estimate

22    on the restoration, which is the bottom line of

23    the cost estimate.

24        Q.   Right.

25        A.   Uh-huh.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                June 23, 2004

Page 62

1       Q.    The final line on your notes from

2   August 19th says "meeting Tuesday, 9/3/02, 7:30,"

3   is that right?

4       A.    Yes.

5       Q.    So that was the date of the continued

6   hearing on the application?

7       A.    Right.

8       Q.    So is it your recollection that Tower

9   Ventures obtained the requested materials

10  addressing issues that the zoning commission had

11  raised on August 19th?

12      A.    Yes.  One of them I think was obtained

13  by DeCesare.

14      Q.    Which item was that?

15      A.    That addressed the radio interference

16  issue, and I don't --

17      Q.    Was that a letter?

18      A.    Letter from a Mark Weiss to Don

19  DeCesare, dated November 7, 2000.

20      Q.    All right.

21      A.    There's also a statement, excuse me,

22  accompanying that.  Something called "State Re:

23  Safe RF Radiation Levels," dated 11/28/97.  And

24  signed by Mr. DeCesare.

25      Q.    And it's your recollection that those

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 63

1    materials were submitted to the zoning commission

2    in advance of the continued hearing on September

3    3, '02?

4        A.   Or at that hearing.

5        Q.   Or at the hearing.  In any event, the

6    hearing proceeded again on September 3rd; is that

7    right?

8        A.   Yes.

9        Q.   What do you recall about the discussion

10   of the tower project at the September 3rd

11   hearing?

12       A.   Well, I believe what we did was to say,

13   "These are the things you identified at the last

14   meeting as being required, and here they are in

15   order," and handing them in.  I don't recall too

16   much other than that.

17       Q.   At the August 19th hearing, do you

18   remember approximately how long the Tower

19   Ventures project was discussed before the

20   commission?

21       A.   I don't remember.  No, I don't know if

22   I could say.

23       Q.   Okay.  Do you have any rough

24   recollection -- I'm just trying to get a sense of

25   whether this is a matter that's discussed for 10

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 23, 2004

Page 64

1    minutes, is this debated vociferously for an hour

2    and a half?

3        A.    Certainly the hour and a half would be

4    a closer -- nothing is treated as de minimis in

5    the land use department.

6        Q.    Okay.

7        A.    So they scrutinize every aspect of the

8    plan.  Have lots of thoughts and lots of

9    questions.

10       Q.    How many members of the zoning

11   commission were there?

12       A.    Well, there are five.  And I presume we

13   had five that evening.

14       Q.    Based upon your appearance on August

15   19th, did you reach any conclusion as to how the

16   commission itself seemed disposed toward the

17   Tower Ventures proposal?

18       A.    Well, my recollection is there was one

19   member who did not like the proposal at all.  I

20   guess I thought maybe the others would favor it,

21   and hoped that they would outvote him, I think is

22   how I felt.

23       Q.    This gentleman who you thought did not

24   favor the proposal, did he express what the basis

25   of his opposition was?

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 65

1      A.    Yes.  He didn't like towers to begin

2   with at all, anywhere, for any purpose, and

3   thought they were blight on the landscape.

4      Q.    So you were starting apparently with a

5   considerable handicap in attempting to persuade

6   this gentleman?

7      A.    Yes.

8      Q.    When you went back for the further

9   hearing on September 3rd, you again attended,

10  correct?

11     A.    Yes.

12     Q.    And do you remember who else was in

13  attendance relating to the project, if anyone?

14     A.    I don't remember.

15     Q.    What discussion of the tower project do

16  you remember from the September 3rd hearing?

17     A.    Well, it was briefer and primarily

18  limited to these issues.  But how long that was,

19  I couldn't recall.

20     Q.    Okay.  In the course of pursuing

21  variances and approval, did any neighbors appear

22  in support of the tower project?

23     A.    Yes.

24     Q.    Do you remember how many?

25     A.    I remember one couple in particular.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 23, 2004

Page 66

1    There may have been others, but I remember one in

2    particular.

3         Q.   How was it that they came to appear?

4         A.   I called them up.  I had just done a

5    closing for them, so I knew that they had just

6    moved into the area, and they were one of the

7    lots on which the guy wire occurred.  And I

8    thought it would be -- I thought that they would

9    consider it advantageous to get rid of that guy

10   wire and that they might well be supportive, and,

11   in any event, that they ought to know about it

12   and we ought to know what they thought about it

13   and not be surprised at the hearing.  So I called

14   them up, and I believe I met with them and showed

15   them the plan.

16        Q.   And did they ultimately appear at one

17   or more public hearings?

18        A.   Yes.

19        Q.   And what was their position concerning

20   the project?

21        A.   They were strongly in favor.

22        Q.   And the basis for their support was

23   removal of the guy wire?

24        A.   Yes.  And the safety issue.  I think

25   those two together.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 67

1        Q.    The safety issue having to do with

2    replacing a structure that was some 40 years old

3    with a new structure?

4        A.    Yes.

5        Q.    What was the outcome of the September

6    3rd hearing?

7        A.    I believe that was the evening they

8    approved the application.

9        Q.    Is there an appeal process when an

10   approval issues from a zoning commission?

11       A.    Yes.

12       Q.    Tell me how that works.

13       A.    You have 15 days from the date that

14   notice of the public -- of the decision is

15   published in the newspaper.  You have 15 days

16   from that date to file an appeal --

17       Q.    All right.

18       A.    -- with the Superior Court.

19       Q.    And was -- to your knowledge, was any

20   appeal ever filed from the zoning commission

21   approval of the Tower Ventures tower project?

22       A.    No.

23       Q.    So it became final sometime in late

24   September; is that right?

25       A.    Yes.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 68

1      Q.   As of that point, when the zoning

2    commission's approval became final, were there

3    any additional approvals, permits, variances or

4    permissions of any kind that, in your opinion,

5    were necessary in order to proceed with

6    construction of the radio tower, the auxiliary

7    radio tower that was contemplated by Tower

8    Ventures, Incorporated?

9      A.   No.   Nothing other than the building

10   permit.

11     Q.   At that point having obtained the

12   approvals that had been obtained, the issuance of

13   the building permit would have been, in your

14   experience, a ministerial act?

15     A.   Yes.

16     Q.   As best you understood it as of late

17   September 2002, Tower Ventures could have walked

18   into the Old Saybrook building department and

19   obtained a building permit to build the tower

20   that's depicted in the drawings that are in your

21   file; is that right?

22     A.   Yes.

23              MR. GRUDBERG:  Can you mark this?

24              (Plaintiff's Exhibit 28 marked

25              for identification.)

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                            June 23, 2004

Page 69

1        Q.   Mr. Childress, Exhibit 28 contains

2   copies of various message slips that were

3   produced to us from your file.  I don't know

4   whether they were kept together in your file or

5   whether they were separate.  Do you recognize

6   those as message slips from your office?

7        A.   Yes.

8        Q.   There's one at the bottom that says

9   "Keenan Brinn, Tower Ventures, September

10  5th, '02."  Is that correct?

11       A.   Yes.

12       Q.   And could you read the balance of that

13  message?

14       A.   Sure.  It says "Julie Donaldson is the

15  other attorney looking into matter in case she

16  calls."

17       Q.   Is that -- do you recognize that

18  handwriting as your receptionist at the time?

19       A.   Yes.

20       Q.   Do you have any memory as to what that

21  message was all about?

22       A.   None whatever.

23       Q.   Does the name Julie Donaldson mean

24  anything to you?

25       A.   Not at all.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                     June 23, 2004

Page 70

1        Q.    At that point, September of '02, were

2    you working with another attorney on behalf of

3    Tower Ventures?

4        A.    No.

5        Q.    Between January of '02 and September

6    of '02, had you, at any point, worked with

7    another attorney on behalf of Tower Ventures in

8    furtherance of the tower project?

9        A.    I believe I may have had an early

10   conversation with Mr. Spigle, but --

11       Q.    He was the gentleman who wrote that

12   December '01 letter that we referenced before?

13       A.    Yes.

14       Q.    All right.

15       A.    I do not remember a Julie Donaldson.

16       Q.    And do you know -- the message from Mr.

17   Brinn seems to be alerting you to the possibility

18   that you might get a call from Ms. Donaldson.  Do

19   you remember whether you ever spoke with a Julie

20   Donaldson?

21       A.    If so, I don't recall it.

22       Q.    Okay.

23              MR. GRUDBERG:  That's all I have.

24   CROSS-EXAMINATION

25   BY MR. HUMPHREY:

Page 71

1    Q.   With respect to the construction of a

2    tower, what did you understand that Tower

3    Ventures' purpose was in getting the approval and

4    constructing the tower, what would the tower be

5    used for?

6    A.   Ultimately, I understand they were

7    going to try to attach -- enter into leases and

8    attach telecommunications antennae of some kind.

9    Q.   Did you discuss this with Keenan Brinn

10   or did he discuss it with you?  By that I mean

11   what the ultimate purpose was?

12   A.   Well, I knew of what the ultimate

13   purpose was.  Whether it came from Keenan or Don,

14   I don't recall, or both of them.  I don't

15   recall.

16   Q.   Talking in the period 2002 when you

17   were working with this, how familiar were you

18   with the telecommunications -- in particular, the

19   wireless industry?

20   A.   Very little.

21   Q.   Had you, at that time, done any work in

22   the siting or placement of telecommunications

23   towers?

24   A.   No.

25   Q.   I take it from your testimony, however,

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                           June 23, 2004

Page 72

1    that in 2002, you became aware that if

2    telecommunications equipment was to be attached

3    to the tower, then the Connecticut Siting Council

4    would be involved?

5         A.   Yes.

6         Q.   And if telecommunications equipment was

7    to be attached, it would be necessary to get some

8    kind of approval or whatever was required by the

9    Connecticut Siting Council from that body?

10        A.   Yes.

11        Q.   And that you would not be able to

12   attach telecommunications equipment without

13   getting approval from the Connecticut Siting

14   Council?

15        A.   Yes.

16        Q.   And did you learn that from your own

17   research or from talking with people during the

18   course of your representation of Tower Ventures?

19        A.   I didn't know of it on my own at that

20   time.

21        Q.   Now, beyond the letter that Mr. -- of

22   Mr. Spigle's that you saw, did you ever discuss

23   the issue with him of who had jurisdiction, the

24   intellectual issue of who had jurisdiction in

25   this situation?

1    A.    I don't honestly recall.  It seems to

2  me I had a conversation with him early on, but --

3  if I can elaborate a little bit.

4    Q.    Sure.

5    A.    It seemed to me that the decision had

6  already been made to go through the local zoning

7  people, by Tower through Spigle, and they had

8  actually been through the local thing and they

9  had been directed by the zoning commission to go

10  get a variance.

11    Q.    All right.

12    A.    Now, I'm a person who has an awful lot

13  of experience in getting variances.  So -- I

14  probably do 80 or 90 percent of the variances in

15  this town that are represented by counsel.  And

16  so that's why I think I was selected to go get a

17  variance, which had already been determined was

18  necessary.

19    Q.    Okay.  But is it fair to say that based

20  upon your experience, when you researched it,

21  that you had a feeling that maybe going for a

22  variance wasn't or shouldn't have been necessary?

23    A.    I certainly felt that argument could be

24  made, yes.

25    Q.    And you made an effort yourself to try

Page 74

1    to discuss this or see if you could move this

2    building inspector around or -- to your way of

3    thinking?

4         A.   Yes.  The zoning officer, yes.

5         Q.   And you were not successful in that

6    either?

7         A.   Correct.

8         Q.   Okay.  Now, did you become aware during

9    this project that when --  Withdrawn.

10             Did you ever see the contract that

11   existed between Tower Ventures and Crossroads?

12        A.   No.

13        Q.   Were you aware that the pole that was

14   there, the original idea was to do a replacement

15   of an identical type tower on the site?

16        A.   No.

17        Q.   Okay.

18        A.   What do you mean the original plan?

19        Q.   I think the record will show that there

20   was a lattice-type tower on the property.

21        A.   Yes.

22        Q.   That the original concept was to

23   replace the lattice with a lattice tower?

24        A.   Tower Ventures' original plan?

25        Q.   Yes.

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                    June 23, 2004

Page 75

```
 1        A.    No.  I was not aware of that.

 2        Q.    You're not aware that sometime in the

 3   fall of 2001, the original plan of a replacement

 4   of the lattice for a lattice was changed to

 5   construction of a new monopole tower?

 6        A.    No.

 7        Q.    Now, with respect to the period of your

 8   representation --  Withdrawn.

 9               When did you finally conclude your

10   representation of Tower Ventures?

11        A.    September 2nd, whenever that last

12   meeting was.

13        Q.    September 3rd.

14        A.    Of '02, yeah.

15        Q.    For the period January '02 through

16   September '02, while you represented Tower

17   Ventures in obtaining the variance, the various

18   approvals, at any time did anything occur which

19   delayed this project in any unusual way?

20        A.    No.

21        Q.    At any time during that period did

22   Tower Ventures or anybody on their behalf either

23   delay work that you wanted to do, tell you to

24   delay work, not supply you with information or

25   material on time?
```

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                     June 23, 2004

Page 76

```
 1       A.   No.

 2       Q.   Okay.  To put it positively, did Tower

 3  Ventures work cooperatively with you during that

 4  period of time in an effort to obtain those

 5  approvals?

 6       A.   Yes.

 7       Q.   Did you get --  Withdrawn.

 8            You've testified Keenan Brinn was

 9  your main contact person?

10       A.   Yes.

11       Q.   In fact, almost exclusively, as far as

12  Tower Ventures, Keenan worked with you in

13  obtaining these approvals?

14       A.   Yes.

15       Q.   Okay.  At any time did Keenan Brinn

16  ever not cooperate with you or produce materials

17  or information that you had requested?

18       A.   No.

19       Q.   Based upon your experience -- how many

20  years have you been doing variance/zoning work in

21  the state of Connecticut?

22       A.   Twenty-five maybe.

23       Q.   Based upon your experience, did

24  anything unusual occur in this process that

25  delayed either the filing of an application, or
```

Page 77

```
 1   having hearings or getting results, decisions

 2   from hearings?

 3       A.   No.

 4       Q.   And, in fact, not only with Keenan,

 5   didn't you also get cooperation from Don DeCesare

 6   in terms of obtaining information or documents

 7   that you might need or that would be helpful for

 8   applications or hearings?

 9       A.   Is it true that I did get cooperation?

10       Q.   Yes.

11       A.   Yes.

12       Q.   You testified that you never saw the

13   contract between Crossroads and Tower Ventures.

14   Did you ever talk with Don DeCesare about that

15   contract?

16       A.   No.

17       Q.   Did he ever mention the contract as

18   such to you?

19       A.   Not to my recollection.

20       Q.   Okay.  Did he ever talk about any of

21   the conditions or requirements, obligations on

22   either him or on Tower Ventures as part of that

23   contract?

24       A.   No.

25       Q.   Did he ever say to you that Tower
```

 1    Ventures was in default in any way under that

 2    contract?

 3        A.    I -- he didn't discuss it with me at

 4    all.

 5        Q.    In July and August, when you were

 6    getting the final -- the recommendations from the

 7    historic committee and the planning commission,

 8    was there any question in your mind as to

 9    assuming they gave positive recommendations, any

10    question in your mind whether or not you would

11    get the ultimate approval from the zoning

12    commission?

13        A.    Yes.

14        Q.    And why did you have such a -- what was

15    the reason for the question in your mind as to

16    whether or not you would get the ultimate

17    approval?

18        A.    The zoning commission in this town is

19    very restrictive.  And certainly was so at that

20    time as well.  And when you go through a special

21    exception process, there is so much subjective --

22    so many subjective standards that you have to

23    meet, such as character of the neighborhood, in

24    harmony with the regulations, some very vague and

25    subjective standards upon which they could base

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                June 23, 2004

Page 79

1    denials, and have done so.  And it was also my

2    general awareness that they didn't like tower

3    projects at all, and I think that had there not

4    been a tower there, there would have been no

5    chance of getting, you know, a tower ab initio,

6    so to speak.

7         Q.   Now, in the zoning process in Old

8    Saybrook, is there allowed for one of the zoning

9    boards to appeal the other's decision or approval

10   of a project?

11        A.   Yes.

12        Q.   Could you explain to me what that quirk

13   in the Old Saybrook zoning regulations is?

14        A.   It's not a quirk in the Old Saybrook

15   zoning regulations.  It's just a matter of they

16   are separate legal entities, and they have

17   separate jurisdiction, separate functions,

18   separate counsel.  They can sue each other and

19   have done so on two or three occasions that I've

20   been involved in, wherein particular, the most

21   typical example of that is where the zoning board

22   of appeal grants a variance, and the zoning

23   commission says, "Well, wait a minute.  Those are

24   our regulations, we don't want you to vary them,

25   we don't like that."

Case 3:03-cv-00459-PCD    Document 46-3    Filed 10/29/2004    Page 40 of 43
CROSSROADS COMMUNICATIONS v. TOWER VENTURES                          June 23, 2004

Page 80

1               That's the most typical lawsuit of

2      a zoning commission suing a zoning board of

3      appeals saying you shouldn't have varied that

4      regulation.

5           Q.   And did you come to learn in this case

6      that the zoning commission was considering filing

7      such an appeal in connection with the approval by

8      the zoning board?

9           A.   I heard some discussion to that

10     effect.

11          Q.   Did this have any bearing on your

12     concern in early August as to whether or not the

13     zoning commission would approve the application?

14          A.   Yes.  I had forgotten that.  I'm glad

15     you brought that up.  There was some discussion.

16               MR. HUMPHREY:  Nothing further.

17               MR. GRUDBERG:  Just a couple brief

18     follow-up.

19     REDIRECT EXAMINATION

20     BY MR. GRUDBERG:

21          Q.   Just a slightly different question than

22     Mr. Humphrey asked.  He asked about Mr.

23     DeCesare's cooperation.  Let me ask you a little

24     differently.

25               At any point during the process of

CROSSROADS COMMUNICATIONS v. TOWER VENTURES                                    June 23, 2004

 1    trying to get the necessary approvals for the

 2    tower, did Mr. DeCesare or Crossroads fail to

 3    cooperate with -- in any fashion?

 4         A.   No.

 5         Q.   I've noted from the applications that

 6    you've provided from your file, and some of the

 7    agendas, that although your client here was Tower

 8    Ventures, Incorporated, the applicant listed was

 9    Crossroads Communications of Old Saybrook; is

10    that correct?

11         A.   Correct.

12         Q.   Was that something that Mr. DeCesare --

13    well, how did that come about?

14         A.   That was a strategic decision I think

15    to make it the -- if you will, the hometown boy

16    who -- the WLIS tower had been there for 40

17    years, and, you know, you sometimes can get a

18    little more sympathy from the zoning boards if

19    it's an existing long-term residence or business,

20    as this was, rather than to say these guys are

21    coming out of Massachusetts.

22              MR. HUMPHREY:  Out of Providence.

23         A.   They're going to put this big tower, so

24    the strategy was, "Look, let's go easily here,

25    get the existing tower replaced.  Once they've

Page 82

```
 1   committed to that, then we can talk about the

 2   telecommunications aspect."  And I think that was

 3   the strategy.  Whether -- again, I guess I should

 4   just answer the questions.

 5        Q.   Did that require Mr. DeCesare's

 6   consent?

 7        A.   Yes.

 8        Q.   And he give that consent?

 9        A.   Yes.  I don't think I have it in

10   writing but --

11        Q.   Verbal.  And it was your perception

12   that the goodwill that he and/or Crossroads and

13   WLIS had would enhance the chances of getting

14   accomplished what you wanted to get accomplished

15   with respect to the tower?

16        A.   Yes.

17             MR. GRUDBERG:  Thank you.  That's

18   all.

19             (Time noted:  4:47 p.m.)

20

21

22

23

24

25
```

# C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____ day of

_____ July _____, 20 04

_____
NOTARY PUBLIC

My Commission Expires:

4/2008