UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CROSSROADS COMMUNICATIONS OF OLD SAYBROOK, LLC,<br>    Plaintiff, | :<br>:<br>:<br>:    CIVIL NO. 3:03CV459(PCD) |
| VS. | :<br>: |
| TOWER VENTURES, INC.,<br>    Defendant. | :    AUGUST 9, 2004 |

**DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT
OF UNDISPUTED MATERIAL FACTS**

Defendant, Tower Ventures, Inc. ("TVI"), submits the following Local Rule 56(a)(1) Statement Of Undisputed Material Facts in support of its Motion for Summary Judgment:

1.  Crossroads Communications of Old Saybrook, LLC ("Crossroads") and TVI entered into an agreement on September 20, 2001. Said agreement is attached hereto as Exhibit A. (Complaint, ¶ 8)

2.  The agreement provided, *inter alia*, that TVI was to construct a telecommunications tower on Crossroads' property. (Complaint, ¶ 10; Ex. A.)

3.  The agreement further provided that TVI was responsible for obtaining any approvals to construct the tower, and that Crossroads shall reasonably cooperate with TVI in connection with TVI's acquisition of approvals. (Complaint, ¶ 10; Ex. A, ¶ 1.)

4.  Specifically, the agreement states:

>    1.  <u>Acquisition of Approvals.</u> Upon execution and delivery of this Agreement by each of the parties hereto, TVI shall apply for as expeditiously as possible, but in no event later than forty-five (45) days after the execution of this Agreement by each of the parties hereto, all approvals, permits, variances, consents, waivers, filings, certificates, certifications and other instruments and documentation

>    from any and all federal, state, local and other governmental entities,
>    and any and all departments and agencies thereof, which are required
>    for and/or otherwise facilitate the construction and operation of the
>    Communications Facility on and at the Tower Site (collectively, the
>    "Approvals"), excluding only those Approvals which by their terms
>    cannot be applied for within such 45 day period and/or until other
>    Approvals are first obtained, provided that such subsequent
>    Approvals shall be applied for as expeditiously as possible, and TVI
>    and [sic] shall thereafter use its best efforts diligently to obtain all
>    such Approvals.  Crossroads shall reasonably cooperate with TVI in
>    connection with TVI's acquisition of the Approvals, provided that all
>    fees, costs and expenses incurred with regard to the Approvals shall
>    be borne exclusively by TVI.  (Ex. A, at 1).

5.      The agreement also provided that TVI would pay off the mortgage and note on Crossroads' property (the "Raycee Mortgage and Note") in an amount not to exceed $150,000, and enter into a ground lease ("Lease") with Crossroads, in which it would pay Crossroads (1) a one-time fee of $150,000; (2) an annual rent of $18,000, payable in equal monthly installments, with increases of 4% on the anniversary of the Rent Start Date; and (3) a share of revenues received by TVI from tenants leasing space on the new communications tower.  (Compl. ¶¶ 10, 12, 14-17.)  In turn, Crossroads would obtain a discharge of the Raycee Mortgage, execute and deliver to TVI a promissory note in the amount of the sum paid by TVI to effect the payoff of the Raycee Note, execute and deliver to TVI a mortgage deed and other related documents, and enter into the Lease.  (Ex. A, at 1.)

6. TVI was under no obligation to pay the Raycee Note nor was Crossroads obligated to issue a note to TVI until each of the enumerated Conditions Precedent had been satisfied.  (Ex. A, at 2.)

7. For the purposes of the agreement, the term "Conditions Precedent" was defined as follows: (i) TVI's receipt of all the Approvals; (ii) TVI receipt of all the Non-disturbance

Agreements (if any); (iii) TVI's receipt of all of the Releases (if any); and (iv) TVI's acceptance and approval of the results of it's Due Diligence Review. (Ex. A, at 2.)

8. "Approvals" is defined in the contract as "all approvals, permits, variances, consents, waivers, filings, certificates, certifications and other instruments and documentation from any and all federal, state, local and other governmental entities, and any and all departments and agencies thereof, which are required for and/or otherwise facilitate the construction and operation of the Communications Facility on and at the Tower Site." (Ex. A, ¶ 1.)

9. The agreement also provided that: "If all of the Conditions Precedent have not been satisfied by July 31, 2002, then either Crossroads or TVI may terminate this Agreement so long as the terminating party is not then in material breach." (Ex. A, at 3.)

10. The agreement provided that upon termination of the agreement, "neither of the parties hereto shall have any further obligations or liabilities hereunder, and this Agreement shall be void and of no further force and effect." (Ex. A, at 3.)

11. After the contract was executed, Keenan Brinn from TVI began working on obtaining the approvals that were required before construction of the tower could commence. (Affidavit of Keenan Brinn, ("Brinn Aff.") at ¶ 5, attached hereto as Exhibit B.)

12. There was an existing lattice tower with guyed wires on the land which was old and being used by Crossroads as a backup radio tower. (Brinn Aff., ¶ 10)

13. The intention of the parties was to replace the existing tower at the same location with a similar, stronger lattice tower. (Deposition transcript of Robert Maccini ("Maccini"), at 75, attached hereto as Exhibit D.)

14. Given the existence of a tower on the property for which a variance had already been obtained, TVI believed that in order to replace the tower at the same location the only application necessary would be for a building permit. (Brinn Aff., ¶11.)

15. Keenan Brinn, with the assistance of others including Don DeCesare, worked on the application for the tower's construction, before and after November 4, 2001. (Brinn Aff.)

16. The 45-day mark by which TVI had to apply for all approvals for the construction of the tower (except approvals which by their terms could not be applied for within the 45-day period) was November 4, 2001. (Ex. A.)

17. When the 45-day period passed, Crossroads did not communicate to TVI that TVI was in breach of the agreement. (Brinn. Aff., at 4)

18. Mr. DeCesare admitted he was aware of the 45-day time frame as it was approaching and as it passed. (Deposition transcript of Don DeCesare ("DeCesare"), at 74-76, attached hereto as Exhibit C.)

19. In his deposition, Mr. DeCesare testified that he wondered to himself "what will I do if we pass the date without any real progress." (Id. at 74).

20. Mr. DeCesare testified that he "ultimately decided" that he "would allow the date to pass." (Id.)

21. Mr. DeCesare never told TVI that he believed TVI was in breach, nor did he send any written communication to TVI notifying TVI that it was in breach prior to TVI's termination of the agreement. (Id. at 74-76.)

22. Never during the nine months following the 45-day mark, namely November 5, 2001 to August 5, 2002 did Crossroads communicate to TVI that TVI was in breach of the agreement. (Brinn Aff., at 4.)

23. Crossroads never demanded TVI's adherence to the 45 day time frame. (Id.)

24. Crossroads continued to work with TVI in the application process for the construction of the tower and never alleged a breach of the agreement until after TVI terminated the contract. (Brinn Aff., at 4-7; DeCesare, at 80)

25. Mr. Brinn spoke with the Old Saybrook Town Planner in November of 2001, at which time she suggested that the proposed lattice guyed tower be changed to a monopole tower. (Brinn Aff., ¶ 34-35.)

26. If the tower to be constructed was changed to a monopole, its location on the property would also be changed. (Brinn Aff., at 5.)

27. A change in the type and location of the tower would eliminate the intrusion on abutting property owners by guyed wires. (Brinn Aff., ¶ 38.)

28. The change from a lattice guyed tower to a monopole tower was discussed with Mr. DeCesare and he agreed to the change. (Brinn Aff., ¶ 40; DeCesare, at 48, 51.)

29. Mr. DeCesare told TVI that changes to the tower which would cause further delay were "fine" with him. (DeCesare, at 48, 51.)

30. In December of 2001, Mr. Brinn and Mr. DeCesare met with Mr. Sklodosky, the Old Saybrook Enforcement Officer to discuss the plans for the new monopole tower. (Brinn Aff., at 5-6.)

31. Mr. Sklodosky informed Mr. Brinn and Mr. DeCesare that they would most likely have to go through the variance application process, rather than the shorter route of seeking a building permit without first obtaining a variance. (Id.)

32. On December 27, 2001, an attorney for TVI, Ken Spigle, sent a letter to Mr. Sklodosky attempting to persuade Mr. Sklodosky that only a building permit was necessary. (Brinn Aff. ¶ 43, Ex. 1.)

33. On January 7, 2002, Mr. Brinn appeared before the Old Saybrook Zoning Commission and was told he had to go to the Old Saybrook Zoning Board of Appeals ("ZBA") to apply for a variance because a building permit would not be issued before a new variance was obtained. (Brinn Aff., at 6.)

34. Mr. DeCesare suggested to Mr. Brinn that TVI hire a prominent local attorney, William Childress, who could help TVI in the variance application process. (Brinn Aff., at 6; DeCesare, at 54.)

35. TVI retained Attorney William Childress in January of 2002 to help with the application process. (Brinn Aff., ¶ 48.)

36. Attorney Childress was an experienced real estate lawyer familiar with the process of applying for variances, and he estimates to handle 80% to 90% of the variances in Old Saybrook that involve counsel. (Deposition transcript of William Childress ("Childress"), at 73, attached hereto as Exhibit F.)

37. Attorney Childress also thought a variance should not be required and he explored this issue with Town officials. (Id., 73.)

38. Attorney Childress was also unsuccessful in persuading the zoning officer that only a building permit was necessary, and thereafter started working on a variance application. (Id. at 73-74.)

39. An application for a variance was filed with the ZBA and put on the ZBA's agenda for a hearing on April 10, 2002, which Attorney Childress, Mr. Brinn and Mr. DeCesare attended. The ZBA voted to approve the variance. (Brinn Aff., at 6-7.)

40. Once the variance was received, the next step was to apply to the Zoning Commission to approve the site plan and obtain a special exemption permit. (Childress, at 33-34.)

41. With Mr. Brinn's help, Attorney Childress applied for Zoning Commission approval and for the special exemption permit in May of 2002. (Childress, at 33-34; Brinn Aff., ¶ 50.)

42. Attorney Childress appeared before the Zoning Commission on July 1, 2002 to explain the application and to request a hearing date. The hearing was set for August 19, 2001. (Childress at 38; Brinn Aff., ¶ 51.)

43. Attorney Childress and Mr. DeCesare thereafter appeared before the Planning Commission on July 17, 2002, and the Planning Commission recommended approval to the Zoning Commission. (Childress, at 39.)

44. Attorney Childress appeared before the Architectural Review Board on July 22, 2002, which ultimately also recommended approval of the application to the Zoning Commission. (Id. at 43.)

45. The next step for Attorney Childress was to appear before the Zoning Commission on August 19, 2002 to obtain the special exemption permit. (Id. at 45.)

46. By July 31, 2002, TVI was not in receipt of all the Approvals, as defined in the agreement. (Brinn Aff., ¶ 54)

47. On August 7, 2002 prior to the hearing before the Zoning Commission, TVI sent a letter to Crossroads exercising its right to terminate the contract because all Conditions Precedent to the contract were not met before July 31, 2002. (Brinn Aff., ¶ 55, Ex. 2.)

48. Crossroads thereafter informed TVI that it was taking the position that the termination as ineffective because TVI was in material breach of the contract. Crossroads claimed that TVI's material breach was its failure to apply for all approvals within 45 days after execution of the contract. (Comp. ¶ 26; Brinn Aff., ¶ 63, Ex. 3.)

49. TVI agreed to continue with the application process before the Zoning Commission without waiving its prior termination at Crossroads' request. (Brinn Aff., at 56.)

50. On August 19, 2002, Attorney Childress and Mr. Brinn appeared before the Zoning Commission for approval of the tower. The meeting had to be continued to the following month because the Commission requested additional information to be made a part of the application. (Brinn Aff., ¶ 57.)

51. On September 3, 2002, the Zoning Commission voted 4 to 1 in favor of issuing the special exemption permit. (Brinn Aff., ¶ 58.)

52. Before it could build the tower, Crossroads still needed to obtain FAA clearance. (Brinn Aff., ¶ 59.)

53. Additionally, before the tower could be operated as a telecommunications tower, Connecticut Siting Council approval was required. (Brinn Aff., ¶ 60.)

54. Attorney Childress thought it was the best strategy to obtain all the local approvals first before filing an application with the Siting Council for approval to operate a telecommunications tower. (Childress, at 48, 51-52; Brinn Aff., ¶ 61.)

55. If TVI properly terminated the contract, then TVI could properly renegotiate the contract subsequent to the termination. (DeCesare, at 90, 118-121.)

DEFENDANT
TOWER VENTURES, INC.


By /s/ Steven R. Humphrey
Steven R. Humphrey (ct06053)
shumphrey@rc.com
Marion B. Manzo (ct22068)
mmanzo@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT  06103-3597
Tel.: (860) 275-8200
Fax:  (860) 275-8299

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed via first-class mail, postage prepaid, on this 9th day of August, 2004, to the following:

David T. Grudberg, Esq.
Jacobs, Grudberg, Belt & Dow, P.C.
350 Orange Street
P. O. Box 606
New Haven, CT 06503-0606

                                                Marion B. Manzo