UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CROSSROADS COMMUNICATIONS OF OLD SAYBROOK, LLC, | : : | |
| Plaintiff, | : : | CIVIL NO. 3:03CV459(PCD) |
| VS. | : : | |
| TOWER VENTURES, INC., | : | OCTOBER 28, 2004 |
| Defendant. | : : | |

**AFFIDAVIT OF DONALD E. DeCESARE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

STATE OF CONNECTICUT)
                     ) ss.:  New Haven
COUNTY OF NEW HAVEN )

    DONALD E. DeCESARE, being duly sworn, deposes and states as follows:

    1.   I am over 18 years of age and believe in the obligations of an oath.

    2.   I am president of plaintiff Crossroads Communications of Old Saybrook, LLC ("Crossroads").

    3.   I testified at a deposition in this matter on June 3, 2004.  I make this affidavit as a supplement to my deposition testimony, and in opposition to the motion for summary judgment filed by defendant Tower Ventures, Inc ("TVI").

    4.   At all relevant times, I was the individual at Crossroads responsible for the negotiations that culminated in the September 20, 2001 agreement with TVI.  After the agreement was signed, I

acted on behalf of Crossroads in all dealings with TVI relating to that agreement.

5.   The contract that is the subject of this litigation was negotiated between April or May of 2001 and September of that year. Most of the negotiations were conducted between me and Robert Maccini, acting on behalf of TVI. At times, a lawyer for Crossroads and a lawyer for TVI were also involved in the negotiations.

6.   During the contract negotiations, the time limits on TVI's performance of its duties was of paramount importance to me. In an early draft of the agreement, see Exhibit A attached, TVI was obligated to apply for and diligently pursue all necessary approvals for the construction and operation of the communications facility; however, there was no time limit placed on TVI's performance of this obligation.

7.   I wanted further assurance that TVI would pursue necessary approvals in an expeditious fashion. I therefore requested that a finite period of time be added to the contract within which TVI would be obligated to apply for any approvals that were necessary.

8.   To the best of my recollection, I initially demanded a 30-day outside limit for TVI's filing of all necessary applications. Ultimately, the parties agreed to a 45-day period for the filing of all such applications, which is set forth in their contract.

9. I considered this time limit to be an essential and important term of the parties' agreement. Because TVI, under the terms of the agreement, bore the responsibility to seek and obtain any necessary approvals, I wanted to ensure that it would do so within 45 days of our execution of the agreement.

10. After execution of the agreement, I dealt primarily with Keenan Brinn from TVI with respect to the communications tower project.

11. I have reviewed the affidavit submitted by Mr. Brinn in connection with TVI's summary judgment motion. In that affidavit, Mr. Brinn indicates he asked me for a FAA "no hazard" letter on "a number of occasions. Brinn Aff., ¶¶ 7-9.

12. I have no recollection of being asked repeatedly for such a letter. I do recall telling Mr. Brinn that such a letter was not in the radio station's files, and, based on my knowledge of FAA regulations, did not need to be, as the existing tower in question was less than 200 feet high. In fact, there was no such letter in the radio station's files.

13. During the period following the signing of the agreement, in late September 2001 through the end of that year, I asked Mr. Brinn several times if he needed any more documentation from me. I was referring to <u>any</u> documentation, not simply material relating to the FAA. He replied that he did not.

14. Mr. Brinn's affidavit also states that he had difficulty obtaining FAA coordinates for the tower, which he needed to provide

to surveyors. He states that I promised him I would provide that information. The alleged approximate date of this discussion regarding coordinates is October 23, 2001, according to Mr. Brinn. Brinn Aff., ¶¶ 24-26.

15. By that date, I had already provided to Mr. Brinn the station's license and FCC registration. Both documents contained the coordinates for the tower in question. In addition, the exact coordinates of the tower were available at that time in various public databases.

16. Mr. Brinn's affidavit also recites a conversation with the Old Saybrook Town Planner, in which she supposedly suggested that the tower design be changed from a guyed tower to a monopole. Brinn Aff., ¶¶ 35-36.

17. I am unaware of any such conversation. Mr. Brinn told me that it was his idea to change the design from a guyed to a monopole tower.

18. Even if the tower design was changed, it was not necessarily a requirement that its location on the property be changed as well.

19. Mr. Brinn also recites in his affidavit the history of the approval process. I believe most of his account is factually correct. However, at the July 22, 2002 meeting of the Architectural Review Board, I presented on behalf of the tower application, because Attorney Childress was either delayed or

4

otherwise obligated.  My recollection is that he joined toward the end of the Board's meeting, after my presentation was complete.

20.  I dispute Mr. Brinn's contention, in paragraph 59 of his affidavit, that as of September 2002 FAA clearance was still necessary before TVI could proceed with construction of the tower.  It is my understanding that FAA approval is necessary only for structures exceeding 200 feet in height above the mean average surrounding terrain.  As noted above, the proposed tower was to be less than 200 feet high.

21.  I also dispute Mr. Brinn's contention that Connecticut Siting Council approval was needed.  It was my understanding from Attorney Childress that, as of September 2002, all necessary approvals for construction of the tower had been obtained.  It was my understanding that Siting Council approval would have been necessary only if and when TVI entered into lease(s) with communications tenants to place communications equipment on the tower.  As of September 2002, there were no such agreements, to the best of my knowledge.

22.  TVI's attempt in August 2002 to exercise a purported right to terminate the contract came as a complete shock to me.  TVI purportedly was attempting to terminate the agreement based on the fact that all necessary approvals had not yet been obtained – even though the last such approval was pending.  In my view, TVI had been responsible for any delay, because they did not file all the necessary approvals within the 45-day window following

execution of the agreement, as required by its express terms. Having caused the delay, I did not understand how TVI could try to benefit from its delay by backing out of our agreement.

                                                _____
                                                Donald E. DeCesare

Sworn to before me this___ day of October, 2004.

_____
Notary Public/Commissioner of Superior Court