Exhibit A

## AGREEMENT RE: LOAN REPAYMENT, MORTGAGE DISCHARGE AND TOWER SITE LEASE

THIS AGREEMENT RE: LOAN REPAYMENT, MORTGAGE DISCHARGE AND TOWER SITE LEASE (the "Agreement") is made and entered into this ____ day of September, 2001 by and between CROSSROADS COMMUNICATIONS OF OLD SAYBROOK, LLC, a Connecticut limited liability company ("Crossroads"); and TOWER VENTURES, INC., a Rhode Island corporation ("TVI").

### RECITALS:

WHEREAS, TVI desires to construct a communications tower and related facilities (the "Communications Facility") on certain parcels of real estate which are owned by Crossroads, located in Old Saybrook, Connecticut, and more particularly described in Exhibit A, attached hereto and by this reference made a part hereof (the "Property"); and

WHEREAS, Crossroads is amenable to leasing a portion of the Property (the "Tower Site") to TVI for the purpose of permitting TVI to construct and operate the Communications Facility thereon; and

WHEREAS, upon TVI's completion and approval of its due diligence review of the Property and acquisition of all permits and approvals which are required for the construction and operation of the Communications Facility on the Tower Site, TVI will: (i) payoff the outstanding principal and interest due under that term promissory note (the "Raycee Note") dated October 25, 1996 by Crossroads in favor of Del Raycee ("Raycee"), which Raycee Note is presently secured by that Mortgage Deed encumbering the Property dated October 25, 1996 by Crossroads in favor of Raycee and recorded in the Old Saybrook Land Records in Book 339, Page 291 (the "Raycee Mortgage"); and (ii) enter into a ground lease with Crossroads pursuant to which TVI shall have the right construct and operate the Communications Facility on and at the Tower Site and the right to utilize certain access, utilities and guy wire and anchor easements described therein; and

WHEREAS, in consideration thereof, Crossroads shall: (i) obtain from Raycee a discharge of the Raycee Mortgage; (ii) execute and deliver to TVI a promissory note in the principal amount of the sum paid by TVI to Raycee to effect the payoff of the Raycee Note; (iii) execute and deliver to TVI a mortgage deed, security agreement and assignment of leases and rents encumbering Property to secure Crossroads payment obligations under the note described in subsection (ii) of this paragraph; and (iv) enter into the ground lease in subsection (ii) of the immediately preceding paragraph.

NOW THEREFORE, in consideration of the foregoing premises and the mutual promises set forth herein and the payment by TVI to Crossroads of $10.00, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1. **Acquisition of Approvals**. Upon execution and delivery of this Agreement by each of the parties hereto, TVI shall apply for and diligently pursue all approvals, permits, variances, consents, waivers, filings, certificates, certifications and other instruments and documentation from any and all federal, state, local and other governmental entities, and any and all departments and agencies thereof, which are required for and/or otherwise facilitate the construction and operation of the Tower Facility on and at the Tower Site (collectively, the "Approvals"). Crossroads shall reasonably cooperate with TVI in connection with TVI's acquisition of the Approvals, provided that all fees, costs and expenses incurred with regard to the Approvals shall be borne exclusively by TVI.

2. **Due Diligence**. Upon execution and delivery of this Agreement by each of the parties hereto, TVI may order with respect to the Property: (i) a title commitment for lessee's title insurance; (ii) a survey and/or (iii) a Phase I Environmental Assessment and NEPA Screen. TVI shall also have the right to inspect (at TVI's expense) the Property and the improvements presently located thereon, and to have conducted such engineering studies and other investigations as it reasonably may deem appropriate, and to review copies of all documentation (the "Property Documentation") in Crossroads' possession relating to the Property (collectively, the "Due Diligence Review"). Crossroads hereby covenants and agrees that it shall deliver to TVI copies of all of the Property Documentation within twenty days after the date hereof.

WO 02

3. <u>Releases and Non-disturbance Agreements</u>. If the Due Diligence Review discloses or TVI otherwise becomes aware of any liens, claims or encumbrances upon the Property and/or any of the improvements and fixtures located thereon (collectively, the "<u>Encumbrances</u>"), TVI may seek to obtain from the holders of such Encumbrances, including, but not limited to, Webster Bank: (i) subordination, attornment and non-disturbance agreements, the form and terms of which shall be acceptable to TVI in its sole discretion (the "<u>Non-Disturbance Agreements</u>"); and/or (ii) releases of the Property and all other assets securing Crossroads' obligations under the Note (as such term is hereinafter defined) pursuant to the Mortgage (as such term is hereinafter defined), provided that the form and terms of such releases shall be acceptable to TVI in its sole discretion (the "<u>Releases</u>").

4. <u>Payoff of Raycee Note and Discharge of Raycee Mortgage</u>.

(a) Upon satisfaction of each of the Conditions Precedent (as such term is hereinafter defined) in accordance with the terms hereof, and subject to the terms of Section 4(b) hereof, TVI (and, if applicable pursuant to Section 4(b) hereof, Crossroads) shall pay to Raycee the principal and interest then outstanding under the Raycee Note, in full satisfaction and payment thereof, upon receipt from Raycee of a executed and recordable discharge and termination of the Raycee Mortgagee, which discharge shall in form and substance be acceptable to TVI in its sole discretion, and receipt from Crossroads of the Note and the Mortgage. TVI shall not be obligated in any manner whatsoever to payoff the Raycee Note until each of the Conditions Precedent has been satisfied in accordance with the terms hereof. For purposes of this Agreement, the term "<u>Conditions Precedent</u> " shall mean: (i) TVI's receipt of all of the Approvals; (ii) TVI receipt of all of the Non-disturbance Agreements (if any); (iii) TVI's receipt of all of the Releases (if any); and (iv) TVI's acceptance and approval of the results of it's Due Diligence Review.

(b) Notwithstanding anything to the contrary set forth herein, the total sum (including both principal and interest) that TVI shall be required to pay to Raycee in order to effect the payoff of the Raycee Note shall not under any circumstances exceed One hundred Fifty Thousand Dollars ($150,000). If the total sum (including principal and interest) that is required to payoff the Raycee Note (i.e. the "<u>Raycee Payoff Amount</u>") exceeds $150,000, Crossroads hereby covenants and agrees that it shall pay to Raycee a sum equal to the amount by which the Raycee Payoff Amount exceeds $150,000, simultaneously with the payment made by TVI to Raycee pursuant to Section 4(a) hereof.

5. <u>Note and Mortgage</u>. Upon satisfaction of the Conditions Precedent in accordance with the terms hereof, simultaneously with the payoff of the Raycee Note and discharge of the Raycee Mortgage, Crossroads shall execute and deliver to TVI: (i) a promissory note (the "<u>Note</u>") in the principal amount equal to the amount paid by TVI to Raycee to satisfy and pay in full the Raycee Note pursuant to Section 4 hereof, which Note shall be exactly in the form attached hereto as <u>Exhibit C</u> with the blank spaces therein completed in accordance with the terms hereof; and (ii) a mortgage deed, security agreement and assignment of leases and rents (the "<u>Mortgage</u>") securing the payment and performance of Crossroads obligations under the Note and otherwise to TVI, which Mortgage shall be exactly in the form attached hereto as <u>Exhibit B</u> with the blank spaces therein completed in accordance with the terms hereof. Notwithstanding anything to the contrary set forth herein, Crossroads' obligations to execute and deliver the Note and the Mortgage are hereby made expressly contingent upon TVI's simultaneous payoff of the Raycee Note in accordance with the terms of Section 4 hereof.

6. <u>Ground Lease</u>. Upon satisfaction of the Conditions Precedent in accordance with the terms hereof, immediately after Crossroads execution and delivery to TVI of the Note and the Mortgage, Crossroads and TVI shall execute and deliver to each other a ground lease (the "<u>Lease</u>") pursuant to which TVI shall lease the Tower Site from Crossroads and have the right to use certain easements and rights of way across the Property described in the Lease. The Lease shall be exactly in the form attached hereto as <u>Exhibit D</u> with the blank spaces therein completed in accordance with the terms hereof. TVI shall not be obligated in any manner whatsoever to execute, deliver and perform in accordance with the Lease until each of the Conditions Precedent has been satisfied in accordance with the terms hereof and the Note and the Mortgage have been executed and delivered to TVI.

2

7. <u>Waiver of Conditions Precedent</u>.    TVI may waive all or any of the Conditions Precedent, provided that such waiver is set forth in a written instrument which has been executed by TVI.

8. <u>Outside Closing Date</u>.    If all of the Conditions Precedent have not been satisfied by August 31, 2002, then either Crossroads or TVI may terminate this Agreement so long as the terminating party is not then in material breach of this Agreement. Upon termination of this Agreement pursuant to this Section 10, neither of the parties hereto shall have any further obligations or liabilities hereunder, and this Agreement shall be void and of no further force and effect.

9. <u>Miscellaneous</u>.

(a) All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given when either personally served or mailed by certified or registered mail, return receipt requested, or overnight courier service, at the addresses set forth on the signature page of this Agreement or to such other address or to such other persons as TVI or Crossroads shall have last designated by written notice to the other parties.

(b) <u>Benefits</u>. This Agreement shall inure to the benefit of and be binding upon the parties and their respective permitted successors and assigns.

(c) <u>Governing Law</u>. This Agreement shall be governed by and construed according to the internal laws of the State of Connecticut.

(d) <u>Assignment</u>. Neither Crossroads nor TVI may assign this Agreement or any rights or obligations hereunder without the consent of the other party hereto.

(e) <u>Modification</u>. Except as provided in Section 9 hereof, this Agreement may not be amended, waived, modified or supplemented at any time, except by a writing executed by the parties hereto.  No amendment, supplement or termination of this Agreement shall affect or impair any rights or obligations which have heretofore matured hereunder.

(f) <u>Cumulative Rights; Waiver</u>. Each and every right granted to a party hereunder, or in any other document contemplated hereby, or delivered hereunder or executed concurrently herewith, or by law or equity, shall be cumulative and may be exercised at any time, or from time to time.  No failure on the part of any party to exercise, and no delay in exercising, any right shall operate as a waiver thereof, nor shall any single or partial exercise by any party of any right preclude any other or future exercise of such right or the exercise of any other right.

(g) <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which, when executed, shall be deemed an original instrument, but all of which taken together shall constitute one and the same agreement.

(h) <u>Severability</u>. Any term or provision of this Agreement which is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Agreement.

**[Signature Block Appears on the Next Page]**

3

**WO 0286**

**IN WITNESS WHEREOF,** the parties hereto have caused these presents to be signed, sealed and delivered as of the date first above written.

WITNESS:                              **CROSSROADS COMMUNICATIONS OF OLD SAYBROOK, LLC**

_____             By:_____
                                          Don DeCesare
                                          President

                                      Address: _157 N. Soir Hill Rd._
                                               _Norwalk, CT. 06850_

WITNESS:                              **TOWER VENTURES, INC.**

_____             By: _____
                                          Robert J. Maccini
                                          President

                                      Address: 170 Westminster Street
                                               Suite 701
                                               Providence, R.I.  02903

4

WO 0287

## EXHIBIT A

## DESCRIPTION OF PROPERTY

That certain piece or parcel of land with the buildings thereon, located on the northerly side of Springbrook Road in the Town of Old Saybrook, County of Middlesex and State of Connecticut; being more particularly shown as parcels A and B on a plan or map entitled "Survey Map of a Portion of the Property of Long Island Sound Radio Corp., Old Saybrook, Connecticut, Scale 1" - 20', Dated January 2, 1970, Revision of 7-2-69 Map, Angus L. McDonald, Land Survey Consultants, P.C., Old Saybrook, Conn.", said plan or map to be filed in the Old Saybrook Land Records; said premises being more particularly bounded and described as follows:

BEGINNING at a point at a post corner on a steel fence on the northerly side of said Springbrook Road, which point marks the southeasterly corner of the within conveyed premises and the southwesterly corner of land now or formerly of Daniel Adanti;

THENCE RUNNING South 58° 59' 10" West by and along the northerly line of Springbrook Road one hundred twenty-one and eighty-five hundredths (121.85) feet to an iron pipe and other land now or formerly of Long Island Sound Radio Corporation;

THENCE RUNNING North 31° 00' West one hundred seventy-nine and forty-five hundredths (179.45) feet to another iron pipe;

THENCE RUNNING North 59° 11' 10" East still by and along land now or formerly of Long Island Sound Radio Corporation one hundred three and seventy-three hundredths (103.73) feet to another iron pipe and land of said Adanti;

THENCE RUNNING South 39° 40' 23" East by and along said Adanti land thirteen and fifty-three hundredths (13.53) feet to a wood fencepost; and

THENCE continuing South 37° 30' 05" East forty-seven and seventy-three hundredths (47.73) feet to an iron pipe;

THENCE continuing South 35° 54' 09" East thirty-seven and seven hundredths (37.07) feet to another iron pipe; and

THENCE continuing South 36° 16' 15" East still by and along said Adanti land eighty-one and sixty-eight hundredths (81.68) feet back to the place or point of BEGINNING.

SAID premises are conveyed together with the right, privilege and authority perpetually to maintain a ground system and guy wires for radio transmission, including the right to lay, maintain, operate, construct, alter, repair and replace the same in or through land adjacent to the land of the Grantee and immediately north and west thereof bounded with a radius of 175 feet from the base of the transmission tower as shown on parcel "B" on the aforesaid plan or map and including the area shown as within said radius on Parcel "C" of said plan or map.

ALSO the right to enter on the land within said easement at any time for the purposes of constructing, servicing, repairing or replacing said ground system or any material therein.

**Said premises are subject to:**

1) Obligations in connection with maintenance of grounds system as more fully set forth in instrument recorded in Volume 253 at Page 4 of the Old Saybrook Land Records.

5

**WO 0288**

2) Building restrictions as more fully set forth in an instrument recorded in Volume 253 at Page 4 of the Old Saybrook Land Records.

3) Right of first refusal in favor of Long Island Sound Radio Corporation as more fully set forth in an instrument recorded in Volume 253 at Page 4 of the Old Saybrook Land Records.

4) Any and all provisions of any public or private law, ordinance or governmental regulation, including building and zoning ordinances and wetland regulations affecting said premises, and to real property taxes due the Town of Old Saybrook on the Grand List of October 1, 1995, second half.

WO 0289

**EXHIBIT B**

<u>FORM OF MORTGAGE</u>

**[See Attached Mortgage]**

**WO 0290**

## MORTGAGE DEED, SECURITY AGREEMENT
## AND ASSIGNMENT OF LEASES AND RENTS

TO ALL PEOPLE TO WHOM THESE PRESENTS SHALL COME, GREETINGS:

KNOW YE, that **Crossroads Communications of Old Saybrook, LLC**, a Connecticut limited liability company with its principal place of business located at _____ (the "Mortgagor"), for consideration paid to the Mortgagor by **Tower Ventures, Inc.**, a Rhode Island corporation with a principal place of business located at 170 Westminster Street, Suite 701, Providence, Rhode Island 02903 (the "Mortgagee"), the receipt of which is hereby acknowledged, does hereby give, grant, bargain, sell and confirm to the Mortgagee, with MORTGAGE COVENANTS (as defined in Section 47-36(l) of the General Statutes of Connecticut (as amended from time to time)), the following described real estate and other property:

**I. LAND:** All of the real estate located in in the Town of Old Saybrook, County of Middlesex, State of Connecticut, more particularly described in Exhibit A attached hereto and by reference made a part hereof (the "Premises").

**II. IMPROVEMENTS AND OTHER PROPERTY:** All buildings and improvements now or hereafter situated upon the Premises (collectively, the "Improvements").

**III. EASEMENTS AND OTHER REAL PROPERTY RIGHTS:** All easements, bridges and right of way contiguous to or adjoining the Premises and the Improvements thereon, and all other easements, if any, inuring to the benefit of the Premises, and all rights, title and interests of the Mortgagor in and to the land lying in the bed of any public street, road or avenue, opened or proposed, in front of or adjoining the Premises, and in and to any and all privileges, rents, tenements, hereditaments or appurtenances, belonging or in any way appertaining thereto and any reversion or reversions and remainder or remainders belonging or in any way appertaining thereto, and also any and all further estates, rights, title, interests, property, claims and demands whatsoever, either in law or in equity, of the Mortgagor of, in or to any of the above (collectively, the "Other Real Property Rights").

**IV. FIXTURES:** All fixtures of every kind and description now or hereafter owned by the Mortgagor or in which the Mortgagor has an interest (but only to the extent of such interest) and situated or to be situated upon or used in connection with the Premises or in any of the Improvements, together with any renewals, replacements or additions thereto or substitutions therefor, all proceeds and products thereof, and now or hereafter located at, or used in connection with the operation of the Premises or the Improvements (collectively, the "Fixtures"). As continuing security for the Secured Obligations (as such term is hereinafter defined) the Mortgagor hereby pledges, assigns and grants to the Mortgagee a security interest in all of the Fixtures.

**V. PROCEEDS FOR DAMAGE TO OR THE TAKING OF THE MORTGAGED PROPERTY:** Any and all awards or payments, including interest thereon, and the right to receive the same, which may be made with respect to the Mortgaged Property (as such term is hereinafter defined) as a result of (i) the exercise of the right of eminent domain, (ii) the alteration of the grade of any street, (iii) any other injury to or decrease in value of the Mortgaged Property, or (iv) any acquisition by any redevelopment or other municipal agency of any portion of the Mortgaged Property pursuant to any right of acquisition reserved by such agency in or as a result of any redevelopment plan or agreement, to the extent of all amounts which may be secured by this Mortgage, and of the reasonable attorneys' fees, costs and disbursements incurred by the Mortgagee in connection with the collection of such award or payment; and the Mortgagor hereby agrees to execute and deliver, from time to time, such further instruments as may be requested by the Mortgagee to confirm such assignment to the Mortgagee of any such award or payment; and all recoveries of judgements with respect to damage or losses to the Mortgaged Property and insurance proceeds; and all awards or payments, including interest thereon, which may be made with respect to the Mortgaged Property as a result of any casualty or other event covered by insurance (collectively, the "Proceeds").

8

**VI. UTILITY DEPOSITS, RECORDS, NAME AND GOODWILL:** All right, title and interest of the Mortgagor in and to all monetary deposits that the Mortgagor has been or will be required to give to any public or private utility with respect to utility services furnished or to be furnished to the Premises, and all of the records and books of account now or hereafter maintained by the Mortgagor in connection with the operation of the Mortgaged Property, and the right, in event of foreclosure of the Mortgaged Property hereunder, to take and use any name by which the Mortgaged Property is then known or any variation of the words thereof, and the goodwill of the Mortgagor with respect thereto (collectively, the "Miscellaneous Property"). ·

**VII. MORTGAGED PROPERTY INCOME:** All rents, income, profits, security deposits and other benefits to which the Mortgagor may now or hereafter be entitled from the Mortgaged Property and/or the business operations conducted at or from the Mortgaged Property (collectively, the "Mortgaged Property Income").

All of the Premises, the Improvements, the Other Real Property Rights, the Fixtures, the Proceeds, the Miscellaneous Property and the Mortgaged Property Income hereby granted and conveyed shall be and are hereinafter generally and collectively referred to as the "Mortgaged Property".

**TO HAVE AND TO HOLD** the Mortgaged Property unto the Mortgagee, and its successors and assigns forever, together with all and singular the tenements, hereditaments and appurtenances belonging or in any way appertaining to the Mortgaged Property, whether now owned or acquired hereafter, with the reversions, remainders, rents, issues, incomes and profits thereof, and all of the estate, rights, title, interests and claims whatsoever which the Mortgagor now has or which it may hereafter acquire in and to the Mortgaged Property.

This conveyance is made for the purpose of securing (collectively, the "Secured Obligations"): ~~in favor of the Mortgagee~~

(a) Payment of any and all present and future indebtedness of the Mortgagor to the Mortgagee, arising out of and/or in connection with the payment of the principal and interest of that certain secured promissory note of the Mortgagor of even date herewith in the amount of _____ Dollars ($_____) (the "Note"), and the payment of all sums due from the Mortgagee under the terms of the Loan Documents (as such term is hereinafter defined). A copy of the Note is attached hereto as **Exhibit B** and incorporated herein by this reference. The Note matures on November 1, 2016 and the principal and interest due thereunder shall be paid in equal consecutive monthly installments in accordance with the terms thereof.

(b) Performance of each and every obligation of the Mortgagor contained herein and in the Note.

The Note, this Mortgage, that Agreement re: Loan Repayment, Mortgage Discharge and Tower Site Lease dated September ____, 2001 by and between the Mortgagor and the Mortgagee (the "Master Agreement"), and all documents executed by the Mortgagor in connection with the Note, this Mortgage and/or Master Agreement, including, but not limited to, other documents securing the Note, shall hereinafter be referred to as the "Loan Documents".

**THE CONDITION OF THIS DEED IS SUCH THAT:**

WHEREAS, the Mortgagor is justly indebted to the Mortgagee in the sum of _____ Dollars ($_____), as evidenced by the Note made by the Mortgagor in favor of the Mortgagee; and

WHEREAS, the Mortgagee desires to secure the prompt payment of the Note, together with the interest accruing thereon and all other Secured Obligations;

9

**WO 0292**

NOW, THEREFORE, the Mortgagor, in order to protect more full the security of the Mortgagee, this Mortgage and the Note, does hereby covenant and agree with the Mortgagee that:

1. **Collateral Assignment of Leases and Rents and Other Agreements**. The Mortgagor hereby assigns to the Mortgagee as collateral security for the Secured Obligations all of the Mortgagor's rights and benefits under any and all of the Assigned Agreements (as such term is hereinafter defined) and any and all rents and other amounts now or hereafter owing with respect to the Assigned Agreements or the use or occupancy of the Mortgaged Property. This collateral assignment shall be absolute and effective immediately, but the Mortgagor shall have a license, revocable by the Mortgagee upon the occurrence and continuation of an Event of Default (as such term is hereinafter defined), to continue to collect all rents and other amounts owing or otherwise due under, to exercise and enjoy all of Mortgagor's rights, title, interests and remedies arising from and/or otherwise set forth in, and to perform in accordance with the Assigned Agreements until an Event of Default occurs and the Mortgagee exercises its rights and remedies to collect such rents and other amounts as set forth herein. The Mortgagor does hereby constitute and appoint the Mortgagee its true and lawful attorney, with full power of substitution and revocation, to sue for and collect all sums due under the Assigned Agreement at any time and from time to time when any Event of Default (hereinafter defined) exists hereunder. The power of attorney granted pursuant to this Section 1 is a power coupled with an interest and shall be irrevocable. For purposes of this Mortgage, the term "Assigned Agreements" means any and all present and future leases, easements, agreements, instruments, tenancies and/or rights of use and occupancy, with amendments, if any, and any extensions, renewals or guarantees of the tenants' obligations thereunder, now or hereafter on or affecting the Mortgaged Property, whether or not recorded, including, without limitation, that Communications Site Lease Agreement dated _____ by and between the Mortgagor and the Mortgagee (the "Site Lease"), with all security therefor, and all books and records which reflect payments made under the Assigned Agreements.

2. **Security Agreement**: It is the intent of the parties hereto that this Mortgage shall also constitute a Security Agreement within the meaning of the Uniform Commercial Code as in effect in the State of Connecticut (the "Uniform Commercial Code") with respect to all Fixtures above referred to and all replacements thereof, substitutions therefor or additions thereto (said property being sometimes hereinafter referred to as the "Collateral"), and that a security interest shall attach thereto for the benefit of the Mortgagee to secure the indebtedness evidenced by the Note and the Loan Documents and secured by this Mortgage, and all other sums and charges which may become due hereunder or thereunder. The Mortgagor hereby authorizes the Mortgagee to file financing and continuation statements with respect to the Collateral without the signature of Mortgagor whenever lawful. Upon the occurrence of an Event of Default and to the extent permitted by law, the Mortgagee shall have the option of proceeding as to both real property and the Fixtures in accordance with its rights and remedies in respect of the real property, in which event the default provisions of the Uniform Commercial Code shall not apply. The parties agree that in the event the Mortgagee elects to proceed with respect to the Collateral separately from the real property, ten (10) days' notice of the sale of the Collateral shall be sufficient notice. The Mortgagor agrees that, without the written consent of the Mortgagee, the Mortgagor will not remove or permit to be removed from the Premises or the improvements thereon any of the Collateral unless the same is immediately replaced with unencumbered fixtures of a quality and value equal or superior to those which they replace. All such replacements, renewals and additions shall become and be immediately subject to the security interest of this Mortgage and this agreement and be covered thereby. CARBON, PHOTOGRAPHIC OR OTHER REPRODUCTION OF THIS MORTGAGE OR ANY FINANCING STATEMENT RELATING TO THIS MORTGAGE SHALL BE SUFFICIENT AS A FINANCING STATEMENT. THIS MORTGAGE IS EFFECTIVE AND SHALL BE EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING WITH RESPECT TO ALL GOODS WHICH ARE OR ARE TO BECOME FIXTURES INCLUDED WITHIN THE PREMISES AND IS TO BE FILED FOR RECORD IN THE REAL ESTATE RECORDS OF THE OFFICE OF THE TOWN CLERK WHERE THE PREMISES ARE SITUATED. THE MAILING ADDRESS OF THE MORTGAGOR AND THE ADDRESS OF THE MORTGAGEE FROM WHICH INFORMATION CONCERNING THE SECURITY INTEREST MAY BE OBTAINED ARE SET FORTH IN SECTION 6.9 HEREOF.

10

WO 0293

3. **Covenants.** The Mortgagor hereby covenants and agrees with the Mortgagee:

3.1. That the Mortgagor is the true, sole and lawful owner of the Mortgaged Property; that the Mortgagor is lawfully seized and possessed of the Mortgaged Property in fee simple; that the Mortgaged Property is free from all encumbrances, except as aforesaid; that the Mortgagor has good right, full power and lawful authority to sell and convey the Mortgaged Property to the Mortgagee.

3.2. That the Mortgagor will warrant and defend the Mortgaged Property to the Mortgagee forever against the lawful claims and demands of all persons, except as aforesaid.

3.3 The Mortgagor will pay the debt evidenced by the Note and all other sums due thereunder in lawful money of the United States and pay and perform all of its obligations under the Note, this Mortgage, and the other Loan Documents and every other instrument now or hereafter securing, evidencing, guarantying or relating to the Note and the loan evidenced thereby at the times and in the manner set forth in the Loan Documents.

3.4. That the Mortgagor shall pay to the Mortgagee all reasonable costs, fees and expenses (including reasonable counsel fees) suffered or incurred by the Mortgagee in the enforcement, exercise or defense of its rights or powers hereunder or in collecting the indebtedness hereby secured, and all taxes and assessments of every kind and nature assessed, imposed or constituting a lien upon this Mortgage or upon the Mortgagee in respect to this Mortgage, the Loan Documents or the indebtedness evidenced hereby and thereby, whether under statutes now in force or that may be hereafter enacted, and any sums expended by the Mortgagee in making any repairs to the Mortgaged Property which the Mortgagee, at its option but without obligation to do so, may make in keeping the Mortgaged Property in good condition and repair, all of which sums shall be secured by this Mortgage and shall bear interest at the rate provided in the Note upon the indebtedness secured hereby until payment thereof.

3.5. That no waiver, forbearance, extension of time or indulgence shown by the Mortgagee to the Mortgagor or any other person now or hereafter interested herein or in the Mortgaged Property or in the Loan Documents with respect to any condition, covenant or agreement on the part of the Mortgagor to be paid, performed or observed as set forth or referred to herein or in the Loan Documents will affect the right of the Mortgagee thereafter to require payment, performance or observance of the same or of any other covenant, condition or agreement.

3.6. That Mortgagor will not sell, convey, assign, transfer, mortgage, pledge, hypothecate, lease or dispose of all or any part of any legal or beneficial interest in the Mortgagor or the Mortgaged Property or any part thereof, or change the ownership of, commence an action to dissolve or otherwise effect or allow the dissolution of the Mortgagor; or initiate or allow any change in the nature of the use and occupancy of the Mortgaged Property; or record any Declaration of Common Interest Community; or permit any of the foregoing.

3.7. That the Mortgagor will not permit to be created or suffer to exist any mortgage, lien, security interest, attachment or other encumbrance or charge on the Mortgaged Property or any part thereof or interest therein (except for any liens, security interests and encumbrances in favor of the Mortgagee), including, without limitation, (i) any lien arising under any Federal, state or local statute, rule, regulation or law pertaining to the release or cleanup of Hazardous Substances and (ii) any mechanics' or materialmen's lien. The Mortgagor further agrees to give the Mortgagee prompt written notice of the imposition of any lien referred to in this Section and to take any action necessary to secure the prompt discharge or release of the same. The Mortgagor agrees to defend its title to the Mortgaged Property and the Mortgagee's interest therein against the claims of all persons and, unless the Mortgagee requests otherwise, to appear in and diligently contest, at the Mortgagor's sole cost and expense, any action or proceeding that purports to affect the Mortgagor's title to the Mortgaged Property or the priority or validity of this Mortgage or the Mortgagee's interest hereunder.

3.8 That the Mortgagor will not enter into or modify the Assigned Agreements without the prior written consent of the Mortgagee, which consent shall not be unreasonably withheld, or execute any

11

**WO 0294**

assignment of the Assigned Agreements except in favor of the Mortgagee, or accept any rentals under any of the Assigned Agreements for more than one month in advance and will at all times perform and fulfill every term and condition of the Assigned Agreements.

3.9.    That if this instrument is signed by more than one party as Mortgagor, the obligations created hereby shall be both joint and several.

3.10.    That the Mortgagor shall pay (a) the indebtedness secured hereby in accordance with the terms and tenor of the Loan Documents; and  (b) all taxes and assessments of every nature levied or to be levied upon the Mortgaged Property prior to the full payment and discharge of said indebtedness, whether under any present or future law.

3.11.    That the Mortgagor will:

(a)  ~~Mortgaged the~~ (i) keep and maintain the Mortgaged Property in good condition, working order and repair, ordinary wear and tear excepted; and (ii) not cause or permit strip or waste to the Mortgaged Property.   The Mortgagee and any person authorized by the Mortgagee shall have the right to enter and inspect the Mortgaged Property at all reasonable times.

(b)  Promptly repair, restore, rebuild, replace or alter as necessary any portion of the Mortgaged Property which may be damaged or destroyed by fire or other casualty, or taken by condemnation, as nearly as possible to the condition such Improvements were in prior to such damage, destruction or taking, at Mortgagor's own cost, risk, and expense, without regard to the availability or adequacy of insurance proceeds or condemnation awards. All such work shall be done promptly in a good and workmanlike manner. The Mortgagor will give the Mortgagee prompt notice of damage in excess of Twenty-Five Thousand Dollars ($25,000) to such Mortgaged Property.

(c)  Pay when due all good faith claims for labor and materials provided to the Mortgaged Property.

(d)  Not remove or demolish any such Improvements, or make any change or alteration to such Improvements as would change their general character or size, without the prior written consent of the Mortgagee.  The Mortgagor further covenants that it will not make, authorize or permit to be made any structural alterations to the Mortgaged Property, or any alteration thereto the estimated cost of which exceeds Twenty-Five Thousand Dollars ($25,000), except in such manner and under such terms and conditions as the Mortgagee may require. No Fixtures shall be removed from the Premises  without the prior written consent of the Mortgagee. The provisions of this subsection shall apply to any change, alteration or addition made or required to be made by the Mortgagor in the course of complying with the provisions of any other Section contained herein.

3.9.   That all leases, if any, of all or any portion of the Mortgaged Property will be subordinated to the lien created by this Mortgage, and shall provide that following the sale of the Mortgaged Property through foreclosure, the tenant under each such lease will, upon ten (10) days' written notice from the purchaser of the Mortgaged Property given within thirty (30) days after the sale thereof, attorn to such purchaser or its assignee as the direct tenant of such purchaser or its assignee, provided the tenant is the recipient of a non-disturbance agreement from such purchaser or assignee and such purchaser or assignee assumes the landlord's obligations under such lease. No such lease will be executed by the Mortgagor without prior written approval of the Mortgagee. The Mortgagor will, from time to time, promptly upon demand, deliver to the Mortgagee a true and correct schedule of all such leases then in effect, showing the name of the tenant, the space occupied, the rental rate and the expiration date of the term.

3.12.    That the Mortgagor will continuously operate the Mortgaged Property in compliance with (a) all applicable laws, ordinances, rules, regulations and directions of government authorities having jurisdiction of the Premises, and (b) the requirements of all policies of insurance on the Mortgaged Property. The Mortgagor will also procure, pay for and maintain all permits, licenses and other

12

**WO 0295**

authorizations needed for the operation of the Mortgaged Property (excluding any permits, licenses and other authorizations required by the Mortgagee to operate the Mortgagee's business on the Premises).

3.1$ That there is no action, suit or proceeding pending, or to the knowledge of the Mortgagor, threatened against or materially affecting the Mortgagor, the Mortgaged Property, the business operations conducted at or from the Mortgaged Property by Mortgagor, or the validity or enforceability of the Loan Documents.

3.1$ That the Mortgagor is not in default under the terms of any instrument evidencing or securing any indebtedness of the Mortgagor and there has occurred no event which would, if uncured or uncorrected, constitute a default under any such instrument with the giving of notice, passage of time, or both.

3.1$. Insurance:

(a) That the Mortgagor will at all times (1) keep the Mortgaged Property fully insured, for the mutual benefit of the Mortgagor and the Mortgagee, as their respective interests may appear, in amounts sufficient to prevent the Mortgagor or the Mortgagee from becoming a co-insurer of any loss under the applicable policies but in any event in amounts not less than one hundred percent (100%) of the full replacement value of the Mortgaged Property, against loss or damage (i) by fire and such other risks and hazards as now are or hereafter may be insured under standard "Extended Coverage" forms or endorsements, covering the completed value of the Improvements and the value of all related material stored on the Premises or stored elsewhere; and (ii) by flood and such other risks of damage as the Mortgagee shall from time to time reasonably require, provided that insurance against such other risks shall then be commonly carried by prudent owners or lessees of buildings or improvements in the locality similar in character, construction, use and occupancy to the Improvements then constituting a portion of the Mortgaged Property; (2) maintain general accident and public liability insurance against all claims for bodily injury, death or property damage occurring upon, in or about the Premises or the Improvements thereon, or any vault space or sidewalk adjoining the Premises, or any area or passageway adjacent to the Premises which is under the control of the Mortgagor, such insurance to afford protection to such limits as the Mortgagee may require; but in any event not less than One Million Dollars ($1,000,000) per occurrence; and (3) maintain rental and/or business interruption insurance, as the case may be, in such amount as the Mortgagee shall require. The Mortgagee shall pay all premiums on the aforementioned insurance policies as and when the same are due. If the Mortgagor fails to provide such insurance or to pay the premiums thereon, the Mortgagee may effect such insurance or pay the premiums thereon, and all premiums so paid shall be secured by this Mortgage and shall bear interest at the rate provided upon the indebtedness secured hereby until payment thereof.

(b) That all such insurance shall be evidenced by valid and enforceable policies whose form and substance shall be reasonably acceptable to the Mortgagee. Said policies shall be issued by insurers of recognized responsibility authorized to do business in the state where the Premises are located. The Mortgagor shall deliver copies of all such insurance policies to the Mortgagee upon request.

(c) That all policies of insurance of the character described in subdivisions (1) and (2) of Section 3.17(a) hereof shall: (i) Contain a standard non-contributory form of mortgagee clause satisfactory to the Mortgagee, which clause shall name the Mortgagee as mortgagee and loss payee; and provide, to the extent obtainable, that such policies may not be canceled or amended without at least twenty (20) days' prior written notice to the Mortgagee.

(d) That if by reason of any damage or destruction to the Mortgaged Property, any sums are paid under any insurance policy mentioned in or contemplated by this Section 3.17 hereof, such sums shall be paid to the Mortgagee alone, to be applied toward reimbursement of all costs and expenses of the Mortgagee in collecting such proceeds, and, at the option of the Mortgagee, either towards the payment of the indebtedness secured hereby or any portion thereof, whether or not due and payable, or to the repair, restoration, rebuilding or replacement of that part of the Mortgaged Property so damaged

13

WO 0296

or destroyed. The Mortgagee is authorized (i) to adjust and compromise such loss without the consent of the Mortgagor, (ii) to collect, receive and receipt for such proceeds in the name of the Mortgagee and the Mortgagor, and (iii) to endorse the Mortgagor's name upon any draft or check in payment of such loss and upon any agreement, release, instrument or document necessary to effect the collection thereof. It is agreed that the Mortgagee shall not be held responsible for any failure or delay in collecting any such proceeds regardless of the cause of such failure or delay.

(e) That nothing contained in this Section 3.11 shall relieve the Mortgagor of its obligations in Section 3.6(a) hereof in the event that no or inadequate proceeds of insurance are available to defray the cost of such work. In addition, nothing contained herein shall relieve the Mortgagor of its duty to pay all installments of principal and interest and to make all other payments called for or required by the Note and this Mortgage subsequent to the occurrence of any fire or other casualty.

3.18. Condemnation:

(a) That forthwith upon receipt by the Mortgagor of notice of the institution of any proceeding or negotiations for the taking of the Mortgaged Property, or any part thereof, or any interest therein (whether for permanent or temporary use) in condemnation or by the exercise of the power of eminent domain, the Mortgagor shall give notice thereof to the Mortgagee. The Mortgagee may appear in any such proceedings and participate in any such negotiations and may be represented by counsel. The Mortgagor, notwithstanding that the Mortgagee may not be a party to any such proceeding, will promptly give to the Mortgagee copies of all notices, pleadings, judgments, determinations and other papers received by the Mortgagor in connection therewith. The Mortgagor will not enter into any agreement for the taking of the Mortgaged Property, or any part thereof, with anyone authorized to acquire the same in condemnation or by eminent domain unless the Mortgagee shall first have consented thereto in writing. In addition, the Mortgagee is authorized (i) to adjust and compromise the claim for any such award without the consent of the Mortgagor, (ii) to collect, receive and issue receipts for the proceeds of any such award in the name of the Mortgagee and the Mortgagor, and (iii) to endorse the Mortgagor's name upon any draft or check in payment of such award and upon any agreement, release, instrument or document necessary to effect the collection thereof. Any and all checks or drafts representing the proceeds from any such award, after deducting any expenses, including reasonable attorneys' fees, incurred by the Mortgagee in the enforcement, settlement, collection and handling of such claim shall be applied in accordance with Section 3.12(d) hereof. It is agreed that the Mortgagee shall not be held responsible for any failure or delay in collecting any such award, regardless of the cause of such failure or delay. Nothing herein shall in any way effect the grant and lien of this Mortgage or the liability of the Mortgagor for the payment of the indebtedness.

(b) That in the event of a taking of all or substantially all of the Mortgaged Property in condemnation or by eminent domain, the whole of the principal sum and interest evidenced and secured by the Note and this Mortgage, together with all other amounts, if any, then secured hereby, shall forthwith become due and payable, at the option of the Mortgagee, and all awards paid or payable on account of such taking shall be paid to the Mortgagee. As used in this Section, a taking of all or substantially all of the Mortgaged Property shall mean a taking of so much of the Mortgaged Property as leaves a balance which cannot economically be operated for the purposes for which the Mortgaged Property was operated or intended to be operated prior to such taking.

(c) That in the event of a taking of less than substantially all of the Mortgaged Property in condemnation or by eminent domain, or by agreement in lieu thereof, all awards payable as a result of such taking shall forthwith be paid to the Mortgagee, and the proceeds of such awards shall, at the option of the Mortgagee, be applied towards the repair or restoration of the Mortgaged Property if such repair or restoration is commercially feasible in the opinion of the Mortgagee or towards the payment of the indebtedness secured hereby, or such portion thereof (in such priority as the Mortgagee shall determine) as the same shall be sufficient to pay; provided, however, that if any Event of Default shall exist hereunder at the time such proceeds are so to be paid over, such proceeds shall be paid over to the Mortgagee alone, to be applied in the Mortgagee's discretion to the payment of the indebtedness secured hereby or the repair of the Mortgaged Property.

14

WO 0297

(d) That notwithstanding any taking by eminent domain, alteration of the grade of any street or other injury to or decrease in value of the Premises by any public or quasi-public authority or corporation, the Mortgagor shall continue to pay interest on the entire principal sum secured hereby until any such award or payment shall have been actually received by the Mortgagee and any reduction in the principal sum resulting from the application by the Mortgagee of such award or payment shall have been effected, and thereafter the Mortgagor shall continue to make payments on the outstanding principal balance of the Note, and the interest accruing thereon, in accordance with the terms of the Note.  If prior to the receipt by the Mortgagee of such award or payment the Mortgaged Property shall have been sold on foreclosure of this Mortgage, the Mortgagee shall have the right to receive said award or payment to the extent of any indebtedness remaining unsatisfied after such sale of the Mortgaged Property with interest thereon as set forth in the Note, whether or not a deficiency judgment on this Mortgage shall have been sought or recovered or denied, and/or for reasonable counsel fees, costs and disbursements incurred by the Mortgagee in connection with the collection of such award or payment.

3.17.  Hazardous Materials and Hazardous Waste Laws:

(a)  That for the purpose of this Mortgage, the term "Hazardous Materials" shall mean any "oil", "hazardous material", "hazardous wastes" or "hazardous substances" as defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq., as amended or in any other federal, state or local law governing the existence, release, generation, storage or disposal of any Hazardous Materials, and the regulations adopted pursuant thereto (collectively, the "Hazardous Waste Laws"), and shall include, without limitation (whether or not included in the definition contained in said laws), petroleum, solvents, asbestos and other chemicals which would be materially dangerous to the environment or to human beings.

(b)  That the Mortgagor does hereby warrant and represent to the Mortgagee that (i) the Mortgagor has never released, generated, stored or disposed of any Hazardous Materials on the Mortgaged Property in violation of any Hazardous Waste Laws, (ii) the Mortgagor is not aware of the existence, release or threat of release of any Hazardous Materials on the Mortgaged Property or on any properties adjacent to the Mortgaged Property in violation of any Hazardous Waste Laws, and (iii) the Mortgagor has not received any notice, order, claim or demand from any governmental authority with respect to the existence, release or threat of release of any Hazardous Materials.

(c)  That the Mortgagor shall not release, generate or dispose of any Hazardous Materials on the Mortgaged Property or on any properties adjacent to the Mortgaged Property in violation of any Hazardous Waste Laws; that in the event that any Hazardous Materials are found on the Mortgaged Property, the Mortgagor shall immediately contain and remove the same in compliance with all Hazardous Waste Laws; and that in general, the Mortgagor shall ensure that all of its properties and operations, and those of its lessees, are in compliance with all Hazardous Waste Laws.

(d)  That the Mortgagor agrees to indemnify and hold the Mortgagee harmless from and against any and all claims, liabilities, reasonable costs and expenses incurred by the Mortgagee, including reasonable attorneys' fees and costs of litigation, arising from the release, existence or removal of, whether now or hereafter and whether before or after payment in full of the obligations under the Loan Documents, any Hazardous Materials on the Mortgaged Property or on any properties adjacent to the Mortgaged Property (so long as the source of such Hazardous Materials is the Mortgaged Property). This indemnification shall survive the loan secured hereby, notwithstanding any cancellation or discharge of this Mortgage.

(e)  That the Mortgagee, at its election, upon a reasonable belief that there has been a violation of any Hazardous Waste Laws by the Mortgagor or any employee, agent, representative, affiliate or contractor of the Mortgagor, and without notice, may at any time and from time to time (but nor more often than once per year), whether or not an Event of Default shall exist under the Loan Documents, cause one or more environmental site assessments of the Mortgaged Property to be undertaken. Environmental site assessments may include a detailed visual inspection of the Mortgaged Property, including, without limitation, all storage areas, storage tanks, drains, dry wells and leaching areas, as

**WO 0298**

*(handwritten annotations in margins: "Mortgagor", "O.K.", "Only have to pay if assess shows violation from of own of mortgage", "Verizon has done site assessments (last couple of years)")*

well as the taking of soil samples, surface water samples and ground water samples, and such other investigation or analysis as is necessary or appropriate for a complete assessment of the compliance of the Mortgaged Property and the use and operation thereof with all Hazardous Waste Laws.

(f) That the Mortgagee, at its election and in its sole discretion and without notice, may (but shall not be obligated to) cure any failure on the part of the Mortgagor or any occupant of the Mortgaged Property to comply with the Hazardous Waste Laws, including, without limitation, the following:

(i) arrange for the cleanup or containment of Hazardous Materials found in, on or near the Mortgaged Property and pay for such cleanup and containment costs and costs associated therewith;

(ii) pay on behalf of the Mortgagor or any occupant of the Mortgaged Property, any fines or penalties imposed on the Mortgagor or any occupant by any federal, state or local governmental agency or authority in connection with such Hazardous Materials; and

(iii) make any other payment or perform any other act which may prevent a release of Hazardous Materials, facilitate the cleanup thereof and/or prevent a lien from attaching to the Mortgaged Property.

(g) Any partial exercise by the Mortgagee of the remedies hereinabove set forth or any partial undertaking on the part of the Mortgagee to cure the failure of the Mortgagor or any occupant of the Mortgaged Property to comply with the Hazardous Waste Laws, shall not obligate the Mortgagee to complete the actions taken or require the Mortgagee to expend further sums to cure the Mortgagor's or any such occupant's noncompliance; neither shall the exercise of any such remedies operate to place upon the Mortgagee any responsibility for the operation, control, care, management or repair of the Mortgaged Property, or make the Mortgagee the "owner" or "operator" of the Mortgaged Property or a "responsible party" within the meaning of the Hazardous Waste Laws.

(h) Any amounts reasonably paid or costs reasonably incurred by the Mortgagee as a result of any of the above, together with interest thereon at the rate set forth in the Loan Documents from the date of payment, shall be immediately due and payable by the Mortgagor to the Mortgagee, and until paid shall be added to and become a part of the obligations secured hereby, and the same may be collected as part of said obligations in any suit herein or upon the Loan Documents or any other instrument included in the collateral or upon a foreclosure of this Mortgage; and the Mortgagee, by making any such payment or incurring any such costs, shall, until repayment in full by the Mortgagor, be subrogated to any rights of the Mortgagor or any occupant of the Mortgaged Property to seek reimbursement from any third parties, including, without limitation, a predecessor in interest to the Mortgagor's title or a predecessor to the occupant's use of the Mortgaged Property, who may be a "responsible party" under the Hazardous Waste Laws, in connection with the presence of such Hazardous Materials in, on or near the Mortgaged Property.

4. **Default Provisions.** The happening and continuance for the period, if any, hereinafter indicated of any of the following events shall constitute an Event of Default hereunder:

4.1. The occurrence of any Event of Default (as such term is defined in the Note) under the Note.

4.2 Failure by the Mortgagor to perform, observe or comply with any of the covenants, agreements, terms or conditions set forth in this Mortgage or in any of the other Loan Documents, and failure to cure such default within 30 days after the date upon which such performance, compliance or observance is due, provided that notwithstanding the foregoing, the cure period for a payment default shall be 20 days after the date upon which such payment is due;

4.3. The mortgage, pledge, hypothecation, sale, lease, license, assignment, transfer or other disposition of the Mortgaged Property, or any part thereof or any interest therein.

16.

4.4    Mortgagor's failure to pay the premiums on or keep in force any insurance required hereunder.

4.5 Mortgagor's failure to pay any taxes assessed against the Mortgaged Property within the applicable time periods in accordance with the terms hereof.

4.6. If any "notice of responsibility" or "notice of violation" or any similar notice is issued by any governmental authority against the Mortgagor or the Mortgaged Property under any Hazardous Waste Law and remains unsatisfied for a period of sixty (60) days after the issuance thereof (or such lesser period of time as may be specified in said notice or in any Hazardous Waste Law).

4.7.  If any lien or claim is filed against the Mortgaged Property under any Hazardous Waste Law.

4.8    The (i) occurrence or threat of any loss, theft, damage, waste, removal, demolition or destruction of or alteration to the Mortgaged Property without the Mortgagee's prior written consent, which consent shall not be unreasonably withheld, or (ii) issuance or making of any levy, seizure, attachment, execution or similar process on all or any portion of the Mortgaged Property;

4.9  The material impairment of the value of any part of the Mortgaged Property by condemnation or casualty.

4.10 If any statement, representation or warranty of the Mortgagor heretofore, now or hereafter made in connection with this Mortgage or in any of the other Loan Documents ~~shall be reasonably determined by the Mortgagee to~~ have been false in any material respect when made. _shall_    _O.K._

4.11 The liquidation, termination, change in ownership or dissolution of the Mortgagor, or the merger or consolidation of the Mortgagor into another entity, or its ceasing to carry on actively its present business, or the appointment of a receiver for its property.

4.12 The institution by or against the Mortgagor of any proceedings under the Bankruptcy Code, 11 USC §101 *et seq.*, or any other law in which the Mortgagor is alleged to be insolvent or unable to pay ~~their~~ respective debts as they mature, which proceedings are not terminated within 60 days after the institution thereof, or the making by the Mortgagor of an assignment for the benefit of creditors or the granting by the Mortgagor of a trust mortgage for the benefit of creditors.

5.  **Remedies Upon Default**.

5.1  Upon the occurrence of any Event of Default hereunder, the Mortgagee, at its option, without presentment, demand, protest or notice of any kind, may declare the indebtedness evidenced by the Note and secured by this Mortgage immediately due and payable.  However, the Mortgagee need not, and is not obligated to, declare said indebtedness due as a condition precedent to exercising its rights under the several remedies upon Default set forth herein.

5.2.  Upon the occurrence of any Event of Default hereunder:

(a)  The Mortgagee, at its option, without obligation to do so, and without notice to or demand on the Mortgagor, and without releasing the Mortgagor from any liability under the Note or this Mortgage, may make any payment or perform any act which the Mortgagor is obligated to pay or do under the terms of this Mortgage.

(b)  In exercising any of the rights set forth under Section 5.2(a) above, the Mortgagee may incur any liability and expend whatever reasonable amounts it may deem necessary.  All such amounts, without notice or demand, shall be immediately due and payable to the Mortgagee by the Mortgagor with interest thereon, to the extent permitted by law, at the rate per annum set forth in the Note, and shall be secured by this Mortgage and a lien on the Mortgaged Property prior to any right, title to, interest in or

17

**WO  0300**

claim upon the Mortgaged Property subordinate to the lien of this Mortgage.

(c) If the Mortgagee shall pay or discharge any lien, rents or claim on the Mortgaged Property, or pay any delinquent tax, assessment or similar charge, the Mortgagee shall, until repayment in full by the Mortgagor, be subrogated to the rights of the holder of such lien, rents or claim or to the rights of such taxing authority.

5.3.    Upon the occurrence of any Event of Default hereunder, the Mortgagee, at its option, without notice, and without any liability to Mortgagor, to the extent permitted by law and without regard to the adequacy of the security for said debt, may:

(a) Enter and take immediate possession of the Mortgaged Property or any part thereof, and the Mortgagee shall have the right to (i) manage, control and/or lease the same to such person or persons and at such rental as it may reasonably deem proper; (ii) cancel any lease, sublease or tenancy for any cause which would entitle the Mortgagor to cancel the same; (iii) collect all rents, issues and profits therefrom, including those past due as well as those thereafter accruing, pursuant to Section 5.4 hereof; (iv) make such reasonable expenditures for maintenance, repairs, replacements, improvements and costs of operation of the Mortgaged Property as Mortgagee may reasonably deem advisable, and after deducting the cost thereof and a reasonable commission upon the gross amounts of rent collected, to apply the residue to the payment of any sums which are unpaid hereunder or under the Note; (v) enforce all terms of existing contracts pertaining to the Mortgaged Property and enter into such new contracts as the Mortgagee may determine necessary in its sole discretion; and/or (v) apply the said rents, issues and profits after payment of all necessary charges and expenses, in reduction of the Note, or any other amount secured hereunder; and said rents, issues and profits are, in such event, hereby assigned to the Mortgagee as further security for the payment of the Note and all other amounts secured hereunder. It is agreed that the Mortgagor or other then owner of the Mortgaged Property, if it is the occupant of the Premises or any part thereof, shall in such event, immediately surrender possession of the Mortgaged Property so occupied or held, to the then holder of this Mortgage, and if such occupant is permitted to remain in possession, the possession shall be as tenant of such holder of this Mortgage, and such occupant shall, on demand, pay monthly in advance to the holder of this Mortgage a reasonable rental for the Mortgaged Property so occupied or held, and, in the default hereof, such occupant may be dispossessed by summary proceedings. This Section 5.3(a) becomes effective either with or without any action of foreclosure, and with or without any application for a receiver of said rents, issues and profits. The taking of possession under this Section 5.3(a) shall not prevent concurrent or later proceedings for the foreclosure of this Mortgage as provided elsewhere herein. Notwithstanding anything to the contrary set forth herein, entry by the Mortgagee upon the Mortgaged Property for any reason shall not cause the Mortgagee to be a "Mortgagee in Possession," except upon the express written declaration of the Mortgagee.

(b) At the option of the Mortgagee and irrespective of whether or not the Mortgagee shall actually elect to declare the Note and all amounts due under the other Loan Documents due and payable, the Mortgagee shall be entitled to the immediate ex-parte appointment of a receiver of the Mortgaged Property and the rents and profits of the Mortgaged Property, and such receiver shall be appointed with or without notice and without regard to the adequacy of any security held for the payment of the Note and other sums secured hereby or the solvency or any person or persons liable for the payment of such amounts. Such receiver may also be granted such extended powers, duties and authority as would be necessary or useful in the management and operation of the Mortgaged Property, including, without limitation, the power to: (i) enter into, modify, terminate and enforce all terms of existing contracts and leases pertaining to the Mortgaged Property and enter into such new contracts and leases as the receiver may determine necessary in its sole discretion; (ii) pay taxes, insurance premiums, assessments and other operating expenses of the Mortgaged Property; (iii) employ and pay property managers for the Mortgaged Property; (iv) make payments of principal and interest on the Note and the other sums due under the Loan Documents and secured by this Mortgage as the same become due; (v) collect all rents, issues and profits from the Mortgaged Property, including those past due as well as those thereafter accruing, and (vi) expend reasonable sums in the repair, replacement, improvement and maintenance of the Mortgaged Property.

18

WO 0301

(c) The Mortgagee shall have the right to foreclose the Mortgage, and in case of sale in an action or proceeding to foreclose this Mortgage, the Mortgaged Property may be sold in parts or as an entirety. In the event of foreclosure, the Mortgagee, its agent or any receiver acting pursuant to Section 5.3(b) hereof may, if a deficiency exists, remain in possession of the Mortgaged Property until (i) the foreclosure sale; (ii) the redemption of the property; or (iii) the expiration of any redemption period of the United States of America extending subsequent to the foreclosure sale. The Mortgagee, its agents or the receiver may in their discretion subordinate this Mortgage to one or more of the Assigned Agreements for the sole purpose of preserving any such Assigned Agreement in the event of a foreclosure. Neither the Mortgagee, its agents nor the receiver shall incur any liability for, nor shall the Mortgagor assert any claim or setoff as a result of, any action taken while the Mortgagee, its agent or the receiver is in possession of the Mortgaged Property.

(d) The Mortgagee shall have the right to sell the Mortgaged Property or any part thereof or interest therein pursuant to exercise of its POWER OF SALE or otherwise at public auction on terms and conditions as the Mortgagee may determine, and upon such sale the Mortgagor shall execute and deliver such instruments as the Mortgagee may request in order to convey and transfer all of the Mortgagor's interest in the Mortgaged Property, and the same shall operate to divest all rights, title and interest of the Mortgagor in and to the Mortgaged Property.

(e) If the Mortgagee enters upon and takes possession of the Mortgaged Property as provided in Section 5.3(a) hereof, the Mortgagee may operate and manage the Mortgaged Property and perform any acts which the Mortgagee, in its sole discretion, deems necessary or desirable to protect and preserve the rentability, increase the income, or conserve the value of the Mortgaged Property. The Mortgagee shall have no liability for any action or inaction while in possession of the Mortgaged Property so long as such action or inaction is taken or refrained from being taken in good faith.

(f) The Mortgagor hereby waives to the fullest extent permitted by law all rights to prior notice or a court hearing in connection with any action by the Mortgagee of the types set forth in this Section 5.3 and the Mortgagor further waives any requirement that the Mortgagee provide any bond, surety, or other security in connection with any said action.

(g) The Mortgagee, its agents, or any receiver acting pursuant to Section 5.3(b) hereof shall in no event be liable or accountable for more monies than actually are received from the Mortgaged Property during the period which the Mortgagee, its agent or any receiver actually is in possession and control of the Mortgaged Property. Neither the Mortgagee, its agents nor any receiver shall be liable or accountable in any manner for the failure to collect any Mortgaged Property Income or rents or other payments due under the Assigned Agreements for any reason whatsoever.

5.4  Upon the occurrence of any Event of Default hereunder, the Mortgagee, at its option, without notice, without any liability to Mortgagor, may, with or without taking possession, receive and collect all rents, income, issues and profits (the "Rents") from the Mortgaged Property (including all real estate in which Mortgagor possesses an interest, to the extent of such interest, regardless of whether past due or thereafter accruing), including as may arise under the Assigned Agreements, and the Mortgagor appoints the Mortgagee as its true and lawful attorney with the power for the Mortgagee in its own name and capacity to demand and collect the Rents and take any action that the Mortgagor is authorized to take under the Assigned Agreements. The Mortgagee shall (after payment of all costs and expenses incurred) apply any Rents received by it to the Secured Obligations in such order as the Mortgagee determines, and the Mortgagor agrees that exercise of such rights and disposition of such funds shall not constitute a waiver of any foreclosure by the Mortgagee hereunder once commenced nor preclude the later commencement of a foreclosure by the Mortgagee hereunder. The Mortgagee shall be liable to account only for such Rents actually received by the Mortgagee. The parties other than Mortgagor under the Assigned Agreements are hereby authorized and directed, following notice from the Mortgagee, to pay all amounts due the Mortgagor under the Assigned Agreements to the Mortgagee, whereupon such parties shall be relieved of any and all duty and obligation to the Mortgagor with respect to such payments so made.

19

WO 0302

5.5  Upon the occurrence of any Event of Default hereunder, the Mortgagee, at its option, without notice, without any liability to Mortgagor, may take such other actions or proceedings as the Mortgagee reasonably deems necessary or advisable to protect its interest in the Mortgaged Property and to ensure payment and performance of the Secured Obligations, including, without limitation, exercise of any of the Mortgagee's remedies set forth in any of the Loan Documents, or otherwise available to a secured party under the Uniform Commercial Code or under other applicable law.

5.6.  Acceptance by the Mortgagee of any payment in an amount less than the amount then due on the Secured Obligations shall be deemed an acceptance on account only and the failure to pay the entire amount then due shall be and continue to be an Event of Default; at any time thereafter and until the entire amount then due on said Secured Obligations has been paid, the Mortgagee shall be entitled to exercise all rights conferred upon it in this Mortgage and in the Loan Documents upon the occurrence of an Event of Default.

5.7.  No remedy herein conferred upon the Mortgagee shall be exclusive of any other remedy herein or by law provided or permitted, but such shall be cumulative and in addition to every other remedy given herein, in the Loan Documents or now or hereafter existing at law.

5.8.  The exercise of any right, option or remedy in this Mortgage by the Mortgagee shall not be deemed a waiver of its rights to exercise any other right, option or remedy; and the filing of a suit for collection of the Note and foreclosure of this Mortgage upon any default hereunder shall not preclude a sale pursuant to the power of sale contained in this Mortgage after a dismissal of the suit.  No provision hereof shall be deemed to release the Mortgagor's obligation to pay the interest, principal and other sums and charges secured hereby until such time as all thereof have been paid to the Mortgagee in full.

5.9.  If foreclosure should be commenced by the Mortgagee, at any time before the sale of the Mortgaged Property, the Mortgagee may abandon such sale and may at any time thereafter again commence such sale, or the Mortgagee may sue for collection of the Note and foreclosure of this instrument in the courts; if the Mortgagee should sue for such collection and/or foreclosure, it may at any time before entry of final judgment dismiss the suit and sell the Mortgaged Property pursuant to the power of sale contained herein.

5.10.  At any foreclosure sale, whether pursuant to the power of sale contained in this Mortgage, or pursuant to the judgment of a court, all of the Mortgaged Property, at the option of the Mortgagee and without notice to Mortgagor, may be sold as a whole.  The recitals in the bill of sale to any purchaser at such sale shall be full and conclusive evidence of the truth of the matters stated therein, and all prerequisites to such sale shall be presumed to have been performed and such sale and bill of sale shall be conclusive against the Mortgagor.

5.11.  The Mortgagor agrees, to the extent that it may lawfully so agree, that if an Event of Default shall occur hereunder, neither the Mortgagor nor anyone claiming through or under the Mortgagor shall or will set up, seek or claim to take advantage of any appraisement, valuation, stay, extension, redemption, moratorium or marshalling laws now or hereafter in force in the locality where the property subject to the lien of this Mortgage may be situated in order to prevent or hinder the enforcement or foreclosure of this Mortgage, or the absolute sale of the Mortgaged Property, or the final or absolute putting into possession thereof, immediately after such sale, of the purchaser thereof.

5.12  In the event the Mortgagee shall acquire title to the Mortgaged Property by conveyance from the Mortgagor, this Mortgage shall not merge in the fee of the Mortgaged Property but shall remain and continue as an existing and enforceable lien for the Secured Obligations until the same shall be released of record by the Mortgagee in writing.

6.      **Miscellaneous Provisions**.

6.1.  Without affecting the liability of Mortgagor, or any other person (except any person expressly released in writing), for payment of any indebtedness secured hereby or for the performance

20

WO 0303

of any obligations set forth in this Mortgage, and without affecting the lien or other rights of the Mortgagee with respect to any property or other security not expressly released in writing, the Mortgagee at any time, and from time to time, either before or after maturity of the Note, and without notice or consent may: (2. release any person liable for payment of said debt, or for the performance of any obligation; (b) make any agreement extending the time, or otherwise altering the terms of payment of said debt, or modifying or waiving any obligation, or subordinating, modifying or otherwise dealing with the lien securing payment of the Note; (c) exercise or refrain from exercising or waive any right the Mortgagee may have; (d) accept additional security of any kind; and/or (e) release or otherwise deal with any property, real or personal, securing said debt, including all or any part of the Mortgaged Property.

6.2. If any action or proceeding be commenced by the Mortgagee to foreclose this Mortgage or otherwise to collect the indebtedness secured hereby, all reasonable sums paid by the Mortgagee for the expense of any such action (including reasonable attorneys' fees) shall on notice and demand be paid by the Mortgagor, together with interest thereon for each day from the date such costs were incurred by the Mortgagee until paid by the Mortgagor at the rate per annum set forth in the Note, and shall be a lien on the Mortgaged Property prior to any right or title to, interest in or claim upon the Mortgage Property subordinate to the lien of this Mortgage and shall be deemed to be secured by this Mortgage and evidenced by the Note and in any action or proceeding to foreclose this Mortgage or to recover or collect the indebtedness secured hereby, the provisions of law respecting the recovery of costs, disbursements and allowances shall prevail unaffected by this covenant.

6.3. In the event the Mortgagor conveys its interest in the Mortgaged Property to parties not appearing in this instrument (without implying any right of the Mortgagor to do so without the Mortgagee's consent), the Mortgagee may, without notice to the Mortgagor, deal with such successor or successors in interest with reference to this Mortgage and the Note secured hereby, either by way of forbearance on the part of the Mortgagee or extension of the time of payment of the debt or any sum hereby secured, without in any way modifying or affecting the conveyance under this Mortgage or the original liability of the Mortgagor or any other party on the Note secured hereby, either in whole or in part.

6.4. All payments on the debt and advances, if any, hereby secured shall be applied, first to advances, if any, in the order of maturity, and second, to the payment of the indebtedness evidenced by the Note and secured hereby in such manner as the Mortgagee shall deem appropriate. Proceeds from foreclosure sales and insurance proceeds or condemnation awards shall be applied in the same manner.

6.5. At any time and from time to time until payment of the indebtedness and upon request of the Mortgagee, the Mortgagor will promptly execute and deliver to the Mortgagee such additional instruments as may be required to effectuate or confirm the estate, title, interest, lien, rights, powers and remedies hereunder or to carry out the intent and purposes of this Mortgage or to further protect the security position of the Mortgagee with respect to the property subject to this Mortgage.

6.6. In the event of any sale of the Mortgaged Property under the provisions hereof, the Mortgagor shall forthwith surrender possession thereof to the purchaser. Upon failure to do so the Mortgagor shall thereupon be a tenant at sufferance of such purchaser, and upon its failure to surrender possession of the Mortgaged Property upon demand, such purchaser, his heirs or assigns, shall be entitled to institute and maintain an appropriate action for possession of the Mortgaged Property.

6.7. Upon payment in full of the indebtedness secured hereby and the performance of all other Secured Obligations, this Mortgage shall, subject to Section 3.17(d) hereof, become null and void and shall be released by the Mortgagee upon the presentation to it of a mortgage discharge prepared by the Mortgagor; such mortgage discharge, once executed by the Mortgagee, shall be recorded by the Mortgagor at the Mortgagor's expense.

6.8. In case any one or more of the provisions contained in the Note, or in this Mortgage or in any of the other Loan Documents shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof or

21

**WO 0304**

thereof, but each shall be construed as if such invalid, illegal or unenforceable provision had never been included.

6.9.    All notices, requests, demands, consents or other communications given hereunder or in connection herewith (collectively, the "Notice") shall be in writing and shall be sent by registered or certified mail, return receipt requested, postage prepaid, or by overnight courier, as follows:

| | |
|---|---|
| If to the Mortgagor: | Crossroads Communications of Old Saybrook, LLC |
| With a copy to: | Michael K. Brown, Esq.<br>Law Office of Michael K. Brown<br>25 Ford Rd., 2nd Floor<br>Westport, CT. 06880 |
| If to the Mortgagee: | Tower Ventures, Inc.<br>170 Westminster Street<br>Suite 701<br>Providence, Rhode Island 02903<br>Attn: Robert J. Maccini, COO |
| With a copy to: | John W. Wolfe, Esq.<br>Cameron & Mittleman, LLP<br>56 Exchange Terrace<br>Providence, Rhode Island 02903 |

Either party may, by Notice given as aforesaid, change its address for any subsequent Notice. Any Notice by or in behalf of the Mortgagee herein named shall be deemed sufficient if signed by any one of its directors, officers or counsel and if otherwise given or made in compliance with this paragraph. Such notice shall be deemed to have been delivered on the third business day after delivery of the same to the United States Postal Service, or one business day after delivery of the same to a nationally recognized overnight courier service, sent by priority overnight delivery.

6.10.    The Mortgagor will maintain, preserve and renew all rights of way, easements, grants, privileges, licenses and franchises necessary for the use of the Mortgaged Property from time to time and will not, without the prior consent of the Mortgagee, initiate, join in or consent to any private restrictive covenant or other public or private restriction limiting or defining the use which may be made of the Mortgaged Property. The Mortgagor shall, however, comply with all restrictive covenants which may at any time affect the Mortgaged Property, zoning ordinances and other public or private restrictions as to the use of the Mortgaged Property.

6.11.    If at any time any governmental body shall impose a stamp, documentary or other similar tax on this Mortgage, the debt secured hereby or the income generated therefrom, or any modification, amendment, extension or consolidation thereof, the Mortgagor will pay the same within ten (10) days after demand by the Mortgagee.

6.12.    Upon the occurrence of any Event of Default resulting in the Mortgagee's entry into possession pursuant to Section 5.3 hereof, the Mortgagor will pay monthly in advance to the Mortgagee, or to any receiver appointed to collect said rents, issues and profits, the fair and rental value for the use and occupation of such part of the Premises as may be in possession of the Mortgagor, and upon default in any such payment, will vacate and surrender possession of such part of the Premises to the Mortgagee or to such receiver and, in default thereof, the Mortgagor may be evicted by summary proceedings or otherwise.

22

**WO 0305**

6.13. This Mortgage shall inure to and bind the successors and assigns of the parties hereto, provided that the Mortgagor may not assign or delegate any of its rights and/or obligations hereunder or under any of the other Loan Documents without the prior written consent of the Mortgagee, which consent may be withheld in the Mortgagee's sole and absolute discretion. This Mortgage may not be waived, amended, modified or discharged orally, but only by an agreement in writing signed by the party against whom any such waiver, amendment, modification or discharge is sought.

6.14. The Mortgagor hereby grants to the Mortgagee a right of set off as security for all liabilities and obligations to the Mortgagee, whether now existing or hereafter arising, upon and against all debts, rental payments and other obligations payable to Mortgagor by Mortgagee. At any time after an Event of Default, without demand or notice, the Mortgagee may set off the same or any part thereof and apply the same to any liability or obligation of the Mortgagor to the Mortgagee even though unmatured and regardless of the adequacy of any other collateral securing the Note. ANY AND ALL RIGHTS TO REQUIRE THE MORTGAGEE TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE NOTE, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEBTS, RENTAL PAYMENTS AND OTHER OBLIGATIONS, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

6.15. Mortgagee and the Mortgagor do hereby agree and acknowledge that their relationship is one of lender and borrower, respectively, and they are in no sense, nor do they ever intend to be, partners or joint venturers. Nothing contained in this Mortgage shall be construed to cause the Mortgagor to become the agent for, or joint venturer with, the Mortgagee for any purpose whatsoever, nor shall the Mortgagee be responsible for any shortage, discrepancy, damage, loss or destruction of any part of the Mortgaged Property for whatever cause unless same is the direct result of the gross negligence of the Mortgagee.

6.16. THE MORTGAGOR ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS MORTGAGE IS A PART IS A COMMERCIAL TRANSACTION AND HEREBY REPRESENTS TO AND COVENANTS WITH THE MORTGAGEE THAT THE PROCEEDS OF THE LOAN REPRESENTED BY THE NOTE SHALL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES. THE MORTGAGOR HEREBY WAIVES ANY AND ALL RIGHTS THE MORTGAGOR MAY HAVE UNDER CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, AS THE SAME MAY BE AMENDED, OR UNDER ANY SIMILAR LAW THAT HEREAFTER MAY BE ENACTED, AND/OR AS IS OTHERWISE ALLOWED BY ANY STATE OR FEDERAL LAW WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH THE MORTGAGEE MAY DESIRE TO USE, INCLUDING, WITHOUT LIMITATION, ANY RIGHTS TO NOTICE AND PRIOR JUDICIAL HEARING, GARNISHMENT, ATTACHMENT AND/OR FOREIGN ATTACHMENT AND REPLEVIN. FURTHER, THE MORTGAGOR HEREBY EXPRESSLY WAIVES, TO THE EXTENT PERMITTED BY LAW, THE BENEFITS OF ALL VALUATION, APPRAISEMENT, HOMESTEAD, EXEMPTION, STAY, REDEMPTION AND MORATORIUM LAWS, NOW IN FORCE OR WHICH MAY HEREAFTER BECOME LAWS. THE MORTGAGOR ACKNOWLEDGES THAT IT MAKES THESE WAIVERS KNOWINGLY AND VOLUNTARILY.

6.18. The Mortgagor hereby agrees to indemnify and hold the Mortgagee and each of its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless from all losses, damages, claims, costs or expenses (including reasonable attorneys' fees and expenses) resulting from the assignment of the Assigned Agreements effected hereby and from all demands that may be asserted against such Indemnitees arising from any undertakings on the part of the Mortgagee to perform any obligations under the Assigned Agreements (excluding any losses, damages, claims, costs and/or expenses arising from the gross negligence or willful misconduct of the Mortgagee or any employee, agent, representative, affiliate or contractor thereof). It is understood that the assignment of the Assigned Agreements effected hereby shall not operate to place responsibility for the control or management of the Mortgaged Property upon the Mortgagee or any Indemnitee or make them liable for the performance of any of the obligations of the Mortgagor under the Assigned Agreements with respect to any condition of the Mortgaged Property or any other agreement or arrangement, written or oral, or applicable law.

23

WO 0306

6.19  The Mortgagor hereby waives notice of nonpayment, demand, presentment, protest or notice of protest of the collateral and all other notices, consents to any renewals or extensions of time of the payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.  No delay or omission of the Mortgagee in exercising or enforcing any of its rights, powers, privileges, remedies, immunities or discretions hereunder shall constitute a waiver thereof; and no waiver by the Mortgagee of any default of the Mortgagor hereunder or of any demand shall operate as a waiver of any other default hereunder or of any other demand.

6.19  THE MORTGAGOR AND THE MORTGAGEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL: (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS MORTGAGE, THE SECURED OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN, WAIVED.  THE MORTGAGOR CERTIFIES THAT NEITHER THE MORTGAGEE NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE MORTGAGEE WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.   THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR MORTGAGEE TO ENTER INTO THIS MORTGAGE AND MAKE THE LOAN SECURED HEREBY.

6.20  The Mortgagor and the Mortgagee agree to submit to jurisdiction in the state of Connecticut in any action or proceeding arising out of this Mortgage or any of the other Loan Documents, and in furtherance of such agreement, the Mortgagor and the Mortgagee hereby agree and consent that any process or notice of motion or other application to any such action or proceeding may be served upon the Mortgagor and the Mortgagee by registered or certified mail to their last known addresses, whether such addresses are  within or without the jurisdiction of any such court.

6.21  This Mortgage is intended to take effect as a sealed instrument and has been executed or completed and is to be performed in Connecticut, and it and all transactions thereunder or pursuant thereto shall be governed as to interpretation, validity, effect, rights, duties and remedies of the parties thereunder and in all other respects by the domestic laws of Connecticut.

6.22  In this Mortgage, unless the context otherwise requires: (a) ~~the term "Borrower" shall mean and include any guarantor of all or any part of the Secured Obligations or any other person directly or indirectly responsible for the payment of all or any part of the Secured Obligations;~~ (b) words of the masculine gender shall mean and include correlative words of the feminine and neuter genders and words importing the singular number shall mean and include the plural number and vice versa; and (c) any headings or captions preceding the texts of the several sections of this Mortgage shall be solely for convenience of reference and shall not constitute a part of this Mortgage, nor shall they affect its meaning, construction or effect.

THE CONDITION OF THIS MORTGAGE DEED is such that whereas the Mortgagor is indebted to Mortgagee in the principal amount of $_____ as evidenced by the Note, and this Mortgage is made  to secure the payment and performance and discharge of the Note and the other Secured Obligations.

NOW, THEREFORE, if the Secured Obligations shall be well and truly paid according to their terms and if all the terms, covenants, conditions and agreements of the Mortgagor herein contained shall be fully and faithfully performed, observed and complied with, then this Mortgage shall be void (subject to Section 3.17(d) hereof), but otherwise shall remain in full force and effect.

24

**IN WITNESS WHEREOF,** this Mortgage has been executed this __ day of
_____, 200_.

WITNESS:                                    **Crossroads Communications of Old
                                            Saybrook, LLC**


_____            By:_____
                                                Name:
                                                Title:


_____


STATE OF _____
COUNTY OF _____


    In _____, on the _____ day of _____, 2001, before me personally appeared
_____, to me known and known by me to be the _____ of
Crossroads Communications of Old Saybrook, LLC, and the party executing the foregoing agreement,
and he acknowledged said instrument by him executed to be his free act and deed and the free act and
deed of said limited liability company.


                                            _____
                                            Notary Public


25

**WO  0308**